**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION**

| | | |
|---|---|---|
| **ONLINE MERCHANTS GUILD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 3:20-cv-00029-GFVT** |
| | ) | |
| **DANIEL CAMERON, in his official** | ) | |
| **capacity as ATTORNEY GENERAL** | ) | |
| **OF KENTUCKY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**THE ONLINE MERCHANTS GUILD'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
AND MEMORANDUM IN SUPPORT THEREOF**

### Introductory Statement

Pursuant to Federal Rule of Procedure 65, the Online Merchants Guild respectfully requests that the Court enter a temporary restraining order and preliminary injunction prohibiting the Attorney General of Kentucky from applying KRS 367.374 and KRS 367.170 to the Online Merchants Guild's members as set forth below. Preliminary injunctive relief is necessary to prevent the further violation of the Online Merchants Guild's members' constitutional rights, and to preserve the *status quo* prior to entry of final judgment. The Online Merchants Guild seeks a temporary restraining order pending full briefing and a decision on the preliminary injunction. The Guild has conferred with the Kentucky AG (and provided notice of the Complaint and this filing) but has been unable to reach a resolution on the relief sought herein.

**Factual Background**

The Online Merchants Guild is a trade association for online merchants.[1] The association's members are currently helping Americans respond to the COVID-19 pandemic by making key goods—for example, hand sanitizer and personal protective equipment like gloves and masks—available for purchase in the interstate marketplace.[2] Most of those sales occur through Amazon's online store, which is the dominant online retail store in the U.S.[3] That market activity helps collect and distribute items to areas of greatest demand—ensuring that crucial resources get to those who need them.[4] And amidst an economic crisis, active online commerce sustains the small businesses that make up the Guild.[5] The need to maintain economic activity is especially acute in Kentucky, with the Nation's highest unemployment rate: approximately a third of workers are out of work, well above the 20% national average.[6]

The Online Merchants Guild brings this action for declaratory and injunctive relief against the Kentucky AG's attempt to use the Commonwealth's price-control laws to regulate aspects of the interstate market that takes place in Amazon's online store. The laws are as follows. KRS 367.374 empowers the AG to punish prices that are "grossly in excess" of pre-emergency prices. A "gross excess" is not explicitly defined, and the overall statute does not offer an intelligible standard by which one could measure their *ex ante* compliance with the law. The scope of covered goods is ambiguous but appears to be quite broad; it could include not just items like hand sanitizer and PPE, but also food, building supplies, and anything that could be considered "emergency supplies." *See* KRS 376.374(b). Penalties can reach $25,000 per day under KRS 376.378. KRS

---

[1] Declaration of Paul S. Rafelson ("Rafelson Dec."), Exhibit 1, ¶ 3.
[2] Rafelson Dec. ¶ 4.
[3] Rafelson Dec. ¶ 8.
[4] Rafelson Dec. ¶ 7.
[5] Rafelson Dec. ¶ 40.
[6] Kim Mackrael, *Nearly a Third of Kentucky Workers Seek Jobless Aid*, The Wall Street Journal (May 10, 2020), https://www.wsj.com/articles/nearly-a-third-of-kentucky-workers-seek-jobless-aid-11589103001.

367.170 is even more broad: it is not limited to emergencies, reaches all "commerce," and proscribes any "unfair" price. Pursuant to those statutes, the Kentucky AG has been issuing subpoenas and conducting investigations into online merchants for sales on Amazon.[7]

Although the goal of consumer protection is understandable, the circumstances in which the Kentucky AG is applying KRS 367.374 and KRS 367.170 exceed the bounds of his constitutional authority and are harming the interstate marketplace and the Online Merchants Guild's members. When the Online Merchants Guild's members make goods available on Amazon, they participate in—and only in—a unitary interstate marketplace.[8] They are unlike brick-and-mortar retailers, or direct-to-consumer sellers outside of Amazon's store, who can calibrate their conduct as to a specific state like Kentucky. In fact, Online Merchants Guild members are not even retailers—they are suppliers of *Amazon's* store. Members using Amazon cannot control the states in which search results appear.[9] Members cannot set Kentucky-specific prices.[10] Members cannot control where transactions are consummated and are not even in privity of contract with consumers (Amazon is).[11] Members cannot simply cancel Kentucky sales, both because of the administrative burden and because Amazon will shut down seller accounts if they cancel too many sales.[12]

By contrast, Amazon has extensive control over its store. Amazon controls search results.[13] Amazon retains final control over pricing.[14] Amazon also has technology that automatically alters prices based on variables like market conditions—inputs that Amazon controls.[15] Amazon's

---

[7] Rafelson Dec. ¶¶ 20-22.
[8] Rafelson Dec. ¶¶ 12; 19; 26.
[9] Rafelson Dec. ¶¶ 12-13; 19.
[10] Rafelson Dec. ¶ 12.
[11] Rafelson Dec. ¶ 16.
[12] Rafelson Dec. ¶ 19.
[13] Rafelson Dec. ¶ 13.
[14] Rafelson Dec. ¶ 14.
[15] Rafelson Dec. ¶ 14.

commissions—which can range from an average of 15% to 45%—are baked into the prices that merchants offer.[16] And although Amazon typically takes the position that it is merely a "marketplace" and is not responsible for third-party sales in its store, the Supreme Court recently rejected a similar attempt to evade responsibility for sales in a company's store through artificial self-definitions. *See Apple Inc. v. Pepper*, --- U.S. ---, 139 S. Ct. 1514, 1523 (2019) (rejecting proposed distinction between commissions and markups as "economically indistinguishable" to hold that Apple could be liable for app sales in its store). The Online Merchants Guild's members have none of Amazon's power over sales in its store.

The upshot is that Online Merchants Guild members cannot market specifically and exclusively to Kentucky at Kentucky-specific prices.[17] So when the Kentucky AG attempts to impose a Kentucky-specific price-control by acting against the Online Merchants Guild's members, the effect is to impose a nationwide price ceiling—or force Online Merchants Guild members to withdraw from the interstate market.[18]

Concerned with unpredictable and excessive legal exposure, members have done just that, and have declined to acquire or sell COVID-response goods, as well as other goods that the Kentucky AG might choose to price-control without advance notice.[19] Some online merchants have received death threats and other forms of abuse as investigators have publicized the merchants' identities.[20] The problem is made worse because other states' Attorneys General are pursuing similar efforts using varying and conflicting state laws.[21] The result is chaos in the marketplace. The chilling effect on online commerce is not only hurting small businesses when

---

[16] Rafelson Dec. ¶¶ 9-10.
[17] Rafelson Dec. ¶¶ 12-13; 19.
[18] Rafelson Dec. ¶¶ 26; 33.
[19] Rafelson Dec. ¶¶ 31-33.
[20] Rafelson Dec. ¶ 35.
[21] Rafelson Dec. ¶ 23.

they are trying to survive, but is also distorting the marketplace and will lead to fewer goods available for sale to the national public.[22]

The AG's application of KRS 367.374 and 367.170 violates the dormant Commerce Clause, which bars state laws that burden interstate commerce. That's not all. The statutes are also unconstitutionally vague, and the AG's application of them to non-Kentuckians violates Due Process Clause limits on personal jurisdiction. The AG's application of KRS 367.374 and 367.170 also restricts commercial speech that is lawful elsewhere.[23] And there are Equal Protection Clause problems with what appears to be the AG's selective application of the law to Online Merchants Guild members.[24]

The Online Merchants Guild is sensitive to the need for the Kentucky AG to enforce consumer protection laws. Fortunately here, there is a solution that is both **constitutional and effective**: regulate Amazon, which does have the means to control product listings and sales in its store.[25] According to media reports, Amazon has already "blocked or removed more than 1 million products from its third-party marketplace that made false claims about the coronavirus," and "suspended or took down tens of thousands of deals from sellers that it accused of charging customers unfair prices."[26] At least thirty-three other state Attorneys General have urged Amazon to undertake systematic regulation of its store, as opposed to what those AGs described as their "whack-a-mole" efforts targeting individual sales.[27] Amazon's efforts demonstrate that it can and

---

[22] Rafelson Dec. ¶¶ 30-33.
[23] Rafelson Dec. ¶ 36.
[24] Rafelson Dec. ¶¶ 37-38; 41.
[25] Rafelson Dec. ¶¶ 13-14; 37; 43.
[26] Annie Palmer, *Amazon Cracks Down on Coronavirus Price-Gouging and Products Making False Claims*, CNBC, (Feb. 27, 2020), https://www.cnbc.com/2020/02/27/amazon-cracks-down-on-coronavirus-price-gouging-false-claims.html
[27] March 25, 2020 Ltr. from Attorneys General to Jeff Bezos, https://www.attorneygeneral.gov/wp-content/uploads/2020/03/Amazon.pdf.

should be accountable for sales in its store. And by holding Amazon accountable, the Kentucky AG can impose transparent and uniform price-control standards.

As to the Online Merchants Guild's members, however, the Kentucky AG's application of the Commonwealth's price-control statutes is unlawful. The Court should enjoin it.

## Legal Standard for Injunctive Relief

The Court should enter an injunction upon the following showing by the Online Merchants Guild:

1. A "strong likelihood of success on the merits";

2. "irreparable injury absent the injunction"

3. a lack of "substantial harm to others"; and

4. the "public interest would be served by issuance of the injunction."

*Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). The Online Merchants Guild satisfies that standard, as set forth below.

## Argument

### a. The Online Merchants Guild is likely to succeed on the merits.

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (same). The Online Merchants Guild's burden is not particularly high. "A party is not required to prove his case in full at a preliminary injunction hearing," just to "show more than a mere possibility of success." *Tenke*, 511 F.3d at 543 (cleaned up). It is enough to raise "serious, substantial" questions. *Id*.

The Online Merchants Guild exceeds that standard. The AG's attempt to impose price controls on the Online Merchants Guild's members violates several constitutional provisions: the dormant Commerce Clause, the Due Process Clause, the First Amendment, and the Equal Protection Clause. We address each in turn.

1. **The AG's application of KRS 367.374 and KRS 367.170 violates the dormant Commerce Clause by regulating extraterritorially and burdening the interstate market.**

The Kentucky AG's application of KRS 367.374 and KRS 367.170 to the Online Merchants Guild's members violates the dormant Commerce Clause for at least two independent reasons. First, the Kentucky AG is giving the statutes unlawfully extraterritorial effect. Second, even if the laws were not extraterritorial as applied, they still impose a heavy burden on interstate commerce that outweighs any local benefits.

A. **The Kentucky AG's application of KRS 367.374 and KRS 367.170 is unlawfully extraterritorial.**

The Kentucky AG's application of KRS 376.374 to the Online Merchants Guild's members is effectively a regulation of the interstate market, which is beyond the power of state law. To foster a "national economic union" and preserve the "autonomy" of the individual states, the Constitution imposes constraints on state regulatory authority: the dormant "Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the state." *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989). "[S]pecifically," states "may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states." *Id*. at 336.

Extraterritorial laws are "virtually *per se* invalid under the Commerce Clause." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986); *see also American Beverage Association v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013) (same); *Bainbridge v. Turner*,

311 F.3d 1104, 1112 (11th Cir. 2002) (explaining that "laws that directly regulate commerce occurring in other states are invalid").

In measuring a state law's compliance with the dormant Commerce Clause, the "critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the state." *Healy*, 491 U.S. at 336. The inquiry is holistic: "the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id*. The problem of conflicting laws is critical because the "Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Id*. at 336-37. Intent to regulate outside the state does not control the analysis; practical effect does. *Id*. at 336 (holding that practically extraterritorial laws are invalid "regardless of whether the statute's reach was intended by the legislature").

The courts have struck down a wide range of state laws that had the practical effect of regulating commerce beyond their borders, imposing interstate pricing schemes, or creating havoc in the national marketplace. *See, e.g.*, *Fla. Transp. Servs. v. Miami-Dade County*, 703 F.3d 1230 (11th Cir. 2012) (collecting cases).

The Fourth Circuit's *Frosh* decision illustrates the exacting scrutiny the courts employ. *See Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664 (4th Cir. 2018), *cert. denied* 139 S. Ct. 1168 (2019). The court struck down a Maryland price-gouging law that purported to ban "unconscionable" price increases in the sale of drugs. *Id*. at 666. It was no defense that some of the drugs might be purchased by Marylanders, because the law's practical effect "still controls the price of transactions that occur wholly outside the state," and was "effectively a price control

8

statute that instructs [sellers] as to the prices they are permitted to charge in transactions that do not take place in Maryland." *Id*. at 671-72.

Following the Supreme Court's guidance in *Healy*, the *Frosh* court also emphasized the law's "potential to subject [interstate sellers] to conflicting state requirements," which would burden interstate commerce. *Id*. at 673. That problem is especially acute where, as here, the law does not clearly define an unlawful price.[28] *See Frosh*, 887 F.3d at 663 (explaining that the "relatively subjective definition of what constitutes an unlawful price increase only exacerbates the problem").

The Sixth Circuit applied the extraterritoriality doctrine in *American Beverage Association v. Snyder*, 735 F.3d 362 (6th Cir. 2013), to strike down a Michigan product-labeling law that controlled labeling in other states. The state's environmental and budget-protection rationale for the law may have been worthy, but the statute was nonetheless "extraterritorial in violation of the dormant Commerce Clause because it impermissibly regulates commerce by controlling conduct beyond the State." *Id*. at 376. And among other things, the court criticized the state for "fail[ing] to explore other alternative measures that could combat" the putative problem without imposing extraterritorial effects. *Id.* at 375.

Using KRS 367.374 and KRS 367.170 to impose Kentucky-specific price controls on members' Amazon sales is extraterritorial because of the nature of the interstate Amazon marketplace. Members' sales on Amazon are unlike the traditional alleged price-gouging fact pattern in an emergency—say, exorbitant gas prices at a Kentucky gas station or lumber prices at a Kentucky lumber yard. Those merchants deliberately target sales in, and only in, Kentucky. The

---

[28] *See* section a.3.A., *infra*, for a discussion of the statutes' vague language.

regulatory effects of KRS 376.374 and KRS 367.170 would occur within the Commonwealth, and would have at most incidental effects across the border.

By contrast, for the Online Merchants Guild's members, Amazon is a unitary interstate marketplace.[29] And members are not even retailers—they are suppliers of Amazon's retail store. There is no realistic way for members to conduct Kentucky-specific business at Kentucky-specific prices on Amazon.[30] Members must either treat Kentucky prices as a national ceiling, or exit the national marketplace.[31]

Moreover, there is a complex patchwork of state laws, made worse by the number of state AGs applying varying laws to the same online market.[32] The conflict with Alabama law is illustrative. It would be lawful to sell, say, hand sanitizer at a 20% price increase over the pre-pandemic average. *See* Ala. Code § 8-31-4 (price-gouging requires a 25% or greater increase). The Kentucky AG might consider the same price unlawful in Kentucky. Yet an Online Merchants Guild member cannot ensure that that product goes to Alabama (or some other state), but not to Kentucky. And things get even more conflicted when one factors in the number of state laws that could potentially apply to Amazon's single online market.

All of that creates the havoc that the dormant Commerce Clause guards against. Online Merchants Guild members are facing conflicting regulatory demands and, unsurprisingly, increasingly reluctant to source and sell important COVID-response goods and other consumer goods for fear of inadvertent legal exposure.[33] That is bad for small businesses at a time when the economy needs them to survive, and also bad for consumers, because it is chilling the efficient

---

[29] Rafelson. Dec. ¶¶ 12-13; 19.
[30] Rafelson Dec. ¶¶ 12-13; 19.
[31] Rafelson Dec. ¶ 26; 33.
[32] Rafelson Dec. ¶¶ 20-21; 23; 30.
[33] Rafelson Dec. ¶¶ 30-33.

collection and allocation of goods across the country.[34] Accordingly, the Court should hold that the Kentucky AG's application of KRS 367.374 and KRS 367.170 is unlawfully extraterritorial.

### B.   Even if there were only in-state effects, the Kentucky AG's application of KRS 367.374 and KRS 367.170 would still fail the *Pike* test.

The AG cannot defend his application of KRS 367.374 and KRS 367.170 by arguing that he is only targeting sales in Kentucky, and that the Court should apply the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). In the first place, states can only resort to *Pike* balancing when they do not impose extraterritorial effects. *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 646 (6th Cir. 2010); *Fla. Transp. Servs. v. Miami-Dade County*, 703 F.3d 1230, 1255 (11th Cir. 2012) (quoting *Pike*, 397 U.S. at 142). That is not the practical effect of the AG's efforts, as explained above. In fact, the AG has even been targeting merchants for supplying goods for Amazon sales that were not made to people in Kentucky.[35] So *Pike* does not apply.

Moreover, the AG's application of KRS 367.374 and KRS 367.170 would still fail the *Pike* balancing test, under which a law will be struck down if its incidental "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefit." *Fla. Transp. Servs.*, 703 F.3d at 1255. Alternatives matter: "[t]he extent of the burden on interstate commerce that will be tolerated will depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id*.

Here, the burden on interstate commerce described above exceeds any interest in policing Amazon's vast online store by targeting individual merchants—especially since the AG could directly regulate Amazon to adopt more calibrated and efficient measures.

---

[34] *Id*.
[35] Rafelson Dec. ¶ 25.

The burden is significant. The AG's application of KRS 367.374 and KRS 367.170 to online merchants is distorting the national marketplace and reducing the supply of COVID-response goods and other items. It is also imposing potentially ruinous costs on small business owners who make up the interstate market. There are also additional constitutional burdens. There are serious due process concerns with the vagueness of the laws, and with applying the Commonwealth's law to out-of-state merchants who did not deliberately target sales in the Commonwealth or seek the benefits of the Commonwealth's laws. *See Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (due process forbids application of a state's law to foreign citizens who do not seek an "affiliation" with the state). There are also First Amendment problems insofar as fear of prosecution in Kentucky chills advertising that would be lawful in other states. *See Central Hudson Gas & Electric v. Public Serv. Comm'n*, 447 U.S. 557 (1980) (government generally may not prohibit lawful commercial speech). And there are Equal Protection problems with the AG's selective application of the laws to online merchants but not to Amazon. Those burdens are real.

The benefits, if any, are likely to be small. Because of KRS 367.374 and KRS 367.170's ambiguity, and the patchwork of varying state laws, *ad hoc* application of the law to individual merchants is necessarily imprecise—the AG will not be able to ensure that the law is having carefully calibrated effects. *Ad hoc* application to U.S. merchants is also of limited effect because approximately half of Amazon's sellers are based in China and therefore practically (if not also legally) beyond the AG's jurisdictional reach.[36] And there are far more efficient and less burdensome means to police Amazon's store—starting with Amazon itself.[37] That is, for example, how the Commonwealth ensures sales tax collection: Amazon, not individual merchants, is

---

[36] Rafelson Dec. ¶ 38.
[37] Rafelson Dec. ¶ 37.

responsible for collecting taxes for sales in its store. *See* KRS 139.550 (requiring companies like Amazon that "facilitate[]" online sales to remit taxes on those sales).

Thus, even if the effects of the Kentucky AG's application of KRS 376.374 and 367.170 were primarily in-state in nature (which they are not), the law would still violate the dormant Commerce Clause.

### 2. The Kentucky AG's application of KRS 367.374 and KRS 367.170 violates the First Amendment.

The AG is violating the First Amendment by burdening commercial speech that is lawful outside of Kentucky, and by imposing an excessive burden on speech in Kentucky that is not tailored to actually accomplish a substantial interest.[38]

The AG cannot meet his "burden" to demonstrate that his application of KRS 367.374 and KRS 367.170 is "consistent with the First Amendment." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571-72 (2011) (citing, *inter alia*, *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980)). The AG must, at a minimum, demonstrate that his application of the price-control laws "directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Id.*

With respect to speech *outside* of Kentucky, the AG cannot meet that standard because he has no interest in suppressing lawful speech beyond the border. And with respect to speech *inside* of Kentucky, the limited and *ad hoc* nature of his investigations will not actually reduce consumer prices for goods in Kentucky and will instead create market distortions and possibly higher prices. Thus, the AG's application of KRS 367.374 and KRS 367.170 to the Online Merchants Guild's members fails the *minimum* standard necessary to comply with the First Amendment.

---

[38] Rafelson Dec. ¶ 36.

But the AG must also surmount a higher bar because his application of KRS 367.374 and KRS 367.170 also appears to be a speaker-based restriction, which is almost never constitutional. The AG appears to be targeting online merchants for sales on Amazon, but not Amazon itself—even though Amazon not only controls the commercial speech in its store, but also sells products just like small online merchants do. Following *Sorrell*, the lower courts have considered whether speaker-based (and content-based) commercial speech restrictions are subject to strict scrutiny, not *Central Hudson*'s intermediate scrutiny. *See Vugo, Inc. v. City of New York*, 931 F.3d 42, 50 (2d Cir. 2019) (collecting cases). The issue arises because *Sorrell* stressed that "heightened judicial scrutiny" applies to such regulations, and then struck down the law under *Central Hudson*, while observing that "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." 564 U.S. at 567; 571-72. The Sixth Circuit has apparently not adopted a position. *But see Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n*, 597 F. App'x 342, 366 (6th Cir. 2015) (Moore, J., concurring in part and dissenting in part) ("[A]lthough *Sorrell* stated that 'heightened judicial scrutiny' applied, it reaffirmed the use of the *Central Hudson* test and simply acknowledged the reality that content-based speech regulation will rarely satisfy the test.").

The Online Merchants Guild contends that *Sorrell* requires strict scrutiny because the dangers of speaker-based restrictions are often just as salient in the context of commercial speech—particularly when prosecutors can use vague laws to punish some speakers but not others. The need for strict scrutiny is apparent here, where the AG appears to be choosing among groups of speakers on the same topic: online merchants, who are threatened with prosecution, and Amazon, which is apparently not. *Cf. Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 139 (3d Cir. 2019) ("If the regulation has the practical effect of promoting some

messages or some speakers based on the content of the speech or the identify of the speaker, something more than intermediate scrutiny may be necessary to survive a First Amendment inquiry.").

For all practical purposes, however, the outcome is the same here: the AG's application of KRS 367.374 and KRS 367.170 fails under *Central Hudson*, so by definition it fails under strict scrutiny.

### 3.  The AG's application of KRS 367.374 and KRS 367.170 violates the Due Process Clause.

There are at least two Due Process problems with the AG's application of KRS 367.374 and KRS 367.170 to the Online Merchants Guild's members. First, KRS 367.374 and KRS 367.170 are unconstitutionally vague. Second, the AG is subjecting foreign citizens who lack sufficient contacts with the Commonwealth to Kentucky law.

### A.  KRS 367.374 and KRS 367.170 are unconstitutionally vague.

For "over a hundred years," the courts have struck down statutes "so vague that [they] fail[] to give ordinary people fair notice of the conduct [they] punish[], or so standardless that [they] invite[] arbitrary enforcement." *Shuti v. Lynch*, 828 F.3d 440, 443 (6th Cir. 2016) (quoting *Johnson v. United States*, --- U.S. ---, 135 S. Ct. 2551 2556 (2015); *Collins v. Kentucky*, 234 U.S. 634, 638 (1914)). Such laws "violate[] the fundamental principles of justice embraced in the conception of due process of law." *Shuti*, 828 F.3d at 443. In fact, just over a century ago the Court struck down a Kentucky price-control law barring prices in excess of the "market value under fair competition." *Int'l Harvester v. Kentucky*, 234 U.S. 216, 221 (1914). Estimating such a price, on pain of prosecution, unlawfully required "exact gifts that mankind does not possess." *Id*. at 223-24.

KRS 367.374 and KRS 367.170 are similarly beyond advance comprehension.[39] During an emergency, KRS 367.374 bans price increases that are "grossly in excess" of pre-emergency prices. What is a "gross excess"? The statute does not say; merchants can only guess.

The statute does contain a few carve-outs, *see* KRS 367.374(c), but they add to the ambiguity. A price increase might not be unlawful if it is "related to an additional cost imposed by a supplier," but what does "related to" mean? How "related" must the cost be? Likewise, a price increase might not be lawful if it is "generally consistent with fluctuations" in the market, but again—what does that mean? On top of that, the statute might be read to frame those carve-outs as defenses that the accused must prove, at least to avoid prosecution.

KRS 367.170 is worse—it is unlimited to emergencies, and is at least as vague. Relevant here, the statute bans "unfair" trade practices, with "unfair . . . construed to mean unconscionable." KIRS 367.170(1); (2). That definition only exchanges one vague word (unfair), for another (unconscionable). The Online Merchants Guild's members have no way of determining *ex ante* whether a sale price violates that standard. And, unlike KRS 367.374, which at least appears to offer some consideration of cost increases due to the emergency, KRS 367.170 does not, so the AG can prosecute under one statute what the other makes lawful.

Businesses—especially small businesses—cannot function with that kind of uncertainty. The price-control laws are creating fear of arbitrary, *post hoc* application to prices or goods that online merchants could not foresee would be considered unlawful. Look no further than the AG's apparent position that the statutes regulate the price of peanut butter but not spices, even though both are plausibly "Consumer food items."[40] KRS 367.374(b)(1). Or look to the AG's apparent

---

[39] *See* Rafelson Dec. ¶¶ 27-29 (describing the adverse impacts of the vague laws).
[40] Rafelson Dec. ¶ 22.

decision to target small online merchants but not the titan Amazon.[41] The confusion and risk of "arbitrary enforcement" render the statutes unconstitutionally vague. *Shuti*, 828 F.3d at 443.

### B. The AG's application of KRS 367.374 and KRS 367.l70 violates the personal jurisdiction rights of non-Kentuckians.

The Due Process Clause forbids the AG from using Kentucky law to regulate the conduct of non-Kentuckians who did not deliberately affiliate with Kentucky or seek the protection of Kentucky laws in connection with supplying goods for Amazon's interstate store.[42] *See Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (due process forbids application of a state's law to foreign citizens who do not seek an "affiliation" with the state).

Simply supplying goods to Amazon's store—without deliberately targeting Kentucky residents—is insufficient to create minimum contacts with the Commonwealth. The Sixth Circuit uses the "stream of commerce plus theory of specific personal jurisdiction," under which, "for a defendant to purposely avail himself of the privilege of acting within a forum state, he must do more than merely place a product into the stream of commerce." *Parker v. Winwood*, 938 F.3d 833, 840 (6th Cir. 2019) (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1987) (O'Connor, J.) (plurality op.)). The "plus" approach requires "affirmative[]" direction of a product into a specific state, not being "merely aware" that a product might enter one of the fifty states. *Id.* at 840-41; *see also J. McIntyre Mach. Ltd. v. Nicastro*, 564 U.S. 873, 883 (2011) (rejecting mere "foreseeability" that a product would enter a state as a basis for personal jurisdiction).

As explained above, the Online Merchants Guild's members do not and cannot use Amazon's store to direct offers or sales into Kentucky.[43] So their use of Amazon does not satisfy

---

[41] Rafelson Dec. ¶¶ 37; 41.
[42] *See* Rafelson Dec. ¶ 39 (describing non-Kentucky members whom the Kentucky AG is nonetheless purporting to regulate).
[43] Rafelson Dec. ¶¶ 12-13; 19.

the stream of commerce plus test. Thus, the Due Process Clause prevents the AG from applying Kentucky's price-control statutes to the Online Merchants Guild's non-Kentucky members.

### 4. The Kentucky AG's selective application of KRS 367.374 and 367.170 violates the Equal Protection Clause.

The AG is heavily targeting individual online merchants while apparently taking a light-touch approach with Amazon. Instead of regulating with an even hand, the AG has described being "grateful to Amazon for working with us" to target "third-party sellers" for their alleged "egregious actions,"[44] while ignoring Amazon's accountability for *its* store, Amazon's first-party sales, and Amazon's significant markup to the cost of "third-party" sales.[45]

By regulating unequally, the AG is burdening the Online Merchants Guild's members' fundamental rights as set forth above, so heightened scrutiny applies. *Kiser v. Kandmar*, 831 F.3d 784, 792 (6th Cir. 2016) (tying equal protection standard to standard for substantive rights violated). The AG cannot satisfy that standard because whatever substantial interest the AG has will not be served by targeting individual merchants on an *ad hoc* basis while leaving Amazon alone.

The AG's use of Kentucky's price-control statutes would also fail rational basis review. Regulating Amazon directly is the only realistic way to impose price-order on Amazon's store. Amazon controls its store: which customers, in which states, see which items at which price. By contrast, targeting individual merchants will not accomplish the AG's price-control goals (but will devastate small businesses). The AG cannot defend that unequal and ineffective regime.

### b. The Online Merchants Guild's members will suffer irreparable injury absent an injunction.

---

[44] Kentucky AG Press Release (March 26, 2020), https://kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=888.
[45] Rafelson Dec. ¶¶ 9-10; 15 (describing Amazon's first-party sales and significant role in third-party sales).

The Online Merchants Guild meets the irreparable injury standard because the organization is seeking to vindicate constitutional rights and because damages will not suffice to remedy the injuries at issue.

"When constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 427 (6th Cir. 2012) (citing *ACLU of Ky. v. McCreary County, Ky.*, 354 F.3d 438, 445 (6th Cir. 2003)); *accord Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (2016); *see also Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (explaining that "if is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is *mandated*"; "a successful showing on the first factor *mandates* a successful showing on the second factor—whether the plaintiff will suffer irreparable harm") (citing *Elrod v. Burns*, 427 U.S. 347 (1976) (emphasis added)). Because the constitutional rights of the Online Merchants Guild's members are being impaired, there is irreparable injury justifying a preliminary injunction.

The Online Merchants Guild satisfies the irreparable injury standard for a second reason: damages will not fix the injury. The Sixth Circuit has explained that a "plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages" *Husted*, 697 F.3d at 427 (quoting *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007)). That condition is present here for a number of reasons. First, the Online Merchants Guild is not seeking damages (although the Guild will seek attorney's fees pursuant to 42 U.S.C. § 1988). Second, it would be difficult or impossible to calculate the effect of lost sales and marketplace distortion. Even if one could calculate damages, that still would not redress the harm to consumers whose buying options were limited. The irreparable injury factor justifies a preliminary injunction.

**c. The injury to the Online Merchants Guild's members and others outweighs any harm to the Kentucky AG.**

The Online Merchants Guild satisfies the third factor because as explained above, there is significant ongoing and future harm to its members, the interstate market, and the interstate buying public. By contrast, any harm to the Kentucky AG is modest. The AG can still pursue his goals by working directly with Amazon, which is able to control the search and sale process in its store. That will build on Amazon's existing efforts to control the prices and marketing of COVID-response goods in its store. If anything, working directly with Amazon to monitor prices will be more efficient than pursuing individual investigations of individual items linked to individual sellers. Any increased administrative work for the Kentucky AG will be outweighed by relieving the burden on the Online Merchants Guild's members and the national marketplace.

**d. The limited injunction the Online Merchants Guild seeks will serve the public interest.**

The relief the Online Merchants Guild seeks will further, not harm, the public interest for at least two reasons. First, the Sixth Circuit has recognized that "the public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. SMART*, 698 F.3d 885, 896 (6th Cir. 2012). Enjoining the unconstitutional application of KRS 376.374 and KRS 367.170 will promote the public interest in that respect.

Second, the American public—nationwide—has a compelling interest in the continued availability of COVID-response goods and other consumer goods supplied by the private marketplace. There is also an important public interest in the survival of small businesses like the Online Merchants Guild's members. And, as set forth above, to the extent there are public interest benefits from Kentucky-specific price controls, the Kentucky AG can work directly with Amazon on that goal.

**Conclusion**

For the foregoing reasons, the Online Merchants Guild respectfully requests that the Court enter temporary restraining order enjoining the Kentucky AG from applying KRS 376.374 and KRS 367.l70, including investigations and threatened or actual prosecution under those laws, to the Online Merchants Guild's members in connection with sales on Amazon. After an opportunity for full briefing, the Online Merchants Guild requests that the Court enter a preliminary injunction of the same scope.

**Request for Hearing and Expedited Consideration**

The Online Merchants Guild respectfully requests a telephonic hearing and expedited consideration given the ongoing nature of the constitutional and market injuries at issue.

Respectfully submitted this 11th day of May, 2020.

s/ Aaron K. Block
Aaron K. Block
The Block Firm, LLC
Georgia Bar No. 508192*
404-997-8419
aaron@blockfirmllc.com
Counsel for the Online Merchants Guild
*Application for admission *pro hac vice* to be submitted


s/ Paul S. Rafelson
Paul S. Rafelson
Rafelson Schick, PLLC
Bar # 16958 (Florida)
2255 Glades Rd
Suite 319
Boca Raton, FL 33431
(561) 326-6529

/s/ William G. Deatherage Jr.
William G. Deatherage Jr.,
Mark A. Gilbert,
Deatherage, Myers & Lackey, PLLC
701 South Main Street
P.O. Box 1065
Hopkinsville, Kentucky  42241-1065
Telephone:     270-886-6800
Facsimile:      270-885-7127
Email:  mgilbert@dmlfirm.com

**Certificate of Service**

I hereby certify that I served the foregoing using the Court's CM/ECF system by mailing,

delivering, emailing, or faxing copies to: **DANIEL CAMERON**, Office of the Attorney

General, 700 Capital Avenue, Suite 118, Frankfort, KY 40601-3449, this 11th day of May, 2020.


/s William G. Deatherage Jr.
William G. Deatherage Jr.,
Mark A. Gilbert,