IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION

| | | |
|---|---|---|
| ONLINE MERCHANTS GUILD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 3:20-cv-00029-GFVT |
| | ) | |
| DANIEL CAMERON, | ) | |
| in his official capacity as | ) | |
| ATTORNEY GENERAL OF | ) | |
| KENTUCKY, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF PAUL S. RAFELSON IN SUPPORT OF ONLINE MERCHANTS GUILD'S MOTION FOR PRELIMINARY INJUNCTION**

1. My name is Paul S. Rafelson. I am over the age of 18, and am under no legal disability that would prevent me from offering the following testimony. I make this declaration on personal knowledge in the field of online merchandising, sales on Amazon, and the other matters discussed herein.

2. I am the Executive Director of the Online Merchants Guild, in which capacity I offer this declaration. I am also an attorney in private practice who represents online merchants. I also have experience as an online merchant myself.

3. The Online Merchants Guild is a trade association for online merchants. The association's purpose is to advocate for a free and fairly-regulated online marketplace, and for the interests of online merchants. Our members are small business owners who have built new enterprises from scratch.

4. The members of the Online Merchants Guild, and similarly-situated online merchants, are making key goods available for sale to Americans during the COVID-19 pandemic. For instance, our members are sourcing in-demand items like masks and hand sanitizer and bringing them to market, so that American institutions and individuals can purchase and deploy them. Those sales also send price signals, which encourage manufacturers to increase production of goods. Our members also continue to source and sell more traditional goods unrelated to COVID-19.

5. In many instances, our members are acquiring overseas goods that would otherwise likely not be accessible to the U.S. market. In so doing, our members are relying on supply chain relationships and market knowledge that they have cultivated over years.

6. Many of our members are engaged in retail arbitrage, the economics of which depend on selling items for more than their purchase price. It is important to note that our members' acquisition costs have increased, such that they must increase their offer prices to cover those costs.

7. In January, many Online Merchants Guild members acquired masks and hand sanitizer in states in the middle of the country at a time where there were no coronavirus cases in the state, and no indication of emergency from the state or federal government. At a time when supply was short in states like California and New York, where the products were needed the most, members were able to reallocate supplies from the local marketplace to a national marketplace, via Amazon's retail store, so that these products would get to the front lines, in order to stop or slow the spread of the virus. There was no emergency order from the Governor of Kentucky. Considering that the best way to fight a pandemic is to

8. Amazon's store is the dominant eCommerce website for sales of COVID-response goods, and is a critically important sales channel for online merchants in general. However, online merchants have little influence over sales on Amazon, as I will explain.

9. Amazon has dominant legal and practical control over sales made through its online retail storefront as a result of Amazon's market power and its contractual terms.[1] Amazon also takes a commission (averaging 15% when delivery is effectuated by the merchant) on sales by online merchants, in addition to a recurring fee for the right to use Amazon's store.

10. Many merchants also participate in a program called Fulfillment by Amazon ("FBA"). Through FBA, merchants can ship their goods to Amazon's warehouse, which is usually the warehouse nearest to them. From there Amazon will redistribute the goods across its network of warehouses and distribution centers throughout the country. When goods are offered via FBA, Amazon features those goods as "Prime Eligible," meaning that members of Amazon's Prime program are more likely to purchase the products, as it will be delivered in two days, a key benefit of being a Prime Member. Amazon's percentage is even higher for FBA sales: 45% of the sale price (30% plus the 15% commission).

11. When Amazon's customers purchase Prime products, Amazon packs and ships the goods in their fulfillment centers and ships it to their customer.

---

[1] The Amazon Services Business Solutions Agreement ("BSA"), through which Amazon sets the contractual terms for selling on Amazon, is available here: https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US. The agreement and related contractual documents are incorporated herein by reference.

12. It is not possible for online merchants using Amazon's store to engage in Kentucky-specific sales or pricing; nor can they realistically avoid making sales in Kentucky. The same is true for every state—from the perspective of our members, Amazon is a single national marketplace.

13. Amazon controls how and where items are listed on Amazon's store and in search results. Amazon maintains "the right to determine the design, content, functionality, availability and appropriateness of its websites, selection, and any product or listing in the Amazon Stores, and all aspects of each Service, including [online merchants'] use of the same."[2] Online merchants cannot control whether customers in a state like Kentucky see the merchant's products in their search results. Our members cannot prohibit items from appearing in certain states. Only Amazon can control where and how search results are displayed.

14. Amazon has ultimate control over prices in its store. Online merchants cannot unilaterally determine the listing price; instead, they can estimate a price Amazon is likely to approve, based on historical sales data Amazon provides, and propose that to Amazon. Amazon retains final control over the price it will accept for listing a good on the Amazon site. Amazon commonly rejects prices for being too high (or too low) in Amazon's view. Of course, the merchant's proposed price will need to account for the merchant's acquisition and other costs, including Amazon's fees, and may reflect a demand premium, but ultimately the price the consumer sees does not happen without Amazon's approval. Amazon also has an Application Programming Interface ("API"), which allows third-party applications to interact with Amazon's store, including

---

[2] BSA at S-6.

applications that automatically adjust the price, in response to changing market conditions, which are determined by a data feed via Amazon's API of prior retail sales of similar products in Amazon's store. Amazon also has the ability to block such applications in times of emergency. Amazon also has a "Match Lowest Price Button," which allows merchants to agree to offer products at whatever Amazon determines the lowest price to be.

15. As the eCommerce store in the United States, responsible for over 50% of all eCommerce sales in the country, Amazon has the ability to set the market by regulating (or not) prices for certain goods. Here, Amazon effectively enabled high prices for certain COVID-response goods by permitting prices at a certain level in January and February, as concern about COVID grew.

16. Online merchants are not in privity of contract with Amazon's customers; Amazon is. Amazon makes clear that customers are "Amazon's customers," not online merchants' customers. In many instances, online merchants do not even ship goods to Amazon customers. Instead, using the Fulfilled by Amazon process, merchants warehouse their goods with Amazon (at a warehouse of Amazon's selection), and then Amazon ships the goods directly to consumers.[3] Amazon also processes customer payments.

17. Amazon controls communications with customers, barring online merchants from sending "unsolicited" communications, requiring use of Amazon's messaging platform to communicate with customers, and limiting the scope of communications to those "necessary for fulfilling the order or providing customer services."[4] Amazon also forbids

---

[3] *See* BSA at Fulfillment Services.
[4] Amazon Selling Policies and Seller Code of Conduct, https://sellercentral.amazon.com/gp/help/external/help.html?itemID=G1801&language=en_US&ref=%20ag_G1801_cont_521.

online merchants from directing Amazon's customers to the merchants' own websites, or to any sales channel other than Amazon.

18. Amazon has a policy of demanding that online merchants validate listings, such as by requiring receipts to prove that name-brand merchandise was lawfully obtained. Amazon will terminate listings, or accounts, if it is not satisfied with sellers' responses. That reflects Amazon's control over its store, and its ability to establish rules that ensure Amazon's sales are in compliance with the law.

19. Online merchants using Amazon cannot realistically avoid sales into states like Kentucky. As explained above, merchants cannot prospectively limit such sales because Amazon controls the search results and listings on Amazon. It is impractical for online merchants to "watch" for sales into particular states and reactively cancel them. Further, Amazon limits the number of sales that an online merchant can cancel, and will shut down the accounts of merchants that Amazon perceives cancel too many orders.

20. I am aware that the Attorney General of Kentucky and Attorneys General from other states are investigating alleged price-gouging in the sale of goods on Amazon, and are attempting to use state law to impose price controls on the sale of various goods in Amazon's store. Our understanding is that the Kentucky AG is conducting his investigations using sales data provided by Amazon.

21. The Online Merchants Guild has had to expend organizational resources in response to the Kentucky AG's investigation (and those of other AGs), such as by working with targeted merchants to understand and respond to the subpoenas. We have also had to analyze the complex web of investigations and discuss open questions with merchants

who have not received subpoenas, but who are confused and concerned about what they can and cannot sell online, beyond hand-sanitizer and facemasks, and at what price.

22. Relative to sales on Amazon, the investigations in Kentucky appear to be somewhat oriented toward the sale of items like hand sanitizer, sanitizing wipes, and personal protective equipment ("PPE") like gloves, masks, and gowns. However, I also understand from members that the Kentucky AG has taken the position that some food items are included in the scope of the AG's investigation. For example, in discussions with the AG's office, one AAG expressed their position to me and other merchants present on the call that peanut butter "may" be covered by the Commonwealth's price-control laws, but McCormick spices are not; masks and hand sanitizers were only the first phase of the investigation.

23. Online merchants are increasingly concerned about their inability to predict which items the Kentucky AG (and other state AGs) may target in the future. For example, online merchants are questioning whether items like video game systems and DVDs could be covered by state price-gouging laws, since people are spending more time at home and are looking for more home entertainment.[5] The same expansive view of which items are "affected" by COVID-19 can conceivably apply to many consumer goods that have not typically been associated with responding to the disease as such.

24. As the duration of the COVID-19 crisis drags on, other states have already enacted such measures. For example, California has expanded their price gouging law to apply to "consumer goods" and any increase of more than 10% establishes a presumption of price

---

[5] *See, e.g.*, Maya Shwayder, *Nintendo Switch Price Gouging Is Rampant on Amazon*, Digital Trends (March 30, 2020) https://www.digitaltrends.com/news/nintendo-switch-amazon-price-gouge/ (media report of alleged price-gouging in the online sale of Nintendo video game systems).

gouging. As states have attempted to enforce these price gouging laws by sending subpoenas to merchants outside of their borders, these merchants whether located in Kentucky or elsewhere are operating under a credible fear that they might be operating their business under a presumption of guilt in California law, imposing a chilling effect on interstate commerce. That illustrates how a single state's law can affect the entire market outside that state's borders.

25. The Kentucky AG has targeted members whose sales via Amazon's retail platform were not made to Amazon's customers located in Kentucky.

26. The Kentucky AG's price-gouging investigations is having chilling effects on the Online Merchants Guild's members. One problem is geographic: from the perspective of members, Amazon's marketplace is a unitary interstate market, not a state-by-state market. It is not possible for members to make Kentucky-only sales or offer Kentucky-only prices on Amazon. So members must either treat Kentucky prices as a possible ceiling, or abstain from selling goods on Amazon entirely.

27. The second problem has to do with Kentucky's price-control scheme: it is not possible to determine *ex ante* which goods are covered and which prices comply with the AG's interpretation of the price-gouging statutes due to the vague statutory language. The AG relies on two price-control statutes: KRS 367.374 and KRS 367.170. Neither defines the scope of coverage or lawful prices in a clear way. Although KRS 367.374 does appear to permit some modest level of price increase, the practical burden appears to fall on the merchant to justify the basis for any increase. KRS 367.170 does not contain a similar exception, which would allow the AG to prosecute under that statute sales that might be lawful under KRS 367.374.

28. Kentucky's price-control statutes do not provide our members fair warning with what they must do to avoid violating Kentucky law. The vague and arbitrary nature of the laws is also restricting our members' participation in the national economy.

29. The Kentucky AG's investigation is adversely affecting the members of the Online Merchants Guild. Members are concerned about their liability, confused about what qualifies as price-gouging and which goods are or will be covered, and concerned that they cannot realistically use Amazon's platform without arguably violating an indeterminate body of law in Kentucky and elsewhere.

30. Kentucky's laws conflict with those of other states, and the overall patchwork of competing laws is disrupting the national marketplace.

31. Online merchants are declining to source and/or sell items for fear of inadvertently violating the law of Kentucky or other states. That is harming their businesses, and also restricting the free flow of goods into the interstate Amazon marketplace. Online merchants are also bearing increased costs as a result of compliance concerns.

32. To give an illustration, an online merchant in the Western U.S. is able to source a large quantity of hand sanitizer from an overseas manufacturer (at an increased cost to him), but is concerned that he could inadvertently violate the law of Kentucky (or other states), or at least be exposed to an expensive investigation, if he offers it for sale at a price that reflects his increased costs and/or a demand premium. However, the company is now reluctant to acquire and sell the hand sanitizer, effectively keeping it out of the interstate market and reducing supply to American consumers, due to fear of prosecution.

33. Various Online Merchants Guild members have developed significant expertise and networks of international manufacturing contacts that make them proficient at sourcing

products that are in demand, including COVID-related items like hand sanitizer and masks that are in high demand. However, rather than putting their expertise to use to bring these high demand products to market, they refuse to act in fear of future civil or criminal ramifications, as the acquisition cost of these products has increased substantially from suppliers around the world, compared to their pre-COVID emergency price. This chilling effect caused by much more than just hypothetical fear, that the sale of these products at higher prices will lead to a presumption of price-gouging, and a subsequent investigation by the AG's office is a substantial burden on interstate commerce, and is actually contributing to the shortages and higher prices that consumers are facing when seeking to acquire these goods. A law or enforcement regime that has the effect of deterring procurement of high demand products for sale in our nation's economy at a time when they are most needed, is not only unconstitutional, it is detrimental to the best interests of our nation. The artificial supply restrictions resulting from the Kentucky AG's efforts to control prices in the national marketplace may actually lead to price *increases*, as well as inefficient allocation of goods in general.

34. Retail arbitragers who regularly find goods in stores to resell online at higher prices, are usually praised for their ingenuity.[6] Because of its low barrier to entry, retail arbitrage is often a path out of a bad situation for our members. In times similar to these, like the high unemployment we saw after the 2008 Financial Crisis, many of our soon-to-be members lost their jobs, and were left with no option, but to seek assistance from the government. However, rather than becoming reliant on government assistance until the economy, and

---

[6] Jill Cornfield, *From $300 T-Shirts to To Retail Arbitrage, Online Entrepeneurs Can Make Serious Bank Whole Doing What They Love*, CNBC (Feb. 11, 2020), https://www.cnbc.com/2020/02/11/how-to-start-by-cleaning-your-closet-and-end-up-making-money-online.html

the job market, recovered, many of our members, the retail arbitragers, learned how to be self-reliant business owners by sourcing goods locally for sale in Amazon's national storefront. Retail arbitrage is often a steppingstone for many of our members, who go on to start their own brands or form valuable relationships with brands that want to sell online and lack the expertise to do so. One of our members recently told Congress about her journey, in testimony submitted to the House Committee on Small Businesses: "I needed to find a way to boost my income so I can tackle the cost of college [for my son]." I can proudly report that this member not only supported her son through college, she was ultimately able to quit her job and support herself. She has also launched a new business where she manufacturers her own product and is able to offer it for sale in Amazon's store front. While many of our members started in arbitrage as a "side-gig" to supplement their "day job," some of our members have been homeless, and even those that weren't have found themselves in situations where they were living on the brink of poverty, and found arbitrage as a way to climb out.

35. Some online merchants have received death threats or other forms of vitriolic abuse due to the publication of their identity in connection with investigations of alleged price-gouging. As one would expect, that too is having a chilling effect on online merchants' participation in the marketplace.

36. The Kentucky AG's investigations and threatened application of Kentucky's price-control statutes is chilling our members' advertising and commercial speech. Our members are concerned that offering a good at a lawful price in one state (or other countries) might be considered unlawful in Kentucky. As a result, they are refraining from engaging in protected commercial speech.

37. The Kentucky AG's investigations and threatened application of Kentucky's price-control statutes is not regulating equally as between our members and Amazon. The Kentucky AG has subpoenaed and threatened our members with legal consequences. On information and belief, he has not done the same to Amazon, even though Amazon is similar to our members in certain ways and a more logical focus for price-control regulation in other ways. It is important to note that Amazon is often a seller itself (making so-called first-party sales, as opposed to third-party sales by our members on Amazon's store). In some cases, Amazon's prices are higher than those of our members or other online merchants, but because Amazon controls product placement, its items appear highest in search results, effectively setting the market at a higher price. AG has apparently not taken action against Amazon for its own first-party sales, contrary to the AG's position as to our members. Amazon also plays a significant role in third-party sales. Amazon's commissions form a large part of the marginal price of goods our members offer, much like a traditional retail upcharge in a brick-and-mortar store. And, as explained above, whereas our members have little influence over Amazon's store, Amazon's control over its store, scale, technical sophistication, and resources make Amazon the most efficient point on which to impose calibrated regulation to comply with Kentucky laws. So not only has the Kentucky AG apparently not been regulating equally, he has been applying more onerous regulations on parties who are less able to bear and further the putative ends of those regulations. In the analogous tax arena, by contrast, Kentucky law places the burden of collecting and remitting sales tax on Amazon, not on individual merchants like our members. *See* KRS 139.550 (requiring "marketplaces" that "facilitate[]" online sales to remit taxes on those sales).

38. Many sellers on Amazon are beyond the Kentucky AG's practical reach and effective legal reach. For example, approximately half of sellers on Amazon are based in China. Investigations against such sellers are unlikely to be effective in controlling prices, whereas the tactic is burdensome on our members. That further illustrates why the burden the Kentucky AG is placing on our members, and the interstate market, is unlikely to achieve the AG's policy goals.

39. The Kentucky AG is effectively regulating and coercing members who do not have sufficient contacts with Kentucky to give him that authority. Most of our members live outside the Commonwealth, and their use of Amazon to list or sell items does not reflect a deliberate affiliation with Kentucky or a decision to seek the protection of the Commonwealth's laws.

40. The costs of actual or threatened application of Kentucky's price-control laws to our members is causing and will cause financial harm. Many of our members are not able to withstand such costs, which threatens the viability of their businesses—especially during a period of general economic distress. Although our members who decline to acquire and/or offer goods are losing sales qualitatively, it is not easy to quantify the amount of those injuries. It is also unclear how to quantify the impact on Americans who lose the opportunity to purchase those items or the other adverse impacts on the national market.

41. Amazon plays a significant role in Kentucky's financial and political economy, as is the case in other states.[7] In my experience, some state officials take a light-touch approach to regulating Amazon so as to seek Amazon's investment in the state or otherwise accommodate Amazon.

---

[7] *See, e.g.*, Amazon, *Amazon's Expansion in Kentucky*, https://blog.aboutamazon.com/transportation/amazons-expansion-in-kentucky (promoting Amazon's investment of "more than $8 billion in the state").

42. Preliminary injunctive relief against application of KRS 367.374 and KRS 367.170 to the Online Merchants Guild's members' sales on Amazon is necessary to protect the interests of the Online Merchants Guild and its members, and to allow them to make COVID-response goods (and other goods) available for purchase in the interstate market. Absent such an injunction, members will remain chilled in their interstate marketplace activity, their businesses will suffer, and there will be fewer such goods for Americans to purchase in the interstate market.

43. It is possible for Amazon to regulate prices and search results on its store. As set forth above, Amazon has practical and legal control over those aspects of its store, and Amazon has historically been able to police its store in response to price concerns, including during the COVID-19 pandemic.[8]

44. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 11, 2020


s/Paul S. Rafelson_____

Paul S. Rafelson

---

[8] *See* Annie Palmer, *Amazon Cracks Down on Coronavirus Price-Gouging and Products Making False Claims*, CNBC (Feb. 27, 2020), https://www.cnbc.com/2020/02/27/amazon-cracks-down-on-coronavirus-price-gouging-false-claims.html (describing Amazon's efforts to police its store).