UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT

*Electronically filed*

ONLINE MERCHANTS GUILD,

    *Plaintiff*

v.

DANIEL CAMERON, in his official
capacity as ATTORNEY GENERAL
OF KENTUCKY,

    *Defendant*

Civil Action No. 3:20-cv-00029
Judge Gregory F. Van Tatenhove

---

**ATTORNEY GENERAL'S RESPONSE TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

---

The Court should deny Plaintiff's motion to preliminarily enjoin Attorney General Daniel Cameron. First, the Court lacks subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) because (1) Plaintiff lacks standing to bring its claims against the Attorney General, and Plaintiff's claims are not ripe for adjudication. Second, Plaintiff has not demonstrated any plausible violation of its constitutional rights arising from the Attorney General's investigation into allegations of price gouging. Plaintiff is thus unlikely to succeed on the merits.

## **INTRODUCTION**

In the midst of a global pandemic, the Attorney General learned of potentially unconscionable price gouging by those seeking to take advantage of Kentuckians, particularly with regard to medical and emergency supplies. To investigate, the Attorney General issued Civil Investigative Demands ("CIDs") to Kentucky merchants pursuant to his authority under the Kentucky Consumer Protection Act ("KCPA"). The plaintiff here, a trade organization known as the Online Merchants Guild (the

"Guild"), is asking the Court to enjoin the Attorney General from investigating, claiming some of those merchants are its members.

Because the Guild lacks standing, and because its claims are not ripe for review, this Court lacks subject-matter jurisdiction and must dismiss the Guild's claims. And, wholly apart from these threshold matters, the Guild is not likely to prevail on the merits, and so the Court should deny the Guild's motion.

## BACKGROUND

In December 2019, the People's Republic of China experienced an outbreak of a never-before-seen disease, Covid-19, caused by a novel coronavirus known as SARS-CoV-2. Since December, Covid-19 has spread throughout the world. The United States reported its first infection in mid-January 2020, and as of May 18, 2020, has seen more than 1,480,349 cases.[1] As of May 18, 2020, Kentucky has had 7,935 confirmed cases and 346 confirmed deaths.[2]

Pursuant to KRS Chapter 39A, on March 6, 2020 Governor Beshear issued Executive Order 2020-215, declaring a state of emergency in the Commonwealth. Governor Beshear activated the price gouging provisions of the KCPA, found at KRS 367.372 to 367.378, when he issued Executive Order 2020-216.   Pursuant to KRS 367.374(a)(1), these laws went into effect for a 15-day period. Governor Beshear extended the price gouging orders for subsequent 15-day periods through Executive Orders 2020-245, 2020-268, and 2020-316.

Kentucky's price gouging statutes are reasonable legislative measures designed to protect the public from excessive prices for scarce goods during times of emergency.  The statutory scheme bars the offering for sale or rental of a good or service, regardless of whether a sale or rental actually occurs, for a price that grossly exceeds the price before an emergency declaration and that is unrelated to any

---

[1] *See* Coronavirus Disease, Cases in US, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

[2] *See* COVID 19, Kentucky Coronavirus Monitoring, https://govstatus.egov.com/kycovid19.

increased cost to the seller. KRS 367.374(1)(b). The goods included in this provision, in relevant part, consist of "emergency supplies" and "medical supplies." *Id.*[3]

Amid this global pandemic and public health emergency, and as the number of Covid-19 cases continued to rise, complaints of price gouging across the Commonwealth soon followed. The Attorney General learned that prices of items thought to be helpful to prevent the spread of the disease, including respirators and hand sanitizers, had risen dramatically, and in some cases unconscionably.[4]  As he is required to do by law, the Attorney General initiated an investigation into the complaints.

Based on the language of the statute, to investigate whether price gouging violations have occurred, the Attorney General must determine the prices at which items were being offered for sale, and information related to additional costs, percentage of price increases, fluctuations in the market, and pre-set contract prices. *See* KRS 367.374(1)(c).  The KCPA provides that the Attorney General may issue CIDs either when "the attorney general has reason to believe that a person has engaged in, is engaging in, or is about to engage in any act or practice declared to be unlawful by [KCPA], or when he believes it to be in the public interest that an investigation should be made to ascertain whether a person in fact has engaged in, is engaging in or is about to engage in, any act or practice declared to be unlawful by [KCPA]." KRS 367.240.

After receiving specific information related to several retailers' offers for sale of respirators and hand sanitizers, the Attorney General issued CIDs with requests specifically tailored to obtain the

---

[3] The statute excludes the following pricing exceptions from being actionable under the Act: (1) additional costs to provide the good or service; (2) ten percent (10%) or less above the price prior to the declaration; (3) ten percent (10%) or less above the sum of the seller's cost and normal price markup for a good or service; (4) consistent fluctuations in the commodity, regional, national, or international markets or seasonal fluctuations; or, (5) a contract price of a price set according to a formula that has been established prior to the Governor's Order. KRS 367.374(1)(c).
[4] "Where Do I Find Your Hand Sanitizor? Sorry, We Have None."
https://www.nytimes.com/2020/02/29/business/coronavirus-hand-sanitizer.html.

information authorized by the KCPA. In fact, despite the Guild's thinly supported motion for injunctive relief,[5] issuing CIDs pursuant to KRS 367.240 to investigate price gouging complaints *is all* the Attorney General has done at this point.

The Guild states that it is a trade association for online merchants. Notably, the Guild does not allege that the Attorney General has issued a CID to the Guild; rather, it claims that unnamed members have received CIDs.[6] As important, the Attorney General has not filed a complaint or taken any enforcement action against the Guild, against any of its members, or against any other online merchant.[7] The Attorney General has simply instituted a lawful investigation into price gouging.

Hoping to thwart the investigation of potential price gouging violations before it begins, the Guild asks the Court to prohibit the Attorney General from applying Kentucky's price gouging statutes to its members. In fact, the Attorney General has *not* applied or even attempted to apply KRS 367.374 or KRS 367.170 to the Guild or its members; rather, he has issued CIDs to certain online sellers pursuant to KRS 367.240. The Guild is thus asking the Court to consider whether *potential* executive action violates its members' constitutional rights.

## **ARGUMENT**

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). To issue a preliminary

---

[5] The Guild's motion for preliminary injunction is supported almost entirely by the declaration of its counsel of record, Paul Rafelson. The Rafelson declaration itself is replete with conclusory statements (*see, e.g.*, ¶¶ 26, 26, 30, 31, 32) and hearsay (*see, e.g.*, ¶34 quoting Congressional testimony of an unspecified date or time ostensibly given by an anonymous guild member).

[6] The Guild has not identified any online merchant as a member. Perhaps it is an oversight, or it may be in keeping with its policy of having all of its members remain anonymous. The Guild "do[es] not disclose member information to anyone, including other members', and all members remain anonymous except those who serve as board members." http://onlinemerchantsguild.org/faq/ (last visited May 17, 2020).

[7] Not content to rely on the standing of its anonymous members, the Guild apparently seeks to establish its own standing by asserting as well the rights of "similarly-situated merchants" who are not Guild members. (Compl. at ¶30).

injunction, the Court considers "whether the movant has shown a strong likelihood of success on the merits, whether the movant will suffer irreparable harm if the injunction is not issued, whether the issuance of the injunction would cause substantial harm to others, and whether the public interest would be served by issuing the injunction." *Houchens v. Beshear*, No. 3:20-CV-00006-GFVT, 2020 WL 948857, at *2 (E.D. Ky. Feb. 27, 2020) (citing *Overstreet*, 305 F.3d at 573) (cleaned up). The movant must satisfy a requirement of "substantial proof [that] is much higher" than on a motion for summary judgment. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

The Guild contends that the Attorney General has violated its members' constitutional rights by investigating possible price gouging, specifically alleging that the CIDs issued to its members are unlawful. The Guild, however, has no chance of success on the merits of that claim for two related reasons: (1) the Guild lacks standing to bring its claims, and (2) the Guild's claims are not ripe for adjudication. Because the first preliminary injunction factor is usually "determinative" of a plaintiff's request for a preliminary injunction, especially where constitutional harm is alleged, the Court should deny the motion. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)) ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." (internal quotation marks omitted)). As a result, the Court need not "consider all of the factors." *Conrad v. Beshear*, No. 3:17-CV-00056-GFVT, 2017 WL 3470917, at *4 (E.D. Ky. Aug. 11, 2017).

In considering all of the factors, however, it is clear that not only does the Guild have no chance of succeeding on the merits, but neither it nor its members will suffer irreparable harm if the injunction is not issued. On the other hand, enjoining the Attorney General's investigation into alleged price gouging by unscrupulous actors in the marketplace will cause substantial harm to Kentuckians in need of fairly priced emergency and medical supplies. And, apart from inapplicable constitutional

law arguments, Plaintiff has presented no compelling public interest that would be served by prohibiting the Attorney General from investigating price gouging allegations.

## I.   THE GUILD HAS NOT ESTABLISHED A LIKLIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS.

### A.   The Court lacks subject-matter jurisdiction.

Federal courts are not "free-range problem solvers." *Hearring v. Sliwowski*, 806 F.3d 864, 868 (6th Cir. 2015). They are courts of limited jurisdiction that exist solely to decide actual cases or controversies. *See* U.S. Const. art III, § 2. This is no small matter. In fact, as far as federal courts are concerned, jurisdiction is the most important matter. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 498 (1975) (holding that "determining the power of the court to entertain the suit" is "the threshold question in every federal case"). Without jurisdiction, a federal court has no authority to do anything, and any actions it takes are illegitimate. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

The limited nature of federal jurisdiction means that a federal court must examine its authority to hear a case before it can consider the merits. *See id.* at 93-94. A plaintiff must demonstrate a federal court's jurisdiction, and if a plaintiff fails to do so, the court must dispose of the matter at the outset. *See Allen v. Wright*, 468 U.S. 737, 751-52 (1984). Here, the Guild has not established that this Court has subject-matter jurisdiction. Indeed, the Court lacks subject-matter jurisdiction for two reasons: (1) the Guild lacks standing; and (2) the Guild's claims are not ripe.

#### 1.   The Guild lacks standing to bring suit against the Attorney General.

An essential element of Article III's case-or-controversy requirement is the concept of standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit." *Raines*, 521 U.S. at 818 (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)). Courts should be "especially rigorous" in making this inquiry when, as here, they are being asked to take the counter-majoritarian measure of striking down a democratically enacted statute. *Raines*, 521

U.S. at 819. This is because "the law of Art. III standing is built on a single basic idea—the idea of separation of powers." *Id.* at 820 (quoting *Allen*, 468 U.S. at 752). In other words, the judiciary's job is to decide real cases or controversies among parties with a genuine dispute over a real injury, not to decide policy disputes that ought to be reserved for the legislature. At bottom, the concept of standing is one of the primary means of "keeping the Judiciary's power within its proper constitutional sphere." *Id.*

The "irreducible constitutional minimum of standing contains three elements": (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). None of these elements is present here.

It is undisputed that the Attorney General has not issued a CID to the Guild. Because no CID has been issued, the Guild has sustained no injury in fact. There is simply no indication that the Guild has been directly injured. The Guild attempts to establish standing by vaguely referring to "divert[ing] its resources" to address the Attorney General's investigation, but that is insufficient. The Guild must show some injury that is independent of the costs of litigation. *See Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991). The Guild has offered no evidence whatsoever of any direct injury; accordingly, it lacks direct organizational standing. The Guild must therefore establish representational standing.

Representational standing requires the Guild to show, among other things, that "its members would otherwise have standing to sue in their own right." *Sierra Club v. EPA*, 793 F.3d 656, 662 (6th Cir. 2015). To show injury-in-fact, the Guild is required to "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). The Court cannot assume the Guild has members affected by the Attorney General's investigation; the Guild must "present specific facts . . . through citations to the

administrative record or 'affidavits or other evidence' demonstrating that identified members of its organization had, or would imminently suffer, a sufficiently concrete injury. *Tenn. Republican Party v. SEC*, 863 F.3d 507, 517 (6th Cir. 2017).

The Guild has not identified *any* member who has suffered *any* injury. For instance, the Guild has presented no evidence of CIDs having been served upon any member, and no affidavits from any member of any concrete or particularized harm caused by the Attorney General's investigation. In other words, the Guild makes no specific allegations establishing that at least one identified member had suffered or would suffer harm. *See Summers*, 555 U.S. 488, 498.

The Court's role is to decide real cases or controversies among parties with a genuine dispute over a real injury. The Guild is not an injured party under any set of facts, and there is no case or controversy involving it. Accordingly, the Guild lacks standing.

### 2.  Plaintiff's claims are not ripe.

Closely related to the Guild's lack of injury is the fact that this case is not ripe. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'" *Ky. Press Ass'n v. Kentucky*, 454 F.3d 505, 409 (6th Cir. 2006) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). "Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Id.* (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 294 (6th Cir. 1997)).

In considering whether a case is ripe for review, the Court considers three factors: (1) "the likelihood that the harm alleged by the plaintiffs will ever come to pass"; (2) "whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims"; and, (3) "the hardship to the parties if judicial relief is denied at this stage in the proceedings." *Id.* (quoting *Adult Video Ass'n v. United States Dep't of Justice*, 71 F.3d 563, 568 (6th Cir. 1995)). These factors all weigh in favor of finding this matter unripe.

### a. The CIDs are the first step of the investigation.

The Attorney General has issued CIDs to several online merchants requesting information related to offers to sell respirators and hand sanitizer. The CIDs are simply the first step taken in the investigation. A CID functions as a pre-filing information-gathering tool to protect Kentucky consumers from fraud and illegal activity, and provides the Attorney General with a means to assess quickly, and at the least cost to all concerned, whether grounds exist for taking further action.

The Attorney General may serve a CID on anyone who is believed to have information relating to a potential violation of the KCPA. The Attorney General is not limited to serving CIDs on one who is believed to have *actually committed* a violation of the KCPA. *See Hancock v. Pineur*, 533 S.W.2d 527, 528-29 (Ky. 1976) (holding that there was no statutory or constitutional requirement that a CID recite the reason or grounds for its issuance, and further stating that "[e]ven if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest." (citation omitted)).

The CIDs are non-self-executing—that is, the Attorney General cannot himself sanction non-compliance. This is a key point. If the recipient of a CID does not comply with it, the Attorney General cannot simply demand that the recipient comply. Instead, to force compliance, the Attorney General must initiate an enforcement proceeding in the circuit court where the recipient resides. KRS 367.290. Likewise, if the recipient of a CID wants to challenge it as improper, the recipient can file a petition to set aside or limit the CID. A Kentucky circuit court may compel the recipient to respond to the CID, it may set aside the CID, or it may decide that the CID is enforceable in part and unenforceable in part. KRS 367.240(2). And because the Attorney General cannot compel compliance without further proceedings, the mere issuance of a CID does not give rise to a ripe case or controversy.

There is ample federal case law considering federal administrative subpoenas—similar to the CIDs here—that were not self-executing. In one case, the recipient of investigatory Federal Trade Commission subpoenas sought injunctive and declaratory relief against their enforcement. *Atl. Richfield Co. v. F.T.C.*, 546 F.2d 646, 647 (5th Cir. 1977). Stressing that the subpoenas were "not self-executing and [could] only be enforced by a district court," the Fifth Circuit held that pre-enforcement equitable relief would be "inappropriate." *Id.* at 649. The Court reasoned that, if and when the FTC moved to enforce the subpoenas as contemplated by statute, the recipient would have an adequate remedy at law. Until then, the recipient would "suffer no undue hardship from denial of judicial relief" because absent a court order it could not "be forced to comply with the subpoenas nor subjected to any penalties for noncompliance." *Id.* at 650; *accord Anheuser-Busch, Inc. v. FTC*, 359 F.2d 487, 490-91 (8th Cir. 1966) (Blackmun, J.).

The Fifth Circuit applied the same logic when the recipient of an administrative subpoena issued by the Immigration and Naturalization Service moved to quash it in federal court. *In re Ramirez*, 905 F.2d 97, 98 (5th Cir. 1990). The operative statute gave the INS no power to enforce its own subpoenas, but authorized district courts to issue orders requiring compliance. *Id.* at 98. Though *both parties* thought the case properly before the district court, the appellate court disagreed, stating:

> Where an agency must resort to judicial enforcement of its subpoenas, courts generally dismiss anticipatory actions filed by parties challenging such subpoenas as not being ripe for review because of the availability of an adequate remedy at law if, and when, the agency files an enforcement action.

*Id.* at 98.

Because the government had not filed an enforcement action, the Fifth Circuit held that the "motion to quash was not ripe for judicial action . . . and . . . should have been dismissed for lack of subject matter jurisdiction." *Id.* at 100; *see also Reisman v. Caplin*, 375 U.S. 440, 443-46 (1964) (holding that a pre-enforcement challenge to a non-self-executing Internal Revenue Service summons was "subject to dismissal for want of equity"); *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334-

35 (10th Cir. 1984) (finding no subject-matter jurisdiction over pre-enforcement challenge to investigative subpoena).

No different result is possible here. The Guild has not received a CID. Yet it is asking the Court to quash the Attorney General's CIDs designed to investigate price gouging without having its members exhaust, or even pursue, available administrative remedies. KRS 367.240, the statute under which the CIDs were issued, does not give the Attorney General authority to enforce them; instead, to compel compliance the Attorney General must apply to the state courts and, after hearing, request an order granting injunctive or other relief. The Attorney General has not brought an enforcement action. If the Attorney General ever were to bring an enforcement proceeding, any of the Guild's members named in such a proceeding could raise objections to the CIDs in the circuit court. That is the proper forum for raising the objections that the Guild seeks to assert—prematurely— here.

Moreover, the case currently before the Court involves a Kentucky state CID, not a federal subpoena. There is no reason why the Commonwealth's non-self-executing CID might be ripe for review when a federal subpoena would not be. If anything, comity should make the Court even less willing to intervene when there is no enforcement proceeding and no current consequence for resisting the CID, and when the same issues before the Court here could be litigated, at the proper time with an appropriate record, in state court. See O'Keefe v. Chisholm, 769 F.3d 936, 939-42 (7th Cir. 2014) (finding that a federal plaintiff's ability to litigate subpoena in state court counseled against injunctive relief).

It is worth repeating, the Guild's complaint is silent with regard to the validity or constitutionality of KRS 367.240, the statute pursuant to which the CIDs are authorized and issued. The Guild is asking the Court to enjoin the enforcement of KRS 367.374 and KRS 367.170. But, the Attorney General has not enforced KRS 367.374 or KRS 367.170 against the Guild or any of its members.

Put simply, even if this were the proper forum, the CID is simply not ripe for review, which places it outside the Court's subject-matter jurisdiction. *See Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002) (citing *Bigelow v. Mich. Dep't of Natural Res.*, 970 F.2d 154, 160 (6th Cir. 1992)).

### b. The Guild has failed to develop any factual record to allow a fair adjudication on the merits of its claims.

A dispute must be mature before a court can intervene to review it. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732 (1998). By drawing upon the expressed limitations of Article III—as well as additional prudential considerations that concern the limits of judicial authority—ripeness prevents parties from entering the judicial system before a cognizable claim has fully materialized. *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n. 18 (1993). It further prevents federal courts from "entangl[ing]" themselves in a "premature adjudication" of legal matters, even ones involving constitutional issues, "that may with time be satisfactorily resolved at the local level and that may turn out differently in different settings." *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537 (6th Cir. 2010).

For reasons set forth above, no cognizable claim has fully materialized here. Furthermore, the Guild has done nothing to develop a "factual record" other than present the Court with a self-serving declaration filed by Paul Rafelson, counsel of record for the Guild. The Rafelson declaration is replete with hearsay, unsupported conclusions, personal opinion, and speculation. It presents no real evidence for the Court to consider. Yet it is the entirety of the Guild's "factual record."

### c. A delay in judicial review will not cause any undue hardship to the Guild.

The Guild will presumably contend that the Court must intervene now to unburden its members from concerns relating to an investigation into price gouging complaints. Worrying about being investigated for gouging consumers for vitally important emergency and medical supplies during a global pandemic is hardly an undue burden to bear. On the other hand, the Commonwealth endurance of unconstrained price gouging in the midst of a declared emergency, without the ability to investigate it, is a far worse hardship than anything the Guild has demonstrated here.

### d. Halting an ongoing investigation would be truly extraordinary where there is currently no justiciable case.

The Attorney General is an officer of the executive branch of Kentucky state government. *See* Ky. Const. §§ 91, 93. The Guild has preemptively requested that the Court enjoin a lawful function of Kentucky's executive branch, namely an investigation, which is purely an executive function. *See Comm., Cabinet for Health & Family Servs. v. Garber*, 340 S.W.3d 588, 590 (Ky. App. 2011). The Attorney General possesses both the statutory and common-law executive power to initiate an investigation. *See Comm. v. Johnson*, 423 S.W.3d 718, 722-23 (Ky. 2014). The Court must reject the Guild's request to enjoin an investigation.

The Attorney General's investigatory authority is well developed, and nothing in the present suit justifies having the Court prevent the Attorney General from investigating price gouging allegations against the Guild's members. This is not, however, to say that the Attorney General's investigatory authority is unchecked. Rather, the check must come at the appropriate time.[8]

### B. Plaintiff has not met its burden of showing a violation of the dormant Commerce Clause.

The Guild bears the burden of showing that Kentucky's price gouging statutes   violate the dormant Commerce Clause. The Guild, however, has not come anywhere close to meeting that burden.

Resolving a claim under the dormant Commerce Clause requires a two-step analysis. *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010). First, the Court considers whether the law discriminates against interstate commerce. *See id.* "A statute can discriminate against out-of-state

---

[8] Enjoining an executive function preemptively (*i.e.*, before the agency has acted on an investigation) would also infringe upon well-accepted separation of powers. *See Appalachian Racing, LLC v. Commonwealth*, 504 S.W.3d 1, 4-5 (Ky. 2016)) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 760-61 (1982)) (emphasizing that the "essential purpose of separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from risk of control, interference, or intimidation by other branches").

interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *E. Ky. Res. v. Fiscal Court of Magoffin Cty.*, 127 F.3d 532, 540 (6th Cir. 1997). If the law is discriminatory, to withstand scrutiny, it must be narrowly tailored to advance a legitimate local purpose. *See Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, __ U.S. __, 139 S. Ct. 2449, 2461 (2019). If the law is not discriminatory, the Court proceeds to the second step of the analysis, which asks whether any "burdens on interstate commerce [created by the law] are 'clearly excessive' in relation to the putative local benefits." *E. Ky. Res.*, 127 F.3d at 540 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). This second step is known as the *Pike* balancing test, and laws evaluated under it "frequently survive . . . scrutiny." *Dep't of Rev. of Ky. v. Davis*, 553 U.S. 328, 339 (2008).

### 1. Kentucky's price gouging statutes do not discriminate against out of state interests

The Guild contends that the Attorney General's threatened application of Kentucky price gouging statutes to its members constitutes an extraterritorial application of Kentucky law and is *per se* unconstitutional discrimination of out-of-state interests. The Guild has misapplied the extraterritorial principle.

Generally speaking, a state may not directly regulate "commerce that takes place wholly outside of the State's borders." *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989). But "[t]he Supreme Court has applied the extraterritoriality doctrine only in the limited context of price-affirmation statutes." *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013).

The Sixth Circuit has only occasionally applied the extraterritoriality doctrine outside of that limited context. *Snyder* concerned Michigan's statutory requirement that manufacturers who sell their beverage containers in Michigan place a "symbol, mark, or other distinguishing characteristic" on the container that demonstrates it is "unique to [Michigan], or used only in [Michigan] and 1 or more

other states that have laws substantially similar to this act."[9] *Snyder*, 735 F.3d at 367. The Sixth Circuit found that the statute had a prohibited extraterritorial effect, in part, because "Michigan's unique-mark requirement not only require[d] beverage companies to package a product unique to Michigan but also allow[ed] Michigan to dictate where the product [could] be sold." *Id.* at 376. The Sixth Circuit also emphasized that, under Michigan's statute, "other states must react today to Michigan's unique-mark requirement or also face legal consequences." *Id.*[10]

Kentucky's price gouging statutes are nothing like the statute struck down in *Snyder*. More to the point, Kentucky's price gouging statutes do not directly regulate commerce that takes place entirely outside of its territory; rather, Kentucky's price gouging statutes *only apply to transactions and proposed transactions that take place in Kentucky*. Since the activation of Kentucky's price gouging statutes as a result of Covid-19, the Attorney General has only issued CIDs to Kentucky businesses who, upon information and belief, were seeking to gouge Kentucky consumers.[11] Unlike in *Snyder*, Kentucky's price gouging statutes in no way directly limit the ability of merchants to sell goods outside of Kentucky. *See id.* Nor do they require "other states" to "react" to Kentucky's law or "face legal consequences." *See id.*

The Guild complains that Amazon's online platform makes it impossible to differentiate between sales inside of and outside of Kentucky, and that a member selling on Amazon "cannot limit her sales to states other than Kentucky or offer Kentucky-only prices." [Compl. ¶ 37]. But that is a function not of Kentucky law, but of Amazon's unique platform. *See Snyder*, 735 F.3d at 373 (holding that "[a] statute is extraterritorial if it '*directly controls* commerce occurring wholly outside the boundaries of a State [and] exceeds the inherent limits of the enacting State's authority'" (emphasis added)

---

[9] Mich. Comp. Laws Ann. § 445.572a (West 2011).
[10] *Snyder* also considered the availability of reasonable alternatives to the challenged statute. *Snyder*, 735 F.3d at 375. That consideration weighs in favor of Kentucky's price gouging laws.
[11] Declaration of Matthew Cocanougher, Exhibit 1, ¶5.

(quoting *Healy*, 491 U.S. at 336)). Taking the Guild's logic to its conclusion, Kentucky's price gouging laws would be constitutional if Amazon merely changed its platform to suit the Guild's members' preferences. At bottom, the Guild's objection is with Amazon, not with Kentucky law. The dormant Commerce Clause does not protect a merchant's "chosen way of doing business." *Brown v. Hovatter*, 561 F.3d 357, 364 (4th Cir. 2009). Stated differently, the Commerce Clause does not "protect the particular structure or methods of operation in a retail market." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978).

Furthermore, Kentucky's price gouging statutes are not "price controls" or "price affirmation" statutes, like those that the Supreme Court has invalidated under the extraterritoriality doctrine. Those statutes "force[d] regulated entities to certify that the in-state price they charge for a good is no higher than the price they charge out-of-state." *Id.* at 373. Kentucky's price gouging laws do no such thing. They do not directly limit the price a merchant uses in out-of-state transactions. *See Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935) (considering a New York law that prohibited out-of-state wholesalers from selling milk in New York unless they purchased their milk from dairy farmers at the price paid to New York dairy farmers); *Healy*, 491 U.S. 324, and *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 682 (1986) (both concerning price affirmation regulations). These laws, moreover, are only in effect during the time of a declared emergency, and are not imposed to control or protect any particular market.

The Guild places great weight upon the Fourth Circuit's divided decision in *Association for Accessible Medicines v. Frosh*, 887 F.3d 664 (4th Cir. 2018). The Guild contends that the court in *Frosh* struck down a Maryland "price gouging law" because it violated the extraterritoriality doctrine. But Kentucky's price gouging laws differ from the statute considered in *Frosh* in several important respects.

*Frosh* arose following Turing Pharmaceuticals' acquisition of the rights to the lifesaving drug Daraprim, who subsequently raised its price from $13.50 to $750 per pill, igniting a public outcry.[12] In response, the Maryland legislature passed House Bill 631, "An [Act] concerning Public Health—Essential Off-Patent or Generic Drugs—Price Gouging—Prohibition."[13] The Act prohibited manufacturers and wholesale distributors—but *not* retailers—from "engag[ing] in price gouging in the sale of an essential off-patent or generic drug." *Id.* at 666, 671. Price gouging was simply defined as "an unconscionable increase in the price of a prescription drug." *Id.* at 666.

A divided panel of the Fourth Circuit found that the plain language of the statute had no limiting constraint and could assign liability against parties to a transaction outside Maryland "that did not result in a single pill being shipped to Maryland." *Id.* at 671. The panel majority emphasized that the statute was not limited "to sales that actually occur within Maryland, nor does it restrict the Act's operation to the context of a resale transaction with a Maryland consumer." *Id.* In this regard, the panel majority distinguished a prior Fourth Circuit case that rejected a dormant Commerce Clause challenge where "[t]he relevant conduct penalized by that state was the sale of a cigarette *in Virginia.*" *Id.* (discussing *Star Scientific, Inc. v. Beales*, 278 F.3d 339, 346 (4th Cir. 2002)). In addition, the panel majority found that the Act, as written, did not apply to Maryland retailers, but instead targeted the upstream manufacturers and wholesalers, nearly all of which transact outside Maryland. *Id.* The statute "effectively seeks to compel manufacturers and wholesalers to act in accordance with Maryland law outside of Maryland." *Id.* at 672. Further, the Fourth Circuit found that the statute effectively and impermissibly served as a price control on out-of-state transactions. *Id.* at 672-73.

Kentucky's price gouging statutes could not be more different. Unlike the manufacturer- and wholesale-focused statute in *Frosh,* Kentucky's statutes only apply to persons and entities offering to

---

12 See Andrew Pollack, *Drug Goes from $13.50 a Tablet to $750, Overnight*, N.Y. Times (Sept. 20, 2015), https://nyti.ms/1V3cJvC [https://perma.cc/AT76-ZKG7].
13 H.B. 631, 2017 Leg., 437th Sess. (Md. 2017).

sell specific, well-defined products and services in Kentucky during the limited time period of a declared emergency. In this respect, Kentucky law is analogous to the case that *Frosh* distinguished, where the statute "specifically limit[ed] its applicability to the sale of cigarettes 'within the Commonwealth.'" *Beales*, 278 F.3d at 356 (citation omitted). Kentucky's price gouging laws do not impose liability on any person or entity not offering to sell the products or services in Kentucky. They are explicitly constrained in both scope and time, whereas the Maryland law at issue in *Frosh* was a direct, unconstrained regulation of out-of-state interests.

Furthermore, at the time Maryland enacted the Act at issue in *Frosh*, it did not have price gouging laws similar to Kentucky's. The Maryland Act's reference to "price gouging" is a misnomer. As the Fourth Circuit held, it was an unsuccessful effort to impose price controls on generic drugs. In the wake of Covid-19, on March 19, 2020, the Maryland legislature passed an emergency bill to authorize its Governor to take specific actions relating to, among other things, "excess retail profits" during a declared emergency, i.e., price gouging. *See* H.B. 1663, 2020 Leg., Reg. Sess. (Md. 2020). The Guild's effort to compare a Maryland price control statute to Kentucky's long-standing price gouging statutes is unavailing.

Practically speaking, the Guild's interpretation of the extraterritoriality principle would invalidate any state's efforts to investigate or enforce price gouging laws against online merchants. Defining the extraterritoriality principle simply by ill-defined extraterritorial effects as the Guild attempts to do is untenable, for it would be no limit at all, putting not only consumer protection laws but also broad swaths of product liability law, internet regulation, and environmental protection laws at risk.

### 2. Kentucky's price gouging statutes do not place a significant burden on interstate commerce.

The Guild contends, in the alternative, that the law places a "significant burden" on interstate commerce, which is a narrow kind of challenge that teeters on the edge of judicial policymaking. *See*

18

*Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring) (describing the task of resolving an undue-burden claim as "ill suited to the judicial function"). A plaintiff bringing this second kind of dormant Commerce Clause claim faces a steep hurdle.

When a state law evenhandedly regulates both in-state and out-of-state activity, it might nevertheless violate the Constitution if it creates an incidental but excessive burden on interstate commerce. *See Bredesen*, 556 F.3d at 449. To prevail on such a claim, the Guild must show that the law substantially burdens the interstate market as a whole—not just commerce in general or a particular individual. *Id.* at 451. That is because "[t]he dormant commerce clause protects interstate commerce, not individual firms or the structure of particular markets." *Id.* (citing *Exxon Corp. v. Governor of Md.*, 437 U.S. at 127). And even then, the Guild must still overcome the deferential balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Under *Pike*, courts must defer to the policy choices of the state legislature unless the plaintiff can demonstrate that the burden on interstate commerce is "clearly excessive." *Bredesen*, 556 F.3d at 451 (quoting *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994)). The Supreme Court "has not invalidated a law under *Pike* balancing in three decades." *Garber v. Menendez*, 888 F.3d 839, 845 (6th Cir. 2018).

So, to prevail in this case, the Guild must plausibly allege that Kentucky's price gouging statute creates such an excessive burden on the interstate market that any local benefit must fall by the wayside. On this front, the Complaint falls woefully short.

Kentucky's price gouging statute makes no distinction between in-state and out-of-state entities. The Guild's members are offering to sell and are selling items in Kentucky (and nationwide) through the Amazon platform. To the extent the Guild's members are Kentucky entities, the Guild does not, and cannot, argue that applying the price gouging statute to items sold in Kentucky by a Kentucky business to a Kentucky customer would be an unconstitutional benefit for in-state economic

interests while burdening out-of-state competitors. Thus, the Guild presumably bases its argument upon items its members' offers for sale to out of state customers.

Kentucky's price gouging statutes do not distinguish between in-state and out-of-state sellers. Any entity *offering to sell* certain goods in Kentucky during the period of time the price gouging statutes are activated is subject to the provisions of the statute. Whether the seller is selling through Amazon, another website, or a physical location, there will be some modest incidental effects on interstate commerce with a statute that is designed to prevent certain unlawful price increases during a declared emergency.  Incidental effects such as this do not, however, render the statute unconstitutional as applied to the Guild or its members.

The Guild has offered the Court no evidence whatsoever to identify any incidental effects on interstate commerce caused by Kentucky's price gouging statutes.  The Guild basis its entire argument upon the self-serving Rafelson declaration. The Guild has not only failed to present evidence of any effect on interstate commerce, the Guild has also failed even to present the Court with any evidence of how any particular online merchant prices its products; how a merchant interacts with Amazon; or, how Amazon protocols may affect an online price. Self-serving, generalized opinions and speculative conclusions do not suffice.

The benefits of the price gouging statutes, by comparison, are substantial. Natural disasters and medical emergencies can cause abnormal market disruptions for critical good and services, allowing unscrupulous sellers to exploit market scarcity and consumer fear to gain windfall profits. By limiting sellers to a reasonable percentage above a pre-emergency base price, Kentucky's statute eliminates prices "grossly in excess" of pre-emergency pricing, maintaining the public's ability to equally access basic necessities. KRS 367.374(1)(b). Left unchecked and without meaningful free-market competition, prices often rise well above conscionable levels and fair value in the face of public

panic and fear. The effect on many consumers is akin to extortion. Price gouging statutes, therefore, are at the core of consumer protection.

The Court must defer to the Kentucky General Assembly's policy decisions unless the Guild demonstrates a clearly excessive burden on interstate commerce. The Court cannot ascertain a discriminatory effect or any excessive burden on interstate commerce because the Guild has proffered no compelling evidence to demonstrate this burden.

### 3. The Court has previously upheld Kentucky's price gouging statutes under a dormant Commerce Clause challenge.

This Court has specifically applied the dormant Commerce Clause to Kentucky's price gouging statutes and found no constitutional violations. In *Marathon Petroleum Co. LLC v. Stumbo*, 528 F.Supp.2d 639 (E.D. Ky. 2007), the Court addressed Governor Fletcher's activation of Kentucky's price gouging statutes in response to Hurricane Katrina. Governor Fletcher specifically activated the price gouging statutes to prevent the illegal inflation in the price of gasoline. Following an investigation, the Attorney General filed suit against Marathon for selling gasoline grossly in excess of its pre-emergency prices and unrelated to any increase in costs. *Id.* at 643. Marathon argued that Kentucky's price gouging statutes were unconstitutional as applied to it based on, among other provisions, the dormant Commerce Clause. *Id.* The Court dismissed Marathon's argument in full, finding "no basis for determining that the statute patently violates the dormant Commerce Clause." *Id.* at 650.

It did not matter that Marathon sells its gasoline nationwide. It was still subject to Kentucky's price gouging statutes. Similarly, the Guild's members' decision to sell products on Amazon to reach a nationwide market does not exempt them from Kentucky's price gouging statutes. Kentucky's statutory scheme does not directly regulate offerings or transactions that take place outside of Kentucky. There is thus no violation of the dormant Commerce Clause, and the Guild's position to the contrary must fail.

### C.     Kentucky's price gouging statutes comport with due process.

### 1.     KRS 367.374 sets forth a legitimate state interest.

The Guild contends that Kentucky's price gouging statutes violate its (or presumably its members') right to due process.  To succeed on its due-process claim, the Guild must show that Kentucky's price gouging statutes are "arbitrary and irrational—that no rational relationship exists between the [laws] and a legitimate government objective." *See Blue Diamond Coal Co. v. Shalala,* 79 F.3d 516, 521 (1996).  Under rational-basis review, a statute must be upheld "under any plausible justification offered by the state, or even hypothesized by the court." *Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 690 (6th Cir. 2011).  This requires the Guild "to negate every conceivable basis which might support [the challenged law]." *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (citation omitted).  Moreover, "there is no need for mathematical precision in the fit between justification and means." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 639 (1993).

The legislative purpose of the Kentucky General Assembly in adopting KRS 367.374 and its accompanying sections is the protection of Kentucky consumers from the unscrupulous and manipulative practice of price gouging in times of disasters or emergencies. A global pandemic unquestionably constitutes such an emergency. This legislative purpose easily survives rational basis review. There can be no doubt that the objectives set forth in Kentucky's price gouging statutes qualify as legitimate government interests. Moreover, the legal effects of KRS 367.374 are effective only for 15 days from the date of implementation. This limitation renders the law rationally and reasonably related to the bad actions the General Assembly seeks to prevent.

Furthermore, the means chosen to advance that purpose, *i.e.*, imposition of civil penalties on persons or businesses engaging in price gouging after a state of emergency is declared, are not unreasonable or arbitrary. In the context of common law, tortious conduct involving economic duress,

22

business compulsion, fraud or undue influence justify the award of compensatory and punitive damages. Accordingly, KRS 367.374, on its face, does not violate substantive due process, and easily survives rational basis review.[14]

>    2.    **The price gouging statutes are not impermissibly vague in violation of due process.**

The Guild contends that KRS 367.374 and KRS 367.170 violate principles of due process because they are "impermissibly vague," stating that they fail to give "citizens reasonable notice of unlawful prices or covered goods…." (Compl. at ¶¶ 57-59.)  Even a cursory examination of KRS 367.374 refutes this claim.

"[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972).  Legislation must provide "fair warning" and "explicit standards for those who apply them." *Id.* If legislation is not concerned with criminal conduct or the First Amendment, the Court is to be lenient to the legislation in evaluating a claim of vagueness. *Doe v. Staples,* 706 F.2d 985 (6th Cir. 1983). Indeed, to find legislation void for vagueness, the Court must find the law or statute impermissibly vague in all its applications or substantially incomprehensible. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494-95 (1982) and *Exxon Corp.* v. *Bushee,* 644 F.2d 1040 (5th Cir. 1981), *cert. denied,* 454 U.S. 340 (1981).

KRS 367.374 plainly and unmistakably provides fair notice of the prohibited conduct. The challenged statute prohibits the sale or rental of goods and services at a grossly excessive price during

---

[14] Consumer protection laws such as KRS 367.374 that prohibit price gouging in the aftermath of a disaster or upon the declaration of an emergency have been widely adopted across the United States.  This model has been regarded as an effective tool in combating gouging in post-disaster environments, where antitrust statutes or common law approaches have failed.  *See* Geoffrey C. Rapp, *Gouging: Terrorist Attacks, Hurricanes, and the Legal and Economic Aspects of Post-Disaster Price Regulation*, 94 Ky. L. J. 535, 540 (2005-2006).

the period of implementation following a declaration of an emergency. A person of average intelligence would understand that the targeted conduct is price gouging during a declared state of emergency. Moreover, KRS 367.376 mandates a state agency, the Division of Emergency Management (the "Division"), to notify the public about the implementation, renewal, or termination (of the implementation) of KRS 367.374 . KRS 367.376 even allows for the registration with the Division for purposes of receiving notices regarding the implementation, renewal, or termination of the implementation of KRS 367.374. These requirements further minimize the risk of any lack of notice, such that KRS 367.374, when implemented, would be unknown only to those who willfully ignore the warning.

Additionally, when read with KRS 367.372, 367.376, and 367.378, KRS 367.374 does not provide for arbitrary or discriminatory enforcement. For instance, KRS 367.372 limits liability to instances where (a) the defendant offers to sell or rent (b) certain goods or services identified in the statute[15], (c) for the duration of the declared emergency, or any extension thereof not to exceed 30 days, (d) at a price grossly in excess of the price before the declaration. These standards protect the businesses likely affected by this type of regulation from arbitrary or discriminatory enforcement.

The Guild only makes broad, generalized references to KRS 367.374's alleged vagueness, providing little detail about why or how Kentucky's price gouging statutes are unlawful. Regardless, in the context of a legislative response to a disaster or an emergency, the law does not demand that the legislature to impose static measures, without regard to mechanism that would adapt to the various crises in human affairs.  To do so would nullify the effective operation of governmental regulation and render it unworkable. *See Opp Cotton Mills v. Adm'r of Wage & Hour Division of Dep't of Labor,* 312

---

[15] The following goods and services are subject to Kentucky's price gouging statute: building materials; consumer food items; emergency supplies; gasoline; medical supplies; repair or reconstruction services; and, transportation, freight, and storage services. Hand sanitizer and ventilators certainly fall within the definition of emergency supplies and medical supplies.

U.S. 126, 145 (1941) (noting that "[i]n an increasingly complex society Congress obviously could not perform its functions if it were obliged to find all the facts subsidiary to the basic conclusions which support the defined legislative policy…."). Neither the United States (nor the Kentucky Constitution) "demand[s] the impossible or impracticable." *Id.*

The essential function of Kentucky's General Assembly is the determination of legislative policy and its formulation as a rule of conduct. That essential function is preserved when the legislature specifies the basic conclusions of fact upon ascertainment of which, from relevant data provided and established by a designated administrative agency, it ordains that its statutory command is to be effective. *See Opp Cotton Mills,* 312 U.S. at 145. Here, KRS 367.374 satisfies those requirements.

Rather than seek to enjoin the KCPA, perhaps the Guild should have made its members aware of Kentucky's Division of Emergency Management, and the ability to receive notice and updates relating to emergency declarations, including the activation of price gouging statutes. This information was and is readily available.  Unmindful, certain online merchants raised prices on essential goods like hand sanitizer and ventilators anywhere from 79% to 1,951%.[16]

### 3. The Attorney General's investigation into price gouging complaints does not violate the Equal Protection Clause.

The Guild contends that the Attorney General's "selective application" of Kentucky's price gouging statutes violates the Equal Protection Clause because it is "targeting" the Guild's members, but not Amazon. (*See* Mot. at 18.) This argument is without merit.

The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause prevents states from making distinctions that: (1) burden a fundamental right; (2) target a suspect class; or, (3) intentionally treat one individual differently from

---

[16] Cocanougher Dec., Ex. 1, ¶7.

others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010).

To state an equal protection claim where neither a suspect class nor a fundamental right is implicated, as here, the Guild must establish that: (1) the state actor intentionally treated it differently from others similarly situated; (2) this difference in treatment was caused by the Guild's membership in a particular, identifiable class; and, (3) this different treatment was not rationally related to a legitimate state interest. *See Davis v. Prison Health Servs.*, 679 F.3d 433, 440 (6th Cir. 2012) ("In typical equal protection cases, plaintiffs 'generally allege that they have been arbitrarily classified as members of an 'identifiable group.'" (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008)).

The Attorney General has not made any distinctions among persons or entities suspected of illegal price gouging. He has not treated any online merchants or traditional retailers differently from others similarly situated, and is investigating all price gouging allegations equally. If the Attorney General receives evidence or information that gives reason to serve a CID upon Amazon *or any other seller or retailer*, then the Attorney General will take appropriate action at the appropriate time. This is only the investigative stage.

The Guild supports its Equal Protection argument with nothing more than a citation to three paragraphs of the Rafelson declaration. But there is nothing in even the Rafelson declaration regarding illegal activity on the part of Amazon. Apart from its vague and unsupported references to Amazon's business model, the Guild does not identify any online merchant or traditional retailer who is "similarly situated" and intentionally being treated differently.

### C.    Kentucky's price gouging statutes do not violate the First Amendment.

In *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.* 425 U.S. 748 (1976), the Supreme Court extended First Amendment free speech protection to commercial speech, noting that speech does not lose its protection simply because money is involved. But, just because

commercial speech is protected speech does not mean that it is immune from government regulation. *Id.* at 770.

In *Central Hudson Gas and Electric Corp. v. Public Service Commission* 457 U.S. 557 (1980), the Court adopted a four-part test for whether governmental regulation of commercial speech is constitutional. First, for the commercial speech to be protected under the First Amendment, the speech must concern *lawful* activity, and the speech must not be misleading. Only if this step is met will the court use the following three steps to determine whether the government regulation is constitutional.  Thus, if the speech is *lawful*, the governmental interest in regulating the speech must be substantial; the regulation must directly advance the governmental interest asserted; and, the regulation must not be more extensive than is necessary to serve the identified substantial interest.

Here, the "speech"—gouging Kentuckians by charging unconscionable prices in the midst of a declared emergency, a global pandemic no less—is *unlawful*.  There is simply no other way to put it. Kentucky's General Assembly, like state legislatures across the country, enacted KCPA to prohibit unscrupulous sellers from offering to sell or selling certain items at exorbitant prices.[17] And, there has never once been a finding that any of these price gouging laws or prohibitions violate commercial free speech rights. Indeed, these laws have been uniformly upheld as protecting a substantial governmental interest.  *See, e.g.*, *Marathon Petroleum Co.*, 528 F. Supp.2d at 650. Because the alleged speech involved

---

[17] These statutes can take many forms. Some include a pricing percentage limit.  *See, e.g.*, Cal. Penal Code § 396 (West 2019); N.J. Stat. Ann. §§ 56:8-108, 56:8-109 (West 2019). Other states with a pricing percentage limit include Arkansas, Kansas, Maryland, Maine, Oklahoma, Oregon and West Virginia. Some include outright bans on price increases during emergencies.  *See, e.g.*, Ga Code Ann. § 10-1-393.4 (West 2020). Other states with an outright ban on price increases during emergencies include Connecticut, Hawaii, Louisiana, Mississippi, and Utah.  Finally, some states prohibit amorphous "unconscionable" pricing.  *See, e.g.*, Tex. Bus. & Com. Code Ann. § 17.46(b)(27) (West 2019); N.Y. Gen. Bus. Law § 396-r (McKinney 2019); Fla. Stat. § 501.160 (2020). Other states that prohibit "unconscionable" pricing include Alabama, Idaho, Iowa, Massachusetts, Michigan, Missouri, North Carolina, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, and Wisconsin.

here is unlawful, the analysis ends. The Guild's speech—or at least the speech of it unidentified members—is not constitutionally protected speech.

## II.       A PRELIMINARY INJUNCTION WOULD HARM THE PUBLIC INTEREST.

The Court must consider whether it is in the public interest to grant or deny the Guild's request to enjoin the Attorney General's investigation into price gouging allegations. In other words, will a greater injury be done by enjoining the Attorney General's investigation that would result from a refusal to do so? *See Houchens*, No. 3:20-CV-00006-GFVT, 2020 WL 948857, at *2 (E.D. Ky. Feb. 27, 2020).

Kentuckians, like all Americans, are rightly worried about their health and the health of their loved ones during this pandemic. They should not also have to worry about being gouged on the critical supplies they need to get through it. As individuals and families learn how to address concerns relating to Covid-19, it is vitally important that the public not be taken advantage of by merchants selling products at unconscionable prices. The Attorney General's investigation into price gouging allegations against certain online merchants is an effort to stand up for consumers during this crisis. The Court should not stop the investigation before it even begins.

## <u>CONCLUSION</u>

Federal courts are not legislative bodies. They certainly are not state legislative bodies, and they do not make state policy. The Guild's Complaint asks this Court to wade into a complex matter of state law and policy in a case that does not even present an actual case or controversy. This Court should reject that invitation. The Framers of our Constitution could never conceive of such a suit— and for good reason. These matters are best left to the States, not the federal judiciary.

Because the Guild lacks standing to bring suit against the Attorney General and because the Guild's claims are not ripe for review, the Guild cannot succeed on the merits of its claims against the Attorney General. And wholly apart from standing and ripeness, the Guild has is unlikely to succeed

on the merits because it is unable to demonstrate any plausible violation of its constitutional rights arising from the Attorney General's investigation into allegations of price gouging. Accordingly, the Court should deny the Guild's motion for a preliminary injunction.

Respectfully submitted,

*/s/ Justin D. Clark*

_____

Victor B. Maddox (KY Bar No. 43095)
*Assistant Deputy Attorney General*
J. Christian Lewis (KY Bar No. 87109)
Justin D. Clark (KY Bar No. 89313)
Matthew Cocanougher (KY Bar No. 94292)
*Office of Consumer Protection*
Kentucky Office of the Attorney General
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Tel:     (502) 696-5300
victor.maddox@ky.gov
christian.lewis@ky.gov
justind.clark@ky.gov
matthew.cocanougher@ky.gov

*Counsel for Attorney General Daniel Cameron*

## CERTIFICATE OF SERVICE

I certify that on May 19, 2020, this document was filed with the CM/ECF filing system, which electronically served a copy to all counsel of record.

*/s/ Justin D. Clark*

_____

*Counsel for Attorney General Daniel Cameron*