**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**

| | | |
|---|---|---|
| **ONLINE MERCHANTS GUILD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 3:20-cv-00029-GFVT** |
| | ) | |
| **DANIEL CAMERON, in his official capacity as ATTORNEY GENERAL OF KENTUCKY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**THE ONLINE MERCHANTS GUILD'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

**Introductory Statement**

The eCommerce economy has given individual Americans opportunities to earn a respectable living, to improve their lives, and to become self-reliant in ways that were unimaginable decades ago. Today, anyone can tap into the interstate economy, regardless of their education or social status, and become a successful business owner from their kitchen table. This new paradigm has had a profound impact in rural areas and other locations where economic opportunity is often out of reach. In Kentucky alone there are over 8,000 small merchants who make a living supplying goods for Amazon's online store.[1] And while the technology enabling access to the market is new, the law protecting access to the market is not. Longstanding constitutional principles apply in this case, just as they applied in earlier eras. The Online

[1] Marketplace Pulse, *Amazon Sellers' Locations by State*, https://www.marketplacepulse.com/amazon/top-states.

Merchants Guild asks the Court to apply those principles, not just to protect online merchants, but also to protect the new eCommerce market itself from burdensome and conflicting state regulation.

The AG does not want this Court to decide this case. Most of his brief is an attempt to distract from the merits, because on the merits he loses. There is no defending the extraterritorial application of state price-control statutes, whether the store is brick-and-mortar or online. So the AG's position boils down to this: he can threaten and effectively shut down businesses without federal judicial review. If he hasn't yet enforced state law, there is no jurisdiction. If he sends a subpoena—to someone else, not the Online Merchants Guild—there is no jurisdiction. If he does seek to enforce state law, he will surely say there is no jurisdiction. He can create a perpetual chilling effect while avoiding accountability for complying with the Constitution.

Unsurprisingly, the cases the AG cites do not actually stand for that novel proposition. It would be a remarkable turn in federal practice, and contrary to the Supreme Court's repeated emphasis that a "federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (cleaned up) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014) (quoting *Sprint Comms., Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (same)). The Court should decline the AG's misguided plea to decline jurisdiction.

Similarly flawed is the AG's protestation that we seek to leave him without tools to protect Kentucky consumers. Of course he can protect consumers, within the bounds of the law. If the AG really wants to regulate prices on Amazon, he can regulate Amazon. What he cannot do is violate the Constitution and burden our members because he finds it more expedient or preferable.

The Online Merchants Guild and its members continue to suffer irreparable injury. They request that the Court declare unlawful and enjoin the AG's threatened application of KRS 367.374 and KRS 367.170.

## Argument

### I. The Online Merchants Guild has standing.

The AG's standing argument is incorrect because it is untied to the record in this case. The Online Merchants Guild has standing on its own behalf and on behalf of its members.

#### a. The Online Merchants Guild has standing in its own right.

The Online Merchants Guild has standing in its own right because the organization itself has experienced injury-in-fact. The AG cites *Housing Opportunities* for the argument that the costs of suing to challenge a statute may not confer standing, but the AG ignores the same opinion's holding that an association "can establish standing by alleging a concrete and demonstrable injury, including an injury arising from a purportedly illegal action that *increases the resources the group must devote to programs independent of its suit challenging the action*." *Housing Opportunities Made Equal v. Cincinnati Enquirer*, 943 F.2d 644, 646 (6th Cir. 1991). Thus, an association like the Guild has standing where the defendant's unlawful conduct "has caused [the association] to devote resources to investigate and negate the impact" of that conduct. *Id*. That is what the Guild has alleged:

> The Online Merchants Guild has had to expend organizational resources in response to the Kentucky AG's investigation (and those of other AGs), such as by working with targeted merchants to understand and respond to the subpoenas. We have also had to analyze the complex web of investigations and discuss open questions with merchants who have not received subpoenas, but who are confused and concerned about what they can and cannot sell online, beyond hand-sanitizer and facemasks, and at what price.[2]

[2] Rafelson Dec., DE 10-1 at 6-14, Page ID# 65-66.

That is associational injury-in-fact under the very case the AG relies on. *Housing Opportunities*, 943 F.2d at 646. The Guild has standing in its own right.

**b. The Online Merchants Guild has standing on behalf of its members.**

The Guild also has organizational standing on behalf of its members because it meets the three criteria: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019).

First, the Guild's members would have standing because they have "suffered an injury in fact," *id*., namely the violation of their constitutional rights and injury to their businesses. Second, the Guild seeks relief that is consistent with its mission to "advocate for a free and fairly-regulated online marketplace, and for the interests of online merchants."[3] Third, the claims the Guild asserts do not require individual members to participate. That is all that is necessary to establish organizational standing here.

The AG attempts to manufacture an issue about whether specific members have been identified, but the AG's invocation of the law bears little relationship to the facts of this case. This is not a case of phantom members. First, the AG knows whom it targeted. Second, Assistant AG Cocanougher has participated in telephone calls with Guild members and Mr. Rafelson regarding the investigations (which is nonetheless omitted from Mr. Cocanougher's declaration). Third, at the TRO hearing the Guild referenced a Guild member against whom the AG has filed a motion to compel compliance with the subpoena.[4] On that point, the statement in the Cocanougher

[3] Rafelson Dec., DE 10-1 at 1, Page ID# 60.

[4] *See* Petition by Jones & Panda, LLC, Jones & Panda, *Jones & Panda, LLC. v. Com. of Kentucky ex rel. Cameron*, No. 20-CI-1252 (April 14, 2020), attached as Exhibit 1; *see also* Jones Dec., attached as Exhibit 2 (describing how

declaration that "the Office has not initiated any action to compel compliance with any of the CIDs or subpoenas" is not quite right. As explained below, several days after the Guild filed this action, the AG filed an "Emergency Motion" to compel compliance with the subpoena against Guild member Jones & Panda, LLC.[5] The bottom line is that there are real members with real interests at stake in this case.

The AG criticizes the Guild for offering its members anonymity to protect them from commercial retaliation. That critique reflects a troubling hostility toward the rights of Americans to privately associate for the purpose of vindicating their constitutional rights. Membership anonymity is a completely lawful part of our society's traditions, and does not deprive an association of standing. *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958) (recognizing constitutional protection for associational anonymity because disclosure of names could expose members to, *inter alia*, "economic reprisal," and permitting association to litigate on behalf of its members). To be sure, this case is not about racial discrimination, but it is about civil rights all the same, including the right to earn a living free of arbitrary regulation. In any case, the Guild has standing on behalf of its members in this case.[6]

**II. This matter is ripe for the Court's consideration.**

Like the AG's standing arguments, his ripeness arguments are a false obstacle. This matter is ripe because the Online Merchants Guild and its members have already been injured, and credibly fear further injury. That is enough.

---

the AG's threatened application of the price-control statutes has deterred her from participating in the interstate market).

[5] *See* n. 9, *infra*.

[6] The AG does not appear to deny that, assuming the Guild and its members have been injured, the causation and redressability elements of standing are met.

**a. This matter is ripe as to the Online Merchants Guild.**

This matter is ripe as to the Online Merchants Guild in its own capacity because the Guild has already experienced injury-in-fact. *See, e.g.*, *Housing Opportunities*, 943 F.2d at 646 (holding that plaintiff organization had experienced injury-in-fact through need to combat defendant's unlawful activities).

**a. This matter is ripe as to the Online Merchants Guild's members.**

This matter is ripe as to the Online Merchants Guild's members because they have a credible fear of the AG applying KRS 367.374 and KRS 367.170 to them—as the AG has publicly threatened to do and refused to disavow in this Court.

The Supreme Court's ripeness cases "permit[] pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). A credible threat of enforcement establishes "injury-in-fact," which in turn "helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." *Id*. at 158 (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

Cases ripen well before prosecution. The courts "do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *SBA List*, 573 U.S. at 158-59. Instead, a plaintiff must simply "allege[] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [arguably] proscribed by a statute, and there exists a credible threat of prosecution thereunder." *SBA List*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

The credible threat standard is "quite forgiving." *Wollschlaeger v. Governor*, 848 F.3d 1293, 1305 (11th Cir. 2017) (*en banc*) (citation omitted); *accord N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996) (explaining that the "credible threat of prosecution standard"

is "quite forgiving"). The relatively low bar ensures that people are not deterred from exercising their constitutional rights or seeking clarification of their rights before they are formally prosecuted. *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014) (finding fear credible prior to "official enforcement action").

Ultimate prosecution need not be guaranteed: "it is not necessary that [a plaintiff] expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *SBA List*, 573 U.S. at 159. It is enough that prosecution be more than "imaginary or wholly speculative." *Id*. at 160.

The Supreme Court has identified various indicia of ripeness: enforcement warnings, *SBA List*, 573 U.S. at 159; the plaintiff's intent to engage in arguably proscribed conduct, *id*. at 160; the presence of "costly compliance measures" that might unconstitutionally deter business conduct, *id*. at 160; and government's refusal to "disavow" prosecution, *id*. at 161.

All are present here, and the fear of enforcement is credible. Take the AG's public statements for starters. When announcing his investigations, the AG made his position clear:

> The **egregious actions** of these third-party sellers **will not be tolerated** in Kentucky, and the subpoenas we issued should serve as a **warning** to anyone who tries to **illegally profit** from COVID-19. **I am grateful to Amazon for working with us to stop these predatory practices** by third-party sellers.[7]

When that is how an investigation begins, our members can rightly fear enforcement is possible. The threat goes beyond the AG's public-facing rhetoric to his subpoenas. To be clear, in this action the Guild is not challenging the subpoenas per se; rather, the fact of those subpoenas is part of the broader set of facts giving rise to a credible threat that the AG will enforce unconstitutional statutes against the Guild's members.

---

[7] Kentucky AG Press Release (March 26, 2020), https://kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=888 (emphasis added).

The subpoena cover letters refer to pricing information about the merchant the AG "received from Amazon," and order the merchant "**to immediately cease and desist**" from violating Kentucky's price-control statutes.[8] The subpoenas themselves, titled "Complaints of Price Gouging," indicate that they are based on the AG's "reason to believe that" the target "has engaged in, is engaging in, or is about to engage in any act or practice declared unlawful by" the code sections embracing KRS 367.374 and KRS 367.170.[9] Although it is conceptually possible for the AG to send a subpoena to a third-party for information about an investigatory target, that is not what the subpoenas to our members are.

The AG has attempted to enforce at least one subpoena against a Guild member via an "Emergency Motion" filed two business days after the complaint in this case.[10] The AG's motion emphasizes the "suspicion of wrongdoing" he has about the subpoena target, based on "detailed" information the AG received from Amazon.[11] (At this time, the Circuit Court has not ruled on the validity of the subpoena or the constitutionality of the statutes.)

Finally, the AG has refused to disavow prosecution, both in our pre-complaint calls with the AG and in this litigation.

On these facts, the Online Merchants Guild's members could credibly fear prosecution. And they do—enough to refrain from engaging in their businesses. To satisfy the credible threat standard, enforcement need not be certain. *SBA List*, 573 U.S. at 160. What is certain here is that Online Merchants Guild members are suffering injury-in-fact: in addition to spending resources responding to the subpoena, they have been actually deterred from exercising their rights to

---

[8] March 25, 2020 Ltr. from Cocanougher to Jones & Panda, LLC, attached as Exhibit 3 (emphasis added). The cover letter and subpoena are similar to those received by other Guild members.

[9] Subpoena and Civil Investigative Demand from Cocanougher to Jones & Panda, LLC, attached as Exhibit 4.

[10] AG's Resp. to Pet. and Emergency Mot. to Enforce Civil Invest. Demand, *Jones & Panda, LLC. v. Com. of Kentucky ex rel. Cameron*, No. 20-CI-1252 (May 5, 2020), attached as Exhibit 5.

[11] *Id*. at 6.

participate in interstate commerce, engage in commercial speech, and engage in other behaviors of a free people. That makes this matter ripe.

**b. The AG's ripeness argument is on the wrong track.**

Instead of addressing the governing ripeness law, the AG goes off track factually and legally. The AG is right that the Supreme Court held that those who receive subpoenas from administrative agencies should generally first challenge that agency action in the venue provided by the administrative scheme (e.g., with the agency's hearing officer). *See Reisman v. Caplin*, 375 U.S. 440 (1964) (declining, on prudential grounds, to exercise equity jurisdiction over challenge to IRS subpoena). *Reisman* is a creature of early administrative law, and plays little to no role in the Supreme Court's modern decisions dealing with pre-enforcement civil rights cases. The handful of cases that have applied *Reisman* to other subpoenas have done so uncritically and without consideration of *Reisman*'s administrative law context and shaky doctrinal foundation. *Reisman* does not apply in this context.

*Reisman* is in tension with (if not contrary to) the Supreme Court's modern ripeness cases, which deemphasize "prudential" barriers to federal jurisdiction. *See SBA List*, 573 U.S. at 167 (expressing skepticism of prudential barriers as "in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases is virtually unflagging," but declining to resolve the issue); *accord Kiser*, 765 F.3d at 607-08 (explaining that "the Supreme Court has cast into some doubt the continuing vitality of the long-established prudential aspects of the ripeness doctrine").[12]

---

[12] The AG's invocation of other prudential concepts, the adequacy of the record and the hardship from delaying review, is misguided for the same reason—they no longer play much, if any role, in the ripeness analysis. *See* AG's Brief at 8. Moreover, the undisputed record here is adequate to consider the interaction between Amazon's interstate store and Kentucky's price-controls. The governing analysis is primarily legal in nature. And, as explained throughout, our members are experiencing real hardship right now. So even if *Reisman* were in the picture, it would not stand in the way of review.

*Reisman*'s vitality is basically academic, because the Online Merchants Guild is not challenging a subpoena—it has not received one. Nor have many of its members, who are nonetheless harmed by the AG's threatened application of KRS 367.374 and KRS 367.170. Nor, as the AG has pointed out, has the Guild challenged the lawfulness of the subpoena statute, KRS KRS 367.240.[13] *Reisman* does not stand in the way of judicial review.

With good reason. If the AG were right, simply issuing a subpoena could prevent federal courts from evaluating constitutional challenges to substantive laws—not just challenges by the subpoenaed party, but by anyone else harmed by the law. That is surely not how our system works. The AG's view of unreviewable prosecutorial power does far more damage to separation of powers—and federalism—and individual rights—than this Court's careful consideration of whether two state statutes comply with settled constitutional principles.

The Court should decline the AG's request to create an exception to the Supreme Court's credible-fear doctrine. This matter is ripe.

## III. The AG has failed to meaningfully defend his application of KRS 367.374 and KRS 367.170 from the Guild's dormant Commerce Clause challenge.

The AG has failed to save his extraterritorial application of Kentucky's price-control statutes. The operative facts are undisputed. Amazon's store is a unitary interstate marketplace. The Guild's members cannot conduct Kentucky-specific marketing at Kentucky-specific prices. Applying Kentucky-specific price-controls to them will either set a national ceiling or force their exit from the interstate marketplace. Thus, the AG's threatened application of KRS 367.374 and KRS 367.170 is having extraterritorial effect, which is unlawful because states "may not adopt

[13] At the TRO hearing, the AG raised the fact that the Online Merchants Guild has only targeted two of the relevant statutes, KRS 367.374 and KRS 367.170. We challenged those because they are the substantive statutes that animate the threatened prosecution. The other code sections referenced in the subpoenas generally supply various procedural items and definitions.

legislation that has the practical effect of establishing a scale of prices for use in other states." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).

The governing law is also undisputed. Extraterritorial laws are "virtually *per se* invalid under the Commerce Clause." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986); *see also American Beverage Association v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013) (same); *Bainbridge v. Turner*, 311 F.3d 1104, 1112 (11th Cir. 2002) (explaining that "laws that directly regulate commerce occurring in other states are invalid"). The AG has failed to identify a single precedent actually approving the extraterritorial application of a state price-control statute.

Instead of squaring his threatened application of KRS 367.374 and KRS 367.170 with settled law, the AG asks the Court to break new ground and be the first to uphold an extraterritorial price-control regime. The AG's arguments do not hold up. For example, the AG tells the Court that "[t]he Court has previously upheld Kentucky's price-gouging statutes under a dormant Commerce Clause challenge."[14] Not so. The *Marathon* Court abstained on *Younger* grounds (because Marathon filed its constitutional challenge hours after the AG began a substantive enforcement proceeding), and held that it could not resolve the dormant Commerce Clause challenge on the face of the law. *Marathon Petroleum Co. LLC v. Stumbo*, 528 F. Supp. 2d 639, 650 (E.D. Ky. 2007). The Court could *not* consider Marathon's challenge on the merits because "[i]n its response to the Attorney General's Motion to Dismiss, Marathon does not point to any statute, regulation or case law in support of its argument that the Kentucky Act violates the dormant Commerce Clause." *Id*. This Court simply did not "uphold" Kentucky's price-control statutes as the AG claims. Moreover, factually *Marathon* does not help the AG because Marathon had an in-

[14] AG's Brief, DE 21-1 at 21, Page ID# 124.

state presence and the AG was targeting sales the company chose to make in-state—or could have chosen not to make, since Marathon controls its store. Marathon may be somewhat like Amazon, but it is nothing like the Guild's members.

The AG also seeks to replace the Supreme Court's bright-line rule against extraterritorial application of state law with dicta about how the dormant Commerce Clause "does not 'protect the particular structure or methods of operation in a retail market.'"[15] That may be so in the case of purely in-state regulation (assuming the regulation satisfies the *Pike* test), but that observation does not give the states extraterritorial power they lack under the dormant Commerce Clause. *Brown-Forman Distillers Corp.*, 476 U.S. at 579.

The AG also tries to limit precedents to their facts, but fails to recognize that the precedents are more similar than not. For example, the problem in *American Beverage Association* is like the problem here. The Sixth Circuit struck down a Michigan statute that dictated how companies could mark their products outside of Michigan. *Am. Beverage Association v. Snyder*, 735 F.3d 362, 376 (6th Cir. 2013). Here, the AG seeks to dictate how online merchants can mark—that is, price and advertise—their products outside of Kentucky. The AG has taken exactly that position in another court, arguing that KRS 367.374 applies to "even [to] items that were eventually sold out-of-state" because they "were also offered to be sold to Kentucky residents."[16] The Commonwealth lacks that extraterritorial power—full stop—whether the extraterritorial effect is labeling or pricing and advertising.

---

[15] AG's Brief, DE 21-1 at 16, Page ID# 119 (quoting *Exxon Corp. v. Gov. of Md.*, 437 U.S. 117, 127 (1978)). Both cases the AG cites are about the tolerable market-altering effects of in-state regulation, not extraterritorial application of a state's laws. *See Exxon Corp.*, 437 U.S. at 133 n.28 (rejecting Exxon's attempt to cast the state statute as applying extraterritorially); *Brown v. Hovatter*, 561 F.3d 357 (2009) (solely considering in-state effects, and not even using the term "extraterritorial").

[16] AG's Emergency Motion, Exhibit 5, at 8-9.

*Frosh* too is like this case. Because our members cannot set Kentucky-specific prices or engage in Kentucky-specific transactions, the AG's price-controls effectively operate outside the Commonwealth. Effect is what matters for dormant Commerce Clause purposes, and the effect is to "instruct [merchants] as to the prices they are permitted to charge in transactions that do not take place in [Kentucky]." *Ass' for Accessible Meds v. Frosh*, 887 F.3d 664, 671-72 (4th Cir. 2018), cert. denied 139 S. Ct. 1168 (2019). That the AG cannot do.

Moreover, the AG fails to explain away the problem of conflicting state laws, even though the "Commerce Clause protects against inconsistent legislation arising from the projection of one state's regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336-37. The AG ignores that problem because he has no solution for it, which is dispositive.

Finally, the AG's brief demonstrates why his use of KRS 367.374 and KRS 367.170 fails the *Pike* test. The Online Merchants Guild has proffered evidence of how the AG is harming the flow of goods in the interstate market, and harming consumers in Kentucky and elsewhere, with no discernible benefit to Kentucky consumers. In recent days, more evidence has emerged about how price-controls harm consumers by diminishing the supply of goods.[17] Further, the AG has still failed to explain why, if the problem is prices that *Amazon* approves and shows in *Amazon's* store, the AG is not regulating Amazon. The AG's costly and gerrymandered price-control scheme fails *Pike*.

### IV. The AG's threatened application of KRS 367.374 and KRS 367.170 violates the First Amendment.

The Online Merchants Guild explained that the AG's threatened use of the price-control statutes unlawfully burdens our members' commercial speech that is lawful outside of Kentucky

[17] Alberto Mingardi, *Italy's Covid Price-Control Fiasco*, The Wall Street Journal, https://www.wsj.com/articles/italys-covid-price-control-fiasco-11589842827 (May 18, 2020) ("The government decreed that masks could cost no more than 50 euro cents. Then came the shortages.").

(and, in our view, lawful inside of Kentucky). The AG does not disagree factually. Rather, he has specifically argued that KRS 367.374 applies "even [to] items that were eventually sold out-of-state" because they "were also offered to be sold to Kentucky residents."[18] In other words, the AG contends he can suppress out-of-state speech because Kentucky residents might also hear it, regardless of whether Kentuckians even act on the speech. It would be like the AG trying to suppress a Super Bowl ad on national TV just because Kentuckians might see it.

That isn't just paternalistic; it's unprecedented and unconstitutional. But rather than engaging with the constitutional problem, the AG just asserts that he can suppress any speech he considers unlawful (based on a vague and arbitrary definition of unlawful). We disagree about whether the AG can suppress our members' protected speech in Kentucky, but regardless the AG cannot declare speech unlawful outside the Commonwealth. The AG fails to make any attempt to meet his "burden" to justify that novel speech restraint as "consistent with the First Amendment" under any form of heightened scrutiny, conceding the point. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571-72 (2011).

The AG's threatened application of KRS 367.374 and KRS 367.170 violates the First Amendment.

## V. The AG has failed to square his threatened application of KRS 367.374 and KRS 367.170 with the Due Process Clause.

The Guild's opening brief pointed out two basic Due Process problems: the vagueness of the price-control statutes is having an unlawful chilling effect, including on merchants who do not have minimum contacts with Kentucky. With respect to vagueness, the AG only defends KRS 367.374, apparently conceding that KRS 367.170 is hopeless.[19] The AG's defense of KRS 367.374

---

[18] Motion at 8-9.

[19] *See* AG's brief at 23-25 (failing to explain how KRS 367.170 provides constitutionally-adequate notice).

misses the point. No one—apparently not even the AG—knows what level of price increase is unlawful. Nor does the AG explain how the statute provides fair notice that, for example, peanut butter is covered but cooking spices are not. Whatever background information the Kentucky Division of Emergency Management made available on its website (which the AG did not provide with its brief) cannot fix that statutory infirmity with KRS 367.374. It also does nothing to help the separate KRS 367.170, which applies regardless of any emergency and is not tied to any defined list of goods. In theory, the AG could seek to apply that statute to anything a retailer arbitrager offers or sells anytime, anywhere, which obviously causes Guild members concern.

The AG also fails to justify the chilling effects his threatened use of KRS 367.374 and KRS 367.170 is having on merchants who reside outside Kentucky and lack minimum contacts with the Commonwealth. The AG could have acknowledged that he lacks regulatory authority over those individuals, but did not. The silence is telling and dispositive.

The Due Process Clause forbids the AG's application of KRS 367.374 and KRS 367.170 to the Online Merchants Guild's members.

## VI. The AG's selective application of KRS 367.374 and KRS 367.170 violates the Equal Protection Clause.

Given the AG's attempt to malign our members, it is worth pointing out who the players are. Our members are individuals—hardworking people from Kentucky and elsewhere who eke out a living.[20] Amazon, on the other hand, is a giant with extraordinary power and behind-the-scenes influence.[21] And it's Amazon's store—Amazon controls it, not our members.[22] Amazon

[20] Written Testimony of Meredith Funston, U.S. House Committee on Small Business (March 3, 2020); Written Testimony of Jennifer Jenson, U.S. House Committee on Small Business (March 3, 2020), both attached as Exhibit 6.

[21] *See, e.g.*, Christian Hetrick, *Emails Show How Philly Officials Tried to Help Escape Proposed Cashless Store Ban*, The Inquirer (Feb. 26, 2019), https://www.inquirer.com/news/amazon-go-cashless-store-philadelphia-lobbying-20190226.html.

[22] Rafelson Dec., DE 10-1 at 4-5, Page ID# 63-64.

approves all pricing, and determines the market-clearing lowest-price.[23] Amazon profits on every good our members supply.[24]

Yet the AG has, for reasons that still remain unsaid, publicly attacked our members while explaining that he is "grateful to Amazon for working with us to stop these predatory practices by third-party sellers."[25] Whatever the reason, the AG has failed to demonstrate that his disparate treatment—which burdens our members' fundamental rights as set forth above—passes rational basis review, much less heightened scrutiny. The AG has violated the Equal Protection Clause.

**Conclusion**

The Online Merchants Guild respectfully requests that the Court declare unlawful and enjoin the Kentucky AG from applying KRS 376.374 and KRS 367.170, including investigations and threatened or actual prosecution under those laws, to the Online Merchants Guild's members in connection with sales on Amazon.

Respectfully submitted this 20th day of May, 2020.

s/ Aaron K. Block
Aaron K. Block
The Block Firm, LLC
Georgia Bar No. 508192*
404-997-8419
aaron@blockfirmllc.com
Counsel for the Online Merchants Guild
*Admitted *pro hac vice*

[23] *Id.*
[24] Rafelson Dec., DE 10-1 at 3, Page ID# 62.
[25] Kentucky AG Press Release (March 26, 2020), https://kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=888.

s/ Paul S. Rafelson
Paul S. Rafelson
Rafelson Schick, PLLC
Bar # 16958 (Florida)
2255 Glades Rd
Suite 319
Boca Raton, FL 33431
(561) 326-6529

/s/ William G. Deatherage Jr.
William G. Deatherage Jr.
Mark A. Gilbert
Deatherage, Myers & Lackey, PLLC
701 South Main Street
P.O. Box 1065
Hopkinsville, Kentucky 42241-1065
Telephone: 270-886-6800
Facsimile: 270-885-7127
Email: mgilbert@dmlfirm.com

**Certificate of Service**

I hereby certify that I served the foregoing using the Court's CM/ECF system.

/s/ William G. Deatherage Jr.
William G. Deatherage Jr.
Mark A. Gilbert