COMMONWEALTH OF KENTUCKY
FAYETTE CIRCUIT COURT
CIVIL ACTION NO. 20-CI-1252
DIVISION 9

**ELECTRONICALLY FILED**

JONES & PANDA, LLC                                                         PETITIONER

V.            **PETITIONER'S RESPONSE TO EMERGENCY MOTION TO
              ENFORCE CIVIL INVESTIGATIVE DEMAND**

COMMONWEALTH OF KENTUCKY,
ex rel. DANIEL CAMERON, in his Official Capacity
as ATTORNEY GENERAL OF KENTUCKY                                  RESPONDENT

************

Comes now the Petitioner, Jones & Panda, LLC ("Jones & Panda"), and for its Response to the Emergency Motion to Enforce the Civil Investigative Demand filed by the Respondent, Commonwealth of Kentucky, ex. Rel. Daniel Cameron, in his Official Capacity as Attorney General of Kentucky, states as follows:

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

Jones & Panda is a limited liability company organized in Kentucky whose sole member is Sarah Elizabeth Jones. *See* Declaration of Sarah Elizabeth Jones, ¶ 2, attached hereto as Exhibit "1". As a sole proprietor, Sarah Jones ("Jones") operates Jones & Panda as a third-party merchant on Amazon's national eCommerce retail store. Essentially, Jones purchases products from retail stores in Kentucky and other states and offers them for sale on Amazon's website. In addition to the retail price Jones paid for the products, Jones & Panda incurs additional expenses related to

1

37C0B2FB-9489-4581-9884-F69F50B99889 : 000002 of 000046

her time, travel and shipping of the products ordered by Amazon's customers, as well as Amazon's commissions and fees, which average 12-15% of each sale and a monthly recurring fee of $40.00. *See* Jones Dec, ¶6.

Due to the COVID-19 health crisis, on March 6, 2020 Kentucky Governor Andy Beshear issued an Executive Order declaring a state of emergency in the Commonwealth and activated the Commonwealth's price-control laws at KRS 367.372 to 367.368 (the "Act"). Pursuant to KRS 367.474(1)(a), the Act is implemented for a period of fifteen days. The Governor renewed activation of the Act by his March 20, 2020 Executive Order, as allowed by KRS 367.374(2).

On March 25, 2020, the Respondent, Daniel Cameron, Attorney General of Kentucky (the "AG"), issued a Subpoena and Civil Investigative Demand In Re Investigation of: Complaints of Price Gouging to Jones, the registered agent of Jones & Panda. *See* Subpoena and Civil Investigative Demand (hereinafter, the "CID"), attached as Exhibit "2". As grounds for the investigation, the CID states: ". . .the Attorney General of Kentucky, having reason to believe that a person has engaged in, is engaging in, or is about to engage in any act or practice declared to be unlawful by KRS 367.110 to 367.300 or KRS 367.372 to 376.378, and that it is in the public interest that an investigation should be made. . . ." The letter accompanying the CID, from Assistant Attorney General Matthew Cocanougher, further states that the "Kentucky Office of the Attorney General (KOAG) has received information from Amazon relating to the prices charged, during the ongoing state of emergency for respirators and hand sanitizers offered for sale on its platform by a third-party seller identified as A9DC8NLML6D8C, with a store front name of Jones & Panda, LLC." *See* Letter dated March 25, 2020, attached as Exhibit "3". The CID requires Jones & Panda to respond to Eight Requests related to its purchases and sales of hand sanitizers and respirators from February 15, 2020 through March 25, 2020.

The Requests are as follows:

1.     Identify, by day and each specific product, the price you charged for hand sanitizers and respirators, offered for resale on the Amazon sales platform from February 15, 2020 through March 25, 2020.

2.     State the basis behind every price change you made to hand sanitizers and respirators, offered for resale on the Amazon sales platform from February 15, 2020 through March 25, 2020.  For each price increase that you contend was related to an increase in your cost, describe the nature of such increase, and identify all documents that substantiate your claim.

3.     Produce all documents relating to your purchases and sales of hand sanitizers and respirators, offered for resale on the Amazon sales platform from February 15, 2020 through March 25, 2020.

4.     Produce all documents relating to the supply and demand of hand sanitizers and respirators, offered for resale on the Amazon sales platform from February 15, 2020 through March 25, 2020, including correspondence, recordkeeping and any sources you relied on in making pricing decisions during that period.

5.     Produce all documents relating to the retail prices you charged for hand sanitizers and respirators, offered for resale on the Amazon sales platform from February 15, 2020 through March 25, 2020, including any documents upon which you rely to justify any price increases that may have occurred.

6.     For each sale you made of hand sanitizers and respirators through the Amazon sales platform from February 15, 2020 through March 25, 2020, identify for each specific product:  (a) the date of the sale; (b) the name, residence/location, and contact information of each buyer of such product; (c) the total cost paid by the buyer for each transaction, broken down by individual components.

7.     Produce all documents relating to each sale you made of hand sanitizers and respirators through the Amazon sales platform from February 15, 2020 through March 25, 2020, which identify, for each specific product:  (a) the date of the sale; (b) the name, residence/location, and contact information of each buyer of such product; and (c) the total cost paid by the buyer for each transaction, broken down by individual components.

8.     Produce all documents you identified in your responses to the questions above.

The CID further requires:  That, under oath or affirmation, you answer the following requests and produce the following documents at the time and place above, or if blank, then by emailing them together with a completed sworn statement of authenticity and completeness of documents, by no later than, **April 15, 2020**.  *See* Exhibit "2".

On April 14, 2020, Jones & Panda filed its Petition to Set Aside the Civil Investigative Demand and to Protect Petitioner from an Unreasonable Investigation, or in the alternative, to Modify the Civil Investigative Demand and extend the Return Date.  The Attorney General ("AG") has filed its Response to the Petition, and an Emergency Motion to Enforce the Civil Investigative Demand.  Contemporaneously with this Response, Jones & Panda has also filed a Motion for Leave to File a First Amended Petition to assert additional constitutional claims. This matter is now set for a hearing on May 22, 2020.

## II.     ARGUMENT

### A.     THE ATTORNEY GENERAL HAS FAILED TO COME FORWARD WITH ANY EVIDENCE THAT THE CID SATISFIES THE REQUIRED STATUTORY STANDARD.

The AG has failed to come forward with any evidence that the CID satisfies the required statutory standard.  The March 25, 2020 letter accompanying the CID provides that "the Kentucky Office of the Attorney General (KOAG) has received information from Amazon relating to the prices charged during the ongoing state of emergency for respirators and hand sanitizers offered for sale on its platform by a third-party seller . . . with a store front name of Jones & Panda."  *See* Exhibit 3.  This is the only support cited for the issuance of the CID.  In its Response, the AG claims to have "detailed information from Amazon regarding Petitioner's potential violations of Kentucky's price gouging statutes."  *See* Response and Emergency Motion, at p.6.  However, the

37C0B2FB-9489-4581-9884-F69F50B99889 : 000004 of 000046

AG has not produced the documentation and facts upon which the AG based his decision. The unsupported statement alone is not enough.

The authority of the AG to issue a civil investigative demand is found in KRS 367.240(1), which provides as follows:

> When the attorney general has reason to believe that a person has engaged in, is engaging in, or is about to engage in any act or practice declared to be unlawful by KRS 367.110 to 367.300, or when he believes it to be in the public interest that an investigation should be made to ascertain whether a person in fact has engaged in, is engaging in or is about to engage in, any act or practice declared to be unlawful by KRS 367.11 to 367.300, he may execute in writing and cause to be served upon any person who is believed to have information, documentary material or physical evidence relevant to the alleged or suspected violation, an investigative demand . . . .

KRS 367.240(1). While the statute does not provide a standard for determining when facts satisfy the two conditions precedent to the issuance of any civil investigative demand, Kentucky courts have considered this issue and provided important guidance.

It is clear the AG does not have unbridled authority to issue a civil investigative demand and that "courts [will] look behind the demand" to protect individual rights. *See Ward v. Commonwealth*, 566 S.W.2d 426, 428 (Ky.App. 1978). *Ward* explained that "[j]udicial review of administrative rulings is a basic part of our legal system and is designed to protect against mistaken or arbitrarily issued investigative order." *Id*. In the case of civil investigative demands, courts must "review the conclusions of the Attorney General so as to protect against arbitrary or mistaken issuance of investigative demands." *Id.* at 429.

*Ward* sets a high bar for judicial approval of a civil investigative demand. "[T]he facts [of an alleged violation] must be established *before* the demand is issued. To use the demand as a means of establishing [the basis of the demand] flies in the fact of the legislative purpose of the Consumer Protection Act." *Id.* at 428-29. (emphasis added). In other words, a civil investigative

37C0B2FB-9489-4581-9884-F69F50B99889 : 000005 of 000046

37C0B2FB-9489-4581-9884-F69F50B99889 : 000006 of 000046

demand cannot be used as a means of establishing either of the two conditions precedent – that the AG has reason to believe that a violation is being committed and that the public interest requires investigation into potential violations.  *Id.* at 428-29.  Simply, the AG may not use the CID to fish for possible violations or to satisfy a statutory prerequisite.

Upon the filing of a Petition, the Court must "review the conclusions of the Attorney General so as to protect against arbitrary or mistaken issuance of investigative demands."  *Id.* at 429.  *See also Commonwealth v. Pineur*, 533 S.W.2d 527 (1976).  While Courts have not required a CID to state a reason for issuance on its face, "under KRS 367.240(2) and 367.260, after the filing of a complaint . . . , it is the duty of the court to examine the documentation and facts upon which the Attorney General based his decision to issue the demand."  *Ward,* 566 S.W.2d at 429.  When reviewing a similar CID after the filing of petition pursuant to KRS 367.240(2), the court in *Ward* found that the reliance on one letter alone was insufficient to satisfy either of the statutes prerequisites.  *Id*. at 429.  The *Ward* court further criticized the Attorney General's thin showing: "[w]ithout further investigation into the truth or falsity of these statements [in the letter], the Attorney General has accepted them at face value.  The record contains no complaints from consumers, nor does it contain the affidavits of anyone who tested the appellants' product and found it defective."  *Id.*

The AG acknowledges *Ward's* requirement, yet still fails to come forward with more than his unsupported statement.  As a result, the AG has not satisfied the statutory standard.  Furthermore, to the extent that the AG expects Jones & Panda and the court to blindly accept its representation of "detailed information regarding Petitioner's potential violations of Kentucky's price-gouging statutes" received from Amazon, the fact that it is Amazon that has complained to the AG is a distorted attempt to shift blame to hard working Kentuckians like Sarah Jones.  It is

37C0B2FB-9489-4581-9884-F69F50B99889 : 000007 of 000046

Amazon that is the store. *See* Declaration of Paul S. Rafelson, filed in *Online Merchants Guild v. Daniel Cameron, ex rel., Attorney General of Kentucky*, U.S. District Court, Eastern District of Kentucky, Civil Action No. 3:20-cv-29, attached hereto as Exhibit "4". Third-party merchants, like Jones & Panda, are simply the suppliers of Amazon's store. When customers buy products supplied by Jones and Panda, the customer is Amazon's customer. Amazon is the sole party in privity of contract with its customer, and the business services agreement specifically states that there is no agency relationship between Amazon and its third-party merchants. In fact, Amazon's Business Solutions Agreement expressly forbids its third-party merchants from soliciting their customers. When checking out, customers utilize Amazon's shopping cart, the online equivalent of a cash register, regardless of whether the goods are offered for sell by Amazon, its third-party merchants, or a mix of two in the same shopping cart transaction. *Id.* at ¶¶16-17.

Amazon retains ultimate control of the price ceiling and price floor. *Id*. at ¶14. Amazon could have prevented any alleged price gouging by blocking automatic reprice software that automatically re-prices a product as the market conditions change. Furthermore, it is Amazon, not Jones & Panda, that sets the return policy, handles all customer service disputes, sets pricing policies, suspends selling activities, charges the customer's credit card, withholds funds for a period of time after the goods were delivered. E-mails sent to customers after a purchase of any good, whether supplied by Amazon or a third-party merchant like Jones & Panda say thank you for shopping with Amazon. *Id.* at ¶¶16-17.

Certainly, it was in Amazon's best interest to allow high-priced goods to be sold to a panicked public, earn the higher commission, then shift the blame to the third-party merchants. If anyone is guilty of price-gouging, it is Amazon, not Jones & Panda. Simply put, if anyone should be the subject of the Attorney General's investigation, it is Amazon. Yet, the Attorney General

has – for unexplained reasons – apparently focused solely on Jones & Panda and similar small businesses.  For these reasons, Jones & Panda respectfully requests that the Court find the CID fails to meet the statutory standard, is an arbitrary order, and constitutes an unreasonable investigation.

**B.   THE AG'S APPLICATION OF KENTUCKY'S PRICE GOUGING LAWS TO JONES & PANDA VIOLATES THE DORMANT COMMERCE CLAUSE OF THE U.S. CONSTITUTION.**

The CID at issue in this case is based on the Commonwealth's price-gouging laws set forth in KRS 367.110 to 367.300 and 367.372 to 367.368.  As explained below, the AG's application of these price-gouging laws violates the dormant Commerce Clause by giving the statutes unlawfully extraterritorial effect and by imposing a heavy burden on interstate commerce that outweighs any local benefits.

**1.   The Attorney General's application of KRS 367.374 and KRS 367.170 is unlawfully extraterritorial.**

Applying KRS 367.374 and KRS 367.170 to Jones & Panda and other third-party merchants on Amazon is effectively a regulation of the interstate market, which is beyond the power of state law.  Article 1, Section 8 of the U.S. Constitution allocates the "Power . . . To regulate Commerce . . . among the several states," U.S. Const. art. 1, § 8, cl. 3, to the federal government.  A direct corollary to this express allocation is a constraint on the power of any state to enact legislation that interferes with or burdens interstate commerce.  This doctrine, known as the "dormant" commerce clause, is "driven by concern about economic protectionism" and seeks to prevent state "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *Dep't of Revenue of Ky v. Davis*, 553 U.S. 328, 337-38 (2008).  Essentially, a state may not regulate commerce occurring wholly outside of its borders.  *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989); *Brown-Forman Distillers Corp. v. N.Y. State Liquor*

37C0B2FB-9489-4581-9884-F69F50B99889 : 000008 of 000046

37C0B2FB-9489-4581-9884-F69F50B99889 : 000009 of 000046

*Auth.*, 476 U.S. 573, 582-83 (1986).  *Edgar v. MITE Corp*.,457 U.S. 624, 642-43 (1982)(plurality opinion).  The principle reflects the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres."  *Healy*, 491 U.S. at 335-36 (footnote omitted).  Simply put, states "may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states."  *Id.* at 336.

Extraterritorial laws are "virtually *per se* invalid under the Commerce Clause."  *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 574, 579 (1986); *see also American Beverage Association v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013)(same).  When determining whether a state law complies with the dormant Commerce Clause, the "critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the state."  *Healy,* 491 U.S. at 336.  The inquiry is holistic: "the practical effect of the statute must be evaluated not only by considering the consequence of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation."  *Id.*  The problem of conflicting laws is critical because the "Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State."  *Id.* at 336-37.  Intent to regulate outside the state does not control the analysis; practical effect does.  *Id.* at 336 (holding that practically extraterritorial laws are invalid "regardless of whether the statute's reach was intended by the legislature").

Other courts have struck down a wide range of state laws that had the practical effect of regulating commerce beyond their borders, imposing interstate pricing schemes, or creating havoc in the national marketplace.  *See, e.g. Fla. Transp. Servs. V. Miami-Dade County*, 703 F.3d 1230

(11th Cir. 2012)(collecting cases). For instance, in *Association for Accessible Meds. v. Frosh*, 887 F.3d 663 (4th Cir. 2018), *cert. denied* 139 S.Ct. 1168 (2019), the Fourth Circuit struck down a Maryland price-gouging law that purported to ban "unconscionable" price increases in the sale of drugs. *Id.* at 666. It was no defense that some of the drugs might be purchased by Marylanders, because the law's practical effect "still controls the price of transactions that occur wholly outside the state," and was "effectively a price control statute that instructs [sellers] as to the prices they are permitted to charge in transactions that do not take place in Maryland." *Id.* at 671-72. The Fourth Circuit in *Frosh* emphasized the law's "potential to subject [interstate sellers] to conflicting state requirements," which would burden interstate commerce. *Id.* at 673. That problem is especially acute where, as here, the law does not clearly define an unlawful price.[1] *See Frosh*, 887 F.3d at 663 (explaining that the "relatively subjective definition of what constitutes an unlawful price increase only exacerbates the problem").

The Sixth Circuit applied the extraterritorial doctrine in *American Beverage Association v. Snyder*, 735 F.3d 362 (6th Cir. 2013), to strike down a Michigan product-labeling law that controlled labeling in other states. The state's environmental and budget-protection rationale for the law may have been worthy, but the statute was nonetheless "extraterritorial in violation of the dormant Commerce Clause because it impermissibly regulates commerce by controlling conduct beyond the State." *Id.* at 376. And among other things, the court criticized the state for "fail[ing] to explore other alternative measures that could combat" the putative problem without imposing extraterritorial effects. *Id.* at 375.

Using KRS 367.374 and KRS 367.170 to impose Kentucky-specific price controls on third-party merchants such as Jones & Panda is extraterritorial because of the nature of the interstate

---

[1] *See* section C.2, *infra*, for a discussion of the statutes' vague language.

Amazon marketplace.  Members' sales on Amazon are unlike the traditional alleged price-gouging fact pattern in an emergency – say, exorbitant gas prices at a Kentucky gas station or lumber prices at a Kentucky lumber yard.  Those merchants deliberately target sales in, and only in, Kentucky.  In these cases, the regulatory effects of KRS 367.374 and KRS 367.170 would occur within the Commonwealth, and would have at most incidental effects across the border.

By contrast, for Jones & Panda and other third-party sellers on Amazon, Amazon is a unitary interstate marketplace.  *See*, Rafelson Dec., ¶15. These sellers are not retailers – they are suppliers of Amazon's retail store.  There is no realistic way for members to conduct Kentucky-specific business at Kentucky-specific prices on Amazon.  Members must either treat Kentucky prices as a national ceiling or exit the national marketplace.  *Id.* at ¶19.  *See also* Jones Dec., ¶8.

Moreover, there is a complex patchwork of state laws, made worse by the number of state Attorney Generals applying varying laws to the same online market.  *See* Rafelson Dec., ¶30.  The conflict with Alabama is illustrative.  It would be lawful to sell hand sanitizer at a 20% price increase over the pre-pandemic average.  *See* Ala. Code § 8-31-4 (price-gouging requires a 25% or greater increase).  The AG might consider the same price unlawful in Kentucky.  Yet, Jones & Panda and other third-party sellers on Amazon cannot ensure that their product goes to Alabama (or some other state), but not to Kentucky.  And things get even more complicated when one factors in the number of state laws that could potentially apply to Amazon's single online market.

This creates the havoc that the dormant Commerce Clause guards against.  Jones & Panda is facing conflicting regulatory demands and, unsurprisingly, increasingly reluctant to source and sell important COVID-response goods and other consumer goods for fear of inadvertent legal exposure.  *See* Jones Dec., ¶9. That is bad for small business at a time when the economy needs them to survive, and also bad for consumers, because it is chilling the efficiency collection and

37C0B2FB-9489-4581-9884-F69F50B99889 : 000011 of 000046

allocations of goods across the country. *See* Rafelson Dec., ¶¶28-31 Accordingly, the Court should hold that the AG's application of KRS 367.374 and KRS 367.170 is unlawfully extraterritorial and in violation of the dormant Commerce Clause.

> **2.      Even if there were only in-state effects, the Kentucky Attorney General's application of KRS 367.374 and KRS 367.170 would still fail the *Pike* test.**

The Kentucky Attorney General cannot defend his application of KRS 367.374 and KRS 367.170 by arguing that he is only targeting sales in Kentucky, and that the Court should apply the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). However, states can only resort to *Pike* balancing when they do not impose extraterritorial effects. *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 646 (6th Cir. 2010); *Fla. Transp. Servs. v. Miami-Dade County*, 703 F.3d 1230, 1255 (11th Cir. 2012)(quoting *Pike*, 397 U.S. at 142). That is not the practical effect of the AG's efforts, as explained above. In fact, the CID at issue in this case targets Jones & Panda for supplying goods for Amazon sales that were not made to people in Kentucky. So *Pike* does not apply.

Moreover, the AG's application of KRS 367.374 and KRS 367.170 would still fail the *Pike* balancing test, under which a law will be struck down if its incidental "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefit." *Fla Transp. Servs.*, 703 F.3d at 1255. Alternatives matter: "[t]he extent of the burden on interstate commerce that will be tolerated will depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.*

Here, the burden on interstate commerce described above exceeds any interest in policing Amazon's vast online store by targeting individual merchants like Jones & Panda – especially since the AG could directly regulate Amazon to adopt more calibrated and efficient measures.

37C0B2FB-9489-4581-9884-F69F50B99889 : 000012 of 000046

37C0B2FB-9489-4581-9884-F69F50B99889 : 000013 of 000046

The burden is significant. The AG's application of KRS 367.374 and KRS 367.170 to online merchants like Jones & Panda is distorting the national marketplace and reducing the supply of COVID-response goods and other items.  It is also imposing potentially ruinous costs and small business owners who make up the interstate market.  *See* Rafelson Dec., ¶¶28-31, 40.  There are also additional constitutional burdens, including serious due process concerns with the vagueness of the laws, and with applying the Commonwealth's law to out-of-state merchants who did not deliberately target sales in the Commonwealth or seek the benefit of the Commonwealth's laws. *See Walden v. Fiore*, 571 U.S. 277, 283-84 (2014)(due process forbids applications of a state's law to foreign citizens who do not seek an "affiliation" with the state).  There are also First Amendment problems insofar as fear of prosecution in Kentucky chills advertising that would be lawful in other states.  *See Central Hudson Gas & Electric v. Public Servs. Comm'n*, 447 U.S. 557 (1980)(government generally may not prohibit lawful commercial speech).  And there are Equal Protection problems with the AG's selective application of the laws to online merchants like Jones & Panda but not to Amazon.  *See* Jones Dec., ¶10.

The benefits, if any, are likely to be small.  Because of KRS 367.374 and KRS 367.170's ambiguity, and the patchwork of varying state laws, *ad hoc* application of the law to individual merchants is necessarily imprecise – the AG will not be able to ensure that the law is having carefully calibrated effects.  *Ad hoc* application to U.S. merchants like Jones & Panda is also of limited effect because approximately half of Amazon's sellers are based in China and therefore practically (if not also legally) beyond the AG's jurisdictional reach.  *See* Rafelson Dec., ¶37.  And there are far more efficient and less burdensome means to police Amazon's store – starting with Amazon itself.  *Id*.  That is, for example, how the Commonwealth ensures sales tax collection: Amazon, not individual merchants, is responsible for collecting taxes for sales in its store.  *See*

KRS 139.550 (requiring companies like Amazon that "facilitate[]" online sales to remit taxes on those sales). Thus, even if the effects of the AG's application of KRS 367.374 and KRS 367.170 were primarily in-state in nature (which they are not), the law would still violate the dormant Commerce Clause.

### C.   THE AG'S APPLICATION OF KENTUCKY'S PRICE GOUGING LAWS TO JONES & PANDA IS UNCONSTITUTIONAL ON OTHER GROUNDS.

#### 1.   The Kentucky Attorney General's application of KRS 367.374 and KRS 367.170 violates the First Amendment.

The AG is violating the First Amendment by burdening commercial speech that is lawful outside of Kentucky, and by imposing an excessive burden on speech in Kentucky that is not tailored to actually accomplish a substantial interest. *See* Rafelson Dec., ¶36.

The AG cannot meet his "burden" to demonstrate that his application of KRS 367.374 and KRS 367.170 is "consistent with the First Amendment." *Sorrell v. IMS Health, Inc.,* 564 U.S. 552, 571-72 (2011)(citing, *inter alia, Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980)). The AG must, at a minimum, demonstrate that his application of the price-control laws "directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Id.*

With respect to speech outside of Kentucky, the AG cannot meet that standard because he has no interest in suppressing lawful speech beyond the border. And with respect to speech *inside* of Kentucky, the limited and *ad hoc* nature of his investigations will not actually reduce consumer prices for goods in Kentucky and will instead create market distortions and possibly higher prices. Thus, the AG's application of KRS 367.374 and KRS 367.170 to Jones & Panda fails the *minimum* standard necessary to comply with the First Amendment.

37C0B2FB-9489-4581-9884-F69F50B99889 : 000014 of 000046

But the AG must also surmount a higher bar because his application of KRS 367.374 and KRS 367.170 also appears to be a speaker-based restriction, which is almost never constitutional. The AG appears to be targeting Jones & Panda and other online merchants for sales on Amazon, but not Amazon itself – even though Amazon not only controls the commercial speech in its store, but also sells products just like small online merchants do.  Following *Sorrell,* the lower courts have considered whether speaker-based (and content-based) commercial speech restrictions are subject to strict scrutiny, not *Central Hudson's* intermediate scrutiny.  *See Vugo, Inc. v. City of New York*, 931 F.3d 42, 50 (2nd Cir. 2019)(collecting cases).  The issue arises because *Sorrell* stressed that "heightened judicial scrutiny" applies to such regulations, and then struck down the law under *Central Hudson*, while observing that "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied."  564 U.S. at 567; 571-72.  The Sixth Circuit has apparently not adopted a position.  *But see Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n,* 597 F.App'x 342, 366 (6th Cir. 2015)(Moore, J. concurring in part and dissenting in part)("[A]lthough *Sorrell* stated that 'heightened judicial scrutiny' applied, it reaffirmed the use of *Central Hudson* test and simply acknowledged the reality that content-based speech regulation will rarely satisfy the test.").

Jones & Panda contends that *Sorrell* requires strict scrutiny because the dangers of speaker-based restrictions are often just as salient in the context of commercial speech – particularly when prosecutors can use vague laws to punish some speakers but not others.  The need for strict scrutiny is apparent here, where the AG appears to be choosing among groups of speakers on the same topic:  Jones & Panda, who is threatened with prosecution, and Amazon, which is apparently not.  *Cf Greater Phila. Chamber of Commerce v. City of Phila*., 949 F.3d 116, 139 (3d Cir. 2019)("If regulation has the practical effect of promoting some messages or some speakers based on the

37C0B2FB-9489-4581-9884-F69F50B99889 : 000015 of 000046

content of the speech or the identity of the speaker, something more than intermediate scrutiny may be necessary to survive a First Amendment inquiry."). For all practical purposes, however, the outcome is the same here: the AG's application of KRs 367.374 and KRS 367.170 fails under *Central Hudson*, so by definition it fails under strict scrutiny.

> **2.    The AG's application of KRS 367.374 and KRS 367.170 violates the Due Process Clause because they are unconstitutionally vague.**

For "over a hundred years," the courts have struck down statutes "so vague that [they] fail[] to give ordinary people fair notice of the conduct [they] punish[], or so standardless that [they] invite[] arbitrary enforcement." *Shuti v. Lynch*, 828 F.3d 440, 443 (6th Cir. 2016)(quoting *Johnson v. United States*, ___ U.S. ___ 135 S.Ct. 2551, 2556 (2015); *Collins v. Kentucky*, 234 U.S. 634, 638 (1914). Such laws "violate[] the fundamental principles of justice embraced in the conception of due process of law." *Shuti*, 828 F.3d 443. In fact, just over a century ago the Court struck down a Kentucky price-control law barring prices in excess of the "market value under fair competition." *Int'l Harvester v. Kentucky*, 234 U.S. 216, 221 (1914). Estimating such a price, on pain of prosecution, unlawfully required "exact gifts that mankind does not possess." *Id*. at 223-24.

KRS 367.374 and KRS 367.170 are similarly beyond advance comprehension. *See* Rafelson Dec., ¶¶27-28; Jones Dec., ¶9. During an emergency, KRS 367.374 bans price increases that are "grossly in excess" of pre-emergency prices. What is a "gross excess"? The statute does not say; merchants can only guess.

The statute does contain a few carve-outs, see KRS 367.374(c), but they add to the ambiguity. A price increase might not be unlawful if it is "related to an additional cost imposed by a supplier," but what does "related to" mean? How "related" must the cost be? Likewise, a price increase might not be unlawful if it is "generally consistent with fluctuations in the market,

16

but again – what does that mean?  On top of that, the statute might be read to frame those carve-outs as defenses that the accused must prove, at least to avoid prosecution.

KRS 367.170 is worse – it is limited to emergencies, and is at least as vague.  Relevant here, the statute bans "unfair" trade practices, with "unfair . . . construed to mean unconscionable." KRS 367.170(1);(2).  That definition only exchanges one vague work (unfair), for another (unconscionable).  Online merchants like Jones & Panda have no way of determining ex ante whether a sale violates that standard. And, unlike KRS 367.374, which at least appears to offer some consideration of cost increases due to the emergency, KRS 367.170 does not, so the AG can prosecute under one statute what the other makes lawful.

Businesses, especially small businesses, cannot function with that kind of uncertainty.  The price-control laws are creating fear of arbitrary, *post hoc* application to prices or goods that online merchants could not forsee would be considered unlawful.  *See* Jones Dec., ¶9.  Look no further than the AG's apparent position that the statutes regulate the price of peanut butter but not spices, even though both are plausibly "Consumer food items."  *See* Rafelson Dec., ¶22.   KRS 367.374(b)(1).  Or look to the AG's decision to target small online merchants like Jones & Panda but not the titan Amazon.  *See* Rafelson Dec., ¶37.  The confusion and risk of "arbitrary enforcement" render the statutes unconstitutionally vague.  *Shuti*, 828 F.3d at 443.

### 3. The Kentucky AG's selective application of KRS 367.374 and 367.170 violates the Equal Protection Clause.

The AG is heavily targeting individual online merchants while apparently taking a light-touch approach with Amazon. Instead of regulating with an even hand, the AG has described being "grateful to Amazon for working with us" to target "third-party sellers" for their alleged "egregious

17

actions,"[2] while ignoring Amazon's accountability for *its* store, Amazon's first-party sales, and Amazon's significant markup to the cost of "third-party" sales.  *See* Rafelson Dec., ¶37; Jones Dec., ¶10.

By regulating unequally, the AG is burdening Jones & Panda's fundamental rights as set forth above, so heightened scrutiny applies. *Kiser v. Kandmar*, 831 F.3d 784, 792 (6th Cir. 2016) (tying equal protection standard to standard for substantive rights violated). The AG cannot satisfy that standard because whatever substantial interest the AG has will not be served by targeting individual merchants on an *ad hoc* basis while leaving Amazon alone.  The AG's use of Kentucky's price-control statutes would also fail rational basis review. Regulating Amazon directly is the only realistic way to impose price-order on Amazon's store. Amazon controls its store: which customers, in which states, see which items at which price. By contrast, targeting individual merchants will not accomplish the AG's price-control goals (but will devastate small businesses). The AG cannot defend that unequal and ineffective regime.

### D.   THE CID IS OVERLY BROAD, UNDULY BURDENSOME AND NOT PROPERLY LIMITED IN TEMPORAL SCOPE.

Should the Court decline to set aside the CID as arbitrary, unreasonable and/or unconstitutional, then Jones & Panda contends that good cause exists to modify the CID pursuant to KRS 367.240(2), as it is overly broad, unduly burdensome and not properly limited in temporal scope in light of the relevant price control laws.  The state of emergency was declared by Governor Beshear on March 6, 2020, thereby activating the Commonwealth's price-gouging laws, KRS 367.372 to 367.368 (the "Act").  The Act states, in relevant part, as follows:

> No person shall sell, rent, or offer to sell or rent, regardless of whether an actual sale or rental occurs, a good or service listed in this paragraph . . . for a price

---

[2] Kentucky AG Press Release (March 26, 2020), https://kentucky.gov/Pages/Activitystream.aspx?n=AttorneyGeneral&prId=888.

which is grossly in excess of the price prior to the declaration and unrelated to any increased cost to the seller. . . .

KRS 367.374(1)(b).   The Act further provides that "[a] person's price does not violate this subsection if it is:

(1)     Related to an additional cost imposed by a supplier of a good or other costs of providing the good or service, including an additional cost for labor or materials used to provide a service;

(2)     Ten percent (10%) or less above the price prior to the declaration;

(3)     Ten percent (10%) or less above the sum of the person's costs and normal markup for a good or service;

(4)     Generally consistent with fluctuations in applicable commodity, regional, national, or international markets, or seasonal fluctuations; or

(5)     A contract price, or the result of a price formula, established prior to the order implementing this subsection."

Whether a price violates this section is a question of law.  KRS 367.374(1)(d).  Importantly, in the definitions of the act, KRS 367.372(10) defines "Price prior to the declaration," as "the person's price for a good or service on the day before the date of the Governor's order implementing the provisions of KRS 367.374.

The eight Requests contained in the CID, however, require Jones & Panda to provide information and documents related to Jones & Panda's sales of hand sanitizers and respirators over an extended period – February 15, 2020 through March 25, 2020.  Any sales of hand sanitizers and respirators before March 6, 2020, would be irrelevant and overly broad, except to the extent necessary to prove the "price prior to the declaration."  As such, the CID should be modified to reflect the time frame March 6, 2020 through March 25, 2020, and any sales which would establish "the price prior to the declaration."

Additionally, the CID contains to no authority for the Kentucky Attorney General to investigate sales of any products outside of Kentucky.  Thus, to the extent the CID requires Jones & Panda to provide information and documents related to Jones & Panda's sales of hand sanitizers and respirators to customers outside of Kentucky, it is unreasonable and overly broad.  As such, the CID should be further modified to request information related to sales of hand sanitizers and respirators only to customers in Kentucky.

### E.   SHOULD THE COURT DECLINE TO SET ASIDE THE CID, JONES & PANDA REQUESTS ADDITIONAL TIME TO RESPOND.

Should the Court require Jones & Panda to respond to the CID, Jones & Panda respectfully requests additional time in light of the current COVID-19 emergency limitations currently in place.  As a result, Jones & Panda respectfully requests that the Court extend the time to respond to the CID until 30 days after the conclusion of this proceeding.

## III.   CONCLUSION

Pursuant to KRS 367.240(2) and KRS 367.260, Jones & Panda respectfully requests that the Court find that the CID is an arbitrary order that fails to meet the statutory standard and constitutes an unreasonable investigation.  Alternatively, Jones & Panda respectfully requests that the Court set aside the CID as unconstitutional, or modify the CID as set out above and extend the return date as requested above.  Jones & Panda further requests that it be awarded its reasonable attorneys' fees and court costs in having to file this Petition in light of the constitutional violations committed by the Attorney General and his extreme indifference in failing to provide a reasonable extension to responding to the Requests given the COVID-19 health emergency.

37C0B2FB-9489-4581-9884-F69F50B99889 : 000020 of 000046

Respectfully submitted,

/s/ Mason Moore Kessinger
Benjamin Lee Kessinger, III
Mason Moore Kessinger
KESSINGER LAW GROUP, PLLC
120 Kentucky Avenue, Suite 220
Lexington, KY 40502
T. (859) 253-2105
F. (877) 747-9184
Lee@KessingerLaw.com
Mason@KessingerLaw.com
ATTORNEYS FOR PETITIONER

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of May, 2020, a true and accurate copy of the foregoing Response was filed electronically with the Court's CourtNet e-filing system and copies of the same were served electronically on the following:

Jake Miller
Staff Attorney for Judge Lucy A. VanMeter
Fayette Circuit Court, Third Division
Jake.Miller@kycourts.net

J. Christian Lewis
Justin D. Clark
Matthew C. Cocanougher
Office of Consumer Protection
Kentucky Office of the Attorney General
Christian.lewis@ky.gov
Justind.clark@ky.gov
Matthew.cocanougher@ky.gov

\s\ Mason Moore Kessinger
Attorney for Petitioner

37C0B2FB-9489-4581-9884-F69F50B99889 : 000021 of 000046

COMMONWEALTH OF KENTUCKY
FAYETTE CIRCUIT COURT
CIVIL ACTION NO. 20-CI-1252
DIVISION 9

JONES & PANDA, LLC                                                    PETITIONER

V.                    **DECLARATION OF SARAH ELIZABETH JONES**

COMMONWEALTH OF KENTUCKY,
ex rel. DANIEL CAMERON, in his official capacity
as ATTORNEY GENERAL OF KENTUCKY                                       RESPONDENT

************

1.      My name is Sarah Elizabeth Jones.  I am over the age of 18, and I am under no legal

disability that would prevent me from offering the following testimony.  I make this declaration

on personal knowledge.

2.      I am the sole member of Jones & Panda, LLC ("Jones & Panda"), in which capacity

I offer this declaration.

3.      I operate Jones & Panda as a sole proprietor.  I do not have any employees.

4.      Jones & Panda is a third-party merchant on Amazon's national eCommerce retail

store.

5.      Jones & Panda is a member of the Online Merchants Guild.

6.      I purchase products from retail stores in Kentucky and other states and offer them

for sale through Amazon's website.  In addition to the retail price paid for the products, Jones &

Panda incurs additional expenses related to my time, travel, and shipping of the products ordered

by Amazon's customers, as well as Amazon's fees and commissions, which amount to 12-15% of

each sale and a monthly recurring fee of $40.00.

1

37C0B2FB-9489-4581-9884-F69F50B99889 : 000022 of 000046

7.      Amazon controls how and where items are listed on Amazon's website and in search results. I cannot control whether Amazon's customers in Kentucky see Jones & Panda's products in their search results. Only Amazon can control where and how search results are displayed.

8.      Amazon has the ultimate control over prices. I cannot unilaterally determine the listing price; instead, I research the price the product is offered by other sellers on Amazon, and use Amazon's "match lowest price" option to determine the price. Amazon retains final control over the price it will accept for listing a good on the Jones & Panda store.

9.      Upon receipt of the Attorney General's CID, I have been deterred from participating in the interstate Amazon marketplace. I am afraid to source and sell important COVID-response goods, as well as other consumer goods, as I am unclear as to how to comply with Kentucky's laws. For example, I am unsure whether some products, like peanut butter, video game systems and DVDs, are covered by Kentucky's price control laws. Additionally, it is not possible to determine prior to the sale what prices comply with the AG's interpretation of the price control statutes due to the vague statutory language.

10.     I do not understand why the Attorney General is targeting my small business, while Amazon maintains control over its store and sales. The Attorney General is applying more onerous regulation on Jones & Panda than Amazon, despite its technical sophistication and resources.

11.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 20, 2020.

_Sarah Jones_
_____
Sarah Elizabeth Jones

5/20/20

2

37C0B2FB-9489-4581-9884-F69F50B99889 : 000023 of 000046

37C0B2FB-9489-4581-9884-F69F50B99889 : 000024 of 000046



COMMONWEALTH OF KENTUCKY
OFFICE OF THE ATTORNEY GENERAL

DANIEL CAMERON
ATTORNEY GENERAL

1024 CAPITAL CENTER DRIVE
SUITE 200
FRANKFORT, KY 40601

## SUBPOENA AND CIVIL INVESTIGATIVE DEMAND
## IN RE INVESTIGATION OF:

### Complaints of Price Gouging

**TO:** Jones & Panda, LLC
1535 Summerhill Drive
Lexington, KY 40515-5849

**SERVE:** Sarah Elizabeth Jones
Registered Agent
1535 Summerhill Drive
Lexington, KY 40515-5849

Pursuant to the authority granted in KRS 367.240, 367.250, and 367.372 to 376.378, the Attorney General of Kentucky, having reason to believe that a person has engaged in, is engaging in, or is about to engage in any act or practice declared to be unlawful by KRS 367.110 to 367.300, or 367.372 to 376.378, and that it is in the public interest that an investigation should be made, hereby executes this Subpoena and Investigative Demand, as follows:

_____ That you furnish, under oath or affirmation, a report in writing setting forth the relevant facts and circumstances of which you have knowledge.

_____ That you personally appear and testify at the following location on the following date and time:

__X__ That, under oath or affirmation, you answer the following requests and produce the following documents at the time and place above or, if blank, then by emailing them together with a completed sworn statement of authenticity and completeness of documents, by no later than, **April 15, 2020** to: Matthew.Cocanougher@ky.gov

**Failure to comply with this Subpoena and Investigative Demand may result in legal action pursuant to KRS 367.290. Intentional concealment, falsification or destruction of documents may be punishable as a class A misdemeanor under KRS 367.990(3). It is a class D felony to intentionally destroy, mutilate, conceal, remove, alter, or fabricate physical evidence believing that an official proceeding may be pending or instituted, pursuant to KRS 524.100.**

Date Issued: March 25, 2020

DANIEL CAMERON
ATTORNEY GENERAL

By: _____

Matthew C. Cocanougher
Assistant Attorney General
Office of Consumer Protection
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
(502) 696-5446
Matthew.Cocanougher@ky.gov

Served via:  _____  1. Certified mail, return receipt requested.
          __X__  2. Personal delivery
          _____  3. Fax

                    Date    _____

                    By      _____

                    Title   _____

37C0B2FB-9489-4581-9884-F69F50B99889 : 000025 of 000046

37C0B2FB-9489-4581-9884-F69F50B99889 : 000026 of 000046

## ATTACHMENT TO SUBPOENA AND CIVIL INVESTIGATIVE DEMAND

### INSTRUCTIONS AND DEFINITIONS

### DEFINITIONS

"You" refers to the individual or entity identified on the Amazon platform as seller A9DC8NLML6D8C, and any person acting on behalf of such person or entity making decisions regarding the pricing matters discussed herein.

"Document" refers to any record of information of any type, including written, electronic, graphic, handwritten, etc. It includes but is not limited to invoices, receipts, notes, email and correspondence.

"Identify" with respect to a person or company means to list name of contact person, name of company, address and phone number. With respect to a document, "identify" means to list the date, title, type (letter, email, invoice, etc.), author and recipients. For documents that are provided to the Attorney General's office with your responses, and indicated as responsive to a specific numbered question, you do not need to list all the identifying information.

### INSTRUCTIONS

a.    Answer each request separately and fully in writing and under oath.

b.    As a convenience, defined terms may be capitalized and/or in bold font, but the presence or absence of capitalization or bold font does not alter or reduce the meaning of such terms.

c.    In answering the requests, furnish all information or documents known by You, or available to You, or in Your possession, direction, custody or control, regardless of how the information was obtained or whether such information is hearsay or otherwise admissible evidence.

d.    Exercise due diligence in answering each request and securing all information with which to answer each request. If You cannot answer a request fully and completely after exercising due diligence, then answer the request to the extent possible, specifying the basis for Your inability to answer the remainder and detailing Your attempts to secure the unknown information.

e.    A request that seeks information contained in whole or in part within a document, or that seeks the identification of any document, may be answered by furnishing a copy of such document, identifying the document and specifying the portion(s) of the document containing the requested information.

f.    All answers should include attachments of as many pages as are necessary to fully and completely respond, and should be identified by the number corresponding to each request as set forth below.

g.   All requests relate to all employees, agents, representatives, successors, assigns, principals, officers and directors, jointly and severally, while acting personally, or through the corporation or any other business entity or form, whose acts, practices, or policies are directed, formulated or controlled by You.

## REQUESTS

1.   Identify, by day and each specific product, the price you charged for hand sanitizers and respirators, offered for resale on the Amazon sales platform from February 15, 2020 through March 25, 2020.

2.   State the basis behind every price change you made to hand sanitizers and respirators, offered for resale on the Amazon sales platform from February 15, 2020 through March 25, 2020. For each price increase that you contend was related to an increase in your cost, describe the nature of such increase, and identify all documents that substantiate your claim.

3.   Produce all documents relating to your purchases and sales of hand sanitizers and respirators, offered for resale on the Amazon sales platform from February 15, 2020 through March 25, 2020.

4.   Produce all documents relating to the supply and demand of hand sanitizers and respirators, offered for resale on the Amazon sales platform from February 15, 2020 through March 25, 2020, including correspondence, recordkeeping and any sources you relied on in making pricing decisions during that period.

5.   Produce all documents relating to the retail prices you charged for hand sanitizers and respirators, offered for resale on the Amazon sales platform from February 15, 2020 through March 25, 2020, including any documents upon which you rely to justify any price increases that may have occurred.

6.   For each sale you made of hand sanitizers and respirators through the Amazon sales

platform from February 15, 2020 through March 25, 2020, identify for each specific product: (a) the date of the sale; (b) the name, residence/location, and contact information of each buyer of such product; and (c) the total cost paid by the buyer for each transaction, broken down by individual components.

7.    Produce all documents relating to each sale you made of hand sanitizers and respirators through the Amazon sales platform from February 15, 2020 through March 25, 2020, which identify, for each specific product: (a) the date of the sale; (b) the name, residence/location, and contact information of each buyer of such product; and (c) the total cost paid by the buyer for each transaction, broken down by individual components.

8.    Produce all documents you identified in your responses to the questions above.

**There is a continuing obligation to disclose pursuant to this CID.**

STATE OF _____    )
COUNTY OF _____    )

        I, _____ declare under oath, subject to the penalty of perjury, that the foregoing statements are true, to my knowledge or belief.

                    Signature:_____

        Subscribed, sworn to and acknowledged before me by _____ (name), _____(title), on behalf of _____, on _____, ____.

        My Commission expires: _____.

                    Signature:_____
                    Print Name:_____
                    Title:    _____



**ANDY BESHEAR**
GOVERNOR

**EXECUTIVE ORDER**

**Secretary of State**
Frankfort
Kentucky

**2020-245**
**March 20, 2020**

### STATE OF EMERGENCY RELATING TO
### THE PROHIBITION AGAINST PRICE GOUGING

**WHEREAS,** on March 6, 2020, a case of the novel coronavirus (COVID-19) was confirmed in the Commonwealth; and

**WHEREAS,** this condition continues to endanger public health and safety; and

**WHEREAS,** state and local governments share responsibility for protection of public health, safety, and security and for taking appropriate actions to ensure the provision of essential public services; and

**WHEREAS,** I, Andy Beshear, Governor of the Commonwealth of Kentucky, by virtue of the authority vested in me by the Constitution of the Commonwealth of Kentucky and by Chapter 39A of the Kentucky Revised Statutes, did on March 6, 2020, declare by Executive Order 2020-215 that a State of Emergency exists in the Commonwealth of Kentucky effective March 6, 2020; and

**WHEREAS,** I, Andy Beshear, Governor of the Commonwealth of Kentucky, by virtue of the authority vested in me by the Constitution of the Commonwealth of Kentucky and Chapter 367 of the Kentucky Revised Statutes, did on March 7, 2020, declare by Executive Order 2020-216 that a State of Emergency exists in the Commonwealth of Kentucky and implemented the provisions of KRS 367.372, *et seq.*, as to the sale of goods and services, to prohibit price gouging; and

**WHEREAS,** as the State of Emergency continues in the Commonwealth, I am empowered by the Constitution of the Commonwealth of Kentucky and Chapter 367 of the Kentucky Revised Statutes to continue to implement certain provisions of law aimed toward protecting Kentucky Consumers:

**NOW, THEREFORE,** I, Andy Beshear, Governor of the Commonwealth of Kentucky, by virtue of the authority vested in me by the Constitution of the Commonwealth



**ANDY BESHEAR**
GOVERNOR

**EXECUTIVE ORDER**

**Secretary of State**
Frankfort
Kentucky

**2020-245**
**March 20, 2020**

of Kentucky and Chapter 367 of the Kentucky Revised Statutes, do hereby renew the implementation of the provisions of KRS 367.372, *et seq.*, as to the sale of goods and services, and do hereby Order and Direct that:

1. No person, within the meaning of KRS 446.010, shall sell or offer to sell any good or service delineated in KRS 367.374(1)(b) at a price grossly in excess of the price prior to the declaration by Executive Order 2020-215 on March 6, 2020, that a Statewide State of Emergency exists in the Commonwealth of Kentucky.

2. The foregoing is subject to the qualifications and limitations set forth otherwise in KRS 367.372, *et seq.*, with regard to increased cost to sellers *inter alia.*

3. Any person who violates the provisions of KRS 367.372. *et seq.*, as implemented by this Order, shall be subject to the penalties set forth in KRS 367.378 or other applicable law.

4. Upon the effective date of this renewal, the Division of Emergency Management shall immediately notify the public and those registered with the Division for the purpose of receiving notice of the implementation, renewal, or termination of the provision of this Order relating to KRS 367.374. The Division shall notify the public by any means available, including the Division's Web site, news media, and electronic mail. Any person or trade association may register with the Division for the purpose of receiving notification.

    This Order shall be effective upon the expiration of Executive Order 2020-216 on March 22, 2020. This Order shall be in effect for the duration of the State of Emergency herein referenced, but shall expire after 15 days from the effective date and notice of implementation and shall be subject to renewal thereafter, subject to applicable law, if necessary to protect the lives, property, or welfare of the citizens of the Commonwealth of Kentucky

ANDY BESHEAR, Governor
Commonwealth of Kentucky

MICHAEL G. ADAMS
Secretary of State



COMMONWEALTH OF KENTUCKY
OFFICE OF THE ATTORNEY GENERAL

DANIEL CAMERON
ATTORNEY GENERAL

1024 CAPITAL CENTER DRIVE
SUITE 200
FRANKFORT, KY 40601

March 25, 2020

VIA HAND DELIVERY

Jones & Panda, LLC
1535 Summerhill Drive
Lexington, KY 40515-5849

c/o Registered Agent
Sarah Elizabeth Jones
1535 Summerhill Drive
Lexington, KY 40515-5849

Re: Investigation of Price Gouging Complaints

Dear Sir or Madam:

In response to a confirmed case of the novel coronavirus in Kentucky, Governor Beshear issued an Executive Order on March 6, 2020, declaring a state of emergency in the Commonwealth and activating the Commonwealth's price-gouging laws set forth in Kentucky Revised Statutes (KRS) 367.372 to 367.368 (the Act). The activation of the Act was just recently renewed through the Governor's March 20, 2020 Executive Order. A copy of the March 20, 2020 Executive Order and the price gouging statute are enclosed herein.

The Kentucky Office of the Attorney General (KOAG) has received information from Amazon relating to the prices charged, during the ongoing state of emergency for respirators and hand sanitizers offered for sale on its platform by a third-party seller identified as A9DC8NLML6D8C, with a store front name of Jones & Panda. This letter is to inform you that the KOAG is opening an investigation into this information. To the extent your current pricing practices are in violation of the aforementioned statute, you are hereby directed to immediately cease and desist from such violations.

In furtherance of its investigation, the KOAG is serving you with the enclosed Subpoena and Civil Investigative Demand. I look forward to receiving your responses as set forth in this document. In the meantime, please feel free to contact me should you have any questions or wish to discuss this matter.

March 25, 2020
Page 2

Sincerely,

Matthew C. Cocanougher
Assistant Attorney General

Encl.

37C0B2FB-9489-4581-9884-F69F50B99889 : 000032 of 000046

37C0B2FB-9489-4581-9884-F69F50B99889 : 000033 of 000046

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**

| | | |
|---|---|---|
| **ONLINE MERCHANTS GUILD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 3:20-cv-00029-GFVT** |
| | ) | |
| **DANIEL CAMERON,** | ) | |
| **in his official capacity as** | ) | |
| **ATTORNEY GENERAL OF** | ) | |
| **KENTUCKY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**DECLARATION OF PAUL S. RAFELSON IN SUPPORT OF ONLINE MERCHANTS GUILD'S MOTION FOR PRELIMINARY INJUNCTION**

---

1. My name is Paul S. Rafelson. I am over the age of 18, and am under no legal disability that would prevent me from offering the following testimony. I make this declaration on personal knowledge in the field of online merchandising, sales on Amazon, and the other matters discussed herein.

2. I am the Executive Director of the Online Merchants Guild, in which capacity I offer this declaration. I am also an attorney in private practice who represents online merchants. I also have experience as an online merchant myself.

3. The Online Merchants Guild is a trade association for online merchants. The association's purpose is to advocate for a free and fairly-regulated online marketplace, and for the interests of online merchants. Our members are small business owners who have built new enterprises from scratch.

37C0B2FB-9489-4581-9884-F69F50B99889 : 000034 of 000046

4. The members of the Online Merchants Guild, and similarly-situated online merchants, are making key goods available for sale to Americans during the COVID-19 pandemic. For instance, our members are sourcing in-demand items like masks and hand sanitizer and bringing them to market, so that American institutions and individuals can purchase and deploy them. Those sales also send price signals, which encourage manufacturers to increase production of goods. Our members also continue to source and sell more traditional goods unrelated to COVID-19.

5. In many instances, our members are acquiring overseas goods that would otherwise likely not be accessible to the U.S. market. In so doing, our members are relying on supply chain relationships and market knowledge that they have cultivated over years.

6. Many of our members are engaged in retail arbitrage, the economics of which depend on selling items for more than their purchase price. It is important to note that our members' acquisition costs have increased, such that they must increase their offer prices to cover those costs.

7. In January, many Online Merchants Guild members acquired masks and hand sanitizer in states in the middle of the country at a time where there were no coronavirus cases in the state, and no indication of emergency from the state or federal government. At a time when supply was short in states like California and New York, where the products were needed the most, members were able to reallocate supplies from the local marketplace to a national marketplace, via Amazon's retail store, so that these products would get to the front lines, in order to stop or slow the spread of the virus. There was no emergency order from the Governor of Kentucky. Considering that the best way to fight a pandemic is to

37C0B2FB-9489-4581-9884-F69F50B99889 : 000035 of 000046

stop or slow the spread, getting these products into the areas where they were needed the most was a matter of national importance.

8. Amazon's store is the dominant eCommerce website for sales of COVID-response goods, and is a critically important sales channel for online merchants in general. However, online merchants have little influence over sales on Amazon, as I will explain.

9. Amazon has dominant legal and practical control over sales made through its online retail storefront as a result of Amazon's market power and its contractual terms.[1] Amazon also takes a commission (averaging 15% when delivery is effectuated by the merchant) on sales by online merchants, in addition to a recurring fee for the right to use Amazon's store.

10. Many merchants also participate in a program called Fulfillment by Amazon ("FBA"). Through FBA, merchants can ship their goods to Amazon's warehouse, which is usually the warehouse nearest to them. From there Amazon will redistribute the goods across its network of warehouses and distribution centers throughout the country. When goods are offered via FBA, Amazon features those goods as "Prime Eligible," meaning that members of Amazon's Prime program are more likely to purchase the products, as it will be delivered in two days, a key benefit of being a Prime Member. Amazon's percentage is even higher for FBA sales: 45% of the sale price (30% plus the 15% commission).

11. When Amazon's customers purchase Prime products, Amazon packs and ships the goods in their fulfillment centers and ships it to their customer.

---

[1] The Amazon Services Business Solutions Agreement ("BSA"), through which Amazon sets the contractual terms for selling on Amazon, is available here: https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US. The agreement and related contractual documents are incorporated herein by reference.

37C0B2FB-9489-4581-9884-F69F50B99889 : 000036 of 000046

12. It is not possible for online merchants using Amazon's store to engage in Kentucky-specific sales or pricing; nor can they realistically avoid making sales in Kentucky. The same is true for every state—from the perspective of our members, Amazon is a single national marketplace.

13. Amazon controls how and where items are listed on Amazon's store and in search results. Amazon maintains "the right to determine the design, content, functionality, availability and appropriateness of its websites, selection, and any product or listing in the Amazon Stores, and all aspects of each Service, including [online merchants'] use of the same."[2] Online merchants cannot control whether customers in a state like Kentucky see the merchant's products in their search results. Our members cannot prohibit items from appearing in certain states. Only Amazon can control where and how search results are displayed.

14. Amazon has ultimate control over prices in its store. Online merchants cannot unilaterally determine the listing price; instead, they can estimate a price Amazon is likely to approve, based on historical sales data Amazon provides, and propose that to Amazon. Amazon retains final control over the price it will accept for listing a good on the Amazon site. Amazon commonly rejects prices for being too high (or too low) in Amazon's view. Of course, the merchant's proposed price will need to account for the merchant's acquisition and other costs, including Amazon's fees, and may reflect a demand premium, but ultimately the price the consumer sees does not happen without Amazon's approval. Amazon also has an Application Programming Interface ("API"), which allows third-party applications to interact with Amazon's store, including

---

[2] BSA at S-6.

37C0B2FB-9489-4581-9884-F69F50B99889 : 000037 of 000046

applications that automatically adjust the price, in response to changing market conditions, which are determined by a data feed via Amazon's API of prior retail sales of similar products in Amazon's store. Amazon also has the ability to block such applications in times of emergency. Amazon also has a "Match Lowest Price Button," which allows merchants to agree to offer products at whatever Amazon determines the lowest price to be.

15. As the eCommerce store in the United States, responsible for over 50% of all eCommerce sales in the country, Amazon has the ability to set the market by regulating (or not) prices for certain goods. Here, Amazon effectively enabled high prices for certain COVID-response goods by permitting prices at a certain level in January and February, as concern about COVID grew.

16. Online merchants are not in privity of contract with Amazon's customers; Amazon is. Amazon makes clear that customers are "Amazon's customers," not online merchants' customers. In many instances, online merchants do not even ship goods to Amazon customers. Instead, using the Fulfilled by Amazon process, merchants warehouse their goods with Amazon (at a warehouse of Amazon's selection), and then Amazon ships the goods directly to consumers.[3] Amazon also processes customer payments.

17. Amazon controls communications with customers, barring online merchants from sending "unsolicited" communications, requiring use of Amazon's messaging platform to communicate with customers, and limiting the scope of communications to those "necessary for fulfilling the order or providing customer services."[4] Amazon also forbids

---

[3] *See* BSA at Fulfillment Services.
[4] Amazon Selling Policies and Seller Code of Conduct, https://sellercentral.amazon.com/gp/help/external/help.html?itemID=G1801&language=en_US&ref=%20ag_G1801 _cont_521.

37C0B2FB-9489-4581-9884-F69F50B99889 : 000038 of 000046

online merchants from directing Amazon's customers to the merchants' own websites, or to any sales channel other than Amazon.

18. Amazon has a policy of demanding that online merchants validate listings, such as by requiring receipts to prove that name-brand merchandise was lawfully obtained. Amazon will terminate listings, or accounts, if it is not satisfied with sellers' responses. That reflects Amazon's control over its store, and its ability to establish rules that ensure Amazon's sales are in compliance with the law.

19. Online merchants using Amazon cannot realistically avoid sales into states like Kentucky. As explained above, merchants cannot prospectively limit such sales because Amazon controls the search results and listings on Amazon. It is impractical for online merchants to "watch" for sales into particular states and reactively cancel them. Further, Amazon limits the number of sales that an online merchant can cancel, and will shut down the accounts of merchants that Amazon perceives cancel too many orders.

20. I am aware that the Attorney General of Kentucky and Attorneys General from other states are investigating alleged price-gouging in the sale of goods on Amazon, and are attempting to use state law to impose price controls on the sale of various goods in Amazon's store. Our understanding is that the Kentucky AG is conducting his investigations using sales data provided by Amazon.

21. The Online Merchants Guild has had to expend organizational resources in response to the Kentucky AG's investigation (and those of other AGs), such as by working with targeted merchants to understand and respond to the subpoenas. We have also had to analyze the complex web of investigations and discuss open questions with merchants

37C0B2FB-9489-4581-9884-F69F50B99889 : 000039 of 000046

who have not received subpoenas, but who are confused and concerned about what they can and cannot sell online, beyond hand-sanitizer and facemasks, and at what price.

22. Relative to sales on Amazon, the investigations in Kentucky appear to be somewhat oriented toward the sale of items like hand sanitizer, sanitizing wipes, and personal protective equipment ("PPE") like gloves, masks, and gowns. However, I also understand from members that the Kentucky AG has taken the position that some food items are included in the scope of the AG's investigation. For example, in discussions with the AG's office, one AAG expressed their position to me and other merchants present on the call that peanut butter "may" be covered by the Commonwealth's price-control laws, but McCormick spices are not; masks and hand sanitizers were only the first phase of the investigation.

23. Online merchants are increasingly concerned about their inability to predict which items the Kentucky AG (and other state AGs) may target in the future. For example, online merchants are questioning whether items like video game systems and DVDs could be covered by state price-gouging laws, since people are spending more time at home and are looking for more home entertainment.[5] The same expansive view of which items are "affected" by COVID-19 can conceivably apply to many consumer goods that have not typically been associated with responding to the disease as such.

24. As the duration of the COVID-19 crisis drags on, other states have already enacted such measures. For example, California has expanded their price gouging law to apply to "consumer goods" and any increase of more than 10% establishes a presumption of price

---

[5] *See, e.g.*, Maya Shwayder, *Nintendo Switch Price Gouging Is Rampant on Amazon*, Digital Trends (March 30, 2020) https://www.digitaltrends.com/news/nintendo-switch-amazon-price-gouge/ (media report of alleged price-gouging in the online sale of Nintendo video game systems).

37C0B2FB-9489-4581-9884-F69F50B99889 : 000040 of 000046

gouging. As states have attempted to enforce these price gouging laws by sending subpoenas to merchants outside of their borders, these merchants whether located in Kentucky or elsewhere are operating under a credible fear that they might be operating their business under a presumption of guilt in California law, imposing a chilling effect on interstate commerce. That illustrates how a single state's law can affect the entire market outside that state's borders.

25. The Kentucky AG has targeted members whose sales via Amazon's retail platform were not made to Amazon's customers located in Kentucky.

26. The Kentucky AG's price-gouging investigations is having chilling effects on the Online Merchants Guild's members. One problem is geographic: from the perspective of members, Amazon's marketplace is a unitary interstate market, not a state-by-state market. It is not possible for members to make Kentucky-only sales or offer Kentucky-only prices on Amazon. So members must either treat Kentucky prices as a possible ceiling, or abstain from selling goods on Amazon entirely.

27. The second problem has to do with Kentucky's price-control scheme: it is not possible to determine *ex ante* which goods are covered and which prices comply with the AG's interpretation of the price-gouging statutes due to the vague statutory language. The AG relies on two price-control statutes: KRS 367.374 and KRS 367.170. Neither defines the scope of coverage or lawful prices in a clear way. Although KRS 367.374 does appear to permit some modest level of price increase, the practical burden appears to fall on the merchant to justify the basis for any increase. KRS 367.170 does not contain a similar exception, which would allow the AG to prosecute under that statute sales that might be lawful under KRS 367.374.

37C0B2FB-9489-4581-9884-F69F50B99889 : 000041 of 000046

28. Kentucky's price-control statutes do not provide our members fair warning with what they must do to avoid violating Kentucky law. The vague and arbitrary nature of the laws is also restricting our members' participation in the national economy.

29. The Kentucky AG's investigation is adversely affecting the members of the Online Merchants Guild. Members are concerned about their liability, confused about what qualifies as price-gouging and which goods are or will be covered, and concerned that they cannot realistically use Amazon's platform without arguably violating an indeterminate body of law in Kentucky and elsewhere.

30. Kentucky's laws conflict with those of other states, and the overall patchwork of competing laws is disrupting the national marketplace.

31. Online merchants are declining to source and/or sell items for fear of inadvertently violating the law of Kentucky or other states. That is harming their businesses, and also restricting the free flow of goods into the interstate Amazon marketplace. Online merchants are also bearing increased costs as a result of compliance concerns.

32. To give an illustration, an online merchant in the Western U.S. is able to source a large quantity of hand sanitizer from an overseas manufacturer (at an increased cost to him), but is concerned that he could inadvertently violate the law of Kentucky (or other states), or at least be exposed to an expensive investigation, if he offers it for sale at a price that reflects his increased costs and/or a demand premium. However, the company is now reluctant to acquire and sell the hand sanitizer, effectively keeping it out of the interstate market and reducing supply to American consumers, due to fear of prosecution.

33. Various Online Merchants Guild members have developed significant expertise and networks of international manufacturing contacts that make them proficient at sourcing

37C0B2FB-9489-4581-9884-F69F50B99889 : 000042 of 000046

products that are in demand, including COVID-related items like hand sanitizer and masks that are in high demand. However, rather than putting their expertise to use to bring these high demand products to market, they refuse to act in fear of future civil or criminal ramifications, as the acquisition cost of these products has increased substantially from suppliers around the world, compared to their pre-COVID emergency price. This chilling effect caused by much more than just hypothetical fear, that the sale of these products at higher prices will lead to a presumption of price-gouging, and a subsequent investigation by the AG's office is a substantial burden on interstate commerce, and is actually contributing to the shortages and higher prices that consumers are facing when seeking to acquire these goods. A law or enforcement regime that has the effect of deterring procurement of high demand products for sale in our nation's economy at a time when they are most needed, is not only unconstitutional, it is detrimental to the best interests of our nation. The artificial supply restrictions resulting from the Kentucky AG's efforts to control prices in the national marketplace may actually lead to price *increases*, as well as inefficient allocation of goods in general.

34. Retail arbitragers who regularly find goods in stores to resell online at higher prices, are usually praised for their ingenuity.[6] Because of its low barrier to entry, retail arbitrage is often a path out of a bad situation for our members. In times similar to these, like the high unemployment we saw after the 2008 Financial Crisis, many of our soon-to-be members lost their jobs, and were left with no option, but to seek assistance from the government. However, rather than becoming reliant on government assistance until the economy, and

---

[6] Jill Cornfield, *From $300 T-Shirts to To Retail Arbitrage, Online Entrepeneurs Can Make Serious Bank Whole Doing What They Love*, CNBC (Feb. 11, 2020), https://www.cnbc.com/2020/02/11/how-to-start-by-cleaning-your-closet-and-end-up-making-money-online.html

37C0B2FB-9489-4581-9884-F69F50B99889 : 000043 of 000046

the job market, recovered, many of our members, the retail arbitragers, learned how to be self-reliant business owners by sourcing goods locally for sale in Amazon's national storefront. Retail arbitrage is often a steppingstone for many of our members, who go on to start their own brands or form valuable relationships with brands that want to sell online and lack the expertise to do so.  One of our members recently told Congress about her journey, in testimony submitted to the House Committee on Small Businesses: "I needed to find a way to boost my income so I can tackle the cost of college [for my son]." I can proudly report that this member not only supported her son through college, she was ultimately able to quit her job and support herself. She has also launched a new business where she manufacturers her own product and is able to offer it for sale in Amazon's store front. While many of our members started in arbitrage as a "side-gig" to supplement their "day job," some of our members have been homeless, and even those that weren't have found themselves in situations where they were living on the brink of poverty, and found arbitrage as a way to climb out.

35. Some online merchants have received death threats or other forms of vitriolic abuse due to the publication of their identity in connection with investigations of alleged price-gouging. As one would expect, that too is having a chilling effect on online merchants' participation in the marketplace.

36. The Kentucky AG's investigations and threatened application of Kentucky's price-control statutes is chilling our members' advertising and commercial speech. Our members are concerned that offering a good at a lawful price in one state (or other countries) might be considered unlawful in Kentucky. As a result, they are refraining from engaging in protected commercial speech.

37C0B2FB-9489-4581-9884-F69F50B99889 : 000044 of 000046

37. The Kentucky AG's investigations and threatened application of Kentucky's price-control statutes is not regulating equally as between our members and Amazon. The Kentucky AG has subpoenaed and threatened our members with legal consequences. On information and belief, he has not done the same to Amazon, even though Amazon is similar to our members in certain ways and a more logical focus for price-control regulation in other ways. It is important to note that Amazon is often a seller itself (making so-called first-party sales, as opposed to third-party sales by our members on Amazon's store). In some cases, Amazon's prices are higher than those of our members or other online merchants, but because Amazon controls product placement, its items appear highest in search results, effectively setting the market at a higher price. AG has apparently not taken action against Amazon for its own first-party sales, contrary to the AG's position as to our members. Amazon also plays a significant role in third-party sales. Amazon's commissions form a large part of the marginal price of goods our members offer, much like a traditional retail upcharge in a brick-and-mortar store. And, as explained above, whereas our members have little influence over Amazon's store, Amazon's control over its store, scale, technical sophistication, and resources make Amazon the most efficient point on which to impose calibrated regulation to comply with Kentucky laws. So not only has the Kentucky AG apparently not been regulating equally, he has been applying more onerous regulations on parties who are less able to bear and further the putative ends of those regulations. In the analogous tax arena, by contrast, Kentucky law places the burden of collecting and remitting sales tax on Amazon, not on individual merchants like our members. *See* KRS 139.550 (requiring "marketplaces" that "facilitate[]" online sales to remit taxes on those sales).

38. Many sellers on Amazon are beyond the Kentucky AG's practical reach and effective legal reach. For example, approximately half of sellers on Amazon are based in China. Investigations against such sellers are unlikely to be effective in controlling prices, whereas the tactic is burdensome on our members. That further illustrates why the burden the Kentucky AG is placing on our members, and the interstate market, is unlikely to achieve the AG's policy goals.

39. The Kentucky AG is effectively regulating and coercing members who do not have sufficient contacts with Kentucky to give him that authority. Most of our members live outside the Commonwealth, and their use of Amazon to list or sell items does not reflect a deliberate affiliation with Kentucky or a decision to seek the protection of the Commonwealth's laws.

40. The costs of actual or threatened application of Kentucky's price-control laws to our members is causing and will cause financial harm. Many of our members are not able to withstand such costs, which threatens the viability of their businesses—especially during a period of general economic distress. Although our members who decline to acquire and/or offer goods are losing sales qualitatively, it is not easy to quantify the amount of those injuries. It is also unclear how to quantify the impact on Americans who lose the opportunity to purchase those items or the other adverse impacts on the national market.

41. Amazon plays a significant role in Kentucky's financial and political economy, as is the case in other states.[7] In my experience, some state officials take a light-touch approach to regulating Amazon so as to seek Amazon's investment in the state or otherwise accommodate Amazon.

---

[7] See, e.g., Amazon, *Amazon's Expansion in Kentucky*, https://blog.aboutamazon.com/transportation/amazons-expansion-in-kentucky (promoting Amazon's investment of "more than $8 billion in the state").

3TC0B2FB-9489-4581-9884-F69F50B99889 : 000046 of 000046

42. Preliminary injunctive relief against application of KRS 367.374 and KRS 367.170 to the Online Merchants Guild's members' sales on Amazon is necessary to protect the interests of the Online Merchants Guild and its members, and to allow them to make COVID-response goods (and other goods) available for purchase in the interstate market. Absent such an injunction, members will remain chilled in their interstate marketplace activity, their businesses will suffer, and there will be fewer such goods for Americans to purchase in the interstate market.

43. It is possible for Amazon to regulate prices and search results on its store. As set forth above, Amazon has practical and legal control over those aspects of its store, and Amazon has historically been able to police its store in response to price concerns, including during the COVID-19 pandemic.[8]

44. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 11, 2020

s/Paul S. Rafelson

Paul S. Rafelson

---

[8] *See* Annie Palmer, *Amazon Cracks Down on Coronavirus Price-Gouging and Products Making False Claims*, CNBC (Feb. 27, 2020), https://www.cnbc.com/2020/02/27/amazon-cracks-down-on-coronavirus-price-gouging-false-claims.html (describing Amazon's efforts to police its store).