UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| ONLINE MERCHANTS GUILD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:20-cv-00029-GFVT |
| | ) | |
| V. | ) | |
| | ) | |
| DANIEL CAMERON, in his official | ) | **MEMORANDUM OPINION** |
| capacity as Attorney General of | ) | **&** |
| Kentucky, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

Is an old constitution relevant to a new economy? This case answers "yes." The protections of the Commerce Clause are available to those in a virtual economy no less than those who trade in an economy defined by bricks and mortar.

At issue here are KRS § 367.170 and KRS § 367.374, two Kentucky statutes crafted to prevent, among other things, any price gouging of Kentucky consumers. In recent months, these statutes have served as the basis for investigations by the Attorney General into potentially excessive prices charged on Amazon's online store. Plaintiff Online Merchants Guild takes issue with these investigations. On May 1, 2020, Merchants Guild filed suit, challenging what it believes is an unconstitutional application of the statutes as they relate to a specific class of retailers—those who use an online, interstate platform like Amazon. [R. 1.]

On May 15, 2020, the Court denied Merchant Guild's Motion for Temporary Restraining Order. [R. 18.] The parties have since submitted additional briefing on the motion for preliminary injunction and participated in oral argument on the matter. The Court now addresses whether the circumstances warrant a preliminary injunction, enjoining Defendant

Attorney General Cameron from investigating Plaintiff's members and similarly situated merchants for potential violations of KRS § 367.170 and KRS § 367.374 or undertaking any related enforcement actions.  For the following reasons, Plaintiff Online Merchant Guild's Motion for Preliminary Injunction [R. 10] is **GRANTED**.

## I

In the wake of the coronavirus pandemic's economic fallout, Kentucky Attorney General Daniel Cameron began investigating alleged price gouging in order to protect Kentucky consumers.  [*See* R. 10-1 at ¶¶ 20, 37.]  As part of this initiative, Attorney General Cameron investigated, and continues to investigate, potential price gouging in the sale of goods on Amazon's online store.  *Id.* at ¶ 20.  As a result of these investigations, Merchants Guild, a trade association for online merchants, brought suit against the Attorney General.  [R. 1.]  Merchants Guild alleges that the Attorney General's investigation into Amazon sales has recently been targeted at certain of its members—merchants who supply Amazon[1]—and that the investigations have caused a large contingent of its membership to grow concerned over potential liability.

Merchants Guild does not contest whether Kentucky law allows for these investigations. Under the Kentucky Consumer Protection Act, the Attorney General has authority to investigate whether price gouging has occurred in violation of KRS § 367.170 and, in times of emergency, the closely related KRS § 367.374.[2]  *See* KRS § 367.240.  And, on the record, it appears the Attorney General acted pursuant to this authority in this instance.

---

[1] In its motion, Merchants Guild repeatedly represents that its members "are not even retailers—they are suppliers of *Amazon's* store."  [R. 10 at 3 (emphasis in original).]  The significance of this distinction will be addressed more fully below.

[2] Pursuant to KRS § 367.378, all powers and duties provided in the first portion of KRS Chapter 367 "apply with equal force and effect to an act declared unlawful by KRS 367.374."

First, the Attorney General began working with Amazon to identify potential price gougers based in Kentucky.  [R. 22 at 7 (citing Kentucky AG Press Release (March 26, 2020), https://kentucky.gov/Pages/Activitystream.aspx? n=AttorneyGeneral&prId=888.).]  Following discussions with Amazon, the Attorney General issued a civil investigative demand (CID) to a newly minted Merchants Guild member, Jones & Panda, LLC, in addition to other vendors who are not members.[3]  [*See* R. 22-1 at 13; *see also* Kentucky AG Press Release (March 26, 2020).]  The CID explained that the Attorney General had "reason to believe" that Jones & Panda "ha[d] engaged in, is engaging in, or is about to engage in any act or practice declared to be unlawful by KRS 367.110 to 367.300 or KRS 367.372 to 376.378," the price gouging statutes.  [R. 22-1 at 13.]  By way of the CID, the Attorney General requested certain business information from Jones & Panda regarding products it sold on Amazon.  *See id.* at 16.  After receipt, Jones & Panda brought suit in Fayette County Circuit Court seeking a court order setting aside or modifying the CID.[4]  *Id.* at 11.  On the present record, that suit remains pending.  [*See* R. 33; R. 34.]

In the present suit, Merchants Guild contests the constitutionality of the price gouging statutes that serve as the basis for the Attorney General's recent investigations—KRS § 367.170 and § 367.374.  [R. 10 at 1.]  In different ways, each statute prohibits price gouging.  KRS § 367.170 prohibits "unfair" acts or practices of any trade or commerce, defining unfair as unconscionable.  KRS § 367.374 is more specific, prohibiting prices charges "grossly in excess" of prices charged prior to a declared emergency.  It further specifies that a price will not violate

---

[3] Merchants Guild also suggests, without providing details, that additional members have been the target of investigatory actions.  [*See* R. 22 at 4 ("[T]he AG knows whom it targeted. . . . Assistant AG Cocanougher has participated in telephone calls with Guild members and Mr. Rafelson regarding the investigations . . . ."; *see also* R. 34 at 7 (discussing "other Guild members who have received subpoenas").
[4] Merchants Guild is not a party to the state court lawsuit.

3

the subsection if it is 10% percent or less above the price prior to the emergency declaration or 10% or less above the sum of the person's costs and normal markup.  KRS § 367.374(1)(c).

Merchants Guild argues the Attorney General's recent application of these statutes are in violation of numerous constitutional provisions: (1) the dormant Commerce Clause; (2) the First Amendment; (3) the Due Process Clause; and (4) the Equal Protection Clause.  [R. 10 at 7.]  In response, Attorney General Cameron argues first that there is no federal subject matter jurisdiction such that a preliminary injunction is not available and, alternatively, that the statutes do not violate the constitutional provisions at issue.  [R. 21-1 at 1.]

## II

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (cleaned up) ("[A] preliminary injunction involv[es] the exercise of a very far-reaching power . . . .")).  To determine whether to issue a preliminary injunction, a court must consider: 1) whether the movant has shown a strong likelihood of success on the merits; 2) whether the movant will suffer irreparable harm if the injunction is not issued; 3) whether the issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing the injunction. *Overstreet,* 305 F.3d at 573 (citations omitted).

A court need not consider all of the factors if it is clear that there is no likelihood of success on the merits.  *See Amoco Protection Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n. 12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on

the merits rather than actual success."). Relatedly, the Sixth Circuit has clarified that, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). However, even if the plaintiff is unable "to show a strong or substantial probability of ultimate success on the merits" an injunction can be issued when the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *In re Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

### A

The Court will first consider whether Merchants Guild can establish a likelihood of success on the merits which, as noted, is often the determinative factor in this context. *Schimmel*, 751 F.3d at 430. In this case, before proceeding to the substance of the constitutional claims, certain jurisdictional considerations must be addressed.

### 1

An essential part of establishing a likelihood of success is establishing standing to sue. The Sixth Circuit has explained that an "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that plaintiff has standing." *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 260 n. 5 (6th Cir. 2018) (quoting *National Wildlife Federation v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (emphasis in original)).

To satisfy the case or controversy requirement of Article III—"the 'irreducible constitutional minimum' of standing"—a plaintiff must demonstrate three things: "that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and

that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "[A] plaintiff must also establish, as a prudential matter, that he or she is the proper proponent of the rights on which the action is based." *Haskell v. Washington Twp.*, 864 F.2d 1266, 1275 (6th Cir. 1988) (citations omitted).

The Attorney General asserts that Merchants Guild lacks standing both (1) to sue on its own behalf, and (2) to sue via associational standing on its members' behalf. [R. 21-1 at 7–8.] These assertions are based on the premise that Merchants Guild "has offered no evidence whatsoever of any direct injury" to itself and "has not identified any member who has suffered any injury." *Id.* at 7, 8. Merchants Guild disagrees. First, Merchants Guild contends that it has standing in its own right because it has demonstrated that the Attorney General's allegedly unlawful conduct has caused it to divert resources in order to address and mitigate the impact of that conduct as to its members. [R. 22 at 3.] In the alternative, it contends that it has associational standing to sue on behalf of injured members. *Id.* at 4.

**a**

To prove that it has suffered an injury-in-fact, Merchants Guild must show "an invasion of a legally protected interest which is 'concrete and particularized,' and 'actual and imminent, not conjectural and hypothetical.'" *Spokeo v. Robins*, 136 S. Ct. 1540 (2016) (quoting *Lujan*, 504 U.S. at 560. For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id.* (citation omitted). And for an injury to be concrete it must be "real, and not abstract." *Id.* (internal quotations and citations omitted).

In the context of organizational standing, the Sixth Circuit has made clear that a cognizable injury may arise "from a 'purportedly illegal action [that] increases the resources the

group must devote to programs independent of its suit challenging the action.'" *Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer*, 943 F.2d 644, 646 (6th Cir. 1991) (alteration in original) (citation omitted).   Stated otherwise, organizational injury exists where an organization alleges that the purportedly illegal action perceptibly impairs or frustrates its mission and there is a "consequent drain on the organization's resources."  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 577 (6th Cir. 2013).

Based on the current record, Merchants Guild has sufficiently established that it has suffered a particularized and concrete injury.  Merchants Guild states that, as a trade association for online merchants, its mission "is to advocate for a free and fairly-regulated online marketplace, and for the interests of online merchants."[5]  [R. 10-1 at ¶ 3.]  So, in response to the price gouging investigations, it represents it "has had to expend organization resources . . . working with targeting merchants to understand and respond to the subpoenas."  *Id.* at ¶ 21.  And, relatedly, that it "had to analyze the complex web of investigations and discuss open questions with [concerned] merchants who have not received subpoenas . . .."  [*Id.*; *see also* R. 1 at ¶ 9.]

Merchants Guild's actions are not taken in response to some vague or distant threat.  In addition to the formal investigatory actions taken to this point, Attorney General Cameron has explicitly stated that "the subpoenas we issued should serve as a warning to anyone who tries to illegally profit from COVID-19."  [R. 22 at 7 (citing Kentucky AG Press Release (March 26, 2020).]  Understandably, Merchants Guild's members who supply goods to Amazon at an increased price due to recent changes in supply and demand now express concern that they will be labeled and prosecuted as price-gougers.  [R. 10-1 at ¶ 21.]  Indeed, one of Merchants Guild's

---

[5] Merchants Guild's allegations relevant to standing are largely included in its Executive Director's declaration.  [*See* R. 10-1.]

main contentions is that illegality is so poorly defined by the price gouging statutes that members cannot readily determine what is or is not illegal in the eyes of the Attorney General.  [*Id.* at ¶ 27; *see also* R. 22-2 at ¶ 9.]

Importantly, as represented by Merchants Guild, addressing these novel matters constitutes a diversion of resources from its ordinary spending as an organization.  *Cf. Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020).  In fact, in the preliminary injunction hearing Merchants Guild's counsel represented that it spent "little to no time" on price gouging issues prior to the pandemic.  In other words, Merchants Guild's recent efforts are not ordinary undertakings in the context of the services and benefits it typically offers its members.

In the injunctive relief context, it is also important that the plaintiff demonstrate that its injury is imminent or ongoing.  *See Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 406 (6th Cir. 2019).  Here, Merchants Guild has done so.  On the record, it appears it and its members continue to wrestle with the potential for liability under the price gouging statutes and, as such, Merchants Guild continues to expend resources advocating for and educating its members on these unique matters.  [*See* R. 34 at 7 ("The Guild and its members also take from the AG's aggressive posturing in the Jones & Panda matter (and this matter) that the AG intends to continue his efforts to apply the price-control statutes to the other Guild members who have received subpoenas and cease-and-desist orders . . . .").]  Consequently, Merchants Guild's allegations are sufficient to meet both prongs of the injury analysis.  *See Phillips v. Snyder*, 836 F.3d 707, 714 (6th Cir. 2016) (citing *Lujan*, 504 U.S. at 560) ("The injury was ongoing and thus actual and imminent as opposed to conjectural or hypothetical, therefore satisfying the second part of the injury inquiry outlined in *Lujan*.").

8

Defendant believes otherwise but offers unconvincing arguments on this issue.  Attorney General Cameron argues Merchants Guild cannot establish injury in fact because Merchants Guild (1) has not received a CID, and (2) cannot show injury "independent of the costs of litigation."  [R. 21 at 7.]  On this first point, it is true that Merchants Guild has not received a CID.  But this type of injury is not the only avenue by which Merchants Guild can establish standing.  As explained above, frustration of mission and a consequent drain on resources is sufficient to establish injury to an organization.  And, as relevant to the Attorney General's second point, Merchants Guild has met this latter "drain on resources" prong.  On the present record, Merchants Guild has expended resources to inquire into the price gouging investigations, to analyze its members potential liability and obligations under the relevant statutes, and to educate its members on these matters, including those members who have yet to receive a CID but still have legitimate concerns.[6]  These efforts may relate to this litigation but are not properly classified solely as "costs of litigation."  At this preliminary stage, Merchants Guild sufficiently demonstrates it has suffered an injury as an organization.

The Merchants Guild also meets the second and third requirements of standing— causation and redressability. *See Miami Valley*, 725 F.3d at 577 (6th Cir. 2013).  The injury, diversion of resources, is fairly traceable to the investigations undertaken by the Attorney General.  And Merchants Guild's requested injunctive relief—enjoinment of investigatory and enforcement actions undertaken pursuant to the price gouging statutes—would redress this injury.

---

[6] The Attorney General also takes issue with the lack of evidence introduced by Plaintiff on certain matters.  [*See* R. 21 at 20.]  This concern is addressed more fully below within the ripeness analysis.  For present purposes, the Court simply notes that "a movant need not prove his case in full at the preliminary injunction stage;" both Merchants Guild and the Attorney General will have the opportunity to more fully develop their arguments and the factual record from this point forward.  *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 31 (6th Cir. 2011).

**b**

Merchants Guild has standing to sue in its own right but also claims it can establish associational standing to sue on behalf of its members. *See Int'l Union v. Brock*, 477 U.S. 274, 281 (1986) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."). To establish associational standing, Merchants Guild must show that: (1) one of its members would have standing to sue in its own right; (2) the relief it seeks is germane to its purpose; and (3) none of its members need to participate in their individual capacity. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As to the first element, like any Art. III standing inquiry, an association must show one of its members "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Importantly, "plaintiff-organizations [must] make specific allegations establishing that at least one identified member has suffered or would suffer harm." *Waskul*, 900 F.3d at 255 (alteration in original) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

Merchants Guild can establish all three standing elements. First, Jones & Panda, a Merchants Guild member, has received a CID and Merchants Guild adequately explains the economic injury this has precipitated on Jones & Panda—namely, Jones & Panda is now hesitant to engage in the interstate marketplace due to the real possibility of price gouging liability. Indeed, Sarah Jones, the sole proprietor of Jones & Panda, has filed a declaration in the state court case stating: "Upon receipt of the Attorney General's CID . . . I am afraid to source and sell important COVID-response goods, as well as other consumer goods, as I am unclear as to how to comply with Kentucky's laws." [R. 22-2 at ¶ 9.] This alone may seem sufficient to establish

injury, but further analysis is required given the nature of the actions taken against Merchants Guild members.  Although a CID was issued to Jones & Panda,[7] the statutes at issue have yet to be enforced against it or any Merchants Guild member, making this a pre-enforcement challenge. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  That said, the pre-enforcement challenge factors, set forth by the Supreme Court in *Susan B. Anthony List* and clarified by the Sixth Circuit in *McKay v. Federspiel*, are met.  *McKay*, 823 F.3d 862, 868 (6th Cir. 2016).

A plaintiff satisfies the injury-in-fact requirement at the pre-enforcement stage where he or she alleges: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that is "proscribed by a [law]," and (3) "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted).  The first two factors are met and do not require extended analysis.  First, Merchants Guild has set out in detail how the conduct of its members is protected under the Commerce Clause and other constitutional provisions.  [*See* R. 10 at 7–18.]  And, as set forth below, the Court finds these allegations establish that the intended conduct of Jones & Panda—engaging in online sales via Amazon—is affected with at least one of these constitutional interests—the dormant Commerce Clause.  *See* discussion *infra* Section II.A.3.  Second, as evidenced by the language of the CID issued to Jones & Panda, at the very least the Attorney General believes the conduct may be proscribed by law.  Given the Attorney General's view on the matter and the potentially broad range of conduct implicated by the wording of the statutory prohibitions, the Court finds this second element is met.

---

[7] As noted, Merchants Guild indicates that other members have also received CIDs but, apparently to protect these members, has not identified the members.  Nonetheless, it argues "[t]his is not a case of phantom members . . . [T]he AG knows whom it targeted."  [R. 22 at 5.]

Finally, Merchants Guild has established a credible threat of prosecution towards Jones & Panda. Here, the language of the CID issued to Jones & Panda is again probative. The CID states the Attorney General "reason to believe" that Jones & Panda "ha[d] engaged in, is engaging in, or is about to engage in any act or practice declared to be unlawful by" the price gouging statutes. [R. 22-1 at 13.] The CID then goes on to list specific information Jones & Panda is to provide to the Attorney General which, logically, will factor into the decision on whether to bring suit for price gouging under the statutes. *See id.* at 16 ("For each price increase you contend was related to an increase in your cost, describe the nature of the increase, and identify all documents that substantiate your claim."). The Attorney General has also repeatedly refused to disavow enforcement of the statutes, as evidenced his public statements and the ongoing nature of this litigation and the Jones & Panda litigation. Further analysis on the credible threat factor is unnecessary—it is met. *See Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 452 (6th Cir. 2014). Therefore, Merchants Guild has established pre-enforcement injury to at least one of its members.

Next, the Court turns to the traceability and redressability elements of standing. As with Merchants Guild's organizational injury, the harm to its members is both traceable to Defendant's conduct and likely to be redressed by a favorable judicial decision. *See* discussion *supra* Section II.A.1.a. So, Merchants Guild can establish Jones & Panda would have standing but must still establish second and third elements of associational standing—that the relief it seeks is germane to its purpose, and that none of its members need to participate in their individual capacity.

These final elements are easily met. The relief Merchants Guild seeks is enjoinment of the investigatory and enforcement actions undertaken pursuant to the price gouging statutes—

12

relief which is certainly in line with its purpose of advocating for a free and fairly-regulated marketplace.  [*See* R. 10-1 at ¶ 3.]  And, none of Merchants Guild's members need to participate in this suit in their individual capacity.  The constitutional issues before the Court are adequately framed and, importantly, the relief sought does not require the Court "to consider the individual circumstances of any aggrieved [Merchants Guild] member."  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287 (1986).  This is a case where "it can reasonably be supposed that the [requested] remedy, if granted, will inure to the benefit of those members of the association actually injured."  *Warth v. Seldin*, 422 U.S. 490, 515 (1975).  Merchants Guild has also established associational standing.

### 2

In light of the ongoing state court litigation, two other jurisdictional considerations—ripeness and abstention—must be addressed before considering the merits of Plaintiff's constitutional claims.  First, ripeness.

### a

The ripeness doctrine serves "to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."  *Hill v. Snyder*, 878 F.3d 193, 213 (6th Cir. 2017) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985).  "The Supreme Court has set forth a two-prong evaluation for addressing ripeness: A claim is ripe where it is 'fit for judicial decision' and where 'withholding court consideration' will cause hardship to the parties."  *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

Claims are fit for review "if they present 'purely legal' issues that 'will not be clarified by further factual development.'"  *Hill*, 878 F.3d at 214.  Using this principle, the Sixth Circuit has

regularly found "pre-enforcement facial constitutional challenges ripe for review." *Id.* For example, the Sixth Circuit has previously found "that a group of plaintiffs could challenge an ordinance's 'judicial review provisions' even before seeking the permits that were the subject of the ordinance." *Id.* (discussing and quoting *Deja Vu of Nashville, Inc. v. Metro Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 399 (6th Cir. 2001).

The present case presents a different type of constitutional challenge, but the same principles apply. Although the record will certainly benefit from further factual development, the present record adequately frames the constitutional issues raised. Take, for example, Merchants Guild's argument that the Attorney General's application of the price gouging statutes violates the dormant Commerce Clause. [*See* R. 10 at 5.] As relevant to this claim, it argues that certain of its members, by making goods available on Amazon, participate in the "unitary interstate marketplace." *Id.* at 3. And, the argument continues, by threatening the enforcement of the price gouging statutes against these members, the Attorney General is requiring the members to "treat Kentucky prices as a national ceiling, or exit the national marketplace." *Id.* at 10. If true, of course, this is the type of extraterritorial effect prohibited by the dormant Commerce Clause. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (cleaned up) ("[A] state may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states."). The respective positions of the parties, as well as the apparent effect of the statutes in the current context, as it relates to this legal issue and the other constitutional disputes are sufficiently framed. In sum, analysis of the constitutionality of the statutes presents primarily legal issues to be resolved, not factual.

This much is clear when reviewing the Attorney General's specific concerns. Attorney General Cameron primarily takes issue with the lack of evidence introduced by Plaintiff to this

14

point concerning how specific members' pricing has been affected, how its members interact

with Amazon, or how other Amazon protocols affect specific members.  [*See* R. 21 at 20.]  From

a practical standpoint, however, the Attorney General fails to explain why the evidence

introduced by Merchants Guild concerning Amazon's pricing scheme—Amazon's standard

agreements that control on these matters—are insufficient to establish Amazon's control on these

matters.  [*See e.g.*, R. 10-1 at ¶ 9 n. 1, ¶ 17 n. 4.]  The evidence introduced to this point is

sufficient given the issues to be resolved and the compressed time frame on which the parties

have operated.  [*See* R. 18 at 3.]  Second, while there is a certainly a lack of a fully developed

record on these matters, this is the preliminary injunction stage where, ordinarily, the record is

not complete.  *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  And, as noted above,

Merchants Guild offers a persuasive explanation for the lack of member-specific evidence:

maintaining its members' anonymity "to protect them from commercial retaliation."  [R. 22 at 5;

*see also* R. 21-1 at 4 n. 6.]  Relatedly, Merchants Guild maintains that "[t]his is not a case of

phantom members . . . [T]he AG knows whom it targeted."  [R. 22 at 5.]  As this case moves

forward and the record develops it may very well be in Merchants Guild's best litigation interests

to identify its members in order to succeed on the merits.  At this stage, however, the Court finds

such identification is unnecessary for the reasons laid out above.  This case is fit for review.

Merchants Guild will also suffer hardship absent judicial consideration of its claims.

Merchants Guild represents that it and its members continue to wrestle with the potential for

liability under the price gouging statutes, resulting in continued diversion of resources in

advocating for and educating its members on these unique matters.  The immediacy of the harm

is made all the more apparent in view of the recent state court litigation involving a CID issued

to a Merchants Guild member, Jones & Panda.  The CID is a logical precursor to an enforcement

15

action, as evidenced by its direct wording, and any concern Merchants Guild and its other members may have about future enforcement is anything but speculative.[8]  Both prongs of the ripeness test are satisfied.

<strong>b</strong>

To conclude the jurisdictional analysis, the Court turns next to *Younger* abstention. Neither party addressed abstention in their briefing, although its potential relevance was briefly alluded to by the Attorney General during the preliminary injunction hearing.  In consideration of the ongoing Jones & Panda proceeding, the Court requested supplemental briefing on the issue, which the parties have now submitted.  [R. 29; R. 33; R. 34.]

At its core, *Younger* abstention requires that federal courts refrain from enjoining a parallel, pending state criminal prosecution.  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013).  The Supreme Court has also extended the doctrine "to particular state civil proceedings that are akin to criminal prosecutions . . . or that implicate a State's interest in enforcing the orders and judgments of its courts."  *Id.* (internal citations omitted).  *Younger* abstention does not apply to party that "is a stranger to the state proceeding."  *Gottfried v. Med. Planning Servs., Inc.*, 142 F.3d 326, 329 (6th Cir. 1998).  But, where a federal plaintiff has "a substantial stake in the state proceedings" or has interests that are "intertwined" with those of the party to the state proceedings, abstention may still be appropriate.  *Hicks v. Miranda*, 422 U.S. 332, 348 (1975).  This type of "derivative abstention" is not proper here.  Because the Jones & Panda state

---

[8] The Attorney General's arguments concerning the "non-self-executing" nature of the CIDs are unavailing on the present record.  [R. 21-1 at 9–11.]  First, simply because procedures are in place at the state level to litigate the legitimacy of an issued CID does not mean Merchants Guild is barred from challenging the statutes that serve as the basis for issuance of the CIDs, where it alleges separate injury.  Indeed, much of the case law relied on by the Attorney General is persuasive authority applying mainly to the federal administrative law context, specifically regarding the ability of the subpoenaed party itself to bring a separate claim in federal court.

16

litigation is not the type of state civil proceeding which warrants abstention, the Court will heed its "virtually unflagging" obligation to exercise jurisdiction and decline to abstain. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

The existence of two types of state civil proceedings can be the basis for *Younger* abstention: (1) civil enforcement proceedings akin to a criminal prosecution, and (2) civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989). The latter category is clearly not implicated here. The only question is whether the Jones & Panda proceeding is a civil enforcement proceeding akin to a criminal prosecution.

Courts look to a number of factors in weighing whether a civil proceeding is akin to a criminal prosecution, including the seriousness of consequences, the initiation or involvement of state agencies, and the purpose of the hearing. *Sprint Commc'ns*, 571 U.S. at 81. The first and third factors are dispositive in this case. The purpose of the Jones & Panda proceeding is simply to determine whether Jones & Panda must comply with the CID and provide the information requested by the Attorney General. Any consequence stemming from an unfavorable decision will not result in liability but, instead, Jones & Panda will simply have to provide the requested information. Such a result is a far cry from any criminal sanction. *Cf. Doe v. Univ. of Ky.*, 860 F.3d 365, 370 (6th Cir. 2017). In fact, the Attorney General, in arguing that this case is not ripe for adjudication notes that, as things stand, "there is no enforcement proceeding and no current consequence for resisting the CID." [R. 22-1 at 11.] These are not the type of "exceptional circumstances" which justify a federal court's refusal to decide a case in the interest of comity.

17

**3**

Jurisdictional considerations resolved, the Court turns to Merchants Guild's likelihood of success on the merits of the substance of its constitutional claims.  Merchants Guild argues the Attorney General's application of the price gouging statutes violate four constitutional provisions: (1) the dormant Commerce Clause; (2) the First Amendment; (3) the Due Process Clause; and (4) the Equal Protection Clause.  [R. 10 at 7.]  The Attorney General disagrees on all fronts.

**a**

**i**

Although the plain text of the Commerce Clause does not limit the power of States to regulate commerce, the Supreme Court has long interpreted the provision "as an implicit restraint on state authority."  *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.,* 550 U.S. 330, 338 (2007) (cleaned up).  This aspect of the Commerce Clause has developed into a doctrine known as the "dormant" Commerce Clause.  *Id.*  And, under the dormant Commerce Clause, the Supreme Court has determined that certain categories of state economic regulations are constitutionally invalid.  *Healy*, 491 at 335.  One such category includes laws that regulate extraterritorial commerce.  *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 645 (6th Cir. 2010) (citing *Healy*, 491 U.S. at 336).

A statute has an impermissible extraterritorial effect "if it 'directly controls commerce occurring wholly outside the boundaries of a State [and] exceeds the inherent limits of the enacting State's authority."  *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013) (alteration in original) (quoting *Healy*, 491 U.S. at 336).  To determine extraterritoriality, the relevant inquiry is whether the "practical effect of the regulation is to control conduct beyond the boundaries of the state," regardless of whether such an effect was intended by the legislature.

*Healy*, 491 U.S. at 336; *see also Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003) (considering whether a statute "regulate[d] the price of any out-of-state transaction, either by its express terms or by its inevitable effect"). Practical effect is "evaluated not only by considering the consequences of the regulation itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Healy*, 491 U.S. at 336.

In *Snyder*, the Sixth Circuit considered whether Michigan law had an impermissible extraterritorial effect. There, the law at issue required beverage companies to include a Michigan-specific mark on their packaging and further restricted those companies to selling those products only in other states with "laws substantially similar to this act." *Id.* at 367 (citation omitted). Applying the principles expounded in *Healy*, the court struck down the law, finding significant that it effectively dictated where beverage manufacturers could sell its products. *Id.* at 376. The *Snyder* court was also troubled by the state's failure to consider alternative measures which could satisfy the state's purpose "in a non-extraterritorial fashion."[9] *Id.* at 375.

In *Frosh*, the Fourth Circuit considered a Maryland law with a different purpose which, in the end, was also deemed to have an impermissible extraterritorial effect. The Maryland legislature passed a price gouging law which banned any "unconscionable increase in the price of a prescription drug." *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 666 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1168 (2019) (citation omitted). Any manufacturer or distributor determined to be in violation of the law was subject to civil penalties or injunctive retribution.

---

[9] Some have cast doubt on the continued viability of the extraterritoriality doctrine in today's interconnected economy. *See, e.g.*, *Snyder*, 735 F.3d at 378. (Sutton, J. concurring) ("Is it possible that the extraterritoriality doctrine, at least as a freestanding branch of the dormant Commerce Clause, is a relic of the old world with no useful role to play in the new? I am inclined to think so."). Nevertheless, like the Sixth Circuit, this Court is required to apply the doctrine in its current form regardless of its view that Judge Sutton is right.

*Id.* The Fourth Circuit struck down the law as extraterritorial, finding three factors significant: (1) the law was "not triggered by any conduct that takes place within Maryland;" (2) "even if it were, the [law] control[led] the prices of transaction that occur outside the state;" and (3) the law, "if similarly enacted by other states, would impose a significant burden on interstate commerce involving prescription drugs." *Id.* at 670.

**ii**

Merchants Guild argues the principles applied in *Snyder* and *Frosh* apply in full force here. More specifically, it argues that the Attorney General's application of the price gouging statutes "giv[es] the statutes unlawfully extraterritorial effect." [R. 10 at 7.] Merchants Guild's argument is best distilled into segments. First, the nature of its members' relationship with Amazon is key. Merchants Guild represents that its members are suppliers of Amazon's online marketplace, a unitary interstate platform where prices are not state-specific. To this point, Merchants Guild further represents its members have no control over the price set on the marketplace, but can only suggest a final price. [R. 10 at 3; R. 10-1 at ¶ 14.] So, Merchants Guild members, when interacting with Amazon, simply provide product but have only limited control over price and have no control over where the product is then sold.

This established, the rest of Merchants Guild's argument is straightforward. Because the Attorney General threatens to enforce the price gouging statutes against members for their listings on Amazon, an interstate marketplace, the Attorney General's actions have the practical effect of controlling the price of transactions that occur wholly outside the state. And, to avoid potential liability Merchants Guild members must either "treat Kentucky prices as a national ceiling, or exit the national marketplace." [R. 10 at 10.] Attorney General Cameron believes this line of argument is unavailing, arguing that the cases relied on by Merchants Guild in which

courts struck down extraterritorial laws are distinguishable.  The Attorney General argues that here, unlike in those cases, "Kentucky's price gouging statutes do not directly regulate commerce that takes place entirely outside its territory," but, instead, "only apply to transactions and proposed transactions that take place in Kentucky."  [R. 21-2 at 15 (emphasis removed).]

### iii

At this stage, the Court finds that Merchants Guild is likely to succeed in showing that the practical effect of Attorney General's recent investigations into possible violations violates the dormant Commerce Clause.  *Healy*, 491 U.S. at 336 (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986).  Like in *Snyder* and *Frosh*, it appears that application of the Kentucky price gouging statutes to transactions that occur on Amazon have the inevitable effect of regulating the price charged outside of Kentucky.  In other words, the Attorney General's actions effectively dictate the price of items for sale on Amazon nationwide.

As set forth above, the nature of Amazon's online store and its relationships with suppliers is key.  Amazon's online platform is available to consumers outside of Kentucky and, on the record, there is no way for Amazon suppliers to suggest state-specific prices.  [R. 10-1 at ¶ 12.]  Logically then, when proposing nationwide prices, Merchants Guild members—even if based in Kentucky—take into account the market conditions *nationwide. See id.* at ¶ 14.  And, the same is true for Amazon in determining whether to accept the price.  But if the Attorney General deems a price excessive as compared to other Kentucky prices, then Merchants Guild's members are effectively restricted from charging that price in Kentucky or anywhere else.

To better flesh out the practical effect of the Attorney General's investigatory efforts, a practical hypothetical is helpful.  Say a Kentucky-based merchant acquires a pallet of peanut butter at $5.00 per 40-ounce jar in the midst of the COVID-19 pandemic. The merchant then,

based on its total acquisition cost and Amazon's historical sales data, suggests to Amazon that it list the jars of peanut butter at $9.50 per jar on the website.  Amazon accepts that proposed price and lists the peanut butter on its website at $9.50 per jar.  Then, after listing, Attorney General Cameron engages in discussions with Amazon and, based on prices charged in Kentucky brick-and-mortar stores, identifies the peanut butter merchant as a potential price-gouger and issues a CID.  After receiving the CID, the peanut butter merchant then looks to prices charged for 40-ounce jars of peanut butter in Kentucky stores and, to avoid liability, suggests another, lower price to Amazon for its peanut butter listing.  Of course, if accepted this lower price would then be the price for buyers nationwide, not just in Kentucky.  This type of extraterritorial impact appears violative of the principles expressed in *Healy*.  491 U.S. at 336 (citation omitted) ("A State may not adopt legislation that has the practical effect of establishing "a scale of prices for use in other states[.]").

Further, like *Snyder* and *Frosh*, analogous restrictions imposed by other states would have the potential to subject merchants, as Amazon suppliers, to conflicting state requirements. For example, Merchants Guild notes that Alabama's analogous law provides that increases of 25% or less are presumptively lawful.  [R. 10 at 10 (citing Ala. Code § 8-31-4).]  In contrast, KRS § 367.374—the more specific of the two Kentucky statutes—only grants safe harbor to those who limit price increases to 10% or less.  Same goal, different prescriptions.  After review, a supplier may be assured that its price is lawful in Alabama and decide it can list its product within Amazon.  But the same supplier may very well come to a different conclusion upon reviewing Kentucky law.  So, clearly, if various states' price gouging laws were applied to products listed on Amazon then it would incumbent on the suppliers to check with each state before listing to avoid the potential for liability.  Consideration of the potential for conflicting

state requirements cuts in favor of finding that Kentucky's price gouging statutes violate the extraterritoriality doctrine.

As to this concern, the Attorney General's related representation that it only seeks to investigate businesses or individuals operating in Kentucky carries some weight, but not enough. [*See* R. 21-2 at ¶¶ 5, 9.]  First, if, like many businesses, a business has operations in more than one state, then the potential for conflicting state requirements endures.  And second, even with this required Kentucky nexus, the extraterritorial practical effect remains.

Here, the Fourth Circuit's reasoning in *Frosh* is informative.  In *Frosh*, the court noted that "[e]ven if the [price gouging law] did require a nexus to an actual sale in Maryland, it is nonetheless invalid because it still controls the price of transactions that occur wholly outside the state." *Frosh*, 887 F.3d at 671 (citing *Brown-Forman*, 476 U.S. at 580).  It explained that, by holding manufacturers and distributors liable for prices set in relation to out-of-state transactions, the Maryland law "attempt[ed] to dictate the price that may be charged elsewhere for a good." *Id.* at 672.  And, further, that "[a]ny legitimate effects the Act may have in Maryland are insufficient to protect the law from invalidation." *Id.*  Similarly, in this case, even if the Attorney General's application of the price gouging statutes had the legitimate effect of protecting Kentucky consumers, this is insufficient in light of its broader effect.[10]  Simply because the Attorney General has limited investigations to Kentucky-based entities does not change the fact that the practical effect of the investigations and any subsequent enforcement is to dictate the price these Kentucky-based entities can charge *outside* of Kentucky.  As noted at length, by

---

[10] The intent of the legislature in enacting the law and, by logical extension, the intent of the executive branch in enforcing the law, are not significant in determining extraterritorial effect.  *Healy*, 491 U.S. at 336.

selling through Amazon, merchants cannot restrict their sales to only Kentucky residents—inevitably transactions will occur outside of the state.

Lastly, like *Snyder*, in this case there are likely alternative measures which could be used combat the same problem in a non-extraterritorial fashion. For one, Merchants Guild notes that the Attorney General could regulate Amazon which, as it represents, "does have the means to control product listings and sales in its store." [R. 10 at 5.] In fact, many Attorney Generals have called on Amazon to take action "by creating and enforcing strong policies that prevent sellers from deviating in any significant way from the price the product was sold at prior to the onset of the emergency." March 25, 2020 Ltr. from Attorneys General to Jeff Bezos, https://www.attorneygeneral.gov/wpcontent/uploads/2020/03/Amazon.pdf. The Court declines to speculate as to other potential measures; the record will benefit from further development on this issue.

In total, after analyzing the relevant considerations as applied to the present record, it appears the inevitable effect of the Attorney General regulating Amazon suppliers is to control commercial conduct beyond Kentucky's borders. Consequently, Merchants Guild has succeeded in proving a likelihood of success on the merits.[11]

**B**

Likelihood of success of the merits is often the determinative factor in the constitutional context and the Court has concluded Merchants Guild is likely to succeed on the merits of its dormant Commerce Clause claim. Nevertheless, the Court will briefly address the remaining preliminary injunction factors. *Obama for Am.*, 697 F.3d at 436.

---

[11] At this preliminary stage, it is unnecessary to consider the likelihood of success on the remaining constitutional claims. The remaining claims will be resolved when this action is determined on the merits.

First, Merchants Guild has proven it will suffer irreparable harm without an injunction.  It is well-established that "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed."  *Obama for Am.*, 697 F.3d at 436 (citing *ACLU of Ky. v. McCreary County, Ky.,* 354 F.3d 438, 445 (6th Cir. 2003)).  And, here, the potential for irreparable harm is made more evident by the nature of the relief sought.  Merchants Guild is seeking injunctive relief only, in light of the alleged unquantifiable economic injury that will befall its members.  [R. 10 at 19.]  On the record, absent an injunction, Merchants Guild members will continue to suffer economic injury due to hesitancy to engage in the interstate marketplace and Merchants Guild itself will continue to suffer injury in devoting additional resources to advising its members and "analyzing the complex web of investigations."  [R. 10-1 at ¶ 21; R. 10 at 19.]

And, finally, the potential harm to Merchants Guild and its members appears to outweigh the potential harm to the Attorney General or to the public interest.  To start, the Sixth Circuit has recognized that "the public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. SMART*, 698 F.3d 885, 896 (6th Cir. 2012).  And, as it concerns this case, contrary to the Attorney General's assertions, it is not clear from the record that enjoining the Attorney General's investigations into price-gouging will necessarily "cause substantial harm to Kentuckians in need of fairly priced emergency and medical supplies."  [R. 21-1 at 5.]  Of course, state governmental actors are not the only individuals with authority to regulate the online marketplace.  The Attorney General partly acknowledges the key role that Amazon plays in controlling price gouging on its platform [R. 21-1 at 16] and, indeed, the record reflects that Amazon has already "removed more than 500,000 offers from its site and suspended 6,000 accounts for violating price policies since the pandemic started."  [R. 35-1 at 4.]

Moreover, the Attorney General's power to investigate potential price gouging will only be enjoined as towards Amazon suppliers, not any other retailer or supplier.

In view of the Plaintiff's likelihood of success on the merits of its constitutional claim, where the remaining preliminary injunction factors do not weigh heavily in Defendants' favor, the Court finds issuance of a preliminary injunction is proper.

### III

The Court is sympathetic with the Attorney General's goal to protect Kentucky consumers.  This is good work and even after today's Order it may continue.  But the Court cannot cast a blind eye to what appears to be an unconstitutional means to achieve this worthwhile end with respect to a specific class of retailers—those who use an online platform like Amazon.  On the present record, the Attorney General's recent investigatory actions and threats of enforcement in this context have the type of impermissible extraterritorial effect on interstate commerce forbidden by the dormant Commerce Clause.  Accordingly, and the Court being otherwise sufficiently advised, it is **ORDERED** as follows:

1.   Defendant's Motion for Leave to Exceed Page Limits [**R. 21**] is **GRANTED**;

2.   Plaintiff's Request for Judicial Notice [**R. 35**] as it relates to the article attached at Docket Entry #35-1 is **GRANTED**, pursuant to Federal Rule of Evidence 201;

3.   Plaintiff's Motion for Preliminary Injunction **[R. 10]** is **GRANTED**; and

4.   Defendant Attorney General Cameron and his staff are enjoined from applying KRS § 367.170 and KRS § 367.374, including by subpoena, investigation, or prosecution, to Amazon suppliers in connection with offers or sales on Amazon.

This the 23rd day of June, 2020.

Gregory F. Van Tatenhove
United States District Judge