1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF KENTUCKY
2            CENTRAL DIVISION FRANKFORT

3

4

5  ONLINE MERCHANTS GUILD,

6        Plaintiff,

7
                                   Docket No. 3:20-CV-29
8  V.                              At Frankfort, Kentucky
                                   Thursday, May 14, 2020
9                                  3:01 p.m.

10

   DANIEL CAMERON,
11 Attorney General of Kentucky,

12        Defendant.

13

14                    - - -

15
      TRANSCRIPT OF TELEPHONIC MOTION HEARING BEFORE
16     U.S. DISTRICT JUDGE GREGORY F. VAN TATENHOVE

17                    - - -

18

19

20  Court Reporter:     SANDRA L. WILDER, RMR, CRR
                        Official Court Reporter
21                      313 John C. Watts Federal Building
                        330 West Broadway, Suite 327
22                      Frankfort, Kentucky  40601
                        (859) 516-4114
23

24
         Proceedings recorded by mechanical stenography,
25   transcript produced by computer.

```
 1

 2
       APPEARANCES:   (Appearing telephonically)
 3

 4    For the Plaintiff:   AARON K. BLOCK
                           The Block Firm
 5                         4200 Northside Parkway NW
                           Building One, Suite 200
 6                         Atlanta, Georgia  30327
                           (404) 997-8419
 7
                           MARK A. GILBERT
 8                         Deatherage, Myers & Lackey, PLLC
                           701 South Main Street
 9                         P. O. Box 1065
                           Hopkinsville, Kentucky  42241-1065
10                         (270) 886-6800

11                         PAUL S. RAFELSON
                           Rafelson Schick, PLLC
12                         2255 Glades Road, Suite 319
                           Boca Raton, Florida  33431
13                         (561) 326-6529

14
      For the Defendant:   JUSTIN D. CLARK
15                         MATTHEW COLEMAN COCANOUGHER
                           J. CHRISTIAN LEWIS
16                         Kentucky Attorney General's Office
                           1024 Capitol Center Drive
17                         Suite 200
                           Frankfort, Kentucky  40601
18                         (502) 696-5300

19                         VICTOR B. MADDOX
                           Kentucky Attorney General's Office
20                         700 Capital Avenue
                           Capitol Building, Suite 118
21                         Frankfort, Kentucky  40601
                           (502) 696-5300
22

23

24

25
```

1          *[Proceedings commenced at 3:01 p.m. in open*
2     *court]*
3          THE COURT:  Thank you.  Good afternoon,
4     ladies and gentlemen.
5          First of all, we are on the record.  I'm
6     appearing in open court this afternoon and sitting in
7     Frankfort.
8          I believe we have our court reporter on the
9     line, if she could state her appearance, please.
10         COURT REPORTER:  Yes, Your Honor.  Sandy
11    Wilder.
12         THE COURT:  Ms. Wilder.  And then, Madam
13    Clerk, if you'll call the pending matter, please.
14         DEPUTY CLERK:  Yes, Your Honor.  Frankfort
15    Civil Action 20-CV-29, Online Merchants Guild versus
16    Cameron.  This matter is called for a motion hearing.
17         THE COURT:  Thank you.  Counsel, I'm going to
18    have you state your appearances.  And my practice is
19    for you to identify anybody that's in your conference
20    room or in your office, or your living room, be as it
21    may this afternoon.
22         First of all, for the plaintiff.
23         MR. BLOCK:  Good afternoon, Your Honor.  This
24    is Aaron Block, B-L-O-C-K, on behalf of the Online
25    Merchants Guild, and I am alone in my office at the

1  moment.

2        THE COURT:  Thank you.  Anybody else for the

3  plaintiff?

4        MR. GILBERT:  Yes, Your Honor.  This is Mark

5  Gilbert, and I'm in the same office as Mr. Deatherage.

6        THE COURT:  Thank you.

7        MR. RAFELSON:  This is Paul Rafelson,

8  R-A-F-E-L-S-O-N, for the plaintiff, Your Honor.  And

9  there is nobody in my office at the moment.

10        THE COURT:  Thank you.  And, Mr. Deatherage?

11        MR. GILBERT:  He is not in the room with me,

12  but he's just available, if necessary.

13        THE COURT:  Okay.  And then anybody else for

14  the plaintiff?

15        All right.  And then on behalf of the

16  Attorney General.

17        MR. CLARK:  Your Honor, this is Justin Clark

18  on behalf of the Attorney General.  No one is

19  currently in my office, but I do believe others from

20  my office are on the phone.

21        THE COURT:  Thank you, Mr. Clark.  Anybody

22  else?

23        MR. MADDOX:  Your Honor, Victor Maddox is

24  here for the Attorney General.  I am also in my office

25  alone.

1          THE COURT:  Thank you, Mr. Maddox.  Anybody

2    else?

3          MR. LEWIS:  Your Honor, Chris Lewis for the

4    Attorney General, also in my office alone.

5          THE COURT:  Mr. Lewis.  Mr. Cocanougher?

6          MR. COCANOUGHER:  Your Honor, Matt

7    Cocanougher for the Attorney General, also in my

8    office alone.

9          THE COURT:  All right.  Then anybody else for

10   the Attorney General?

11         All right.  This matter has been called on my

12   docket for purpose of considering a motion that I have

13   pending in front of me for a preliminary injunction,

14   and more specifically, to address the issue of whether

15   a temporary restraining order is appropriate in this

16   particular case.

17         The procedural posture matters.  The question

18   is, is this the kind of case that requires me to enter

19   a TRO to kind of put everything on hold for 14 days

20   until we can more completely sort this out.  Or is

21   this the kind of case that while it might be

22   appropriate to issue a preliminary injunction, we

23   could have, even on an expedited basis, briefing in

24   this case.

25         Mr. Block, are you comfortable with

1 proceeding in a manner on an expedited basis that

2 would allow the Attorney General some time to respond,

3 or do you believe this is one of those rare instances

4 in which a TRO's required?

5      MR. BLOCK:  Thank you, Your Honor.  We do

6 believe it's the rare instance where a TRO is

7 required.  And the reason, Your Honor, is that our

8 members are experiencing ongoing injury as we speak,

9 as is the interstate buying public.

10      And not to argue the merits, Your Honor, but

11 our position is that as long as there is this looming

12 threat of enforcement by the Attorney General of a

13 statute or set of statutes in a way that we believe is

14 unlawful, our members are unwilling to source goods

15 from overseas or from the domestic market and make

16 them available for the interstate buying public, or at

17 a minimum, they are, you know, chilled in having to

18 factor that into their decision-making.

19      We actually had a conversation -- a set of

20 conversations with counsel for the Attorney General to

21 try and work out some sort of interim relief where we

22 could get a stipulation that the Attorney General

23 wouldn't enforce the law, pending a briefing schedule,

24 because we do want to give them some time to respond.

25 These are serious issues and detailed issues, and so

1  we want to -- we want to be reasonable about, you

2  know, what the lawyers need to do to keep the case up

3  for the Court.  We were not able to enter into a

4  stipulation, and let the Attorney General know that we

5  would instead have to seek a TRO to protect our

6  members while the -- while the briefing took place.

7        THE COURT:  Any of your membership -- have

8  any enforcement action been taken against any of your

9  membership pursuant to the Kentucky Statutes by the

10 Attorney General?

11       MR. BLOCK:  What I can report, Your Honor --

12 and I will let the AG correct me if there have been

13 further developments in the interim -- the posture is

14 as follows:

15       The Attorney General has sent a number of

16 subpoenas and civil investigative demands to our

17 members and similarly-situated merchants.  One online

18 merchant sought to challenge the subpoena and CID in

19 state court, and actually believe was not a member of

20 the Online Merchants Guild at that time, and although

21 was similarly-situated, then became a member of the

22 Online Merchants Guild.  And then about four days

23 after we filed our complaint on the 1st, or maybe

24 three days after we -- three or four days after we

25 filed our complaint on the 1st, the Attorney General

1  filed an emergency motion to enforce the subpoena and

2  CID.

3         So I think the short answer to your question,

4  Your Honor, is there has been some -- not -- not

5  enforcement on the merits, but enforcement of the CID

6  as a sworn member, that I know of.

7         THE COURT:  Okay.  Well, Mr. Clark, give me a

8  sense of where the Attorney General is in terms of

9  enforcement in this case.

10        MR. CLARK:  Yes.  Thank you, Your Honor.

11        First, we -- we strongly disagree with the

12  plaintiff's position on the need for a TRO; I want to

13  make sure I get that on the record.  But you asked a

14  very good question about, has any enforcement action

15  been taken?  And the easy answer to that is no.  We

16  have sent CIDs, which stand for civil investigatory

17  demands, pursuant to Kentucky Statute 367.240.  We

18  have sent those demands to several retailers who are

19  offering to sell goods in Kentucky, including online

20  sellers, which I guess would include some of the

21  plaintiff's members.  Those CIDs are what would be

22  called non-self-executing, being that if a member

23  disputes or does not comply with one, then the

24  Attorney General would need to seek relief in a

25  circuit court pursuant to the statute to enforce that.

1          It's very important here to recognize what a
2     CID is.  It is the very first step in instituting an
3     investigation into alleged price gouging.  It is
4     simply an investigatory tool.
5          So while the issues that the plaintiff has
6     raised, both in the complaint and in their motion for
7     injunctive relief, are way down the road in that
8     they're actually referencing statutes that the
9     Attorney General has not self-enforced, specifically
10    367.374, and then .170, which is simply a catch-all
11    provision, there's been no action taken to enforce
12    either of those statutes.
13         So what we would like to do here is get a
14    response to Your Honor very quickly that lays out that
15    not only is this case not ripe for a motion for a TRO,
16    plaintiff arguably lacks standing, but this case is
17    certainly not ripe for adjudication in that no
18    enforcement action has been taken.
19         And interestingly enough, what the plaintiff
20    states there about one of its members filing a
21    petition to either modify or set aside a CID in the
22    Fayette Circuit Court, that has in fact happened, and
23    raising very similar issues that plaintiff raises in
24    the pleadings to Your Honor, that would, you know --
25    maybe necessitate this Court abstaining from even

1 hearing what the plaintiff is putting before it.

2      So because no enforcement action's been taken

3 at all, it would be truly extraordinary to enter a TRO

4 against a state agency, particularly an executive

5 branch agency, in the investigatory stage of a matter

6 before any enforcement action's taken.

7      So I've raised a lot there, but I think that

8 status of enforcement action is very important, and

9 actually answers a whole lot of what we're on the call

10 about today, so we'd certainly like the opportunity to

11 brief it quickly.

12      THE COURT:  Let me ask you this.

13      MR. BLOCK:  Your Honor --

14      THE COURT:  Just a moment, Mr. Block; you'll

15 have an opportunity to respond.

16      MR. BLOCK:  Thank you, Your Honor.

17      THE COURT:  But the -- you've referenced

18 standing.  Is it your argument that perhaps there's no

19 injury here that would give the plaintiff standing?

20 That's just a yes or no question.

21      MR. CLARK:  Yes.

22      THE COURT:  So what about the argument that

23 the plaintiff makes that the injury is this chilling

24 effect?  This is -- seems to be unfolding in the

25 classic pre-enforcement kind of lawsuits, and your

1  argument, you need to wait until enforcement takes

2  place.  But the plaintiff's going to argue, Well, if

3  you wait until enforcement takes place, we've already

4  incurred lots of injury because we've got

5  international suppliers, and our membership, you know,

6  is not ordering, and is just going to decide to sit

7  this out because the risk is too great.  And so you

8  can see why that's injury.  Why would that not be

9  injury in fact in this case?

10        MR. CLARK:  Because all that has been done is

11  a request for information relating to Kentucky's

12  Consumer Protection Act, specifically price gouging

13  statute.

14        So this chilling effect that the plaintiff

15  discusses or talks about is to not price gouge.  All

16  we're asking them to do is to give us information that

17  would allow us to investigate whether price gouging

18  has taken place.  All of the CIDs that were issued

19  that they've signed specific information, either

20  received from consumer complaints, or directly from

21  Amazon, in some instances, where price gouging was

22  alleged or noticed.  We are seeking just simple

23  information under a statute, very limited, asking for

24  information relating to these allegations.

25        So the chilling effect is I don't really see

1  it, unless they're going on record to say some of our

2  members may have violated a price gouging statute, and

3  it's chilling to us to offer information about that.

4        If they give me information that answers our

5  question about how Amazon works or that Amazon set a

6  price, but even in Mr. Rafelson's kind of self-serving

7  declaration, he says his merchants propose a price,

8  and then Amazon may have ability to put parameters

9  around that.  Well, if they answer the CID and we

10  noticed that they propose prices that do not violate

11  the price gouging statute, then there may be no

12  enforcement action at all.  So part of the issue --

13        THE COURT:  Excuse me.  Excuse me.  Part of

14  the argument is that the plaintiff doesn't know

15  whether they're in violation of the statute because

16  the language of the statute is unconstitutionally

17  vague.  It doesn't put them on notice unless, you

18  know, it's mostly excessive.

19        And so part of the chilling effect is we've

20  got a statute that's so vague, is the argument, that

21  we can't -- we can't determine.  It's not that we're

22  concerned that we're violating it.  We don't know

23  whether we're violating it or not, so we're just going

24  to back away from the market entirely.

25        MR. CLARK:  The statute and -- that they

reference -- and again, I want to be careful here, what they're challenging is the issue of a CID, which is pursuant to 367.240.  Nowhere in the plaintiff's complaint or its motion do they reference that statute as being vague or unconstitutional.  All that's happened here is an investigatory stage.

         To the issue of whether it is vague, there -- even a cursory examination of 367.374 would refute that.

         It's very specific in the -- what is allowed and not allowed as far as percentages to provide fair notice of a prohibited conduct.  It identifies the products that would be subject to it.

         What -- what the plaintiff has done is just made very generalized and broad references to vagueness, but they've actually not detailed any problems with it.  And specifically, if the plaintiffs think that, their clients can actually register with the Division of Emergency Management that has a website, news media, sends emails that allows for registration for receiving notices regarding the implementation, renewal or termination of the price gouging statutes.

         So number one, it couldn't be more clear. Number two, if these sellers are worried about it,

1  there's actually a means to register and be fully

2  aware of both timing, notice, scope, and the end.

3  There's no -- there's nothing arbitrary about it.

4          THE COURT:  All right.  Thank you.  Thank

5  you, Mr. Clark.

6          Mr. Block, I'll give you a chance to respond,

7  but I want to try to understand kind of the factual

8  context.  And the way I've been thinking about these

9  issues is to try to analogize them to kind of

10  something we're more familiar with because the

11  economic relationships here are quite unique because

12  of the development related to technology.

13          So consider a sporting goods store that's a

14  brick and mortar sporting goods store and it's located

15  in Frankfort, Kentucky, and it sells items that are

16  provided by hundreds or even thousands of providers,

17  many of which manufacture those items and sell those

18  items to the sporting goods store from out-of-state

19  entities.

20          So let's say a basketball manufacturer or

21  perhaps even it's a middleman -- a middle person

22  that's in Indiana, and provides Indiana basketballs to

23  the Kentucky sporting goods store.

24          It's a hypothetical in part because there's

25  no sporting goods store in Kentucky that would sell

1  Indiana basketballs, by the way.  But assume that with

2  me.  I assume you would have no -- there would be no

3  constitutional problem for these Kentucky statutory

4  provisions to be focused on the sporting goods store,

5  right?  I mean, the sporting goods store pays whatever

6  it pays to its vendors and it's going to put a price

7  on it, and if it decides that it's everybody's, you

8  know, that for some reason's required to have a

9  basketball now and it wants to sell them for five

10  times what they typically would go for, then -- then

11  under the consumer statutes in Kentucky, you could

12  bring some kind of enforcement action against the

13  sporting goods store.  Are you with me?

14          MR. BLOCK:  Yes, Your Honor.  And I --

15          THE COURT:  So you represent all of those --

16  those companies that are providing the sporting goods.

17  And your concern is that these statutes are being used

18  against them, even though -- even though they don't

19  directly sell in Kentucky to the consumer.  They

20  simply are selling to the bricks and mortar retailer,

21  which is availing themself of the Kentucky forum,

22  fair?

23          MR. BLOCK:  Yes, I think to a point, Your

24  Honor.  I mean, I think -- where I think the argument

25  would be weak for me is if I represented the retailer,

1  the Kentucky-based retailer, I wouldn't have a dormant

2  Commerce Clause argument.  I might have a due process

3  argument because the statutes are vague, but I

4  wouldn't have a dormant Commerce Clause argument

5  because I had made a deliberate choice to open shop in

6  Kentucky.  And as a retailer, I set the prices, you

7  know, the basketballs -- I decide, you know, what the

8  basketballs are going to retail for.  And I have the

9  ability -- going back to my first point -- the ability

10 to sell or not to sell to people in Kentucky.

11          And so, you know -- and there aren't

12 really -- it's hard to understand how there are more

13 than incidental effects on interstate commerce if

14 Kentucky were to say you gotta keep the price of

15 basketballs fairly low.  That's the retailer.

16          For the supplier --

17          THE COURT:  Go ahead.

18          MR. BLOCK:  Maybe it's more your question.  I

19 think for the suppliers it's a little -- it's a little

20 different because the suppliers, I suppose, really

21 aren't selling to -- directly to the public.  They're

22 selling to the retailer.

23          And so if the Kentucky law tried to dictate

24 the cost of that transaction and it crossed state

25 lines, I -- honestly, Your Honor, that's -- that, to

1 me, seems complicated, but it's a little bit different

2 than what we're saying, which is that there's --

3 there's really one Amazon, and it's interstate, and

4 our members do not have the ability to engage in

5 Kentucky's specific conduct, and they don't have the

6 ability to avoid Kentucky, unless they want to exit

7 the marketplace entirely, which -- and so that's where

8 I think the -- I think that's maybe where the

9 traditional brick and mortar example sort of runs --

10 or hypothetical runs out a little bit.

11          And we have to sort of turn back to the first

12 principles here, which the Supreme Court has been very

13 clear on, which is that states have no power to set

14 prices in the interstate market or establish price

15 controls in interstate commerce.  Those are virtually

16 per se invalid, and I actually think that it might be

17 more than virtually because I haven't seen a Supreme

18 Court case where the Court, or for that matter, any

19 appellate court I'm aware of, has upheld an interstate

20 price controlled regimen.  So --

21          THE COURT:  Well --

22          MR. BLOCK:  Yes?

23          THE COURT:  -- the challenge here, though --

24 and I agree with you, the analogy at some point

25 breaks -- it does break down, and the challenge, it

1  seems to me is, but why is it -- why would regulating

2  Amazon be any different in this kind of online retail

3  environment than directly regulating the providers who

4  are selling on Amazon?  Do you see the distinction

5  there?  Because you -- you pose in your filing the

6  solution, and the solution is --

7          MR. BLOCK:  Yes.

8          THE COURT:  -- Commonwealth, go -- go after

9  Amazon.  That's who -- that's the appropriate entity

10 here that these statutes are designed to regulate.

11 Don't go after the suppliers to Amazon.  But your

12 suppliers are going to end up in the same spot, right?

13         So if Kentucky says, One of your suppliers --

14 they're -- Amazon's charging too much for that, it's

15 three times what it should charge based on what you

16 would -- on what Kentucky thinks is grossly in excess,

17 then that's going to have the effect of the same

18 impact that you're worried about if Kentucky says the

19 same thing to your supplier to Amazon.

20         MR. BLOCK:  So in terms of economics, Your

21 Honor, I agree with you.  I think for us the important

22 distinction is the legal effect, and that is that in

23 Your Honor's hypothetical, Amazon is the regulated

24 party.  Amazon is the party who is actually in a

25 position to control prices in its store and control

where sales are occurring or not occurring.  There is,
you know, pre-sale transparency on what is lawful and
what is not.  And our -- our members can then make a
decision about what they want -- do they want to
engage with Amazon on those terms or not, and they're
not doing so under the threat of punishment that can
total $25,000 a day, which are ruinous for small
business people.

So I think that -- and part of my answer,
too, Your Honor, is I think as a matter of legal
theory, that the hypothetical you point out in the
sort of economic -- the similar economic outcome, it
does -- it does sort of soften our -- the legal theory
in the abstract matter.  But what we're trying to
accomplish here is not -- and we made a deliberate
tactical choice, Your Honor, which I'll be really
transparent about; it's probably transparent from our
briefing.  We are not trying to come into federal
court and defend price gouging.  We are not trying to
say that the Commonwealth has no tools to protect
Kentucky consumers during the COVID crisis.  We are
simply trying to say the way that the Commonwealth and
the AG are pursuing what might be lawful ends -- but
what -- excuse me -- what might be important as, if
not lawful, as applied to our members.

1          You know, if I were arguing for Amazon, I
2   might have a different take on Your Honor's
3   hypothetical, but I'm not.  And so we're trying to
4   be -- we're trying to be realistic and reasonable and
5   not completely get in the way of what the Attorney
6   General is trying to do for the citizens of the
7   Commonwealth.
8          THE COURT:  Mr. Block, speak, if you would,
9   please, to the Attorney General's suggestion that
10  maybe you do not have a standing.
11         MR. BLOCK:  Yes, Your Honor.  We disagree.  I
12  think for the reasons Your Honor was alluding to.  The
13  standard for a pre-enforcement challenge is whether
14  you have a -- whether one has a credible fear of
15  enforcement, and we absolutely do here, because our
16  members have received subpoenas.  And in at least one
17  instance, the Attorney General is trying to enforce a
18  subpoena.
19         Now, I -- I can't -- I would -- where I
20  struggle a little bit is with the distinction that the
21  Attorney General is trying to draw between a civil
22  investigative demand for documents and an enforcement
23  action for punishment.
24         For our members, these CIDs are the scariest
25  piece of paper they will ever receive.  These are,

1  many of them mom-and-pop businesses who are operating
2  in a really chaotic environment trying to do their
3  level best and make a living and support the American
4  people.  And when one, and really many Attorneys
5  General are sending document demands, it's terrifying,
6  and it does deter and chill business activity.
7  Because the threat of legal exposure means you call a
8  lawyer, like Mr. Rafelson, and we've three lawyers on
9  this call, you know, like, this is expensive.
10          And, you know, another problem I have with
11  that distinction is the only valid basis that the
12  Attorney General has for serving a CID is if they have
13  a good faith belief that there might be a violation of
14  the law.
15          And we're really cutting to the chase.  We
16  are saying the AG cannot apply these substantive
17  provisions of the price gouging statutes to our
18  membership for the reasons that we articulate in our
19  brief, ergo, any subpoena seeking documents to build a
20  case to apply those statutes is unlawful.  Beyond the
21  simply burdensome costs and the fear that anyone would
22  have in terms of receiving a subpoena, they can't --
23  the AG sort of can't take it to the next step
24  lawfully.
25          So we think that we're entitled to challenge

it now, and it's more efficient to TRO now, as opposed
to waiting until someone has been, you know, brought
into court, which I think addresses the ripeness
argument, Your Honor.

The other point I would make about ripeness
is the minute that the Attorney General files an
enforcement action on the merits, if I filed this
lawsuit, I'm going to hear about Younger Abstention,
and I'm going to have a -- you know, I have some
arguments.  Younger Abstention is a lot tighter now
than it was a few years ago after the *Sprint* decision
from 2015, by the Supreme Court, but it's still a --
it's still a problem for me if I wait until the AG has
filed a merits-based enforcement action.

So -- and so I don't think the AG's position
can be that I can't challenge the law when it's just a
subpoena.  I have to wait until there's an enforcement
action, but I can't challenge it constitutionally at
that level either, and that can't be right, and I
think that's not what the ripeness doctrine means, and
I don't think that's what the Circuit's ripeness
doctrines cases say.

THE COURT:  Mr. Clark, is there any reason to
issue a CID, other than as a precursor to an
enforcement action?

1          MR. CLARK:  As a matter of fact, Your Honor,

2     there is.  Under -- under KRS, well, 367.240, we

3     can -- the Attorney General has the authority to issue

4     a CID to someone to gather information about another

5     entity.  Even if that CID is issued with someone that

6     we don't have reason to believe violated a price

7     gouging statute, if we have reason to believe that

8     person has information about another entity who may

9     have violated a price gouging statute, the statute

10    actually allows us to issue the CID to that person, so

11    ...

12          THE COURT:  If you thought Amazon, for

13    example, was perhaps in violation of the Kentucky

14    Statutes, might issue CIDs to Amazon suppliers as a

15    way of gathering information that ultimately would be

16    used for an enforcement action against Amazon?

17          MR. CLARK:  Yes, Your Honor.

18          THE COURT:  Okay.  Let me ask you this,

19    Mr. Clark.  If I denied the TRO but put the

20    preliminary injunction on an expedited briefing, how

21    long would the Attorney General like to respond to the

22    filings of the Merchants Guild?

23          MR. CLARK:  I believe we could file a

24    motion -- or a response of a motion by close of

25    business tomorrow.

```
 1            THE COURT:  All right.  And then if you
 2   wanted to reply, Mr. Block, how long would you like to
 3   reply?
 4            MR. BLOCK:  We can turn a reply by Monday --
 5   by close of business Monday.
 6            And, Your Honor, if I -- if I could just
 7   respond to that last point about the use of Section
 8   240.  I don't believe that is what is going on here.
 9   My understanding is that the subpoenas and CIDs have
10   said, We suspect you target of violating the law, so
11   we want your documents about your potential violation
12   of the law.  These are not -- in my understanding,
13   these are not third-party subpoenas.  Amazon is the
14   custodian of sales records.  And so in so far -- and
15   as I understand it, Amazon has been cooperating
16   voluntarily with the Attorney General.  So if -- I
17   think some of this information is in the custody of
18   the Attorney General, but I hope if they're -- if the
19   AG's position is that these are simply third-party
20   subpoenas that we're talking about, they'll make that
21   clear in their filing that our members have not in
22   fact been targeted through these subpoenas.  But I
23   just don't believe that to be the case.
24            And the other point I would make, Your Honor,
25   is the Attorney General on its website has made very
```

1 clear that it believes our members are bad actors who

2 need to be punished, and that alone is having a

3 chilling effect and supports the idea that these are

4 first-party subpoenas in anticipation of prosecution,

5 not third-party subpoenas of unrelated witnesses who

6 might just happen to have a piece of information.  So

7 I just -- I want to express my concern with that line

8 of argument.  I don't think that applies here.

9 　　　　　THE COURT:  Okay.  Well, Mr. Clark, you may

10 have come wanting to make certain points.  Let me see

11 if there's anything else you want to say.  Mr. Block,

12 I'll give you an opportunity to make any final points

13 you want to make, and then I'll give you a sense

14 preliminarily of how I think we're going to proceed.

15 　　　　　Mr. Clark, anything else, sir?

16 　　　　　MR. CLARK:  No.  I mean, I was a little

17 confused by Mr. Block's last statement there, which

18 again, we are very much in the investigatory stage of

19 this.

20 　　　　　I guess what I would ask, and this doesn't go

21 to the substance, but, Your Honor, you asked me a

22 briefing schedule, and as I kind of made notes on

23 issues to brief here, I would like to ask for Tuesday

24 of next week to get a brief on file.

25 　　　　　THE COURT:  Well, I appreciated your kind of

1  aggressive response to my request, so I actually was

2  going to give you longer because I do think -- I will

3  say preliminarily, I don't think this is a case in

4  which a -- issuing a TRO is necessary, and I'll set

5  those out in a subsequent order.  But I do think it's

6  a case in which we ought to have expedited briefing.

7          So why don't I do this.  The plaintiffs have

8  filed very thoughtful, pretty extensive filings in

9  this case.  I'm going to give the Attorney General the

10 requested amount of time to respond to Tuesday of next

11 week, by close of business that day.  Any final

12 reply -- and again, the nature of litigation is the

13 plaintiff always has a lot longer often to prepare in

14 those responding in an expedited way.  We'll ask that

15 you respond by close of business on Wednesday.  And

16 then I anticipate having a hearing on the preliminary

17 injunction on Thursday afternoon of next week.  And I

18 do think it's the kind of case, given how it's

19 unfolding, it deserves some expedited consideration,

20 but I don't think that a temporary restraining order

21 is necessary.

22          Mr. Block, I promised you a chance to bring

23 to my attention any final arguments.  Let me make sure

24 I've done that.  Anything else from you, sir?

25          MR. BLOCK:  I think your -- no, I think Your

1 Honor -- I think Your Honor has illuminated what we --
2 what we had to say, and we look forward to responding
3 to the state's papers.
4         THE COURT:  Okay.  And anything else on
5 behalf of the plaintiff?
6         MR. BLOCK:  No, Your Honor.  No, Your Honor.
7         THE COURT:  I know you're at a disadvantage
8 in terms of maybe being able to consult.
9         But then, Mr. Clark, anything else on behalf
10 of the Attorney General?
11         MR. CLARK:  No, Your Honor, not at this
12 moment.
13         THE COURT:  Okay.  Well, I think we've got a
14 good briefing schedule.  I'll take the matter under
15 advisement.  You can expect a scheduling order, as
16 well as an order that rules on the temporary
17 restraining order portion of the motion.
18         Thank you for your attention, counsel.  We'll
19 stand adjourned.
20         MR. BLOCK:  Thank you, Your Honor.
21         MR. CLARK:  Thank you, Your Honor.
22         MR. RAFELSON:  Thank you, Your Honor.
23         [PROCEEDINGS ADJOURNED AT 3:34 p.m.]
24                 * * * * *
25

1           I, SANDRA L. WILDER, RMR, CRR, certify that

2    the foregoing is a correct transcript from the record

3    of proceedings in the above-entitled matter.

4

5    /s/ Sandra L. Wilder RMR, CRR      Date of Certification:
     Official Court Reporter            June 29, 2020

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25