1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF KENTUCKY
2              CENTRAL DIVISION FRANKFORT

3

4

5    ONLINE MERCHANTS GUILD,

6        Plaintiff,

7
                              Docket No. 3:20-CV-29
8    V.                       At Frankfort, Kentucky
                              Thursday, May 21, 2020
9                             1:31 p.m.

10

11   DANIEL CAMERON,
     Attorney General of Kentucky,

12       Defendant.

13

14                      - - -

15

16     TRANSCRIPT OF TELEPHONIC MOTION HEARING BEFORE
        U.S. DISTRICT JUDGE GREGORY F. VAN TATENHOVE

17                      - - -

18

19

20   Court Reporter:      SANDRA L. WILDER, RMR, CRR
                          Official Court Reporter
21                        313 John C. Watts Federal Building
                          330 West Broadway, Suite 327
22                        Frankfort, Kentucky  40601

23

24
         Proceedings recorded by mechanical stenography,
25    transcript produced by computer.

```
 1

 2      APPEARANCES:   (Appearing telephonically)

 3

 4   For the Plaintiff:   AARON K. BLOCK
                          The Block Firm
 5                        4200 Northside Parkway NW
                          Building One, Suite 200
 6                        Atlanta, Georgia  30327
                          (404) 997-8419
 7
                          MARK A. GILBERT
 8                        Deatherage, Myers & Lackey, PLLC
                          701 South Main Street
 9                        P. O. Box 1065
                          Hopkinsville, Kentucky  42241-1065
10                        (270) 886-6800

11                        PAUL S. RAFELSON
                          Rafelson Schick, PLLC
12                        2255 Glades Road, Suite 319
                          Boca Raton, Florida  33431
13                        (561) 326-6529

14
     For the Defendant:   JUSTIN D. CLARK
15                        MATTHEW COLEMAN COCANOUGHER
                          J. CHRISTIAN LEWIS
16                        Kentucky Attorney General's Office
                          1024 Capitol Center Drive
17                        Suite 200
                          Frankfort, Kentucky  40601
18                        (502) 696-5300

19                        VICTOR B. MADDOX
                          Kentucky Attorney General's Office
20                        700 Capital Avenue
                          Capitol Building, Suite 118
21                        Frankfort, Kentucky  40601
                          (502) 696-5300
22

23

24

25
```

1           *[Proceedings commenced at 1:31 p.m. in open*
2  *court]*
3           THE COURT:  Good afternoon, ladies and
4  gentlemen.  This is Judge Van Tatenhove.  I'm in open
5  court conducting this proceeding in the presence of
6  the court reporter.
7           First of all, Madam Clerk, would you call the
8  pending matter, please.
9           DEPUTY CLERK:  Yes, Your Honor.  Frankfort
10 Civil Action 20-CV-29, Online Merchants Guild versus
11 Cameron.  This matter is called for a motion hearing.
12          THE COURT:  Thank you.  Counsel for the
13 plaintiff, would you state your appearance.  And my
14 requirement is that you identify anybody in your
15 office or your conference room with you this
16 afternoon.
17          MR. BLOCK:  Good afternoon, Your Honor.  This
18 is Aaron Block for the plaintiffs, and I am by myself.
19          THE COURT:  Anybody else?
20          MR. BLOCK:  There are others for the
21 plaintiffs, but I'm by myself physically.
22          THE COURT:  Okay.  Thank you.  Any other
23 counsel, please?
24          MR. GILBERT:  Your Honor, this is Mark
25 Gilbert for the plaintiff, and I am by myself.

1              THE COURT:  Thank you.

2              MR. RAFELSON:  Thank you, Your Honor.  This

3    is Paul Rafelson for the plaintiff, and I am by myself

4    in my office.

5              THE COURT:  Thank you.  Anybody else for the

6    plaintiff?  And then counsel for the Attorney General.

7              MR. CLARK:  Your Honor, this is Justin Clark

8    for the Attorney General.  And in my office with me is

9    my colleague Chris Lewis.  And those are the only

10   folks in my office.

11             THE COURT:  All right.  Anybody else on

12   behalf of the Attorney General?

13             MR. MADDOX:  Good afternoon, Your Honor.

14   Victor Maddox here.  I am alone in my office.

15             THE COURT:  Mr. Maddox.  Anybody else?

16             MR. COCANOUGHER:  Your Honor, Matt

17   Cocanougher, and I'm also alone.

18             THE COURT:  Thank you.  I don't think I have

19   anybody else on the list.  Anybody else need to state

20   your appearance, please?

21             Okay.  This matter is called for a hearing

22   with regard to the pending motion in front of me, the

23   preliminary injunction that the plaintiff seeks

24   against the actions of the Attorney General.  And I've

25   now -- we have the benefit of the full briefing in the

1 case.  There's been a thoughtful and detailed response

2 provided by the Attorney General.  The plaintiff has

3 had a chance to reply to that response.

4         And as you can imagine, counsel, the

5 threshold question on my mind is the issue of

6 standing.  And to understand that, I need to make sure

7 that I understand the procedural posture.

8         So as I understand it, based on the filings

9 of the Attorney General, is that the posture of the

10 Attorney General's actions, which are being challenged

11 here, is that they have begun investigations on more

12 than one Kentucky business that they suspect of

13 violating the Commonwealth's statute that addresses

14 price gouging.  And the focus has been on Kentucky

15 corporations, despite how they might sell their goods,

16 and nothing has proceeded further than the issuance of

17 a CID.

18         Mr. Clark, does that sound like an accurate

19 statement of the facts from your perspective?

20         MR. CLARK:  It does.

21         THE COURT:  Mr. Block, do you disagree with

22 that statement of the facts so far?

23         MR. BLOCK:  Respectfully, Your Honor, I do.

24 I need to add a couple of facts that we included in

25 our reply brief.

```
 1              The state has moved to compel compliance with
 2    the CID against one of our members named Jones & Panda
 3    that was omitted from the brief and affidavit that the
 4    state filed.  I assumed that was because they were
 5    operating under a quick timeline, but that is a --
 6    that is a fact.  And we have attached the state's
 7    emergency motion to compel to our reply brief, so that
 8    is in the record.
 9              And I would also point out, Your Honor --
10              THE COURT:  Let me have you pause there.
11    Mr. Block, let me have you pause there --
12              MR. BLOCK:  Yes.
13              THE COURT:  -- and let me let Mr. Clark
14    respond to that particular point.
15              MR. CLARK:  Thank you, Your Honor.  A couple
16    of interesting things there in the brief words of
17    Mr. Block to bring up.
18              To the point of standing, which I believe is
19    what you were asking about, standing is to be
20    determined at the commencement of the suit.  So what
21    they've done is in the reply, identify members that
22    have received CIDs that are now, I believe, after the
23    fact, members of the Guild.  So I'm not sure that
24    reply fixes the question Your Honor has about
25    standing.
```

1        The second thing I will mention is that the
2   Jones & Panda lawsuit, which was mentioned as the
3   reply, that's an interesting case because it is in the
4   Fayette Circuit Court.  It pre-dates this case.  The
5   Guild is not a party to that case.  Jones & Panda is
6   now, to my understanding, a member of the Guild, and
7   the Guild or Jones & Panda has now put the exact same
8   issues that are before Your Honor, constitutional
9   claims, before Judge VanMeter in the Fayette Circuit
10  Court.
11       So we didn't mention Jones & Panda in our
12  reply because the Jones & Panda issue was simply
13  insufficient to modify a CID that had been issued to
14  Jones & Panda under 367.240.  That is not the statute
15  that the Guild -- that the Guild raised in their
16  motion for preliminary injunction.  They're seeking to
17  declare the entire price gouging statute in Kentucky
18  unconstitutional as they apply to online sellers.  So
19  we did not omit anything.  That was a different case
20  at the time.
21       But now what's interesting, that not only is
22  there a standing threshold issue, and clearly a
23  ripeness issue, is the Court may want to consider the
24  Younger Abstention Doctrine because now these cases
25  are in front of a state court judge in a pre-filed

1  matter.

2          THE COURT:  So, Mr. Block -- and I understand

3  you may have a disagreement about the impact of the

4  procedural posture, so --

5          MR. BLOCK:  Yes, Your Honor.

6          THE COURT:  -- and please know that I'm going

7  to give you a chance to respond to the import of the

8  procedural posture.  I'm just trying to make sure we

9  have an agreement about what the procedural posture

10 is.

11         Do you think that the AG has accurately

12 stated the procedural posture of the Jones & Panda

13 case, that it was a CID action that pre-dates this

14 case certainly, its subject of adjudication in the

15 Fayette County Circuit Court, which the statutory

16 scheme allows?

17         MR. BLOCK:  What I -- Your Honor, what I

18 disagree with is the statement in the brief, and the

19 statement that I think I just heard on the record,

20 that the AG has not moved to enforce any of the CIDs.

21 And my -- my statement, Your Honor, is that that is

22 factually not true.  We can argue about the legal

23 implications, but the state, three or four days after

24 we filed our complaint, filed an emergency motion to

25 compel compliance with the CID against one of our

members.  So just at the basic level of facts, I think
we need to get -- I think that it would be helpful if
the AG could confirm that that factual statement is
accurate, not the statement in the brief and -- a few
minutes ago, but the statement that they have in fact
sought to enforce one of the CIDs against our member.

THE COURT:  Mr. Clark, is that true?

MR. CLARK:  The -- there's nothing inaccurate
in our papers or our brief.  What -- what has happened
in the Fayette Circuit Court is that Jones & Panda
initiated that by filing a petition to modify or set
aside a CID that was issued to it, and we responded to
that with a motion to compel compliance with the CID,
which again, is an investigatory tool.

THE COURT:  Okay.

MR. CLARK:  We're not enforcing a penalty of
any sort.

THE COURT:  Okay.  So what -- I think there
is some enforcement action taking place, and it's
taking place in exactly how the statute contemplates.
If there's a concern about whether a CID has been
appropriately issued by the Attorney General's office,
there's a forum in which parties can go and adjudicate
that matter, have a full opportunity to be heard, and
have a court of the Commonwealth make that decision.

1  And that seems to be unfolding.

2          As it relates to the membership of Jones &

3  Panda, how long have they been a member of your

4  association, Mr. Block?

5          MR. BLOCK:  It's fairly recent, Your Honor.

6  And I don't have the sign-up date, but I do believe

7  that it took place after we filed our lawsuit.

8          THE COURT:  Okay.

9          MR. BLOCK:  And I will confirm, we were

10  contacted by Jones & Panda after we filed our lawsuit.

11          THE COURT:  Okay.

12          MR. BLOCK:  Your Honor, if I could, just so

13  the record is completely clear on this last issue.

14  I'm looking at paragraph 10 of the affidavit that's

15  attached --

16          THE COURT:  And if you would state -- yes,

17  and would you state your name, please, so we can

18  create a good record.

19          MR. BLOCK:  Yes, Your Honor.  This is -- I'm

20  sorry, this is Aaron Block.  And I'm looking at page

21  ID number 134 in the record.  This is the second to

22  last physical page of the Attorney General's response;

23  it's paragraph 10 of the affidavit that accompanied

24  the Attorney General's response.  And it says,

25  "Because the investigation's under way in the Office

1  of the Attorney General are in their preliminary

2  stages, the Office has not initiated any action to

3  compel compliance with any of the CIDs or subpoenas."

4  And that's the statement, Your Honor, that I'm -- I do

5  feel the need to make sure on the record, that

6  statement is not accurate.  They have moved to compel

7  --

8         THE COURT:  What's your point -- what's your

9  point -- counsel, what's your point; is that they're

10 dishonest?

11        MR. BLOCK:  No, Your Honor, but I think that

12 because the state is taking the position that the --

13 the -- well, I think they've been taking the position

14 that because they haven't moved to compel compliance

15 with the subpoena, the case isn't ripe.  And my

16 suggestion is that they have in fact moved to compel

17 compliance with the subpoena.

18        THE COURT:  In response --

19        MR. BLOCK:  And then we, you know, can argue

20 about the ripeness implications of that -- of that

21 conduct.

22        THE COURT:  So your -- but this is in

23 response to now your member who's become a member

24 after the fact, but is now your member seeking to

25 exercise their rights in Fayette County Circuit Court,

1  the Attorney General responded to that, and you view

2  that as initiating an action.  They view that as your

3  client having initiated the action, but we're in

4  agreement about what's going on, correct?

5          MR. BLOCK:  Yes, Your Honor.

6          THE COURT:  Okay.  So -- and to be clear, and

7  this was, I thought, helpful to kind of learn the way

8  these CIDs are enforced, in essence, is precisely how

9  it's happening with the Jones & Panda situation in

10 which it is a matter of state law, and the

11 jurisdiction -- there is a forum available to

12 adjudicate that without having to come into federal

13 court and adjudicate that.

14         So is it -- is it your opinion and your

15 position, Mr. Block, on behalf of your clients that

16 the very fact that the AG is investigating your

17 members, that in and of itself is a constitutional

18 violation?

19         MR. BLOCK:  Yes, Your Honor, with a little

20 bit more explanation, if I could --

21         THE COURT:  Please.

22         MR. BLOCK:  It's the collection of -- oh, I'm

23 sorry?

24         THE COURT:  No, please, go ahead.

25         MR. BLOCK:  Okay.  I'm sorry.  It's a little

1 hard on the sound.

2        It's the collection of facts, Your Honor,
3 that we articulated in the reply briefs.  It is the
4 Attorney General's public statements that are written
5 in very threatening language.  It is the service of
6 the subpoenas and the CIDs.  It is also the state's
7 litigation position and the Commonwealth's litigation
8 position in this matter.  All of that, as we read the
9 Supreme Court's credible fear cases, all of that
10 reflects a possibility that the Attorney General will
11 seek to enforce the substantive laws, the price
12 control laws against our members, and we believe that
13 is what is -- that gives rise to standing and ripeness
14 because the application of those laws would be
15 unconstitutional.  In other words, it's an action to
16 apply an unconstitutional law, which, of course, would
17 itself be unconstitutional.  That is our position,
18 Your Honor.

19        THE COURT:  Okay.  Well, respond to that,
20 Mr. Clark.

21        MR. CLARK:  Yeah, that was interesting there.
22 I mean, what the Guild is asking the Court to stop
23 here is the Attorney General from investigating price
24 gouging allegations in the midst of a
25 nationally-declared emergency, a global pandemic.

1          So I think what -- that answer there was
2     pretty instructive, is they are seeking to stop the
3     Attorney General from investigating price gouging
4     allegations, I think, simply because the fact that
5     those transactions or offers to sell take place on the
6     Internet.  But the fact that an ordinary commercial
7     transaction happens in the current cyberspace is not
8     excluded from traditional consumer protection laws.
9          THE COURT:  I think the plaintiff here -- I
10    do think the plaintiff here is seeking to challenge
11    the underlying statute.  It's in essence saying you
12    can't investigate violations of the statute because
13    the statute's unconstitutional.  So now you are -- by
14    initiating investigations, you're harming our
15    membership and our members who are saying, I may be
16    subject to some sort of enforcement action under that
17    statute.  And the plaintiff is saying, Well, that
18    statute's unconstitutional, to use kind of First
19    Amendment language, it's chilling their economic
20    interest and their ability to participate in the
21    economic market because of a -- you know, based on a
22    statute that is fundamentally unconstitutional.
23          Now, we're going to -- it's a separate
24    question of whether or not that they're likely to
25    succeed on that, right?  But I'm still at this

1  threshold question, which is whether there's the kind

2  of injury here that gives this Court the jurisdiction

3  to even get to that next question and whether there's

4  a likelihood -- at this preliminary injunction

5  stage -- of whether there's a likelihood to succeed on

6  the merits.

7          MR. CLARK:  Well, if we're looking at it that

8  way, I certainly don't believe that the Guild has

9  alleged in a well-pleaded complaint, the type of

10  injury that would give rise -- or that the Guild

11  itself has not received any subpoenas or investigation

12  and its complaint, which is what we're looking --

13          THE COURT:  Well, let me --

14          MR. CLARK:  -- at.  They never pled at the

15  time of filing the lawsuit an injury to any of its

16  members.  And the --

17          THE COURT:  So their response to that,

18  Mr. Clark, is we -- we don't have to have that kind of

19  injury.  We can have the kind of injury that's

20  identified in the *Housing Opportunities* case out of

21  the Sixth Circuit in which we've had to expend our

22  organizational resources because of this

23  unconstitutional statute, and so that's injury enough

24  in the Sixth Circuit to allow us to go forward.

25          MR. CLARK:  But even in the *Housing*

1  *Opportunities* case, that court says there has to be
2  some injury, independent of cost of litigation.  If
3  the Guild is asserting direct organizational -- or
4  direct standing, it can't just be extent or burden of
5  litigation because that would apply and give standing
6  to any organization or group that files any lawsuit.
7          THE COURT:  I think that's correct.
8          MR. CLARK:  There's always a cost of burden
9  of litigation.  There has to be something more.
10          THE COURT:  I think that's correct.
11  Mr. Block, let me give you a chance to articulate the
12  something more.
13          MR. BLOCK:  So I think, Your Honor, there are
14  two things.  There's pure litigation costs, so that
15  the fees that I might charge to be on the phone today,
16  that might not give rise to standing.  But before we
17  filed the lawsuit, when our members contacted us
18  because they had received these letters from the
19  Attorney General, when other members began to hear
20  about these potential enforcement actions -- and I
21  should add, too, the subpoena cover letters also
22  contained cease and desist language, so there's more
23  than -- you know, there's more than just the subpoena.
24  There's also what appears to be some sort of cease and
25  desist order.

1        When our members began to receive that kind
2  of contact from the Attorney General, that threatened
3  enforcement, and our organization, in turn, had to
4  investigate the issues, had to advise our members
5  about what to do, had to, you know, sort of figure out
6  what the situation was.  That does give rise to
7  standing.  That's the diversion of resources theory
8  from *Housing Opportunities*.

9        The other thing, very quickly, Your Honor, if
10  I could, just to add a little bit more on the standing
11  of the individual members.  We could file an amended
12  complaint today because we're within the time frame,
13  and they haven't responded yet, that identifies Jones
14  & Panda, that identifies other members.  And so I, you
15  know, I actually think that the standing end reason is
16  I think a little bit different than -- I think it's
17  not quite as formalistic on that point, but we
18  could -- we could easily abjure that if it were a sort
19  of scrivener's error-type issue.

20        So not to mention, these are -- our members
21  are known to the Attorney General because they've
22  been, you know, pursuing them.

23        So I just -- I want to sort of challenge the
24  notion that this is a case about phantom members who
25  might not really exist and an phantom organization

1 that doesn't have members and it's just running around

2 filing lawsuits.  That's not what's going on here.  We

3 have been injured, and our members who are known to

4 the Attorney Generals have been injured.

5           THE COURT:  And are all those members

6 Kentucky members?

7           MR. BLOCK:  No, Your Honor.  Because the --

8 as we've tried to explain in our brief, because the --

9 because of the way the market works, the interstate

10 market works, someone who lives in the 49 other

11 states, anything that they do on Amazon is visible to

12 a Kentucky consumer, could be purchased by a

13 Kentucky -- could be -- the offer could be viewed by a

14 Kentucky consumer -- it could be purchased by a

15 Kentucky -- yes?

16           THE COURT:  No, no, I understand -- I

17 understand all of that argument, Mr. Block.  What I'm

18 asking is --

19           MR. BLOCK:  Okay.

20           THE COURT:  -- has the Attorney General sent

21 a CID letter to anyone other than a Kentucky entity?

22           MR. BLOCK:  Not to my knowledge, but I

23 actually would have to defer to the Attorney General

24 because I don't have the distribution list for all of

25 the subpoenas to speak on my knowledge.

```
 1            THE COURT:  Okay.  So, Mr. Clark, why don't
 2   you speak to that.  I think the representation is that
 3   the only individuals -- the only entities which you're
 4   seeking to, in essence -- and I think -- I think the
 5   plaintiff's correct, there is that cease and desist
 6   language in the CID that initially goes to an entity,
 7   but the only entities in which you are beginning an
 8   investigation against are Kentucky entities; is that
 9   correct?
10            MR. CLARK:  That is correct, Your Honor.
11            THE COURT:  Okay.  All right.  So let's -- I
12   want to give each side an opportunity to kind of say
13   what they want on standing, and then I want to get
14   more to the merits of the case.
15            So, Mr. Block, I think you've made your
16   point.  And as I understand it, your point is that
17   your individual members are in fact injured in this
18   particular instance because of the cease and desist
19   language, as well as the overall chilling effect that
20   it has.
21            And I should -- I should say, other than --
22   other than Jones & Panda, are the other entities that
23   the AG's office has begun an investigation, Kentucky
24   entities; are they all members of your organization?
25            MR. BLOCK:  I can tell Your Honor the other
```

1  members of ours in Kentucky have received subpoenas

2  and CIDs.  I believe there may be some additional

3  similarly-situated online merchants who have received

4  the subpoenas and CIDs, but are not members.

5          THE COURT:  Okay.  So --

6          MR. BLOCK:  So I think it's a little bit of

7  both.

8          THE COURT:  -- so you would say you have

9  individual Kentucky members who have been injured

10 because of the fact that they've received these CIDs.

11 And because of this enforcement action that the AG's

12 taken, they are afraid to go forward and participate

13 in the economy because of the consequences of those

14 actions, which, of course, is always the case in an

15 enforcement action, and is actually okay, unless the

16 underlying statute is unconstitutional?

17         MR. BLOCK:  Yes, Your Honor.  And I would

18 simply add to that, that others of our members outside

19 of Kentucky fear exposure to Kentucky law.  Even

20 though the Attorney General hasn't sent them subpoenas

21 and CIDs, I don't believe he has disclaimed the -- the

22 authority of the ability to pursue them as well.  And

23 I think the language of the AG's public statements has

24 not been limited to Kentucky.

25         But I did think of an analogy, Your Honor,

1  that I -- that I would offer.  You know, if the state
2  had a law that said you can read one book of the Bible
3  and not the other book, and we'd all agree that that's
4  completely unconstitutional for various reasons, and
5  the Attorney General said, I'm going to -- I'm going
6  to start asking people which books of the Bible
7  they're reading.  I think we all agree that readers of
8  the Bible could come into federal court and have that
9  issue litigated.  And obviously, we're talking about
10 different interests.  These are not -- you know, these
11 are not religious liberty interests.  But the
12 principle is the same, and that's why we like to rely
13 on the Court's large and very current and very strong
14 body of pre-enforcement credible fear law, because
15 what we're allowed to do as free citizens is come into
16 court and seek adjudication and vindification of our
17 rights before we get arrested, before we get sued,
18 before we are subject to prosecution by the Attorney
19 General.  We think that is the -- we think that's the
20 governing legal framework, and I think Your Honor has
21 articulated the facts that we think bring us right
22 into the core of that legal framework.
23         THE COURT:  And the second one, of course, is
24 that you as an organization have been injured based on
25 this theory of the diversion of organizational

1  resources, which you say is more than just litigation

2  costs.  It's the fact that you've had to try to --

3  you've had to respond to members' questions, you've

4  had to talk to the members about the application, and

5  you've had to take a look at it long before you filed

6  a lawsuit.

7       MR. BLOCK:  Yes, Your Honor.  That would even

8  include phone calls with the -- with Mr. Rafelson on

9  behalf of Online Merchants Guild, along with members

10 who've received subpoenas.  These were phone calls

11 with the Attorney General.  So that wasn't a lawsuit

12 to challenge the subpoena.  That was a, you know, the

13 typical discussion that you have with a prosecuting

14 agency.  That's just part of it.

15      But yes, you've articulated the diversion of

16 resources theory that we believe gives our

17 organization standing, independent of our members.

18      THE COURT:  Okay.  Mr. Clark, I want to give

19 you the chance to respond.  And as I understand the

20 Attorney General's position, it is that the -- we're

21 in a pre-enforcement stage, nobody has been held

22 accountable for price gouging.  If an individual

23 member of the plaintiff's organization believes that

24 they should not have to respond to the information,

25 there is a way for them to litigate that issue and

have their rights determined, but that the place to do
that is not in a federal court, but in the courts of
the Commonwealth.  And the statutory framework
provides for that mechanism, provides for an
individual to seek to quash the CID in essence in
circuit courts, and that can be decided in circuit
court, and is appropriately decided in circuit court,
and until that process unfolds, no one's been injured.

        MR. CLARK:  Your Honor, with all due respect,
you might have just made the argument that I've made,
so I'm just going to say that yes, I agree; that is
our position.  And it also goes to why the case, you
know, standing alone -- the standing issue alone, that
everything you've just stated also applies why the
case is not ripe for review because that state process
that can take place, and at least the Jones & Panda at
least look like at least one of them, the Guild's
members now has that in the Fayette Circuit Court,
that matter, the investigation, the challenge to the
investigation is taking place in the Fayette Circuit
Court.

        So everything Your Honor just stated is our
position on standing, and also on ripeness, and also
why, you know, this Court should defer to the Fayette
Circuit Court and lacks jurisdiction over this matter.

1          So without taking more of the Court's time,

2     I'll just simply say yes, that's our position, and we

3     agree.

4               THE COURT:  Okay.  And on the issue of --

5               MR. BLOCK:  May I respond, Your Honor?

6               THE COURT:  -- and then on the issue of

7     representational standing, the -- what else do you

8     have to say about that?  I'll give you the final word

9     on that.  The plaintiff argues that it's not just

10    litigation costs.  It's these other diversion of

11    organizational resources in a case like this.

12              MR. CLARK:  On -- with regard to

13    representational standing?

14              THE COURT:  Yeah.  That's the *Housing*

15    *Opportunities* case.

16              MR. CLARK:  Well, the *Housing Opportunities*

17    case, as I understand it, refers to direct

18    organizational standing.  And I think that's what

19    we've been talking about here, to where they do have

20    to show something more than just litigation cost or

21    burden of litigation, that there has to be something

22    more to the actual organization that's caused harm.

23              THE COURT:  And Mr. Block says -- and

24    Mr. Block says there is.  And what he says is that,

25    you know, because of this allegedly unconstitutional

statutory scheme, we've had to put our good people to
work responding to calls, analyzing, doing a lots of
things that might have been a precursor to litigation,
but were not necessarily required, and we've had to
extend lots of our resources on this, and that's fine;
this is what we're designed to do.  But it's certainly
an injury if it's involving an unconstitutional
scheme.

          MR. CLARK:  I think we'll point out that
essentially, but I think that the only purpose of the
Guild is to do just that.  Like, I don't -- according
to the declaration that Mr. Rafelson filed, that
the -- you know, that is the mission of the Guild.

          The Housing Corps. -- or the *Housing
Opportunities* made equal issue, for example, in the
Sixth Circuit case, they had a whole different
mission.  They had a whole different thing to do.  The
only thing the Guild, according to Rafelson's --
Mr. Rafelson's declaration, the only reason they exist
is to do just that; that's their sole mission.  There
is no other injury to them.

          THE COURT:  Okay.  Thank you, Mr. Clark.
Mr. Block -- Mr. Block, I will give you the final word
on this since you're the movant, then we're going to
move on.

1          MR. BLOCK:  Yes, thank you, Your Honor.  So
2    our organization exists to advocate for our members
3    across an array of issues, not just price gouging.  In
4    fact, I really think before the COVID pandemic, we
5    spent little to no time on this particular issue.
6    We'd do things about tax policies and other things
7    that benefit our members, but this is -- this is new
8    and novel.
9          And the other thing I would just like to
10   point out, Your Honor, very briefly is, I can't, as
11   the Online Merchants Guild, I can't go challenge a
12   subpoena in the Fayette County Circuit Court because I
13   haven't received one.  So whatever process there might
14   be for an individual member who's a Kentuckian, I
15   don't have that.  So I can't be barred from federal
16   court for not exercising a right that I don't have.
17         THE COURT:  Well, you could -- you could be
18   barred, though, if I were to determine that it's not
19   ripe.  So the only way you can get into -- there are
20   two ways you can get into federal court.  Either one
21   of your members could get into federal court, and if I
22   didn't think their claim was ripe, they couldn't get
23   into federal court.  Or you can get into federal court
24   independently on some notion of representational
25   standing, right?

```
 1              MR. BLOCK:  Yes, Your Honor, yes.
 2              THE COURT:  Okay.  All right.
 3              MR. BLOCK:  Okay.  I just -- I took the
 4   Attorney General to be saying something different,
 5   which is that sort of independently of the traditional
 6   ripeness test that looks at credible fear of
 7   enforcement, the fact of a subpoena being issued to
 8   one of our members leads to some sort of abstention or
 9   lack of reference.  And that's all I was trying to
10   respond to, Your Honor.
11              THE COURT:  Okay.
12              MR. BLOCK:  I was tying to say that that
13   doesn't -- whatever that does to Jones & Panda, it
14   doesn't do anything to the Online Merchants Guild
15   because we don't have that subpoena challenge remedy.
16              THE COURT:  Okay.  Well, let me move forward
17   to the likelihood of success on the merits of the
18   challenge of the statute.
19              Let me begin with a question for Mr. Block.
20   There's a number of arguments that you make in terms
21   of the constitutionality of the statute, and you're
22   relying on cases that are primarily dormant Commerce
23   Clause cases that deal with this extra-territorial
24   notion, and then kind of what impact it has outside
25   the borders of Kentucky.  But I haven't found in the
```

1  record anywhere where one of these statutes, which are

2  fairly ubiquitous, has ever been struck down as

3  unconstitutional; is that fair?

4        MR. BLOCK:  Your Honor, I haven't seen one

5  where such a statute was struck down or upheld against

6  a challenge on the merits either.  No, I actually -- I

7  honestly don't know how much litigation there is about

8  these kinds of statutes period, constitutional or

9  otherwise.  You know, one of the statutes here only

10 operates during periods of emergency, which in

11 Kentucky don't last that -- written by statute don't

12 last a terribly long time.  And, you know, I'm -- my

13 sense is, I can't go further than that, that there

14 just isn't a whole lot of litigation, constitutional

15 litigation anyway, about these kinds of price gouging

16 or price control statutes.  There's a little bit

17 maybe, but not that I've -- not that I've seen.  And

18 so the short answer to your question is, I haven't

19 seen a statute that's been upheld or struck down on

20 the grounds that we raised.

21       THE COURT:  Okay.  My second question for you

22 is one of the things I think we've confirmed since the

23 TRO hearing is that Kentucky has only focused its

24 investigations on Kentucky entities.  Doesn't that

25 make a difference ultimately in terms of the economic

1   impact that an enforcement action in these instances

2   would have extra-territorially and, you know, isn't it

3   -- it just -- it seems like that becomes -- I think

4   your argument is in part no, because of a

5   technological development, and the technological

6   development is Amazon.  So that it's almost impossible

7   anymore to have a circumstance in which a state could

8   just focus -- that where it would matter -- whether a

9   state just focused on its own citizens.  That's not a

10  very artfully -- that's not a very artfully stated

11  question, but I hope you understand what I'm trying to

12  explore.

13        MR. BLOCK:  I do, Your Honor.  And I actually

14  think I can tie together my answer to your first

15  question to my second question.  And what I should

16  have added to my answer to your first question is that

17  these price control statutes are actually very similar

18  in economic effect to the price affirmation statutes

19  that the Supreme Court struck down twice.  Because

20  what they do is they allow a particular state to

21  dictate prices in another state.  And two times the

22  Supreme Court considered and rejected those.

23        So I think my answer is price gouging

24  statutes have evaded constitutional scrutiny, but

25  their very, very close sibling price affirmation

statutes haven't struck down.  And I think that if --
if you think about it -- if one thinks about those
cases, the way those kinds of laws work, they tell a
beer seller or a beer distributor, If you want to sell
beer in our state, that's fine.  If you want to sell
beer in New York, that's fine, but you can't charge
any more in New York than you charge in neighboring
states like Vermont and Connecticut.  And I think here
what we're dealing with is a situation where the AG is
telling, let's say a member sitting in Kentucky, a
resident of Kentucky, whatever you charge in Kentucky
for a particular good in the Amazon Interstate
Marketplace, you cannot charge any more in neighboring
states or states across the country because that could
be a potential violation of Kentucky's price control
statute.  And that's not my -- Yes, Your Honor.

THE COURT:  And, of course, they're not --
you're not saying that.  I think what you're saying is
that's the practical effect in the world of Amazon if
they determine only what a grossly excessive price is
in Kentucky, right?  They don't really have any
authority to say, You can't charge this anywhere else.
They don't really have any -- any interest in deciding
what they charge anywhere else.  They'd be perfectly
fine from Kentucky's perspective if you charged what

1   was viewed as a fair price here, and let other states

2   litigate whether that's grossly excessive or fair in

3   those states. But as a practical effect, I think your

4   point is, they can't do that because of Amazon.

5           MR. BLOCK: So, Your Honor, I actually think

6   the state has made exactly the argument that you just

7   said they can't make because we quoted a couple of

8   times in our brief in the Jones & Panda case, the

9   state has taken the position that it is unlawful -- it

10  is a violation of Kentucky law to sell something or --

11  excuse me -- to offer a good at a price that is too

12  high by Kentucky -- by the Kentucky AG's standard,

13  even if it's purchased by somebody in a different

14  state because a Kentuckian could have seen the offer.

15          So I agree with Your Honor that that is not

16  constitutional, but it is also exactly what the AG --

17  part of what the AG is saying, the price control

18  statutes allow them to do.

19          THE COURT: But that only -- the focus,

20  though, still is only on Kentucky citizens. So a

21  Kentucky citizen -- it's not focused on who purchases

22  the good. It's focused on who makes the offer.

23  They're not trying to prosecute in some sense people

24  who overpay. They're simply trying to enforce this

25  statutory scheme against Kentucky citizens who

1  overcharge.

2      MR. BLOCK:  And the problem we have, Your

3  Honor, is that there's not a Kentucky market, or

4  there's not a Kentucky only market.  This is unlike

5  the traditional brick and mortar context, Marathon

6  Oil, for example, where there is a clearly defined

7  Kentucky market any private citizen can make an

8  affirmative decision to participate in, and if they

9  want to only in a Kentucky market, and can calibrate

10 their pricing and marketing accordingly, Amazon is --

11 it's an all or none proposition.  You market

12 nationally, or really, internationally, or not at all.

13      And I -- so when the Kentucky Attorney

14 General might try to -- I think there's sort of a

15 theoretical argument that all that the AG is really

16 doing is regulating Kentucky prices.  But the

17 practical effect, and the Supreme Court has stressed

18 that it's the practical effect that matters regarding

19 the Commerce Clause, the practical effect is to impose

20 Kentucky price controls across the whole market,

21 really, whether you live in Kentucky or anywhere else.

22      THE COURT:  So if a particular state wants to

23 regulate price gouging, and wants to regulate what it

24 views are excessive prices, individual Kentucky

25 citizens who are taking advantage of a hurricane or a

1  tornado or a pandemic, what -- what would that statute

2  look like that would pass constitutional muster from

3  your perspective?

4        MR. BLOCK:  Well, I'll start with the easy

5  cases where I think the existing statute actually

6  applies and any -- you know, the block revisions would

7  apply.  A brick and mortar store in Kentucky that can

8  set Kentucky specific prices and can conduct Kentucky

9  specific marketing, a direct to consumer store.  So,

10  you know, pick a brand, nike.com, you know, perhaps

11  can do that because they can calibrate their own

12  website that way.  And actually Amazon itself.  You

13  know, we've taken the position that because Amazon

14  controls the show, Amazon controls its store as it

15  relates to Kentucky and every other state, it seems

16  possible, at least as against and extra-territoriality

17  challenge that the AG could regulate Amazon with this

18  kind of statute, and under *Pike*, it'd sort of make the

19  most sense; that'd be the only practical way of doing

20  it.  But I'm trying to revise a statute that would

21  allow the AG to regulate people who can't engage in

22  Kentucky specific pricing directly.  I think it's very

23  difficult, Your Honor.  I'm not saying I couldn't

24  draft one, but I think on the -- you know, on the fly,

25  and it's because the states have inherent limitations.

1   I mean, that may not be the answer that the AG wants

2   to hear, but in our federation, the states have very

3   clear limitations on their authority.

4          If we look at the parallel contexts of

5   personal jurisdiction, there are plenty of times where

6   we think, Gosh, that dispute -- maybe it made sense to

7   have that dispute in -- held in Kentucky or in another

8   state, but we can't because the due process clause

9   imposes limits on what the states can do to protect

10  the rights of citizens in other states.  And, you

11  know, we just have those -- we have those -- their --

12  you know, I think of them as features, not bugs, but

13  we certainly have those characteristics in our system,

14  where there just are inherent limits on state

15  authority.

16         And I think what I'm trying to suggest is

17  that they're fairly narrow in practical terms because

18  brick and mortar direct to consumer retailers probably

19  can be reached by the current statute, and Amazon

20  probably can be reached by the current statute.

21         Our members are in the unique position of

22  because of the way this particular and really

23  important interstate marketplace works, it's an all or

24  none proposition.  And so if they want to participate

25  at all, they can be subject to the price control of an

1  individual state like Kentucky, and that means that

2  they can't participate potentially.

3          THE COURT:  Okay.

4          MR. BLOCK:  So that's -- that was my long

5  answer to your short question, Your Honor.

6          THE COURT:  That's a helpful answer, counsel.

7          Mr. Clark, let me let you respond to that,

8  this notion, which is kind of -- kind of what my sense

9  has been, that this is a really relatively narrow

10 legal issue in terms of the applicability of this

11 statute because of the technological limitations of

12 Amazon.  How would you respond to that argument that's

13 being made?

14         MR. CLARK:  Well, I mean, I think that as we

15 point out in our brief, that what the Guild -- what

16 their real issue here is not a function of Kentucky

17 law, but a function of Amazon's unique platform.  I

18 mean, because Mr. Block just stated there, not only

19 would his -- even his revised statute or this existing

20 statute apply to brick and mortars, but he mentioned

21 Nike's website.  Well, any of these online sellers or

22 online merchants who have their own website, they

23 could control things through a different online

24 platform.

25         What the Guild's issue is, is a practical

1  issue with Amazon's platform.  Nothing in Kentucky's
2  price gouging statute directly controls commerce
3  occurring outside of Kentucky, which is the only
4  analysis that has to be done under this
5  extra-territoriality doctrine, which in the Sixth
6  Circuit, I believe it was the concurrent opinion
7  called it the dormant part of the dormant Commerce
8  Clause, you know, if we're going to talk about relics.
9  Like this is a really unique thing that is only
10  applied at the U.S. Supreme Court through direct price
11  control price affirmation issue.
12          Here with the Kentucky price gouging statute,
13  transactions can take place outside of Kentucky
14  regardless of whether Kentucky consents or not.
15  Kentucky does not dictate the terms of any
16  out-of-state transaction.  We're not projecting our
17  legislation onto other states.  If you chose to do
18  business in Kentucky, you should follow Kentucky's
19  price gouging statutes, and the laws prohibiting the
20  same, especially in the midst of a global pandemic.
21  Kentucky's price gouging statutes do not require
22  out-of-state commerce to be conducted according to our
23  terms.
24          So taking the Guild's logic to its
25  conclusion, Kentucky's price gouging statutes would be

1  constitutional.  Amazon just changed its platform to

2  this member's preferences, but that's not -- that's

3  not an issue.

4          THE COURT:  But that may be the case.  Think

5  of it this way.  Maybe it's a circumstance in which

6  from a public policy standpoint states have a problem.

7  And the problem is that price gougers have a safe

8  haven from state prosecution and enforcement because

9  of the technological framework presented by Amazon.

10 It's not that it's not a problem.  From a policy

11 standpoint, it's a serious problem, right?  Because

12 taken to its logical conclusion, it may be there's not

13 a way for a particular state to be able to enforce a

14 price gouging statute for anybody who uses Amazon.

15         Now, that's a public policy problem, but it's

16 not one for me to solve; it's one probably for the

17 federal government to solve, would be the argument.

18         I'm not saying I agree with this.  It would

19 be the argument that the federal government would have

20 to come in because of the nature of the platform.

21         So, sure, Amazon could change its platform in

22 a way in which it would be open for states to

23 challenge price gouging for those who use the

24 platform, but they're not compelled to do it

25 necessarily.  There shouldn't be a reason to be --

1   they would be compelled to do it.  And it may be an

2   area in which there's just no way to enforce price

3   gouging, which is a problem, but not the problem that

4   will be solved by a federal court.  It's a problem

5   that's going to be solved by the political process.

6   And if it's because of the Commerce Clause, if it's

7   not able to be solved by individual states, then the

8   way those problems get solved -- and that's kind of

9   the whole idea behind the Commerce Clause, is at the

10  federal level and through federal legislation.

11          MR. BLOCK:  Your Honor, if I could.  This is

12  Mr. Block.  I think that's right, and I think that

13  it's -- you know, one of the considerations that the

14  Supreme Court instructed us to think about is what

15  would the effect be if multiple states had overlapping

16  regulatory regimes.  And we, for obvious reasons,

17  spent a lot of time talking today about Kentucky, but

18  the reality is that most states have some kind of

19  price gouging statute, and many attorneys general are

20  conducting similar investigations, and the statutes

21  really differ.

22          We articulated in our brief, you know, some

23  are really clear.  Alabama has a percentage threshold,

24  and if you're under that, there's no price gouging.

25  But that's inconsistent with the laws of other states

1  and in Kentucky. And so it's -- it's -- actually the

2  problem in some ways is worse than the cure because if

3  we were to allow -- if the dormant Commerce Clause

4  were to allow every state to impose a potentially

5  conflicting price control regime on a national market,

6  you'd have chao -- you'd have actually what we've

7  described in our brief, which is you'd have sellers

8  not wanting to participate.

9          If I -- if I could, Your Honor, add a little

10 bit more to explain why it's less of a problem than I

11 think the AG might be appreciating.

12         Amazon is a store. Amazon controls the sale,

13 and Amazon actually takes a pretty hefty piece of

14 every sale. And so if the Attorney General, or any

15 attorney general wants to regulate prices on Amazon,

16 going in to Amazon starting with Amazon makes a good

17 deal of sense and is we believe both more likely to be

18 lawful, but also technologically much more efficient,

19 and I think that's -- you know, I think that's part of

20 the dormant Commerce Clause issue here as well. You

21 know, we -- so that's -- well, I'll stop there, Your

22 Honor.

23         THE COURT: Let me ask you this question, and

24 then I'll get back to you, Mr. Clark, because I want

25 to give you a chance to continue to kind of address

1   this particular part of the argument.

2            But would it matter -- and I don't know the

3   answer to this -- whether any of those individual

4   Kentucky entities actually have a brick and mortar

5   presence in Kentucky as well, and does that matter,

6   Mr. Block?  Or are we really talking about a subset of

7   only those who have a brick and mortar presence and

8   perhaps they participate on the Internet, but they

9   don't do it through Amazon?

10           MR. CLARK:  Well, I -- our -- so our

11  position, Your Honor, is -- well, I should, just to

12  clarify, our members are Amazon -- they sell on

13  Amazon.  They supply Amazon.  They don't have brick

14  and mortar stores, our Kentucky members anyway.  And

15  my view is that even if they had a brick and mortar

16  store, it wouldn't make a doctrinal difference as to

17  the sales on Amazon.

18           Now, if the AG -- if I had a member with a

19  Kentucky store who had high prices -- I won't concede

20  they're price gouging -- but if they had high prices

21  in the brick and mortar store, I wouldn't have brought

22  this lawsuit as to an investigation there.  This is

23  about the Amazon Interstate Marketplace.  So

24  that's the -- that's the short answer, Your Honor.

25           THE COURT:  Okay.  And could a brick and

1  mortar store that participates in Amazon be a member

2  of your organization?

3          MR. CLARK:  They could.  I think it's just

4  the economic reality that our members tend to be

5  individuals who -- they participate in retail

6  arbitrage.  They basically find things or source

7  things for a lower price than they think they can sell

8  it online.  And that does not lend itself well to

9  having a brick and mortar enterprise, in addition just

10  to the capital costs.  The kind of people we're

11  talking about tend to be people who run their business

12  from their kitchen table, not people who can invest in

13  a big building, too.  You know, maybe they hope to get

14  there some day, but they're not -- they're not.

15          THE COURT:  Okay.  So, Mr. Clark, I want to

16  give you a chance -- and I think I understand the AG's

17  position on this, but I want to make sure you've had a

18  full opportunity to address this -- this part of the

19  argument, which is it's not that this statute cannot

20  be used to enforce price gouging in -- by Kentucky

21  businesses in a time of crisis like this.  It's just

22  that there's a loophole, and the loophole is not one

23  that the AG can fix.  It's not one that the Court can

24  fix, but requires some legislative fix that perhaps

25  has to happen at the federal level.

1          MR. CLARK:  I mean, respectfully, Your Honor,

2   I do know that there's a conversation going on with

3   the FCC and other places at the federal level, and

4   perhaps other states are starting to address this in

5   different ways, but neither of those have acted on

6   this.  So what -- it's up to the state here in the

7   Commonwealth of Kentucky for the Attorney General to

8   do, is to enforce the laws and statutes that have been

9   passed by the state's General Assembly to protect the

10  health and welfare of its citizens.  And here what

11  it's doing is protecting the health and welfare of

12  those citizens during the midst of a declared

13  emergency.  So this isn't a static -- or a static mold

14  of a price control or a price affirmation or telling

15  someone how to do business.  When a national emergency

16  is declared for a temporary amount of time, defined by

17  statute, we have price gouging statutes, which online

18  sellers should be sophisticated enough to know,

19  particularly they have a guild now that should be able

20  to help them know that raising prices, not just in

21  Kentucky, but really anywhere, but particularly in

22  Kentucky, 100 to 2,000 percent on emergency supplies

23  or medical supplies violates those price gouging

24  statutes.

25          I believe Mr. Block's made this much more

1  complicated of what's actually going on here.  This
2  isn't a -- this isn't a uniformed static scheme to
3  control pricing over the Internet.  This is an effort
4  to enforce laws on the books passed by the General
5  Assembly because there is no federal law on this.  And
6  I'm not -- I'm not in a position to argue whether
7  there should or shouldn't be.  But the federal
8  government hasn't acted, so it is up to the states to
9  comply.  And it's up to merchants not only to not
10 gouge consumers, but maybe a group like the Guild
11 could educate its members on how not to gouge.  These
12 aren't accidental gotcha' instances of 14 percent
13 increase in March on a hand sanitizer.  These are
14 gross, excessive, unconscionable price increases that
15 these sellers knew exactly what they were doing.
16        So although we're talking very lofty
17 constitutional arguments here, I don't want the public
18 policy to get lost in the weeds there.
19        THE COURT:  I don't think -- and I don't
20 think the public policy's lost here at all.  You know,
21 it's one of the difficult things kind of from a public
22 perception standpoint if I were to grant the
23 preliminary injunction, is that the public's going to
24 perceive that as some decision that what's taking
25 place here is okay.  But that's not it at all.  For

good -- for important reasons, the Constitution
doesn't allow the states to legislate in every area
that requires the -- a policy fix because of
commerce-related values.

And so I -- I could agree a hundred percent
that what's taking place here is wrong, it's
unconscionable, and it ought to be fixed.  The narrow
question in front of me is whether an individual state
can fix it for this very narrow context in which there
is a -- someone doing business who is a Kentucky
citizen, but only does business in a national online
forum like Amazon versus their own discrete -- their
own discrete website in which they have complete
control.  It's the nature of Amazon's requirements.
It's not only its bounty and its potential, but it
comes with certain restrictions.  That's why people
want to -- want to avail themselves of it.  And it --
the question is -- I don't know for sure the answer --
but the question seems to be is, if they engage in
conduct that's wrong there, can you fix it as the
Commonwealth of Kentucky?  It's not a debate about
whether it's unconscionable or whether it's wrong.  I
recognize there's some other First Amendment
articles -- arguments, but it's a question of whether
the individual states can reach that wrong conduct.

And I think your argument is they shouldn't be able to
do it because it's wrong.  Okay, that's fine.  But the
very narrow issue that I'm wrestling with is can they
do it given the constitutional restrictions related to
commerce?

          MR. CLARK:  Your Honor, I respectfully
believe that the Attorney General can and should,
because one, there's no other person or entity doing
it, and it is the policy of the General Assembly to
have these laws that I do not think applies, for all
the reasons I've already stated outside the
Commonwealth, but -- and I will quote here the Sixth
Circuit.  "The Commerce Clause does not protect the
particular structure or methods of operation in a
retail market."  So -- and that's from the *Snyder*
case.

          What that means here is that the Guild and
its members have chosen to participate in the Amazon
platform; they've chosen to do that.  And in choosing
to do that, they need to understand what the laws and
limitations are in that choice.  They have not done
that.  They use the Amazon platform.  Amazon doesn't
set prices to go on.  And again, we'll get into a
factual record that hasn't been developed here, but
the prices might be approved and the money might be

1  collected and the shipments might go out from Amazon.
2  It's the online seller that sets the price.
3         And so they've chosen to enter into that
4  market and use that structure, and if they'd done so
5  in a way that even if they don't understand or in a
6  way that violates Kentucky law, then that's on them.
7  Because the dormant Commerce Clause doesn't protect a
8  certain merchant's chosen way of doing business.
9  That's -- so again --
10            THE COURT:  Okay.
11            MR. CLARK:  -- we don't have an issue, as I
12  understand it, with Kentucky law.  The issue
13  specifically here is an issue with Amazon's platform.
14            THE COURT:  Yes, I under -- I think I have --
15  and I appreciate the good briefing and argument.  I
16  think I understand both the plaintiff's arguments on
17  that point as well as that raised by the Attorney
18  General.
19            Mr. Block, I recognize --
20            MR. BLOCK:  Your Honor --
21            THE COURT:  -- I recognize that the plaintiff
22  has made some additional arguments -- some -- a First
23  Amendment argument, for example, and equal protection
24  argument.  I don't come with any specific questions
25  about those.  I understand those arguments that are

1  being made, but I want to give you a chance to draw my

2  attention to anything particular about those arguments

3  that you want to make sure that I focus on.

4          MR. BLOCK:  Thank you, Your Honor.  And if I

5  could just very briefly respond to that last point.

6          Within the regulatory sphere that the state

7  has under the Constitution, they can impact the way a

8  particular market is structured.  That's what *Snyder*

9  is talking about.  That's what the other cases the

10  Attorney General is talking about.

11          So once the state is in its zone of lawful

12  authority, subject to *Pike* and other restrictions, the

13  state does have the ability to alter market structure.

14  We are talking about an antecedent question, which is

15  whether the state has any authority to regulate this

16  market in this way at all.  Our position is no, the

17  Commonwealth does not have the power to apply the

18  price control statutes the way the Commonwealth is

19  trying to.  And I know Your Honor's heard us at

20  length.  I just wanted to make that last point on that

21  sort of market alteration doctrine.

22          THE COURT:  Which I certainly understand --

23          MR. BLOCK:  I think that --

24          THE COURT:  -- I understand your argument on

25  that.

1           MR. BLOCK:  Thank you, Your Honor.  As to

2    the -- I'd like to begin, Your Honor, with the First

3    Amendment argument because I think it tracks in many

4    ways what we're saying about the extra-territorial

5    application of the state's laws that state, and again,

6    we quoted, "The state's position in its brief seeking

7    to enforce a subpoena against our member Jones &

8    Panda.  The state's position is that it can regulate

9    commercial speech that might be lawful in another

10   state because it might be unlawful in Kentucky."  The

11   effect of that is to suppress speech that is lawful or

12   we felt it is lawful in Kentucky.  But it's

13   certainly -- the AG can't determine that it's unlawful

14   in, let's say, Tennessee, and we think that is a clear

15   First Amendment violation.

16           And the reason that I would draw Your Honor's

17   attention to that argument, is that once we are in

18   First Amendment, once we are talking about commercial

19   speech, it is the state's burden to justify the

20   particular speech regulation under some form of

21   heightened scrutiny, and the AG did not make that

22   attempt at all.  So we think we've just -- you know,

23   frankly as a matter of the burden of proof, we think

24   we win that argument.

25           I think Your Honor appreciates -- if I turn

1  to the due process argument -- I think Your Honor,

2  based on the TRO hearing, I think Your Honor

3  understands what we're saying here, that the statutes

4  really don't give the kind of guidance that we need,

5  and that adds to the chilling effect that we're

6  talking about really across the board.  That -- and I

7  think the equal protection argument, you know, I'll

8  let that -- the papers speak on equal protection

9  argument, unless Your Honor has questions.

10         THE COURT:  Thank you very much.  Well,

11  Mr. Clark, let me let you respond to the First

12  Amendment argument that's been articulated by

13  Mr. Block, and then I want to make sure you've had a

14  chance to make any particular points that you'd want

15  to make as well.

16         MR. CLARK:  I mean, with regard to the First

17  Amendment for the speech to be -- I mean, we have to

18  be talking about lawful speech, and pursuant to

19  Kentucky law, a price increase, which is all we're

20  talking about here, is the stated price that you're

21  offering to sell an item, if we have information to

22  believe that that violates state of Kentucky laws,

23  then we have the right to investigate it.  It's not --

24  the *Central Hudson* test only applies if we're talking

25  about lawful speech.  A price gouging statute has

1  never been held unconstitutional as if it were a

2  violation of free speech.  I'm not even sure a price

3  control statute has ever been held unconstitutional as

4  a violation of free speech.  So here, we're not even

5  dealing with a price control.  We're dealing with

6  allegations of excessive, unconscionable, unreasonable

7  price gouging.  That is not protected or lawful

8  speech.  The analysis can end, with all due respect.

9          MR. BLOCK:  But it's more than -- I'm sorry,

10 Your Honor -- it's more than just the price.  It's --

11 if we can't market the product, period, because the

12 price that we want to market the product at might be

13 unlawful, we can't speak at all.  But it's the

14 whole -- it's the whole advertising package.  We can't

15 fill up on the Internet on Amazon because of the

16 chilling effect of these two laws.  And to be very

17 clear, Your Honor, we've challenged two.  We've spent

18 a lot of time talking about the pandemic and the price

19 control statute number 374 that goes into effect

20 during declared states of emergency.  But the other

21 one, Section 170 operates, as far as I can tell, 365

22 days a year, and is, if anything, less determinant

23 than the emergency-related one.  And when you have

24 statutes that broad, they are actually chilling

25 protected commercial speech far beyond the price point

1 that we're trying to offer.

2        THE COURT:  Okay.  All right.

3        MR. CLARK:  And, Your Honor, may I -- oh.  Go

4 ahead.

5        THE COURT:  You may, Mr. Clark, you can

6 respond to that.

7        MR. CLARK:  I want to be very clear that this

8 idea that somehow or another Kentucky's price gouging

9 statutes or the Attorney General's investigation into

10 it is preventing the online merchants or the Guild's

11 members from entering the marketplace has no basis in

12 fact nor in law.  Kentucky's price gouging statutes

13 has done nothing and are doing nothing to prevent the

14 Guild's members from operating or selling products,

15 even online.  They're clearly aware of price gouging

16 statutes, both in Kentucky, and I'm assuming

17 elsewhere.  All we're doing at this time is

18 investigating price gouging allegations.

19        There has been no chilling effect whatsoever

20 on the ability to market items, sell items.  We're in

21 the midst of a declared emergency.  Online sellers,

22 just like brick and mortar retailers are under a duty

23 to comply with the law.  That is all we're talking

24 about here.  There's no chilling effect for business

25 or stating prices.

1          THE COURT:  Well, Mr. Block, it's your

2   motion, and I'll give you the last word, and see if

3   there are any other matters we need to address.

4          MR. BLOCK:  Yes, Your Honor.  The last word

5   there is we have made a factual record.  This is at

6   the preliminary injunction stage, we can do it with

7   affidavits, which we've done, to document under oath

8   the chilling effect that is happening.

9          The other point, Your Honor, if I could just

10  briefly touch on the public policy question.  You

11  know, we also put this in our papers as well.  The --

12  and this relates to exactly what I'm saying about the

13  chilling effect.  It is not necessarily the case that

14  imposing or threatening to impose punishment for price

15  controls actually has the desired effect because we

16  put in record evidence to show it can actually, by

17  deterring people from participating in the market, it

18  can actually reduce supply, and thereby increase

19  prices in an organic sense as well.

20         So I -- the reason I make that point is that

21  the public policy case is not all in the Attorney

22  General's -- or all in the Attorney General's side of

23  the ledger.  There's a -- there's a complicated

24  economic question there.  But we've put in evidence to

25  show that it's not -- it's not black and white, I

53

think, in the way that the AG portrays it.

THE COURT:  Yes.  And I think -- I think the AG, though's, right in some sense, is that any of your members can go sell their goods online.  What they're being prevented from doing is selling at the price that they'd like to sell it for.  They are -- because they're fearful that they'll have an enforcement action brought that will in essence say that price is grossly in excess, and that goes to the vagueness issue, and I understand those arguments as well.

So, you know, if they -- they -- they could sell it for, you know, a modest, you know, two percent over manufacturing costs, and not have any concerns at all.  Their concern that the price that they judge the market will bear will be viewed as a violation of a statute that they believe is unconstitutional.

MR. BLOCK:  And I think in that respect, Your Honor, it's important to note that the stat -- because the statutes are so vague, the line between lawful and unlawful is lost on our members, and it is lost on me.

And the other thing here is that because prices have gone up -- so when we talk about COVID response goods, masks cost more today than they cost six months ago because supplies are -- have dwindled, you know.  And the same is true for hand sanitizer.

1          So our members –– the reason that's important
2    is our members' acquisition costs have gone up because
3    that's how markets work.  But the way that the
4    investigations work, all the Attorney General has is
5    some piece of paper from Amazon that we haven't seen
6    that purports to have price increases.  Then we get a
7    nasty letter threatening cease and desist, and
8    threatening serious legal consequences, could be
9    $25,000 a day, which is absolutely ruinous, unless our
10   members can prove that that price was lawful under
11   some indeterminate standard, or that it was –– it was
12   –– the increase was related to our acquisition costs,
13   which may be further back in the supply chain than we
14   can even document.  And all of that, the vagueness,
15   the way the statute works, the fact that we can't
16   engage in state–by–state pricing, all of that combines
17   together.
18          The reason we have so many constitutional
19   arguments, Your Honor, and normally, that's not a
20   great strategy; it looks like they're all over the
21   place.  But here, they all –– they all sit together.
22   It's sort of this combination that makes it impossible
23   for our members to participate in interstate economic
24   activity, which they're entitled to do, and which
25   Kentucky cannot keep them from doing.

1          THE COURT:  Okay.  Well, I think I understand

2    the arguments that have been made on both sides.  I

3    appreciate the excellent briefing.

4          Pending in front of me is the motion for a

5    preliminary injunction, which I'll take under

6    advisement, and turn to promptly, given the

7    preliminary nature of the requested relief.

8          Let me see if there any other matters I need

9    to address for you, Mr. Block?

10          MR. BLOCK:  No, Your Honor.  Thank you.

11          THE COURT:  Mr. Clark, anything additional

12    for the AG?

13          MR. CLARK:  No, Your Honor.  Thank you.

14          THE COURT:  Thank you very much, counsel.

15    We'll stand in recess, pending the next item on my

16    docket.

17          [PROCEEDINGS ADJOURNED AT 2:38 p.m.]

18                    * * * * *

19          I, SANDRA L. WILDER, RMR, CRR, certify that

20    the foregoing is a correct transcript from the record

21    of proceedings in the above-entitled matter.

22

23    /s/ Sandra L. Wilder RMR, CRR      Date of Certification:
      Official Court Reporter           June 29, 2020

24

25