RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ONLINE MERCHANTS GUILD,

                *Plaintiff-Appellee,*

    *v.*

DANIEL J. CAMERON, in his official capacity as Attorney General of Kentucky,

                *Defendant-Appellant.*

> No. 20-5723

———————————

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 3:20-cv-00029—Gregory F. Van Tatenhove, District Judge.

Argued: March 10, 2021

Decided and Filed: April 29, 2021

Before: BATCHELDER, MOORE, and BUSH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Matthew F. Kuhn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant. Aaron K. Block, THE BLOCK FIRM LLC, Atlanta, Georgia, for Appellee. **ON BRIEF:** Matthew F. Kuhn, Brett R. Nolan, Victor B. Maddox, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant. Aaron K. Block, THE BLOCK FIRM LLC, Atlanta, Georgia, Paul S. Rafelson, RAFELSON SCHICK, PLLC, Boca Raton, Florida, Mark A. Gilbert, DEATHERAGE, MYERS & LACKEY, Hopkinsville, Kentucky, for Appellee. Sarah A. Hunger, OFFICE OF THE ILLINOIS ATTORNEY GENERAL, Chicago, Illinois, Christopher E. Ondeck, Jennifer E. Tarr, PROSKAUER ROSE LLP, Washington, D.C., Kelly Landers Hawthorne, Chantel L. Febus, PROSKAUER ROSE LLP, New York, New York, for Amici Curiae.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge.  Early in the COVID-19 pandemic, some sought to capitalize on consumers' fear and uncertainty by charging outrageous prices for hand sanitizer, disinfecting wipes, masks, and other cleaning and protective products.  In response, the Commonwealth of Kentucky's Attorney General, Daniel J. Cameron, announced that his office would enforce the Commonwealth's price-gouging laws against Kentucky businesses involved in such schemes.  True to his word, the Attorney General opened civil price-gouging investigations into various Kentucky-based merchants, including at least one member of Plaintiff Online Merchants Guild (the "Guild") that was selling goods to Kentuckians through Amazon's online marketplace.

The Guild brought suit against Attorney General Cameron to challenge the constitutionality of Kentucky's price-gouging laws as applied to sellers on Amazon, invoking, among other things, the extraterritoriality doctrine of the dormant commerce clause.  Accepting that the Attorney General sought only to enforce the Commonwealth's price-gouging laws against Kentucky-based sellers in connection with sales to Kentucky consumers through Amazon's platform, the district court nevertheless granted the Guild's motion for a preliminary injunction, concluding that enforcing the laws in connection with Amazon sales would have impermissible extraterritorial effects.  Because we conclude that the Attorney General's enforcement of Kentucky's price-gouging laws in this fashion is unlikely to run afoul of the dormant commerce clause's extraterritoriality doctrine, we **VACATE** the preliminary injunction and **REMAND** for further proceedings.

# I. BACKGROUND

## A. Amazon's Online Marketplace and the Guild

Because the district court's analysis depended on the structure of Amazon's online marketplace, a brief overview is in order.[1] Amazon is an eCommerce website that offers goods for sale via the internet and is "responsible for over 50% of all eCommerce sales in the [United States]." R. 10-1 (Rafelson Decl. at ¶ 15) (Page ID #64). It operates by contracting with third-party sellers, which supply the goods to Amazon, which in turn sells the products to consumers. *See id.* at ¶¶ 9–10, 16 (Page ID #62, 64). Thus, according to the Guild, the third-party sellers "are not in privity of contract with Amazon's customers; Amazon is." *Id.* at ¶ 16 (Page ID #64). Most notably for present purposes, Amazon operates as a national online marketplace. It allegedly sets a single, national price for goods, and third-party sellers cannot choose to have their goods withheld from consumers in particular states. *Id.* at ¶¶ 12–14 (Page ID #63–64). Third-party sellers propose a price for their goods, but it is Amazon that has final authority as to whether to accept or reject that price. *Id.* at ¶ 14 (Page ID #63–64).

The Guild "is a trade association for online merchants," such as Amazon's third-party sellers. *Id.* at ¶ 3 (Page ID #60). The Guild's purpose "is to advocate for a free and fairly-regulated online marketplace, and for the interests of online merchants." *Id.* According to the Guild, "Amazon's store is . . . a critically important sales channel for online merchants." *Id.* at ¶ 8 (Page ID #62).

## B. Kentucky's Price-Gouging Laws

The Commonwealth has two statutes that address price gouging. The first—and the more direct of the two—is Kentucky Revised Statutes § 367.374, which is triggered when the Governor or the United States Department of Homeland Security declares a state of emergency.

---

[1]The factual record regarding Amazon's functioning comes exclusively from the declaration of the Guild's executive director. The Attorney General accepts these representations at this stage, but states that "[t]he Guild's averments will be thoroughly tested during discovery." Appellant's Br. at 7 n.5.

§ 367.374(1)(a).   Once triggered,[2] the statute prohibits any person from selling, renting, or offering to sell specified goods—including "[g]oods . . . used for emergency cleanup," "[e]mergency supplies," and "[m]edical supplies"—"for a price which is grossly in excess of the price prior to the declaration and unrelated to any increased cost to the seller."  § 367.374(1)(b). The statute includes safe-harbor provisions that preclude liability where, for example, the price is (1) ten percent (or less) above the pre-declaration price for the good; (2) ten percent (or less) above "costs and normal markup" for the good; or (3) "[g]enerally consistent with fluctuations in applicable commodity, regional, national, or international markets, or seasonal fluctuations." § 367.374(1)(c).

The second applicable statute is the Kentucky Consumer Protection Act, which prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."  Ky. Rev. Stat. § 367.170.  The statute defines "unfair . . . to mean unconscionable." § 367.170(2).  "[T]rade" and "commerce," as used in the statute, mean "the advertising, offering for sale, or distribution of any . . . property . . . and shall include any trade or commerce directly or indirectly affecting the people of this Commonwealth."  Ky. Rev. Stat. § 367.110(2).

Kentucky law empowers the Attorney General to initiate civil investigations into suspected price gouging when he "has reason to believe" that a violation has occurred, is occurring, or will occur.  *See* Ky. Rev. Stat. §§ 367.240(1), 367.378.  Consistent with this authority, the Attorney General may compel the production of documentation or testimony regarding the subject matter of the investigation through subpoenas and civil investigative demands ("CIDs").  Ky. Rev. Stat. §§ 367.240(1), 367.250.  The Attorney General may also petition a state court for a restraining order where doing so would be in the public interest and he has reason to believe a violation has occurred, is occurring, or will occur.  *See* Ky. Rev. Stat. § 367.190(1).  Those found to have committed a price-gouging violation face civil monetary penalties and private damages actions.  *See* Ky. Rev. Stat. §§ 367.220, 367.378, 367.990.

---

[2]At this time, the Guild does not contest that an emergency order triggering the statute's protections was in place at all relevant times.

## C.  The Attorney General's Response to Suspected Price Gouging

On March 26, 2020, in response to complaints by Kentucky consumers of price gouging involving N95 masks and other essential goods by third-party sellers on Amazon—including markups of up to 1,951%—Kentucky's Attorney General publicly announced that "[t]he egregious actions of these third-party sellers will not be tolerated in Kentucky."  Elizabeth Kuhn, *Attorney General Cameron Issues Subpoenas to Amazon Third-Party Sellers for Price Gouging During COVID-19 Pandemic* (March 26, 2020), https://kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=888 (last visited April 28, 2021).  This was not just tough talk; the Attorney General issued subpoenas to six Kentucky-based sellers "who used Amazon's online platform to engage in suspected price gouging during the [COVID-19] pandemic" and stated in a press release that the subpoenas "should serve as a warning to anyone who tries to illegally profit from COVID-19."  *Id.*

Among the Kentucky-based sellers that drew the Attorney General's attention regarding suspected price-gouging was a member of the Guild, Jones & Panda, LLC ("Jones & Panda").  R. 22-3 (Cocanougher Ltr. at 1) (Page ID #179).  On March 25, 2020, the Attorney General sent a letter informing Jones & Panda that he was opening a price-gouging investigation into its pricing of hand sanitizer and respirators on Amazon.  *Id.*[3]  "In furtherance of [his] investigation," *id.*, the Attorney General served Jones & Panda with a subpoena and CID stating that he had "reason to believe that a person has engaged in, is engaging in, or is about to engage in" an unlawful act under Kentucky's price-gouging laws, R. 22-4 (CID at 1) (Page ID #181).  The CID requested pricing, sales, and cost data for hand sanitizer and respirators offered on Amazon between February 15, 2020 and March 25, 2020, along with documentation and records regarding the sales or justifying any price increases.  *See id.*, Att. at 2–3 (Page ID #184–85).  Rather than comply with the CID, Jones & Panda petitioned in state court to have the CID set aside or modified.  *See* R. 34-3 (First Am. Pet. at 1) (Page ID #393).

---

[3]The letter erroneously refers to "the Commonwealth's price-gouging laws set forth in Kentucky Revised Statutes (KRS) 367.372 to 367.*368*."  R. 22-3 (Cocanougher Ltr. at 1) (Page ID #179) (emphasis added).  The end of that range should be "367.*378*" as it appears in the CID that accompanied the letter.  *See* R. 22-4 (CID at 1) (Page ID #181).

### D.  This Lawsuit

The Guild initiated this suit on May 1, 2020, seeking through injunctive and declaratory relief to prevent the Attorney General from enforcing § 367.374 and § 367.170 against the Guild's members.  *See* R. 1 (Compl. at ¶ 65) (Page ID #16).[4]  It alleges that the application (or threatened application) of Kentucky's price-gouging laws to members of the Guild for sales on Amazon violated the dormant commerce clause, the Due Process Clause, and the First Amendment.  *Id.* at ¶¶ 48–64 (Page ID #14–16).  After a series of briefings and telephonic hearings, the district court granted the Guild's motion for a preliminary injunction and enjoined the Attorney General from "applying KRS § 367.170 and KRS § 367.374, including by subpoena, investigation, or prosecution, to Amazon suppliers in connection with offers or sales on Amazon."  *Online Merchants Guild v. Cameron*, 468 F. Supp. 3d 883, 904 (E.D. Ky. 2020). In doing so, the district court concluded that the Guild was likely to succeed on the merits of its dormant commerce clause claim—invoking the clause's extraterritoriality doctrine to find a per se violation—and that it was likely to establish standing to pursue its challenge.  *Id.* at 891–902. The district court did not address the Guild's other constitutional claims.  This timely interlocutory appeal followed.

## II.  DISCUSSION

"While the ultimate decision to grant or deny a preliminary injunction is reviewed for an abuse of discretion, we review the district court's legal conclusions *de novo* and its factual findings for clear error."  *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012).  To obtain a preliminary injunction, "[a] plaintiff . . . must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  Here, the district court abused its discretion in granting the Guild's motion for a preliminary injunction because it "improperly applied the governing law," *Obama for Am.*, 697 F.3d at 428 (quoting *Mascio v. Pub. Emps. Ret. Sys. of Ohio,* 160 F.3d 310,

---

[4]At various points in its complaint the Guild erroneously refers to Kentucky Revised Statutes § 367.364 instead of § 367.374.  *See, e.g.*, R. 1 (Compl. at ¶ 25) (Page ID #8).

312 (6th Cir. 1998)), namely, the dormant commerce clause's extraterritoriality doctrine, to conclude that the Guild is likely to succeed on the merits.

## A.  Likelihood of Success on the Merits

The State Attorney General attacks on two fronts the district court's conclusion that the Guild is likely to succeed on the merits of its constitutional challenge to Kentucky's price-gouging laws.  First, the Attorney General argues that the Guild is unlikely to establish standing, such that it is unlikely even to reach the merits in the first place.  Second, the Attorney General argues that its enforcement of the Commonwealth's price-gouging laws against Kentucky-based sellers in connection with Amazon sales to Kentucky consumers does not offend the extraterritoriality doctrine of the dormant commerce clause.  Although we agree with the district court that the Guild is likely to establish standing, we hold that it erred in concluding that the Guild is likely to succeed on its extraterritoriality doctrine claim.  *See id.* ("The district court's determination that a plaintiff is likely to succeed on the merits is a question of law that we review *de novo*.").

### 1.  Standing

To succeed on the merits, a party must first reach the merits, and to do so it must establish standing.  Thus, a preliminary injunction is warranted only where the party seeking relief is likely to establish:  (1) an injury in fact; (2) traceability; and (3) redressability.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018).  The injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Where, as here, injunctive relief is sought, "a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review."  *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997).  The Guild argues that it is likely to establish standing to sue on its own behalf and also on behalf of its members.  *See MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002) ("An association or organization may assert standing in one of two ways:

(1) on its own behalf because it has suffered a palpable injury as a result of the defendants' actions; or (2) as the representative of its members."). We agree.

### a. Direct Organizational Standing

To establish direct standing to sue in its own right, an organizational plaintiff like the Guild must demonstrate that the "purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action." *Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991) (alteration omitted) (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)). We have, however, rejected assertions of direct organizational standing where an overly speculative fear triggered the shift in organizational resources. *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 389 (6th Cir. 2020).

The district court found a likelihood that the Guild would establish direct organizational standing based upon the declaration of its executive director, Paul S. Rafelson. *See* R. 10-1 (Rafelson Decl. at ¶ 2) (Page ID #60). Rafelson declared that the Guild has "expend[ed] organizational resources in response to the [Attorney General's price-gouging] investigation" by working with members on how best to respond to the subpoenas and CIDs, analyzing "the complex web of investigations," and "discuss[ing] open questions with merchants who have not received subpoenas, but are confused and concerned about what they can and cannot sell online." *Id.* at ¶ 21 (Page ID #65–66). Although Rafelson does not say so explicitly, it can reasonably be inferred that the Guild was not previously expending resources in this fashion from the fact that the Attorney General's investigations triggered the shift in resources. *See id.* Indeed, at one of the hearings on the Guild's motion for a preliminary injunction below, counsel for the Guild confirmed that, prior to the pandemic (and the Attorney General investigations that followed closely thereafter), the Guild "spent 'little to no time' on price gouging issues." *Online Merchants Guild*, 468 F. Supp. 3d at 893. That comes as little surprise, given that § 367.374 is enforceable only during declared emergencies and that the unprecedented COVID-19 pandemic has led to extended emergency declarations. *See* § 367.374(1)(a).

Rafelson's declaration is uncontroverted with respect to the Guild's shifted resources, and the facts asserted therein are in line with those where this court has found direct organizational standing. The Guild diverted resources that could have been expended elsewhere to address the Attorney General's price-gouging investigations, and price gouging is an issue that the Guild had previously spent a negligible amount of time on. *See, e.g.*, *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013) (diverting staff time and resources to address purportedly discriminatory housing advertisement); *cf. Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–60 (6th Cir. 2014) (no direct organizational standing where premised on activities that would have happened anyway at a "single regularly scheduled meeting"). Moreover, there is no issue regarding the speculative nature of the harm, given that the Guild's new price-gouging activities resulted from subpoenas and CIDs directed at its own membership regarding activities—online sales—in which its members partake. *Cf. Memphis A. Philip Randolph Inst.*, 978 F.3d at 389 (no standing for speculative harm). Accordingly, based on the record as it stands, the Guild is likely to establish direct organizational standing.

The Attorney General's sole rejoinder is that the Guild cannot point to its recent price-gouging expenditures to establish direct organizational standing because they fall within its mission to advocate for the interests of online merchants. To support this argument, he cites *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir.) (per curiam), *cert. denied,* 141 S. Ct. 257 (2020), for the sweeping proposition that if an organizational plaintiff's new expenditures "are actually part of the organization's mission, then there is no diversion of resources and thus no injury-in-fact." Appellant's Br. at 14. But *Shelby Advocates* stands for no such thing, because that would contradict the various earlier—and thus controlling—cases to the contrary from this circuit, not to mention Supreme Court precedent, all of which affirm that within-mission organizational expenditures are enough to establish direct organizational standing. *See, e.g.*, *Miami Valley Fair Hous. Ctr.*, 725 F.3d at 576 (concluding that an organization with a mission to "promote fair housing and eliminate housing discrimination" had direct standing to sue over an allegedly discriminatory housing advertisement); *Hous. Opportunities Made Equal, Inc.*, 943 F.2d at 646; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 368, 379 (1982). In *Shelby Advocates*, we concluded that the voting rights organization in question lacked standing to seek injunctive relief due to the "speculative" nature

of its fears that voting irregularities would occur in an upcoming election, applying the rule that only "certainly impending" future harms can constitute an injury in fact where injunctive relief is sought.  947 F.3d at 982.  So, the opinion's brief discussion of the organization's factual claim that it had to divert funds from its mission did not contribute to the panel's holding.  *See id.*  In short, *Shelby Advocates* does not undermine the district court's correct conclusion that the Guild is likely to establish direct organizational standing by way of a straightforward application of this circuit's (and the Supreme Court's) longstanding precedent.

### b.  Representative Standing

Even where an organizational plaintiff lacks standing to sue in its own right, it may sue on behalf of its members if "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  The district court concluded that Jones & Panda—the Guild member that received the Attorney General's price-gouging subpoena and CID—would be able to sue in its own right, a conclusion that the Attorney General contests.  There is no question that the Guild otherwise satisfies the requirements of representative standing:  addressing price gouging as it relates to eCommerce falls within the scope of the Guild's mission, "to advocate for a free and fairly-regulated online marketplace," R. 10-1 (Rafelson Decl. at ¶ 3) (Page ID #60), and the constitutional claims asserted and injunctive relief sought do not require Jones & Panda's participation.

Because the Guild's assertion of Jones & Panda's standing to sue is based on Jones & Panda's receipt of the Attorney General's subpoena and CID, this case implicates the rules for pre-enforcement challenges, where it is the "threatened enforcement of a law" that is said to create an injury in fact.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  In such cases, the plaintiff establishes a sufficiently imminent injury where it has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  *Id.* at 159 (quoting *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)).

The first requirement for pre-enforcement standing—intent "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute," *id.* (quoting *Babbitt*, 442 U.S. at 298)—is met here. Jones & Panda is engaged in commercial activity through Amazon's national (interstate) marketplace. R. 33-1 (Jones Decl. at ¶ 4) (Page ID #253). This conduct, which Jones & Panda hopes to continue, *see id.* at ¶ 9 (Page ID #254), is affected with a constitutional interest because the dormant commerce clause protects commercial actors against discriminatory, extraterritorial, and unduly burdensome state regulations of interstate commerce. *See Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019) (citing *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994)). Furthermore, Jones & Panda's online sales are arguably proscribed by Kentucky's price-gouging laws. *See Susan B. Anthony List*, 573 U.S. at 159. Indeed, the subpoena and CID that Jones & Panda received asserted that the Attorney General had "reason to believe that a person has engaged in, is engaging in, or is about to engage in" unlawful acts under the Commonwealth's price-gouging laws. R. 22-4 (CID at 1) (Page ID #181); *see Susan B. Anthony List*, 573 U.S. at 163 ("Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law.").

The Attorney General does not dispute that Jones & Panda's commercial activity is affected with a constitutional interest or arguably proscribed by the Commonwealth's price-gouging laws, but instead, by minimizing the subpoena and CID, argues that Jones & Panda is not subject to a "credible threat of prosecution." *See Susan B. Anthony List*, 573 U.S. at 159. Various factors inform our analysis of whether there is a credible threat of prosecution sufficient to confer standing: (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016). These *McKay* factors are not exhaustive, nor must each be established. *See id.* (noting that this court has held there to be standing where "some combination" of the factors are present). We address each in turn.

*History of Enforcement.*  Although the record does not establish a particularly significant history of enforcement for the Commonwealth's price-gouging laws, this first factor carries little weight here.  Because § 367.374 is enforceable only during a declared emergency, it makes sense that there would be at best limited evidence of a history of enforcement.  In any case, there is at least some evidence of past enforcement actions, not to mention the other subpoenas and CIDs that the Attorney General issued in 2020.  *See Commonwealth ex rel. Conway v. Wingate*, No. 2009-SC-000324-MR, 2010 WL 252251 (Ky. Jan. 21, 2010) (regarding a discovery dispute in a civil price-gouging action brought by the Attorney General related to gasoline sales after Hurricane Katrina); *Marathon Petroleum Co. v. Stumbo*, 528 F. Supp. 2d 639, 643 (E.D. Ky. 2007) (dismissing, on abstention grounds, a suit against the Attorney General seeking to enjoin enforcement of Kentucky's price-gouging laws because of a pending civil enforcement action).

*Warning Letters.*  The second factor favors the Guild.  The Attorney General sent Jones & Panda a subpoena and CID regarding suspected price gouging.  Although these materials were formally part of the investigative process and stopped short of asserting that Jones & Panda in fact committed price gouging, the subpoena also represents that the Attorney General has "reason to believe" that a violation of Kentucky's price-gouging laws has occurred or will occur. *See* R. 22-4 (CID at 1) (Page ID #181).  To downplay the significance of the subpoena and CID, the Attorney General points to *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014), and *Berry v. Schmitt*, 688 F.3d 290, 297 (6th Cir. 2012), both of which involve warning letters that specifically stated that the recipient had been found in violation of the challenged regulation. According to the Attorney General, the CID here, which stops short of finding a violation has occurred, is "nothing like" the warning letters in *Kiser* and *Berry* and thus Jones & Panda lacks a credible fear of prosecution.  Appellant's Br. at 20.  But the Attorney General's argument makes a logical error; the letters in those cases may have been *more* threatening than the subpoena and CID here, but it does not follow that the subpoena and CID negate the credibility of Jones & Panda's fear of prosecution.   Indeed, this court has held there to be standing for a pre-enforcement challenge without any warning letter or similar specific correspondence whatsoever. *See Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 452 (6th Cir. 2014).  Thus, the Attorney General's subpoena and CID, directed to Jones & Panda

specifically and with "reason to believe" a price-gouging violation had or was likely to occur, support the conclusion that Jones & Panda has a "credible" fear of enforcement.

**Statutory Attributes.**   As for the third factor—attributes of the law that would make enforcement more likely—it cuts both ways, but still slightly favors the Guild.  As the Attorney General concedes, private plaintiffs may bring a damages action to remedy price-gouging violations, which increases the likelihood that Guild members will have to defend against price-gouging suits.  Appellant's Br. at 25; *see* Ky. Rev. Stat. §§ 367.220, 367.378; *Platt*, 769 F.3d at 452 (threat of enforcement credible where "any person—not just a prosecutor or state agency— may initiate enforcement").  And although § 367.374 employs various safe harbors that preclude liability if an enforcement action materializes, this does not preclude enforcement actions and the associated costs that the Guild's members would incur in cases where the Attorney General's investigative actions are inconclusive.  In any case, this factor is most probative in cases without an express threat of enforcement, and so it is less weighty here given that the Attorney General has already targeted Jones & Panda specifically with a subpoena and CID.  *Cf. Platt*, 769 F.3d at 452.

**Disavowed Enforcement.**   Finally, the fourth factor strongly favors the Guild.  The Attorney General has not disavowed enforcement with respect to Jones & Panda.  To the contrary, he has vigorously litigated enforcement of the Jones & Panda subpoena and CID in state court.  *See Online Merchants Guild*, 468 F. Supp. 3d at 898 (considering whether abstention under *Younger v. Harris,* 401 U.S. 37 (1971), was appropriate because of the state court proceedings); R. 34-2 (Mot. to Enforce at 1–2) (Page ID #378–79).  Moreover, the Attorney General has engaged in significant posturing regarding his price-gouging investigations in public comments.  For example, the Attorney General denounced "[t]he egregious actions of" third-party sellers suspected of price gouging, which "will not be tolerated in Kentucky," and warned that the subpoenas and CIDs "should serve as a warning to anyone who tries to illegally profit from COVID-19."  Kuhn, *supra*, *Attorney General Cameron Issues Subpoenas*.  Indeed, as the Guild points out, the Attorney General made use of "drug bust imagery" in a public appearance by posing with hand sanitizer, disinfecting wipes, and other products recovered from a suspected

price-gouging investigation.[5]   Appellee's Br. at 7.   Especially with regard to the Attorney General's public comments and appearances, his actions have undercut his arguments here, which seek to minimize the subpoenas and CIDs as preliminary, investigatory actions unlikely to lead to enforcement.

In sum, the *McKay* factors demonstrate that Jones & Panda's fear of prosecution is far from "imaginary or wholly speculative." *Susan B. Anthony List*, 573 U.S. at 160 (quoting *Babbitt*, 442 U.S. at 302).   Although not all of the factors are present here in strength, this court's precedent is clear that a threat of prosecution can be sufficiently "credible" for the purposes of establishing an injury in fact in circumstances such as these.   *See Platt*, 769 F.3d at 452.   Thus, the Guild is likely to establish that one of its members—Jones & Panda—has suffered an injury in fact.   Because Jones & Panda would have no difficulty demonstrating that this injury can be traced directly to the Attorney General's enforcement of Kentucky's price-gouging laws and that injunctive relief would redress the injury, the Guild is likely to establish standing on its member's behalf.   *See Spoeko*, 136 S. Ct. at 1547.   Thus, the Guild is likely to be able to proceed to the merits of its constitutional claims, which we turn to now.

## 2.  Extraterritoriality

The Commerce Clause's grant to Congress of the authority to "regulate Commerce with foreign Nations, and among the several States," U.S. Const. art. I, § 8, cl. 3, connotes an unspoken limit on state authority "to enact laws imposing substantial burdens on such commerce," *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010) (quoting *S.–Cent. Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 87 (1984)).   To address claims brought under this "dormant" feature of the Commerce Clause, we typically employ a "two-tiered analysis."   *Id.*   At the first tier, the court must determine whether the challenged state law is (virtually) per se invalid, because either it discriminates against interstate commerce, favors in-state interests, or regulates extraterritorially.   *Id.*; *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362,

---

[5] *See* Lawrence Smith, *Kentucky, Tennessee authorities seize 17,000 bottles of hand sanitizer in alleged price gouging scheme*, WDRB (updated April 28, 2020), https://www.wdrb.com/news/kentucky-tennessee-authorities-seize-17-000-bottles-of-hand-sanitizer-in-alleged-price-gouging-scheme/article_cd56f5e0-6ac7-11ea-bf6b-ff9ce788c5be.html (last visited March 22, 2021).

369–70 (6th Cir. 2013).  If the state law is not discriminatory or impermissibly extraterritorial, then the second tier comes into play, and "the court must apply the balancing test established in *Pike* [*v. Bruce Church, Inc.*, 397 U.S. 137 (1970)].  Under the *Pike* balancing test, a state regulation is upheld unless the burden it imposes upon interstate commerce is clearly excessive in relation to the putative local benefits."  *Am. Beverage*, 735 F.3d at 370 (internal quotation marks omitted).  Thus, although there are two tiers to our dormant commerce clause analysis, there are three sorts of dormant commerce clause claims:  (1) claims that a state regulation discriminates in favor of state interests or against interstate commerce; (2) claims that a state law regulates extraterritorially; and (3) claims that a state regulation, although not discriminatory or impermissibly extraterritorial, unduly burdens interstate commerce.  *See id.*; *Int'l Dairy*, 622 F.3d at 644.

We are concerned here with the second of those categories—extraterritoriality—which was the sole basis for the district court's conclusion that the Guild was likely to succeed on the merits of its challenge to the constitutionality of Kentucky's price-gouging laws.  Although extraterritoriality cases are rarer than others invoking the dormant commerce clause, *see Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1172 (10th Cir. 2015) (Gorsuch, J.) (describing extraterritoriality as "the most dormant" strand of dormant commerce clause doctrine), we distilled the essence of such a claim in *American Beverage*, explaining that "[a] statute is extraterritorial," and thus per se invalid under the dormant commerce clause, "if it 'directly controls commerce occurring wholly outside the boundaries of a State [and] exceeds the inherent limits of the enacting State's authority.'"  735 F.3d at 373 (quoting *Healy v. Beer Inst. Inc.*, 491 U.S. 324, 336 (1989)).  Put in terms of the Supreme Court's most recent occasion to address the extraterritoriality doctrine, a state law is invalid if it controls wholly out-of-state commerce "by its express terms or by its inevitable effect."  *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003) (quoting *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 81–82 (1st Cir. 2001), *aff'd sub nom. Pharm. Research & Mfrs. of Am.*, 538 U.S. 644).  To conduct our extraterritoriality inquiry, we ask "whether the 'practical effect of the regulation is to control conduct beyond the boundaries of the State.'"  *Am. Beverage*, 735 F.3d at 373 (quoting *Healy*, 491 U.S. at 336).  In doing so, we "not only consider[] the consequences of the statute itself, but also 'how the challenged statute may interact with the legitimate regulatory

regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.'"  *Id.* (quoting *Healy*, 491 U.S. at 336).  Broadly speaking, "[t]he principles guiding this assessment . . . reflect the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres."  *Healy*, 491 U.S. at 335–36 (footnote omitted).

The district court thought that Kentucky's price-gouging laws likely violate the dormant commerce clause because their enforcement against third-party sellers on Amazon would "have the inevitable effect of regulating the price charged outside of Kentucky.  In other words, the Attorney General's actions effectively dictate the price of items for sale on Amazon nationwide."  *Online Merchants Guild*, 468 F. Supp. 3d at 901.  The district court based this conclusion on the limitations of Amazon's marketplace, which does not allow third-party sellers to set state-specific prices for their goods or to limit sales to consumers in certain states.  *See id.*  Rather, as explained above, third-party sellers propose a national price for their goods, which Amazon can accept or reject in selling the product to a consumer.  *See id.*  Based on this understanding, the district court reasoned that the enforcement of Kentucky's price-gouging laws would enable the Attorney General to set a ceiling on the price of goods supplied by third-party sellers in Kentucky but sold out of state.  *See id.*  To avoid liability, the third-party seller would have to propose a lower price, which would apply to all sales—including out-of-state sales—because of Amazon's national pricing model, or stop selling on Amazon altogether.  *See id.*

The Attorney General argues that fundamental errors infect the district court's extraterritoriality analysis.  Primarily, he argues that Kentucky's price-gouging laws do not directly or inevitably control commerce occurring wholly outside of the Commonwealth.  First, the Attorney General argues that because Kentucky's price-gouging laws apply only to sales made to Kentucky consumers, they do not control wholly out-of-state commerce, such that there is no extraterritoriality concern.  Second, the Attorney General argues that even if the Commonwealth's price-gouging laws do have an effect on wholly out-of-state commerce, that effect is not the law's direct or inevitable result.  We agree with the second of the Attorney General's arguments.  Whether Kentucky's price-gouging laws address only sales made to

Kentucky consumers is inconsequential because our inquiry also considers a law's practical effect.  *See Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 583 (1986) ("That the [purportedly extraterritorial law] is addressed only to sales of liquor in New York is irrelevant if the 'practical effect' of the law is to control liquor prices in other States."). But there is no extraterritoriality problem here because, even if the enforcement of Kentucky's price-gouging laws against Kentucky-based sellers involved in Amazon sales to Kentucky consumers would have the practical effect of setting a price ceiling for wholly out-of-state Amazon sales, that is not the *direct* or *inevitable* result of those state laws.

To begin, the record does support the district court's conclusion that—because of Amazon's structure—the enforcement of Kentucky's price-gouging laws against Kentucky-based third-party sellers involved in Amazon sales to Kentucky consumers would have the practical effect of setting a maximum national price for goods sold on Amazon.  Like the district court, we think that an example illustrates the point.  Mom & Pop's is a fictional partnership based in Lexington, Kentucky that sells widgets.  Although it started selling widgets out of its brick-and-mortar shop in town, Mom & Pop's decided recently to sell its widgets also through Amazon's online marketplace.  Through Amazon, Mom & Pop's has supplied widgets sold to consumers in Kentucky and every other state, at a price of $5, which it proposed and Amazon approved.  As the number of COVID-19 cases increased and the Governor declared an emergency, Mom & Pop's saw an opportunity to profit from its widget's supposed health benefits and proposed a new price of $50 per widget, which Amazon again approved, resulting in sales to consumers both inside and outside of Kentucky.  This brought scrutiny by the Kentucky Attorney General, who issued Mom & Pop's a CID asserting that he had reason to believe that Mom & Pop's was engaged in price gouging in its sale of widgets on Amazon, in violation of § 367.374 and § 367.170.  Mom & Pop's wants to avoid liability but cannot limit the sale of $50 widgets on Amazon to consumers outside of Kentucky because Amazon does not allow Mom & Pop's to set state-specific prices or to limit widget sales to certain states.  Thus, to comply with Kentucky's price-gouging laws, Mom & Pop's proposes, and Amazon approves, a reduced national price of $5.50 per widget, within § 367.374(1)(c)(2)'s statutory safe harbor for price increases of up to 10% of the pre-emergency declaration price.  As a practical matter, then, the enforcement of Kentucky's price-gouging laws would set a national ceiling—applicable to

Kentuckians and non-Kentuckians alike—on the price of Mom & Pop's widgets sold on Amazon.  At least insofar as the sales involving out-of-state consumers would formally be between those consumers and Amazon, a foreign entity (not Mom & Pop's, a Kentucky partnership), *see* R. 10-1 (Rafelson Decl. at ¶ 16) (Page ID #64), the practical effect of Kentucky's price-gouging laws would be to affect wholly out-of-state commerce, raising extraterritoriality concerns.

It does not follow, however, that Kentucky's price-gouging laws are unconstitutional—a state law's effect on out-of-state commerce must be direct or inevitable to be invalid under the extraterritoriality doctrine.  That is not the case here because the effect of Kentucky's price-gouging laws depends entirely upon Amazon's independent decisions in how it structures its online marketplace.  If Amazon allowed for state-specific pricing or allowed third-party sellers to limit where their goods were sold—and no one contends that Amazon lacks the power to structure its marketplace in this fashion—then there would be no effect at all on interstate commerce (or at most the effect would be de minimis).  Returning to our example, Mom & Pop's could propose a Kentucky-specific price for widgets sold on Amazon that did not violate the Commonwealth's price-gouging laws, while charging higher prices elsewhere, or Mom & Pop's could limit their Amazon sales to only consumers outside of Kentucky.  In either case, the enforcement or threatened enforcement of Kentucky's price-gouging laws would not set a national price ceiling for widgets, as a practical matter or otherwise, because any responsive pricing or limitation on availability would affect only Kentucky consumers.  Thus, the effect of Kentucky's price-gouging laws on out-of-state commerce is far from "inevitable," *Pharm. Research & Mfrs. of Am.*, 538 U.S. at 669; it is at best *indirect*, because it depends entirely upon decisions made by Amazon.  That being the case, the district court erred in concluding that the Guild is likely to succeed on its extraterritoriality claim.

Two of our most recent extraterritoriality cases illustrate this flaw in the Guild's argument.  On the one hand, there is *American Beverage*, where we considered a Michigan law that "require[d] certain returnable bottles and cans to possess a unique-to-Michigan mark designation" in order to facilitate container deposit redemptions and inhibit fraudulent redemptions.  735 F.3d at 366.  Because the law provided that the unique mark could be used

only on beverage containers sold in Michigan (or states with a substantially similar law), *id.* at 367–68, 375, the law "not only require[d] beverage companies to package a product unique to Michigan but also allow[ed] Michigan to dictate where the product can be sold," *id.* at 376. We held the law to be an invalid extraterritorial regulation because it directly and expressly prohibited wholly out-of-state commerce—the sale of a beverage bearing a unique Michigan mark outside of Michigan. *Id.*

On the other hand, there is *International Dairy*, a case that we distinguished in *American Beverage*. In *International Dairy*, we considered an Ohio dairy label regulation that "prohibit[ed] dairy processors from making claims about the absence of artificial hormones in their milk products . . . and . . . also require[d] them to include a disclaimer when making [certain] claims about their production processes." 622 F.3d at 632. The plaintiffs raised a similar challenge to the one that the Guild raises here, arguing that "due to the complex national distribution channels through which milk products are delivered and the costs associated with changing their labels, the Rule in effect forces them to create a nationwide label in accordance with Ohio's requirements." *Id.* at 647. But we rejected that argument, concluding that Ohio's "labeling requirements have no *direct* effect on the Processors' out-of-state labeling conduct." *Id.* (emphasis added). Rather, any impact that the label regulation had on out-of-state labeling was due to the nature of the milk market's distribution channels—milk producers might choose to utilize Ohio-compliant labels in wholly out-of-state transactions because doing so was more cost-efficient, but that was not a direct result of the regulation. *See id.*

To us, this case is analogous to *International Dairy*. As in that case, it is not the state law that directly controls out-of-state commerce; rather, the effect is indirect because it depends on the realities of a given market or marketplace and the independent choices of private market participants. In *International Dairy*, it was "the complex national distribution channels through which milk products are delivered and the costs associated with changing their labels" that compelled out-of-state labeling conduct. 622 F.3d at 647. Here, it is Amazon's decision to structure its online marketplace to allow only a single, national price while preventing third-party sellers from limiting the states in which their goods are sold that allows Kentucky's price-gouging laws to set, in effect, a national ceiling for certain goods sold on Amazon. Unlike in

*American Beverage*, where the Michigan law expressly forbade a class of out-of-state transactions, here Kentucky's price-gouging laws say nothing about the prices to be charged in out-of-state transactions, and the laws' effect on out-of-state commerce would be virtually nonexistent but for Amazon's limitations on third-party sellers. *See* 735 F.3d at 376. Although Kentucky's price-gouging laws may indirectly impact out-of-state pricing on Amazon, that is not the laws' "inevitable effect" nor is that effect dictated by the laws' "express terms." *Pharm. Research & Mfrs. of Am.*, 538 U.S. at 669; *see also Am. Express Travel Related Servs. Co. v. Kentucky*, 730 F.3d 628, 634 (6th Cir. 2013) (no extraterritoriality issue where extraterritorial effect resulted from seller's own choices).

The Guild largely eschews *International Dairy* in favor of an analogy to the sole context where the Supreme Court has invalidated a state law under the extraterritoriality doctrine: price-affirmation statutes, which "force regulated entities to certify that the in-state price they charge for a good is no higher than the price they charge out-of-state." *Am. Beverage*, 735 F.3d at 373. But the Court's price-affirmation cases are of no help to the Guild because those cases involve state laws that directly controlled out-of-state commerce and thus underscore the inapplicability of the extraterritoriality doctrine here.

For example, in *Brown-Forman*, the Supreme Court invalidated a New York price-affirmation statute that required "every liquor distiller or producer that sells liquor to wholesalers within the State to sell at a price that is no higher than the lowest price the distiller charges wholesalers anywhere else in the United States." 476 U.S. at 575. The law operated in part by requiring distillers to file a monthly price schedule "contain[ing] a precise description of each item the distiller intend[ed] to sell, and a per-bottle and per-case price." *Id.* By tying in-state and out-of-state prices in this fashion, the New York statute directly and inevitably controlled out of state transactions because "[o]nce a distiller . . . posted prices in New York, it [was] not free to change its prices elsewhere in the United States during the relevant month." *Id.* at 582. That is not the case here. *Kentucky* has not tied its in-state prices to those charged out of state; *Amazon* has tied those prices together by structuring its online marketplace as it has. The effect of Kentucky's price-gouging laws on Amazon's national prices is not inevitable or direct because it depends upon Amazon's decisionmaking.

The Court reached a similar conclusion in *Healy*, which is no more helpful to the Guild than *Brown-Forman*.  *Healy* involved a Connecticut law that "require[d] out-of-state shippers of beer to affirm that their posted prices for products sold to Connecticut wholesalers [were], as of the moment of posting, no higher than the prices at which those products [were] sold in the bordering States of Massachusetts, New York, and Rhode Island."  491 U.S. at 326.  The Connecticut law interacted with those states' regulatory regimes to control directly the price of beer sold in those states.  For example, because Massachusetts required brewers to post monthly prices on the first of the month, "as a practical matter, Connecticut's . . . affirmation statute prospectively preclude[d] the alteration of out-of-state prices after the moment of affirmation." *Id.* at 338 (internal quotation marks omitted).  Similarly, because Massachusetts, New York, and Rhode Island laws allowed volume discounts, and Connecticut did not but treated such discounts as a reduction in price, "[t]he Connecticut [price-affirmation] statute, like the New York law struck down in *Brown–Forman,* require[d] out-of-state shippers to forgo the implementation of competitive-pricing schemes in out-of-state markets because those pricing decisions [were] imported by statute into the Connecticut market regardless of local competitive conditions." *Id.* at 339.  Thus, the Court held that the Connecticut law was invalid under the extraterritoriality doctrine because it had "the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State." *Id.* at 337.  Again, that is not the case here.  It is not Kentucky law (alone or in combination with other state laws) that dictates a price ceiling for Amazon transactions, it is Amazon that does so by structuring its online marketplace so that there can be only a single, national price for goods.

Relying on the Court's price-affirmation cases, the Guild points to other states' price-gouging laws and argues that "applying such vague and conflicting standards to the interstate marketplace 'create[s] just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude.'"  Appellee's Br. at 31–32 (quoting *Healy*, 491 U.S. at 337).  To be sure, many states have adopted price-gouging laws of their own, and as the thirty amici states and the District of Columbia[6] readily acknowledge, there is some variation

---

[6]In support of the Attorney General's position, the following states filed a brief as amici curiae:  Alaska, Arkansas, California, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, North Carolina, Ohio, Oregon,

in what qualifies as unlawful price gouging under these laws.  Br. Amici Curiae Illinois et al. at 31.   Thus, a price increase of over 10% might be unlawful under Kentucky law, *see* § 367.374(1)(c)(1) (safe harbor for increases of 10% or less from pre-emergency price), but lawful under Alabama law, *see* Ala. Code § 8-31-4 (increase of 25% prima facie evidence of price gouging).   But this is not the sort of conflict that the Court's extraterritoriality cases target when they task us with determining whether every or many states adopting a similar law would result in "inconsistent legislation."   *Healy*, 491 U.S. at 337.   As we explained in *International Dairy*, the "key problem with the New York statute in *Brown-Forman*" was that compliance with the New York law "raise[d] the possibility" that a regulated entity's compliance with New York's law would put it out of compliance with another state's laws.  622 F.3d at 647.  That was not an issue in *International Dairy* because producers could employ state-specific labels or national (or regional labels) that complied with all the relevant state laws.  *See id.*  Similarly, that is not an issue here because sellers can sell in non-Amazon marketplaces where they are allowed to establish state-specific prices.  Thus, the fact that numerous states have enacted or might enact price-gouging laws that differ somewhat from Kentucky's is of little consequence here.  *See id.* Entities doing business in multiple states must comply with those states' valid consumer protection laws—this is nothing new, and nothing that the extraterritoriality doctrine frowns upon.  *See id.*[7]

---

Pennsylvania, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and Wisconsin.  *See* Br. Amici Curiae Illinois et al.  United Egg Producers, Inc., "a Capper-Volstead Agriculture Cooperative with egg farmer-members from around the country, who collectively represent approximately 95 percent of all U.S. egg production," filed an amicus brief in support of the Guild.  Br. Amicus Curiae United Egg Producers, Inc. at 1.

[7]The Guild finds no more support for its argument in the out-of-circuit extraterritoriality precedent that it cites than in the Supreme Court's precedent or our own.  The most analogous of these is *Association for Accessible Medicines v. Frosh*, 887 F.3d 664 (4th Cir. 2018), on which the district court heavily relied.  There, the Fourth Circuit, in a split decision, invalidated a Maryland pharmaceutical price-gouging law because it "directly regulate[d] the price of transactions that occur outside Maryland."  *Id.* at 666.  But the Maryland law at issue in *Frosh* is fundamentally different from Kentucky's price-gouging laws.  Whereas the Maryland law expressly targeted upstream sales that took place wholly outside of Maryland and would have imposed liability for unconscionable price increases in those transactions, *see id.* at 671–72, the Kentucky laws at issue here do no such thing.  Rather, Kentucky's price-gouging statutes apply to transactions involving Kentucky consumers and only indirectly impact out-of-state transactions due to the structure of Amazon's online marketplace.  In *Frosh*, the effect on wholly out-of-state commerce was a direct result of the Maryland law's express terms, but here the effect on out-of-state commerce is at most an indirect result of Kentucky's price-gouging laws.  *See id.*

The district court characterized this case by posing a question: "Is an old constitution relevant to a new economy?" *Online Merchants Guild*, 468 F. Supp. 3d at 889. In answering that question in the affirmative, the district court explained that "[t]he protections of the Commerce Clause are available to those in a virtual economy no less than those who trade in an economy defined by bricks and mortar." *Id.* Fair enough, but that does not mean that a virtual economy should expand those protections. The Guild conceded at our oral argument that there would be no extraterritoriality problem if the Attorney General enforced the Commonwealth's price-gouging laws against a Kentucky brick-and-mortar shop for sales made in-person in Kentucky. In terms of our hypothetical Mom & Pop's, the Guild concedes that if Mom & Pop's engaged in price-gouging in the sale of widgets at its brick-and-mortar Lexington shop, the extraterritoriality doctrine would be no bar to the Attorney General's enforcement of those laws. Yet the Guild is asking us to reach a *different* result because Mom & Pop's—or any other Kentucky-based business—has chosen to sell to Kentuckians through Amazon. The Guild has given us no reason to hold that the choice to sell in the virtual economy should afford a business *added* protection in these circumstances. Yes, the choice to sell through Amazon's online marketplace means that merchants may need to consider Kentucky's price-gouging laws when they propose a price for their goods. But that is not inevitable, nor is it the direct result of the statute's express terms. Rather, it is dependent on Amazon's decision in how it structures its marketplace, which is not enough to limit the Attorney General's authority to enforce the Commonwealth's consumer protection laws to protect Kentuckians against price gouging. The dormant commerce clause prevents a state from "project[ing] its legislation" into another state, *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 521 (1935), but it does not invalidate a state law when some private third-party has done the projecting of its own accord.

All of this means that it would take a sweeping expansion of what has been a jealously circumscribed, narrow doctrine for the Guild to prevail. The Guild argues for that expansion by focusing on the Supreme Court's instruction that we must consider a law's "practical effect," *Healy*, 491 U.S. at 336, to the exclusion of the Court's limitation of the extraterritoriality doctrine to state laws that "directly," *Healy*, 491 U.S. at 336, and "inevitabl[y]" control wholly out-of-state commerce, *Pharm. Research & Mfrs. of Am.*, 538 U.S. at 669. Although there is some ambiguity in the Court's articulations of the extraterritoriality doctrine, it makes little sense

to read the Court's "practical effect" language so broadly when it has held state laws invalid under the doctrine in only three cases over the last century or so, and exclusively in the price-affirmation context.  Indeed, courts and commentators—recognizing that in a modern economy just about every state law will have some "practical effect" on extraterritorial commerce—have cautioned against approaches like the one that the Guild advocates here.  *See Epel*, 793 F.3d at 1173–75 (Gorsuch, J.); *Am. Beverage*, 735 F.3d at 378–79 (Sutton, J., concurring); *see generally* Brannon P. Denning, *Extraterritoriality and the Dormant Commerce Clause: A Doctrinal Post-Mortem*, 73 La. L. Rev. 979 (2013).  As then-Judge, now-Justice Gorsuch explained in a 2015 opinion, approaches like the Guild's "risk serious problems of overinclusion" and would threaten a wide range of state health-and-safety and laws.  *Epel*, 793 F.3d at 1175.  Here, the Guild would have us apply the extraterritoriality doctrine in a manner that would draw into question not just Kentucky's price-gouging laws, but a bevy of heretofore uncontroversial state consumer protection laws that might apply in the context of eCommerce.  But the extraterritoriality doctrine is designed in part to ensure the "autonomy of the individual States within their respective spheres," *Healy*, 491 U.S. at 336, and it does not preclude Kentucky from enforcing its price-gouging laws against Kentucky-based third-party sellers on Amazon in relation to sales to Kentucky consumers.  *See Baldwin*, 294 U.S. at 528 (cautioning that its invalidation of a price-affirmation law did not undermine the validity of other consumer protection laws).

In sum, the extraterritoriality doctrine "isn't just a couple cases about beer," Appellee's Br. at 30, but neither is it the 100-proof menace that the district court made it out to be.  The extraterritoriality doctrine is a powerful but precise instrument—invalidating state laws as per se unconstitutional in the narrow instances where a state expressly or inevitably exceeds its authority and seeks to control wholly out-of-state commerce, but otherwise inapplicable—and we decline the Guild's invitation to expand it here.  Because the effect on out-of-state commerce of Kentucky's price-gouging laws is entirely dependent upon Amazon's independent decisionmaking with regard to the structure of its online marketplace, the application of those laws to Kentucky-based third-party sellers on Amazon in connection with sales to Kentucky consumers is unlikely to offend the extraterritoriality doctrine of the dormant commerce clause. The district court erred in concluding otherwise.

***

The Guild insists that if we disagree with the district court's extraterritoriality analysis, we should uphold its preliminary injunction based on alternative grounds not addressed by the district court. Specifically, the Guild contends that Kentucky's price-gouging laws also offend the dormant commerce clause because they are discriminatory and because they unduly burden interstate commerce under the *Pike* balancing test. The Guild also raises vagueness, First Amendment, Due Process, and Equal Protection challenges. We decline to address the Guild's alternative arguments, which are underdeveloped here, and we leave them for the district court's consideration in the first instance. *See Cavin v. Michigan Dep't of Corr.*, 927 F.3d 455, 459 (6th Cir. 2019) ("As a court of review, not of first view, we will remand the case to the district court to resolve the point in the first instance.") (internal quotation marks and citation omitted).[8]

## B. The Remaining Preliminary Injunction Factors

With likelihood of success resolved, we turn briefly to the remaining preliminary injunction factors. "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am.*, 697 F.3d at 436 (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). That is the case here. First, the district court concluded that the Guild would suffer irreparable injury based in large part on its conclusion that Kentucky's price-gouging laws are unconstitutional. *Online Merchants Guild*, 468 F. Supp. 3d at 903 ("When constitutional rights are threatened or impaired, irreparable injury is presumed." (alteration omitted) (quoting *Obama for Am.*, 697 F.3d at 436)). Insofar as the price-gouging laws are likely constitutional, this consideration no longer favors a preliminary injunction. *See Obama for Am.*, 697 F.3d at 436. Second, Kentucky would be irreparably harmed by its inability to enforce constitutional price-gouging laws. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Thus, the balance of harms does not favor a preliminary injunction. As for the public interest,

---

[8]In addressing the Guild's remaining dormant commerce clause claims, and in particular its claim that Kentucky's price-gouging laws unduly burden interstate commerce under *Pike*, the district court should consider our precedent establishing that a state has a significant interest in consumer protection, *see Int'l Dairy*, 622 F.3d at 649–50, and suggesting that the possibility of uncompelled decisions of private parties to exit a given market is not a significant burden on interstate commerce, *see Am. Express*, 730 F.3d at 634.

this factor favors the state when a challenged law is likely constitutional.  *See Daunt v. Benson*, 956 F.3d 396, 422 (6th Cir. 2020).

### III.  CONCLUSION

For the foregoing reasons, we **VACATE** the district court's preliminary injunction and **REMAND** for further proceedings.  The district court abused its discretion in granting the preliminary injunction by improperly applying the governing law and concluding that the equities favored injunctive relief.