UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT

*Electronically filed*

ONLINE MERCHANTS GUILD,

     *Plaintiff*

v.

DANIEL CAMERON, in his official
capacity as ATTORNEY GENERAL
OF KENTUCKY,

     *Defendant*

Civil Action No. 3:20-cv-00029
Judge Gregory F. Van Tatenhove

---

**THE ATTORNEY GENERAL'S MOTION FOR JUDGMENT ON THE PLEADINGS**

---

The Defendant, Attorney General Daniel Cameron, moves under Fed. R. Civ. P. 12(c) for judgment on the pleadings. Even accepting the allegations in the complaint as true, and interpreting the facts in a light most favorable to the Guild, all of the Guild's claims fail as a matter of law; therefore, they should be dismissed with prejudice.

## I. INTRODUCTION

During the midst of the COVID-19 pandemic, the Guild sued the Attorney General and sought to prevent him from even investigating allegations of price gouging by third-party sellers using Amazon. This Court sided with the Guild on its extraterritoriality argument under the Dormant Commerce Clause and issued a preliminary injunction, broadly enjoining the Attorney General from "applying KRS § 367.170 and KRS § 367.374, including by subpoena, investigation, or prosecution, to Amazon suppliers in connection with offers or sales on Amazon."

On appeal, the Guild advanced not only its extraterritoriality argument but also a number

of alternative bases (under the First Amendment, the Due Process Clause, and the Equal Protection Clause) to uphold the preliminary injunction. The Attorney General explained then why these alternative claims were meritless but ultimately urged the Sixth Circuit to decline to review them and to instead wait for a "reasoned decision below." Now is the time for such a decision. The Sixth Circuit has roundly rejected the Guild's extraterritoriality argument and vacated the preliminary injunction. The alternative claims and the extraterritoriality claim are now squarely before this Court and, for the reasons outlined below, all of them are ripe for dismissal.

## II. BACKGROUND

In response to the outbreak of COVID-19, Governor Beshear issued Executive Orders 2020-215 and 2020-216, declaring a state of emergency in the Commonwealth and activating the price-gouging provisions under KRS 367.372 to 367.378.[1] During this time, complaints of price gouging across the Commonwealth skyrocketed. The Attorney General responded by opening investigations into these complaints. As part of that work, the Attorney General issued civil investigative demands (or CIDs) to various Kentucky-based entities. The CIDs requested information regarding the entities' sales and offers for sale of certain goods. Some of those entities were or are now members of the Guild, a trade association for online merchants.

The Guild, on behalf of itself and its anonymous members, then filed this lawsuit against the Attorney General. [Complaint, DN 1]. The complaint asserts three causes of action, all of which are alleged to have ripened due to the Attorney General's mere issuance of the CIDs: (1) violation of the Dormant Commerce Clause; (2) violation of the Due Process Clause; and (3) violation of the First Amendment. [*Id.*]. Soon after filing the complaint, the Guild moved for a preliminary injunction, arguing that it was likely to succeed on the merits of each of these claims, plus one additional claim

---

[1] Relevant to the timeline for this case, these orders were extended for subsequent 15-day periods through Executive Orders 2020-245, 2020-268, and 2020-316.

under the Equal Protection Clause. [Motion for Preliminary Injunction, DN 10]. This Court heard argument on the motion and entered an opinion and order granting a preliminary injunction on the sole basis of the extraterritoriality argument. [Opinion and Order, DN 36]. This Court did not reach any conclusions as to the remaining claims. [*Id.* at Page ID#: 45 n. 11]. The Attorney General then promptly appealed. [Notice of Appeal, DN 38].

Relying "exclusively" on the Guild's factual allegations, the Sixth Circuit ultimately held that Kentucky's price-gouging statutes posed "no extraterritoriality problem" because their effect, if any, on wholly out-of-state commerce was not a "direct or inevitable result." *Online Merchants Guild v. Cameron*, 995 F.3d 540, 544 n.1, 554 (6th Cir. 2021).[2] Indeed, any effect on out-of-state commerce arising from those statutes, the Sixth Circuit found, "depends *entirely* upon decisions made by Amazon." *Id.* at 555 (emphasis added). As a result, granting the Guild's motion was an abuse of discretion. *Id.* at 560. The Sixth Circuit vacated the preliminary injunction and remanded the matter for further proceedings. *Id.*

The Attorney General now moves for judgment on the pleadings.

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "'For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment.'" *Moderwell v. Cuyahoga County, Ohio*, 997 F.3d 653, 659 (6th Cir. 2021) (quoting *Jackson v. Prof'l Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017)). It is acceptable under this inquiry for a court to take into account "matters

---

[2] The Sixth Circuit's opinion appears in the record of this case at DN 48-2; however, for convenience, this motion uses the official reporter citation.

of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (internal citations and quotations omitted). And while the complaint is construed "in the light most favorable to the plaintiff," a court "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). Thus, to survive a Rule 12(c) motion, "a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Barany-Snyder*, 539 F.3d at 333 (internal citations and quotations omitted).

### IV. ARGUMENT

**A.   The Guild's Dormant Commerce Clause claim fails as a matter of law.**

The Guild's Dormant Commerce Clause claim rests on three arguments: Kentucky's price-gouging statutes discriminate against out-of-state interests; the statutes regulate extraterritorially; and the statutes fail the balancing test used in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). As shown below, each argument fails and the claim should be dismissed.

**1.   Kentucky's price-gouging laws do not discriminate against out-of-state interests.**

The first strand of the Guild's Dormant Commerce Clause argument claims that KRS 367.374 and KRS 367.170 are unconstitutional because they "achieve [a] protectionist end." [Complaint, DN 1, Page ID#: 15, para. 52]. A statute is unconstitutionally "protectionist," *i.e.*, discriminatory, if it "results in 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 648 (6th Cir. 2010) (quoting *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 449 (6th Cir. 2009)). Discrimination, in turn, comes in three varieties: facially, purposefully, or in practical effect. *Id.* (quoting *E. Ky. Res. v. Fiscal Court of Magoffin County*, 127 F.3d 532, 540 (6th Cir.

4

1997)). It is not clear what form animates the Guild's claim. Regardless, none of the three apply here.

### a. Facial discrimination.

A law is facially discriminatory if, for example, it distinguishes on its face between in-state and out-of-state actors. *American Beverage Ass'n v. Snyder*, 735 F.3d 362, 370-71 (6th Cir. 2013). Neither KRS 367.374 nor KRS 367.170 fits that bill. The provisions of both statutes are neutral in application. Both apply to "persons," with that term defined to include *all* individuals and entities regardless of location. *See* KRS 367.374(1)(b) (proscribing conduct for "persons"); KRS 367.372(9) (defining "person" as "bodies-politic and corporate, societies, communities, the public generally, individuals, partnerships, joint stock companies, and limited liability companies"); *see also* KRS 367.190 (authorizing injunctive relief against any "person" who violates KRS 367.170); KRS 367.110(1) (defining "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity"). In other words, the term "person" does not distinguish based on location. Therefore, the statutes are not facially discriminatory. *See Snyder*, 735 F.3d at 371; *see also Online Merchants Guild*, 995 F.3d at 556 ("[H]ere Kentucky's price-gouging laws say nothing about the prices to be charged in out-of-state transactions….").

### b. Purposeful discrimination.

Both statutes also clear the second discrimination hurdle. Purposeful discrimination is determined by reviewing "the actual language in the statute" and, in particular, the "plain meaning" of those words. *Snyder*, 735 F.3d at 371. Absent a clear answer there, courts will turn to the "legislative history and legislative intent to determine whether the statute achieved its legislative purpose." *See id*. In performing these reviews, the court is looking to see if, by enacting the statute,

the state is "attempting to protect its local economic interests or burden out-of-state actors." *See, e.g.*, *Int'l Dairy*, 622 F.3d at 648.

Here, a review of both statutes reveals no such protectionist intent. With KRS 367.170, the General Assembly intended to further the "public health, welfare, and interest" by creating a "strong and effective consumer protection program" that would "protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services." KRS 367.120(1). Likewise, in KRS 367.374, the goal was also consumer protection. *See* KRS 367.374(1)(b) (prohibiting the charging of grossly excessive prices by "persons" no matter their residency status); *see also* H.B. 471 (codified at KRS 367.374), 2004 Gen. Assemb., Reg. Sess. (Ky. 2004) ("Whereas the General Assembly finds that in the interest of public policy and protecting Kentucky consumers, a prohibition on price gouging during a state of emergency is warranted and passage of this Act is necessary.").[3]

Thus, the purpose of these statutes is to protect the public from unscrupulous business practices used by in-state and out-of-state businesses alike, and not "to protect local economic actors or to economically isolate the Commonwealth from the rest of the nation." *See E. Ky. Res.*, 127 F.3d at 542; *see also Snyder*, 735 F.3d at 372; *Int'l Dairy*, 622 F.3d at 648.

### c. Discriminatory effect.

Last, Kentucky's price-gouging statutes do not have any discriminatory effect. To prove the existence of that effect, the Guild must show two things—"how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation." *E. Ky. Res.*, 127 F.3d at 543; *see also Snyder*, 735 F.3d at 372. To explain these types of benefits and burdens, the Sixth Circuit routinely cites to *Hunt v. Washington State Apple Advertising*

---

[3] A copy is attached as **Exhibit 1**.

*Commission*, 432 U.S. 333 (1977). *See, e.g.*, *Int'l Dairy*, 622 F.3d at 648 (calling *Hunt* "illustrative" of discriminatory effect). In that case, a North Carolina law prohibited the importation of containers of apples bearing another state's grading or classification system. *Id.* at 648-49. As a result of the North Carolina law, apple growers from the state of Washington, who faced strict labeling requirements under their own state law, could not sell apples in North Carolina using their labels. *Id.* at 649. Or, in the words of the Sixth Circuit, the North Carolina law effectively placed "an embargo" on Washington-grown apples. *Garber v. Menendez*, 888 F.3d 839, 844 (6th Cir. 2018). Thus, the practical effect of the law was to favor North Carolina growers at the expense of Washington growers. *Id.* The law did so by raising the cost of doing business in North Carolina for only the Washington growers and by removing the "competitive and economic advantages" the Washington apple industry had "earned for itself" through its inspection and grading system. *Hunt*, 432 U.S. at 351-52.

In this case, Kentucky's price-gouging statutes have no such disparate effects on in-state and out-of-state sellers. To the extent KRS 367.374 and KRS 367.170 raise the cost of doing business in Kentucky, they do so equally for in-state and out-of-state sellers. Likewise, if those laws are said to eliminate any competitive or economic advantages for sellers, they do so for all sellers regardless of whether they are located within or outside the Commonwealth. Thus, in-state sellers and out-of-state sellers alike are subject to the same "burden" of complying with those statutes, and it cannot be said that the laws enact an "embargo" only on goods sold by out-of-state sellers. The Guild cannot show otherwise. That failure is fatal to this last strand of the Guild's Dormant Commerce Clause "discrimination" claim. *See, e.g.*, *Int'l Dairy*, 622 F.3d at 649.

### 2.   Kentucky's price-gouging laws are not extraterritorial.

On appeal, the Sixth Circuit analyzed every argument the Guild could muster on

extraterritoriality and rejected all of them. In doing so, it repeatedly held that Amazon's independent decisions about how to run its business, and *not* Kentucky's price-gouging statutes themselves, are the reason Kentucky's price-gouging laws have any effect on out-of-state commerce. As the Court stated no less than three separate times, the out-of-state effect of Kentucky's price-gouging laws "depends entirely upon" Amazon's decisions. *Online Merchants Guild*, 995 F.3d at 555, 559. Without Amazon, "there would be no effect at all on interstate commerce." *Id.* at 555.[4]

Importantly, the Sixth Circuit reached these conclusions by assuming the truth of the Guild's allegations about how Amazon operates.[5] This leaves no doubt that even if the Guild could prove that Amazon operates its marketplace the way the Guild says it does—whereby the Guild's members have no ability to set state-specific prices or to limit their sales to specific states—the Guild's extraterritoriality claim still fails. That is, Kentucky's price-gouging statutes simply do not offend the extraterritoriality doctrine. *Id.* at 554 (finding "no extraterritorial problem here"). And there is nothing the Guild could re-plead, discover, or show in this Court to prove otherwise. For this reason, dismissal of the extraterritoriality claim is warranted. *See Moderwell*, 997 F.3d at 659 ("[A]ll well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment") (internal quotations omitted).

### 3.  Kentucky's price-gouging laws satisfy the *Pike* balancing test.

The third and final thrust of the Guild's Dormant Commerce Clause claim—that Kentucky's price-gouging statutes fail the *Pike* balancing test—fares no better than the first two

---

[4] "(or at most the effect would be de minimis)."

[5] *Id.* at p. 3 n. 1 ("The factual record regarding Amazon's functioning comes exclusively from the declaration of the Guild's executive director.").

and should be rejected along with the others. Under the *Pike* test, a court must "weigh [the] burdens and benefits" of the challenged law. *Int'l Dairy*, 622 F.3d at 649. The law must be upheld "'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike*, 397 U.S. at 142). The party challenging the law "bears the responsibility of proving that the burdens placed on interstate commerce outweigh the law's benefits." *Garber*, 888 F.3d at 845. The Sixth Circuit has not been afraid to "turn[] away challengers who failed to meet that responsibility." *See, e.g.*, *id.*; *see also Int'l Dairy*, 622 F.3d at 649-50; *Tenn. Scrap*, 556 F.3d at 452; *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 805-806 (6th Cir. 2005); *E. Ky. Res.*, 127 F.3d at 544-45. And the U.S. Supreme Court has not invalidated a law under *Pike* in over three decades. *Garber*, 888 F.3d at 845.

Here, the Guild cannot make the requisite showing. That is, the burden, if any, imposed by KRS 367.374 and KRS 367.170 is not clearly excessive in comparison to those laws' local benefits. Start with the burden. The Guild claims that by operation of Kentucky's price-gouging laws, its members must "either treat Kentucky prices as a national ceiling, or exit the national marketplace." [Motion for Preliminary Injunction, DN 10, Page ID#: 46]. But that alleged burden is legally insufficient. *See Int'l Dairy*, 622 F.3d at 649-50 (finding that the local interest of "consumer protection" outweighed any burden imposed by an Ohio dairy labeling requirement, including allegedly causing businesses to "either stop selling in Ohio or conform their national labels to Ohio's requirements"); *Am. Express Travel Related Servs. Co., Inc. v. Kentucky*, 730 F.3d 628, 634 (6th Cir. 2013) (holding that a business's voluntary decision to exit a market (for a specific good or service) altogether in response to a Kentucky law does not violate the Dormant Commerce Clause).

Next, the local benefits. Both KRS 367.170 and KRS 367.374 are intended to promote the

public health and welfare of Kentuckians by protecting Kentucky consumers.[6] As the Sixth Circuit has recognized, these are "legitimate," "important," and "significant" interests. *See E. Ky. Res.*, 127 F.3d at 544 ("Legislation which pertains to the public health and welfare has been consistently recognized as being important and legitimate."); *Int'l Dairy*, 622 F.3d at 649 ("Ohio has a reasonable basis to believe that the Rule's intended benefit—consumer protection—is significant."). On appeal in this case, the Sixth Circuit reaffirmed this view and expressly directed this Court to *Int'l Dairy* for the proposition that "consumer protection" is a "significant" state interest. *See Online Merchants Guild*, 995 F.3d at 560 n. 8. In other words, the importance or significance of "public health and welfare" or "consumer protection" as a "local benefit" under *Pike* is clearly established. *See also Maine v. Taylor*, 477 U.S. 131, 151 (1986) (explaining that under the Commerce Clause states "retain[] broad regulatory authority to protect the health and safety of [their] citizens").

Last, the balancing. On the one hand is the alleged burden (private businesses having to treat Kentucky prices as a national ceiling or exit the national marketplace), and on the other there are the putative benefits (consumer protection and health and welfare of a state's citizens). In *Int'l Dairy*, the Sixth Circuit analyzed a similar contest between burdens and benefits and determined that the former was not "clearly excessive" in comparison to the latter. *Int'l Dairy*, 622 F.3d at 649-50 (finding that the local interest of "consumer protection" outweighed any burden imposed by an Ohio dairy labeling requirement, including allegedly causing businesses to "either stop selling in Ohio or conform their national labels to Ohio's requirements"); *see also E. Ky. Res.*, 127

---

[6] *See* KRS 367.120(1) ("The General Assembly finds that the public health, welfare and interest require a strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services."); Exhibit 1, H.B. 471 (codified at KRS 367.374), 2004 Gen. Assemb., Reg. Sess. (Ky. 2004) ("Whereas the General Assembly finds that in the interest of public policy and *protecting Kentucky consumers*, a prohibition on price gouging during a state of emergency is warranted and passage of this Act is necessary.") (emphasis added).

F.3d at 544 (finding the local interest of "protect[ing] the public health and welfare" outweighed any burdens imposed by a Kentucky waste disposal program).

The result should be no different here, especially considering that the Sixth Circuit has already cast doubt on the Guild's *Pike* claim. It did so by directing this Court to two of its precedents, *Int'l Dairy* and *Am. Express*, for the express purpose of performing *Pike* balancing.[7] In both of those cases, the challenger's Dormant Commerce Clause claim under *Pike* failed. *See Int'l Dairy*, 622 F.3d at 649-50; *Am. Express*, 730 F.3d at 634. The Guild's claim must experience the same fate.

**B. The Guild's claim under the Due Process Clause fails as a matter of law.**

The Guild's due process claim has two components. First, the Guild claims that Kentucky's price-gouging statutes are impermissibly vague in several respects. Second, the Guild claims that the Attorney General is threatening to apply Kentucky's price-gouging statutes against non-Kentuckians who have not deliberately affiliated with the Commonwealth. Neither of these arguments has any merit, but the Guild does not even have standing to lodge the first one.

**1. The Guild lacks standing to assert a facial challenge for vagueness.**

To the extent the Guild is asserting a facial challenge to KRS 367.374 and 367.170 on the basis of vagueness, its claim fails right off the bat.[8] As the Sixth Circuit has explained, if a statute

---

[7] *Online Merchants Guild*, 995 F.3d at 560 n. 8 ("In addressing the Guild's remaining dormant commerce clause claims, and in particular its claim that Kentucky's price-gouging laws unduly burden interstate commerce under *Pike*, the district court should consider our precedent establishing that a state has a significant interest in consumer protection [citing *Int'l Dairy*], and suggesting that the possibility of uncompelled decisions of private parties to exit a given market is not a significant burden on interstate commerce [citing *Am. Express*].").

[8] On appeal, the Sixth Circuit held that the Guild had standing to assert an extraterritoriality argument under the Dormant Commerce Clause, but that does not mean the Guild automatically has standing to assert a due process claim, nor does it preclude the Attorney General from asserting a separate standing challenge as to that claim. *See Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 253 (6th Cir. 2018) ([J]ust as an individual must demonstrate standing for each claim he seeks to press *and* for each form of relief sought, so too must an association that relies upon an individual member for standing purposes.") (emphasis in original) (internal quotations and citations omitted).

does not implicate First Amendment rights and if it does not impose criminal sanctions, then a litigant can only challenge the statute for vagueness as the statute has been applied to the facts of his or her case. *Johnson v. Morales*, 946 F.3d 911, 928-29 (6th Cir. 2020) (citing *New York v. Ferber*, 458 U.S. 747, 767-69 (1982)).[9]

Neither KRS 367.374 nor KRS 367.170 implicates First Amendment rights (as discussed in Section IV(C)), nor do they impose criminal sanctions;[10] therefore, the Guild can only assert a vagueness challenge as to the facts of its case. But the Guild has failed to do so by articulating, for example, how it was unclear as to whether the *specific goods its members were selling or offering* were covered by Kentucky's statutes.[11] And without that information, the Guild has failed to advance a viable legal claim under an as-applied vagueness theory. *See Barany-Snyder*, 539 F.3d at 333 ("[A] complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory.").

## 2.   KRS 367.374 and KRS 367.170 are not impermissibly vague.

Even on the merits, the vagueness claim fails. The Guild identifies five parts of KRS 367.374 and KRS 367.170 that are allegedly vague: (1) the type of goods and services covered under KRS 367.374; (2) the term "grossly in excess"; (3) the term "related to"; (4) the term "generally consistent with fluctuations"; and (5) the term "unconscionable." [Motion for Preliminary Injunction, DN 10, Page ID#: 52]. In general, "[a] statute can be impermissibly vague

---

[9] To be sure, the standing rule from *Johnson* speaks in terms of whether the litigant *claims* the statute implicates the First Amendment, and the Guild has done so here; however, for reasons outlined in this motion, the First Amendment is not implicated at all, but even if it were, it has not been violated. Therefore, *Johnson*'s standing rule applies here.

[10] *See* KRS 367.378(1) (listing the "civil monetary penalty" of $5,000, $10,000 or $25,000 for violations of KRS 367.374); KRS 367.990(2) (listing the "civil penalty" of $2,000 per violation of KRS 367.170).

[11] *See, e.g.*, Complaint, DN 1, para. 28 ("Those statutes are unlawfully vague because they do not provide fair notice of whether an offer or sale will violate the law."); *id.* at para. 32 (attempting to show an uncertainty as to what goods are covered but not asserting that members are actually selling those goods or offering those goods for sale).

for either of two independent reasons." *Johnson*, 946 F.3d at 929. If "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Id.* Or, if "it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* The Supreme Court has explained, however, that "the void for vagueness doctrine is applied less strictly to economic regulations." *Id.* (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982)). That is so, in part, "because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Village of Hoffman Estates*, 455 U.S. at 498.

Here, none of the challenged language fails the "ordinary intelligence" standard and neither statute allows or promotes arbitrary or discriminatory application by the government.

### a. The statutes pass the "ordinary intelligence" standard.

### i. Types of goods and services covered

First, KRS 367.374 sufficiently describes the types of goods and services it covers. By its express terms, the statute applies to any "repair or reconstruction service" or any of the nine enumerated items in KRS 367.374(b), including, for example, "consumer food items," "emergency supplies," and "medical supplies." KRS 367.374(b)(1), (3), (4). Those terms are defined in KRS 367.372. *See* KRS 367.372(2) (consumer food item), 367.372(4) (emergency supplies), and 367.372(8) (medical supplies). Some definitions turn on the *use* of the item in question, while others list non-exhaustive *examples* of goods covered. *See* KRS 367.372(2) ("'Consumer food item' means any article *used or intended for use for* food, drink, confection, or condiment by a person or animal.") (emphasis added); KRS 367.372(8) ("'Medical supplies' *includes but is not limited to* prescription and nonprescription medications, bandages, gauze, isopropyl alcohol, and antibacterial products.") (emphasis added).

13

But both types of definitions ultimately rest upon "common terms"—like "food" and "drink" or "medications," "bandages," and "antibacterial products"—terms that "individuals of common intelligence do not have to guess at their meaning." *See Chambers v. Stengel*, 256 F.3d 397, 401 (6th Cir. 2001) (finding "solicit," "victim," "accident or disaster," and "general public" were "common terms"); *see also Johnson*, 946 F.3d at 929 (holding "interest of the public health, morals, safety, or welfare" was not vague). Even if those terms leave some uncertainty at the margins, that fact does not render the statute impermissibly vague. *See Rose v. Locke*, 423 U.S. 48, 49-50 (1975) (per curiam) ("Many statutes will have some inherent vagueness, for in most English words and phrases there lurk uncertainties.") (cleaned up) (citation omitted); *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 503 (6th Cir. 2012) ("Given the constraints of the English language, a law need not contain meticulous specificity to avoid constitutional infirmity.") (internal citations and quotations omitted).

### ii. "Grossly in excess"

Second, the term "grossly in excess" is not, contrary to the Guild's position, undefined in the statute. Rather, the five subsections within KRS 367.374(c) flesh out the term's meaning. That is, each of those subsections is an instance where a price is *not* "grossly in excess." *See, e.g.*, KRS 367.374(c)(2) ("A person's price does not violate this subsection if it is…2. Ten percent (10%) or less above the price prior to the declaration."). Read together, these subsections and the definitions from KRS 367.372 sufficiently set out the prohibited conduct. *See Chambers*, 256 F.3d at 400 (reciting the rule that "a statute is void for vagueness only if it is so vague that no standard of conduct is specified at all") (internal quotations omitted). That the Guild's members may have to review the statute carefully and in its entirety before discerning what it means does not render the statute vague. *See Village of Hoffman Estates*, 455 U.S. at 498 (explaining that "businesses, which

14

face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action"). Nor does it mean that the members must possess something beyond "ordinary intelligence" to understand it.

### iii. "Relate to"

Third, the term "relate to"—as in a price is not "grossly in excess" if it is "*[r]elated to* an additional cost imposed by a supplier of a good or other costs of providing the good or service"[12]— is not beyond ordinary understanding. One dictionary defines it as meaning "to connect (something) with (something else)" or "to be connected with (someone or something): to be about (someone or something)."[13] Unsurprisingly, Kentucky courts have long interpreted that phrase to mean just that. *See, e.g.*, *Com. ex rel. Armstrong v. Collins*, 709 S.W.2d 437, 444 (Ky. 1986) (interpreting "relate to" in Section 51 of the Kentucky Constitution to mean "'remotely germane to, or in any wise connected with'") (quoting *Talbott v. Laffoon,* 79 S.W.2d 244, 246 (Ky. App. 1935)). If that were not enough, the statute also uses another common term, "unrelated," in the same context as "relate to," which further explains the meaning of the latter term. *See* KRS 367.374 (1)(b) ("No person shall sell…a good or service…for a price which is grossly in excess of the price prior to the declaration and *unrelated to* any increased cost to the seller.") (emphasis added).

### iv. "Generally consistent with fluctuations"

Fourth, the term "generally consistent with fluctuations" is used in one of the statute's five safe harbors. KRS 367.374(1)(c)(4) ("A person's price does not violate this subsection if it is… [g]enerally consistent with fluctuations in applicable commodity, regional, national, or

---

[12] KRS 367.374(c)(1) (emphasis added).

[13] *See* Meriam-Webster Dictionary, "Relate to," https://www.merriam-webster.com/dictionary/relate%20to (last visited on September 17, 2021). *See also Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 530 (Ky. 2006) (reviewing *Merriam-Webster's Collegiate Dictionary* to construe "claim," pursuant to KRS 446.080(4), according to its common usage).

15

international markets, or seasonal fluctuations."). Clearly, the challenged phrase refers to fluctuations in the respective markets for the goods or services. Businesses operating in those markets would no doubt be familiar with and understand these fluctuations. [*See, e.g.*, Rafelson Dec., DN 10-1, Page ID#: 61, para. 5 (noting that Guild members "rely[] on" "market knowledge" that has been "cultivated over years" when they do business)]. And none of the individual words used in the phrase—"generally," "consistent," or "fluctuations"—are beyond the grasp of an individual with ordinary intelligence.

### v. "Unconscionable"

Last, the term "unconscionable," as used in KRS 367.170, is not impermissibly vague. Under Kentucky common law, unconscionability has two forms, procedural and substantive. *See Schnuerle v. Insight Commc'ns, Co., L.P.*, 376 S.W.3d 561, 575-76 (Ky. 2012). Procedural unconscionability concerns "the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language." *Id.* at 576 (internal quotations omitted). Substantive unconscionability, on the other hand, refers to "contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Id.* Courts determine if the latter form is present by considering "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* (internal quotations omitted).

Commercial reasonableness, in turn, can be derived from the Uniform Commercial Code and its interpretation. *See* KRS 355.2-302 ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract…."); *State v. Strong Oil Co., Inc.*, 433 N.Y.S.2d 345, 359 (Sup. Ct. 1980)

16

(collecting cases under UCC Section 2-302 and interpreting them to have "uniformly held that a contract will be found unconscionable on the basis of price when there is a great disparity between the selling price of the goods and its actual market value").

Kentucky's highest courts and the Eastern District in particular have applied the unconscionability standard without any difficulty. *See, e.g.*, *Ford Motor Co. v. Mayes*, 575 S.W.2d 480, 485-86 (Ky. App. 1978) (upholding a jury verdict finding that a particular business practice was "unconscionable" under KRS 367.170); *Schnuerle*, 376 S.W.3d at 575-77 (finding no procedural or substantive unconscionability in a contract), *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835-36 (Ky. 2013) (same); *CK Franchising, Inc. v. SAS Servs. Inc.*, 398 F. Supp. 3d 163,175-183 (E.D. Ky. 2019) (same). *See also Dare to be Great, Inc. v. Com. ex rel. Hancock*, 511 S.W.2d 224, 227 (Ky. App. 1974) (finding the words "false, misleading, and deceptive" under KRS 367.170 not vague because they are "generally well understood by those who want to understand them").

Other courts across the country have upheld the same or similar terms against vagueness challenges. *See, e.g.*, *Strong Oil Co.*, 433 N.Y.S.2d at 359 ("[T]he use of the term unconscionably excessive price does not render the statute vague."); *State ex rel. Hood v. Louisville Tire Ctr., Inc.*, 55 So. 3d 1068, 1072-74 (Miss. 2011) (upholding "shall not exceed the prices ordinarily charged for comparable goods and services in the same market area at or immediately before the declaration of a state of emergency or local emergency"); *Inman v. Ken Hyatt Chrysler Plymouth, Inc.*, 363 S.E.2d 691, 692-93 (S.C. 1988) (upholding "[u]nfair methods of competition and unfair or deceptive acts or practices"); *State v. Ralph Williams' N. W. Chrysler Plymouth, Inc.*, 510 P.2d 233, 242 (Wash. 1973) (upholding "unfair methods of competition" and "unfair or deceptive acts or practices").

17

Accordingly, for all of these reasons, the vagueness challenge to "unconscionable" is unfounded.

### b. The statutes do not authorize or encourage arbitrary or discriminatory enforcement.

As to the second vagueness category, the statutes here do not permit or encourage arbitrary enforcement.[14] As to KRS 367.374, the statute carefully limits what counts as a grossly excessive price by codifying five circumstances where prices are *not* illegal. *See* KRS 367.374(1)(c)(1)-(5). Meaning, the statute places serious limitations on the Attorney General's ability to show that a violation occurred in the first place. In addition, the penalty portion of the statute, KRS 367.378, contains a scienter requirement, thereby further restricting the Attorney General's ability to recover civil monetary penalties to only those cases where persons committed *willful* violations. *See* KRS 367.378(1) ("A *willful* violation of KRS 367.374 is punishable by a civil monetary penalty….") (emphasis added); *see also Village of Hoffman Estates*, 455 U.S. at 499 ("And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.").

The second statute, KRS 367.170, contains similar limitations and restrictions. As noted above, "unconscionable" is a term of art under Kentucky common law; therefore, it is not standardless. And monetary penalties for violations of KRS 367.170 are only available if the violation is willful. KRS 367.990(2) ("In any action brought under KRS 367.190, if the court finds that a person is *willfully using or has willfully used* a method, act, or practice declared unlawful

---

[14] Because this lawsuit is a pre-enforcement challenge to a law, the "emphasis" of the vagueness inquiry should be on the "fair warning" or "ordinary intelligence" prong. *See Village of Hoffman Estates*, 455 U.S. at 503 ("In reviewing a business regulation for facial vagueness, however, the principal inquiry is whether the law affords fair warning of what is proscribed. Moreover, this emphasis is almost inescapable in reviewing a pre-enforcement challenge to a law."); *see also Online Merchants Guild*, 995 F.3d at 549 ("[T]his case implicates the rules for pre-enforcement challenges, where it is the 'threatened enforcement of a law' that is said to create an injury in fact."). Nevertheless, this Motion also addresses this second vagueness category.

18

by KRS 367.170, the Attorney General, upon petition to the court, may recover, on behalf of the Commonwealth, a civil penalty….") (emphasis added).

### 3.   The Attorney General has not applied or threatened to apply state law to non-Kentucky residents in violation of the Due Process Clause.

The second part of the Guild's due process claim is untenable because the Attorney General[15] has not enforced or tried to enforce state law against non-Kentuckians. As noted in the record, the price-gouging CIDs that led to this lawsuit were issued only to Kentucky-based businesses or individuals. [Cocanougher Dec., DN 21-2, Page ID#: 134, paras. 6-9]. Kentucky courts could exercise personal jurisdiction (either general or specific) over those businesses and individuals.

For those Guild members that received a price-gouging CID and for whom Kentucky is its domicile, place of incorporation, or principal place of business, they are subject to general personal jurisdiction in Kentucky. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (reiterating that general personal jurisdiction exists when a defendant is "essentially at home" in the state and that the "paradigm" instance (but not only instance) of being "at home" is, for an individual and a corporation, respectively, her place of domicile and the place of incorporation and principal place of business); *see also Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009) (holding that a limited liability company has the citizenship of each of its members).

Similarly, Kentucky courts have specific personal jurisdiction over the Guild members that were served with a price-gouging CID. Those members received those CIDs specifically as a result

---

[15] The argument the Attorney General made to the Sixth Circuit on this issue (that only courts, not the Attorney General himself, can exercise personal jurisdiction over someone) applies here with equal force, and is incorporated herein; however, to be thorough, this Motion addresses the Guild's argument as if it were one challenging *a Kentucky court's* power over the Guild's members.

of their online commercial activity on Amazon. [*See* Cocanougher Dec., DN 21-2, Page ID#: 134, paras. 6-9]. And Amazon provided the Attorney General with address information indicating that the sellers were in fact Kentucky-based. [*See id.*]. These are addresses the Guild's members were contractually required to provide to Amazon for purpose of doing business on Amazon's website.[16] Thus, the members have purposefully availed themselves of conducting activities in Kentucky, as evidenced by their using Kentucky addresses for their businesses, and the Attorney General's so-called "claim" (*i.e.*, the CID) arises out of or relates to those activities.[17] *See Ford Motor Co.*, 141 S. Ct. at 1024-25 ("The defendant, we have said, must take some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State…The plaintiff 's claims, we have often stated, must arise out of or relate to the defendant's contacts with the forum.") (internal citations and quotations omitted).

At bottom then, the Attorney General is not "effectively regulating and coercing" any individual or business outside of Kentucky, as the Guild claims. The price-gouging CIDs that led to this lawsuit were issued only to Kentucky-based businesses or individuals. And Kentucky courts would have personal jurisdiction over them.

### C. Kentucky's price-gouging laws do not violate the First Amendment.

Kentucky's price-gouging laws do not violate the First Amendment for three

---

[16] The Guild has incorporated Amazon's terms of service, called the Amazon Services Business Solutions Agreement (the "Amazon Agreement"), into the record of this case. *See* Rafelson Dec., DN 10-1, Page ID#: 62, para. 9 n. 1. Under that Agreement, in order to use Amazon's services, individuals or businesses must register with Amazon and "provide [Amazon] with your (or your business') legal name, address, phone number and e-mail address…." Amazon Agreement, General Terms, Section 1; *id.* at Section 18 ("You may change your e-mail addresses and certain other information in Seller Central, as applicable. You will ensure that all of your information is up to date and accurate at all times.").

[17] For instance, one of the businesses that received a CID, Jones & Panda, LLC, is an LLC organized under Kentucky law. *See* Petition, DN 22-1, Page ID#: 155. Its sole member has admitted that the business, which consists of offering and selling goods on Amazon, operates in Kentucky. *See* Declaration of Sarah Elizabeth Jones, DN 22-2, Page ID#: 177, paras. 2, 3, 6 ("I operate Jones & Panda as a sole proprietor…I purchase products from retail stores in Kentucky and other states and offer them for sale through Amazon's website.").

complementary reasons. First, the statutes regulate conduct, not speech. Second, if they regulate speech, the speech "relates to" illegal conduct and is not protected by the First Amendment. And third, if they regulate protected speech, the statutes nevertheless survive First Amendment scrutiny.

### 1.  KRS 367.374 and KRS 367.170 regulate conduct not speech.

Although worded differently, both KRS 367.374 and KRS 367.170 proscribe, and therefore regulate, certain conduct. They prohibit the offer or collection of "grossly excessive" prices and "unconscionable" prices for goods and services. *See* KRS 367.374 ("No person shall sell, rent, or offer to sell or rent…a good or service…for a price which is grossly in excess of the price prior to the declaration...."); KRS 367.170(1)-(2) ("Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful…unfair shall be construed to mean unconscionable"). As the U.S. Supreme Court has explained, regulating the price that a seller can collect is the same as regulating that seller's conduct. *See Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1150-51 (2017) (describing a "typical price regulation" as one that "simply regulate[s] the amount that a store could collect," which is, in turn, a "regulat[ion]" of the "seller's conduct").

Viewed this way, price regulations have never posed a problem under the First Amendment. *See*, *e.g.*, *Munn v. Illinois*, 94 U.S. 113, 125 (1876) ("[It] has been customary…in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, & c., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) (plurality opinion) (reaffirming that states may continue to make certain prices unlawful through "direct regulation"); *id.* at 524 (Thomas, J., concurring in part and concurring in the judgment); *id.* at 530 (O'Connor, J., concurring in the judgment); *Nicopure Labs,*

*LLC v. Food & Drug Admin.*, 944 F.3d 267, 292 (D.C. Cir. 2019) ("The Supreme Court in [*Expressions Hair Design*] recently reaffirmed that ordinary price regulation does not implicate constitutionally protected speech.").

This is true even though all price regulations, at least to a degree, have an incidental impact on speech. *See Expressions Hair Design*, 137 S. Ct. at 1150-51 ("But the [price regulation's] effect on speech would be only incidental to its primary effect on conduct, and 'it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'") (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006)); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("It is also true that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.").

These bedrock First Amendment principles apply with equal force in this case. The Guild's First Amendment claim rests entirely on the premise that by regulating *prices*,[18] Kentucky's laws impermissibly burden commercial speech. [*See* Complaint, DN 1, Page ID# 13, para. 43 ("The Kentucky AG's application of Kentucky-specific price-controls is burdening the commercial speech of the Online Merchants Guild's members….")]. But the Guild has it backwards. Its First Amendment claim fails *precisely because* the statutes regulate prices. Therefore, even on the Guild's theoretical best day in court—at trial when the Guild proves all the factual allegations in the Complaint to be true—it loses. Kentucky's price-gouging statutes regulate prices. Regulating

---

[18] The Guild recognizes that KRS 367.170 and KRS 367.374 do in fact regulate *prices themselves*, as opposed to how sellers can communicate prices. *See* Complaint, DN 1, Page ID#: 8, para. 25 (describing KRS 367.374 as a "*price-control* law that, in general terms, *prohibits certain price increases* on covered goods during emergencies") (emphasis added); *id.* at Page ID#: 9, para. 27 ("KRS 367.170 is a similar *price-control* measure, which bars 'unconscionable' *prices* and is not limited to emergencies.") (emphasis added). By extension then, under *Expressions Hair Design*, the Guild has also admitted that the statutes regulate conduct, not speech. *Expressions Hair Design*, 137 S. Ct. at 1150-51.

22

prices is regulating conduct. And regulating conduct is not regulating speech. Therefore, the First Amendment has not been, and cannot be as a matter of law, violated in this case. *See Expressions Hair Design*, 137 S. Ct. at 1150-51.

> ### 2. If KRS 367.374 and KRS 367.170 regulate speech, the speech is not protected by the First Amendment.

If the Court interprets Kentucky's price-gouging statutes as regulating speech, it should nevertheless dismiss the Guild's First Amendment claim because the statutes do not regulate speech protected by the First Amendment. First Amendment challenges to commercial speech regulations generally undergo a four-step analysis. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). The first step is to determine if the First Amendment even applies. *Id.* ("At the outset, we must determine whether the expression is protected by the First Amendment."). Commercial speech is protected by the First Amendment if it "concern[s] lawful activity and [is] not [] misleading." *Id.*

Conversely, if commercial speech concerns illegal activity, then the government may ban the speech without offending the First Amendment. *Id.* at 563-64 ("The government may ban forms of communication more likely to deceive the public than to inform it...or commercial speech related to illegal activity.") (citing *Pittsburg Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973)). And if the first step under *Central Hudson* cannot be satisfied, then the analysis necessarily ends. *See Int'l Dairy*, 622 F.3d at 636 ("If a court finds in the affirmative on either prong [under the first *Central Hudson* factor], the speech is not entitled to First Amendment protection, and the analysis ends.").

Commercial speech "concerns" or "relate[s] to" illegal activity when the underlying activity that is the subject of the speech is illegal. For example, in the seminal case on this issue, *Pittsburgh Press v. Human Relations Comm'n*, the U.S. Supreme Court held that a City of

Pittsburgh ordinance that banned employment advertisements that discriminate on the basis of sex passed First Amendment scrutiny because the commercial activity about which the ads were concerned—sex-based discrimination in employment—was itself illegal.[19] 413 U.S. 376, 391 (1973). The Court used the analogy: "[w]e have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes." *Id.* at 388. Therefore, the Court explained, "[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising in incidental to a valid limitation on economic activity." *Id.* at 389.

The Sixth Circuit has thus interpreted *Pittsburgh Press* to "stand[] for the proposition that the government may ban an advertisement if it advertises unlawful conduct." *Kiser v. Kamdar*, 831 F.3d 784, 788 (6th Cir. 2016); *see also Katt v. Dykhouse*, 983 F.2d 690, 695 (6th Cir. 1992) ("A state or municipality may, of course, ban a particular type of commercial transaction within its borders. Once it has done so, speech proposing or facilitating the unlawful transaction may be banned without offending the First Amendment.").

Here, the Guild's First Amendment challenge fails the first step of the *Central Hudson* test because the commercial speech the Guild claims has been impermissibly burdened "relate[s] to illegal activity." Kentucky has outlawed both the sale of goods at grossly excessive or unconscionable prices and the offer (or advertisement) of such sales. KRS 367.374(1)(b) ("No

---

[19] Specifically, the ordinance banned "discrimination against any person with respect to hiring…because of…sex" as well as the practice of providing "aid…in the doing of any act declared to be an unlawful employment practice by this ordinance…." *Pittsburg Press*, 413 U.S. at 378. The Pittsburgh Commission on Human Relations charged the Pittsburgh Press Company with violating the ordinance on the basis that placing the sex-designated ads in its newspaper at the request of employers aided employers in illegally discriminating on the basis of sex in hiring decisions. *Id.* at 389.

person shall sell, rent, or offer to sell or rent, regardless of whether an actual sale or rental occurs…."); KRS 367.170 (outlawing "unconscionable" acts and practices). As a result, the commercial speech at issue in this case (if it is considered speech at all)—advertising or offering goods for sale at grossly excessive and unconscionable prices—relates to the sale of goods at grossly excessive and unconscionable prices. Therefore, the commercial speech is not protected by the First Amendment, and Kentucky is constitutionally permitted to prohibit it. *Kiser*, 831 F.3d at 788 ("[t]he government may ban an advertisement if it advertises unlawful conduct."). The Guild's First Amendment claim then necessarily fails as a matter of law.

Importantly, neither *Kiser v. Kandar* nor *Katt v. Dykhouse* changes this conclusion. Although the Sixth Circuit held in both cases that the speech at issue was *not* related to illegal activity, those cases are easily distinguished. First, *Kiser v. Kandar*. There, a dentist sued the state dental board, alleging that the board's regulations violated his First Amendment commercial speech rights by restricting his ability to advertise himself as a specialist in endodontics while also practicing as a general dentist. *Kiser*, 831 F.3d at 786. The board defended, in part, by arguing that the commercial speech that was banned related to illegal activity. *Id.* at 787. The Sixth Circuit disagreed, finding that the underlying activity—performing endodontic procedures while providing general dentistry services—was not actually illegal under Ohio law. *Id.* ("Properly understood, the challenged regulations do not ban Kiser from practicing outside his specialty. Rather, they ban him from doing so *while advertising that he is an 'endodontist.'*") (emphasis in original). Therefore, the illegal-activity exception under *Central Hudson*, as the Court called it, did not apply. *Id.* at 788.

By contrast, here, Kentucky's laws *do* prohibit the underlying activity at issue—selling goods at grossly excessive or unconscionable prices. *See* KRS 367.374(1)(b) ("*No person shall*

25

*sell*…a good or service…for a price which is grossly in excess of the price prior to the declaration and unrelated to any increased cost to the seller.") (emphasis added); KRS 367.170(1) ("Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce *are hereby declared unlawful*.") (emphasis added). As a result, Kentucky can outlaw the advertisement of those sales without offending the First Amendment. *Kiser*, 831 F.3d at 788 ("the government may ban an advertisement if it advertises unlawful conduct.").

Second, *Katt v. Dykhouse*. In that case, an insurance agent licensed in Michigan sued the Michigan Insurance Commissioner and Attorney General, alleging that the Commission's interpretation of Michigan's anti-rebating statute violated his First Amendment rights to inform his clients about commission rebating in Florida. *Katt*, 983 F.2d at 693. The state defended on the basis that the speech concerned insurance rebating, which was an unlawful activity in Michigan. *Id.* at 695. The Sixth Circuit framed the question to be decided as "whether the First Amendment protects speech that proposes a transaction lawful in the place where the transaction is to occur when both the underlying transaction and the offer are unlawful in the place where the offer is made." *Id.* The Court concluded that the First Amendment does provide protection in that scenario, and because rebating was lawful in Florida, the agent's offers to rebate *in Florida* passed the first prong of *Central Hudson*. *Id.* at 697.

Here, however, the proposed transaction (the sale of goods for grossly excessive or unconscionable prices) is *unlawful* in the place where the transaction is to occur (Kentucky).[20] *See*

―――――――――――

[20] For purposes of the Guild's as-applied constitutional challenge to KRS 367.170 and KRS 367.374, the transactions (*i.e.*, sales) proposed by the Guild's members through their commercial speech (*i.e.*, their offers or advertisements on Amazon) are "to occur" in Kentucky. As the record in this case shows, all of the sellers that originally received CIDs from the Attorney General are based in Kentucky. Cocanougher Dec., DN 21-2, Page ID# 134, para. 9 ("In each case involving an Amazon reseller, the Office of the Attorney General sent the CIDs and subpoenas only to Kentucky-based resellers."). Therefore, any offer for sale made by those entities or individuals was made or would be made in Kentucky. Likewise, if Kentucky consumers accepted those offers for sale, they would have done so in Kentucky. And finally, under Kentucky's UCC, the "sale" of goods by the Guild's members to Kentucky consumers for goods

26

KRS 367.374 and KRS 367.170. Therefore, any speech concerning those proposed transactions fails the first prong of the *Central Hudson* test and Kentucky can regulate the speech. *Katt*, 983 F.2d at 695 ("A state or municipality may, of course, ban a particular type of commercial transaction within its borders. Once it has done so, speech proposing or facilitating the unlawful transaction may be banned without offending the First Amendment.").

### 3. KRS 367.374 and KRS 367.170 are nevertheless valid commercial speech regulations.

Should the Court reach the remaining steps in the *Central Hudson* analysis, it should conclude that KRS 367.374 and KRS 367.170 are nevertheless valid commercial speech regulations. Steps two, three, and four of the test under *Central Hudson* require the Court to "ask whether the asserted governmental interest is substantial" and, if so, to "determine whether the regulation directly advances the governmental interest asserted" along with "whether it is not more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 566. This last step is "less onerous than the least-restrictive means standard applied to other restrictions on expressions." *First Choice Chiropractic, LLC v. DeWine*, 969 F.3d 675, 682 (6th Cir. 2020). A state need only show "a fit [between the challenged regulation and the asserted interest] that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) (internal quotations and citations omitted).

Here, Kentucky's laws satisfy each of the remaining *Central Hudson* factors. First, Kentucky has a substantial interest in protecting its consumers by ensuring the availability of goods

---

to be shipped to Kentucky addresses would also have occurred in Kentucky. *See* KRS 355.2-106 (defining "sale" as "the passing of title from seller to the buyer for a price"); KRS 355.2-401(2)(b) (stating that "if the contract requires delivery at destination, title passes on tender there").

and services at fair prices. *See Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988) ("Our examination and analysis of the various cases indicates clearly that the Kentucky legislature created a statute [KRS 367.170] which has the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts."); KRS 367.120(1) ("The General Assembly finds that the public health, welfare and interest require a strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services"); H.B. 471 (codified at KRS 367.374), 2004 Gen. Assemb., Reg. Sess. (Ky. 2004) ("Whereas the General Assembly finds that in the interest of public policy and *protecting Kentucky consumers*, a prohibition on price gouging during a state of emergency is warranted and passage of this Act is necessary.") (emphasis added)[21]; *Int'l Dairy*, 622 F.3d at 649 (finding "consumer protection" to be a "significant" state interest); *Online Merchants Guild*, 995 F.3d at 560 n. 8 (identifying *Int'l Dairy* as "precedent establishing that a state has a significant interest in consumer protection").

Next, Kentucky's price-gouging statutes directly advance this substantial interest, in both emergency and non-emergency situations, by regulating the price at which goods and services are offered or rented or sold. *See* KRS 367.170; KRS 367.374. That is, both statutes are intended to protect consumers—they ensure the availability of goods and services at fair prices by outlawing unfair prices (*i.e.*, unconscionable and grossly excessive prices). *See id.*; *see also First Choice Chiropractic*, 969 F.3d at 683 n.5 (holding that the third prong under *Central Hudson* was satisfied, in part, because "[c]ommon sense tells us that [the statute] directly advances Ohio's interest in protecting the privacy of accident and crime victims by restricting intrusions upon that privacy").

And last, the statutes are not more extensive than is necessary to serve Kentucky's interest.

---

[21] *See* Exhibit 1.

To the extent the statutes regulate speech, they only regulate speech that would impair Kentucky's interest in protecting consumers by ensuring the availability of goods and services at fair prices. *See Central Hudson*, 447 U.S. at 570 (holding under the fourth factor that "[t]o the extent the Commission's order suppresses speech that in no way impairs the State's interest in energy conservation, the Commission's Order violates the First and Fourteenth Amendments and must be invalidated"). The statutes do not outright ban the offer or sale of *all* goods and services, at *all* times, in *all* geographic areas, and for *all* prices. Rather, together, KRS 367.374 and KRS 367.170 outlaw the offer and sale of only certain goods and services (those enumerated in KRS 367.374), at certain times (during an emergency), in certain geographic areas (the entire Commonwealth or a subset), and only at certain prices (those that are unconscionable or grossly excessive). *See* KRS 367.374; KRS 367.170. The statutes, therefore, are sufficiently targeted to survive scrutiny under the fourth and final prong of the *Central Hudson* test.

Importantly, outlawing the *offer* (in addition to the actual sale or rental) of goods and services at unconscionable or grossly excessive prices is also tied to the state's interest of ensuring availability of goods and services at fair prices. That is because the mere act of posting prices sends certain pricing signals to the respective markets for goods and services. As the Guild recognizes, prices send important signals to the market. [*See* Complaint, DN 1, Page ID#: 6, para. 17 ("[Sales transactions] lead to an efficient allocation of goods in the national marketplace, and generate price signals for manufacturers…"); Rafelson Dec., DN 10-1, Page ID#: 61, para. 4 ("Those sales also send price signals, which encourage manufacturers to increase production of goods.")]. Those signals themselves can affect the availability of goods at *fair* prices. Specifically, allowing offers or postings of grossly excessive or unconscionable prices will tell market suppliers of goods and services that additional goods and services should be supplied *at that price* (the unconscionable or

29

grossly excessive price). And if more goods and services are supplied at unconscionable or grossly excessive prices, then that necessarily impairs Kentucky's substantial interest in ensuring the availability of goods and services at *fair* prices. As a result, regulating offers does not doom Kentucky's statutes under the final *Central Hudson* factor.

### D. The Guild has not pled an Equal Protection Clause claim, but it would fail on the merits anyway.

First and foremost, the Guild's equal protection "claim" fails because it has not been properly pled. The Guild's Complaint does not contain an equal protection claim, and the Guild has not moved to amend its Complaint by the deadline to do so. [*See* Scheduling Order, DN 47, setting deadline of August 16, 2021]. The Guild was aware of the facts that would animate an equal protection claim—the Guild's filings in this case evidence as much[22]—yet it has not amended its Complaint to include one. It should not be permitted to do so now. *See, e.g.*, *Thomas v. Tennessee Dep't of Transp.*, 579 F. App'x 331, 334 (6th Cir. 2014) (affirming lower court's denial of motion for leave to amend the complaint when motion was made almost two months after the deadline in the scheduling order and the party was aware of the facts underlying the proposed amendment before the deadline).

Should the Court nevertheless reach the merits, the Guild's equal protection claim fails primarily because its First Amendment challenge fails. That is, as shown above, KRS 367.170 and KRS 367.374 are narrowly tailored to further a substantial governmental interest in protecting consumers by ensuring the availability of goods and services at fair prices. Therefore, the statutes pose no equal protection problem. *See Chambers*, 256 F.3d at 401 ("Because regulation of commercial speech is subject to intermediate scrutiny in a First Amendment challenge, it follows that equal protection claims involving commercial speech also are subject to the same level of

---

[22] *See, e.g.*, Motion for Preliminary Injunction, DN 10, Page ID#: 54.

review."); *see also First Choice Chiropractic*, 969 F.3d at 685 ("Because [the regulation] survives intermediate scrutiny under the First Amendment analysis, it likewise survives the plaintiffs' equal protection challenge. Put differently, the statute is narrowly tailored to further a significant governmental interest….") (internal quotations omitted).

The equal protection claim also fails because Amazon and the Guild's members are not "similarly situated." The Guild has done its best in this case to try and convince the Court and the Attorney General that Amazon, and not the members, should be targeted. [*See* Complaint, DN 1, Page ID#: 13, para. 45; Motion for Preliminary Injunction, DN 10, Page ID#: 41]. Indeed, the Guild has gone so far as to state that regulating Amazon is the "only realistic way" of regulating the prices of goods in Amazon's store. [Motion for Preliminary Injunction, DN 10, Page ID#: 54]. That is because, in the Guild's view, Amazon effectively exercises complete control over the Amazon store. [Rafelson Dec., DN 10-1, Page ID#: 63. paras. 13-14].

But as the Guild has conceded, its members and Amazon are not "similarly situated" as to the specific activity that triggered the Attorney General's initial price-gouging investigations last year and that are the subject of the Guild's as-applied[23] equal protection challenge. That is, the Guild recognizes that there is a difference between so-called "third-party" sales on Amazon (performed by the Guild's members) and "first-party" sales on Amazon (performed by Amazon itself). [*See* Rafelson Dec., DN 10-1, Page ID#: 71, para. 37 ("It is important to note that Amazon is often a seller itself (making so-called first-party sales, as opposed to third-party sales by our members on Amazon's store).")]. The Guild also recognizes that in those third-party sales, *its members* (and not Amazon) are the ones that bear the costs associated with sourcing and supplying certain goods to the market. [*See id.* at Page ID#: 68, paras. 31-33 (identifying online merchants

---

[23] *See* Motion for Preliminary Injunction, DN 10, Page ID#: 54 ("The Kentucky AG's *selective application* of KRS 367.374 and 367.170 violates the Equal Protection Clause.") (emphasis added).

as the ones who "source and/or sell items" and who bear the attendant "costs" in doing so)].

It was entirely appropriate then for the Attorney General, after learning of information giving him reason to believe that price gouging may have occurred as to certain third-party offers or sales on Amazon, to have looked at those third-parties—the Guild's members. They were the ones who actually made the offers or sales and who actually incurred the relevant costs. That latter point is crucial, considering that the statutory defenses to price gouging under KRS 367.374 depend, in part, on cost data unique to each of the Guild's members and not to Amazon. *See* KRS 367.374 (1)(c) (listing five separate safe harbors, including if the price is "[t]en percent (10%) or less above the sum *of the person's costs* and normal markup for a good or service") (emphasis added).

Accordingly, even if the Guild's arguments are accepted as true, and the Attorney General is treating Amazon and the Guild's members materially differently (which the Attorney General denies), the Guild could still not prove, as a matter of law, either that Amazon and the Guild's members are "similarly situated" or that the Attorney General's disparate treatment of the two groups is unjustified. The Guild's equal protection claim, therefore, cannot stand. *See Capobianco v. Summers*, 377 F.3d 559 (6th Cir. 2004) ("The Equal Protection Clause does not require that the state treat all persons alike. It requires only that the state treat *similarly situated* persons alike….") (emphasis added).

### E.   The Guild cannot cure the Complaint's legal deficiencies through amendment.

The Attorney General anticipates that the Guild will urge this Court to deny the Attorney General's motion as premature because any deficits will be fixed with an amended complaint. That argument is unfounded. First, the deadline under the scheduling order for amending pleadings has passed. [*See* Scheduling Order, DN 47, setting a deadline of August 16, 2021]. Second, as

32

demonstrated above, the shortcomings of the complaint are legal not factual in nature and the Guild cannot, therefore, re-plead around them. *See Etapa v. Asset Acceptance Corp.*, 373 F.Supp.2d 687, 693 (E.D. Ky. 2004) (denying leave to file an amended complaint in light of a motion for judgment on the pleadings because the amendment would have been futile—it could not overcome the legal defenses to the plaintiff's claims). Accordingly, the Guild's claims are ripe for dismissal.

## V. CONCLUSION

All of the Guild's claims should be dismissed with prejudice. As shown here, each fails as a matter of law. This is so even when every factual allegation in the Complaint is accepted as true and interpreted in a light most favorable to the Guild. No amended complaint will change this outcome. As a result, the Attorney General's motion should be granted.

Respectfully submitted,

*/s/ Philip R. Heleringer*
J. Christian Lewis (KY Bar No. 87109)
Philip R. Heleringer (KY Bar No. 96748)
Matthew Cocanougher (KY Bar No. 94292)
*Office of Consumer Protection*
Kentucky Office of the Attorney General
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Tel:    (502) 696-5300
christian.lewis@ky.gov
philip.heleringer@ky.gov
matthew.cocanougher@ky.gov
*Counsel for Attorney General Daniel Cameron*

## CERTIFICATE OF SERVICE

I certify that on September 17, 2021, this document was filed with the CM/ECF filing system, which electronically served a copy to all counsel of record.

*/s/ Philip R. Heleringer*
*Counsel for Attorney General Daniel Cameron*

33